**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**Indianapolis Division**

| | |
|---|---|
| DEMONA FREEMAN, | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) **Case No.**    1:18-cv-3844 |
| | ) |
| OCWEN LOAN SERVICING, INC., | ) |
| *Defendant*. | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Demona Freeman, by and through undersigned counsel, hereby complains of Defendant Ocwen Loan Servicing, LLC., as follows:

## INTRODUCTION

1.  Through no fault of her own, Plaintiff Demona Freeman (hereinafter "Freeman") finds herself on the brink of foreclosure this holiday season. Yet she has timely paid every monthly mortgage installment required of her. She has done everything in her power to prevent her home from being unlawfully taken, to have the errors which have drug her into such a horrible state of affairs corrected, but all efforts have been met with callous indifference.

## PARTIES, JURISDICTION, AND VENUE

2.  Freeman is the owner of real property and improvements located at and commonly known as 17373 Pine Wood Lane, Westfield, Indiana 46074 (the "Home").

3.  Freeman purchased the Home on or about December 2, 2003 as her primary, principal residence and financed that purchase by receiving a loan as evidenced by a note (the "Note") and a mortgage on the Home that allegedly secures the Note (the "Mortgage") (collectively referred to hereinafter as the Loan).

4.      Freeman's Loan was originated by Sun Mortgage Company, LLC., and subsequently placed in a mortgage-backed security guaranteed by Fannie Mae.

5.      Thereafter, ownership of the Note was transferred to The Bank of New York Mellon f/k/a The Bank of New York as successor in interest to JPMorgan Chase Bank, N.A., as Trsutee for C-BASS Mortgage Loan Asset-Backed Certificates, Series 2005-RPI ("The Bank of New York Mellon").

6.      Ocwen Loan Servicing, LLC ("Ocwen") is the servicer of the Loan.

7.      Ocwen obtained servicing rights from Litton Loan Servicing on or about September 1, 2011, after the Loan was in default.

8.      Ocwen is a wholly owned and operated subsidiary of Ocwen Financial Corporation and is a limited liability company incorporated under the laws of the State of Delaware.

9.      At all times relevant herein, Ocwen acted and acts as the agent of and loan servicer for The Bank of New York Mellon. As a loan servicer, Ocwen is a partial assignee of the Loan.

10.     Jurisdiction of claims against Ocwen is conferred by 28 U.S.C. §1331 as this action arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA), the Real Estate Settlement Procedures Act, 12 U.S.C. §2601, et seq. (RESPA), and the Fair Debt Collection Practices Act, 15 U.S.C. §1692, et seq. (FDCPA). This action is specifically filed to enforce regulations promulgated by the Consumer Finance Protection Bureau (CFPB) that became effective on January 10, 2014, specifically, 12 C.F.R. §1024.35 and §1024.36 of Regulation X.

2

11.     This Court has supplemental jurisdiction to hear all state law claims pursuant to 28 U.S.C. §1367.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the property that is the subject of the action is situated in this district.

## SUMMARY OF FEDERAL CLAIMS

### The Real Estate Settlement Procedures Act & Reg. X

13.     The Real Estate Settlement Procedures Act ("RESPA"), originally enacted in 1974, was designed to ensure that consumers in real estate transactions would receive timely information on the nature and costs of the settlement process and would be protected from abusive practices.

14.     The Cranston-Gonzalez National Affordable Housing Act of 1990 expanded the scope of RESPA by addressing mortgage servicer practices. These amendments to RESPA followed reports of a substantial number of consumer complaints about mortgage servicing problems.

15.     In response to evidence of additional servicer abuses during the preceding mortgage crisis, RESPA was amended in 2010 by the Dodd-Frank Act to expand some of the statute's existing servicer requirements.

16.     RESPA's provisions relating to loan servicing are to be construed liberally so as to carry out the statue's remedial consumer protection purpose. Medrano v. Flagstaff Bank, 704 F.3d 661, 665 (9th Cir. 2012).

17.     In January 2013, the CFPB issued a number of final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111- 203, 124 Stat. 1376 (2010).

18.     Specifically, on January 17, 2013, the CFPB issued the RESPA Mortgage Servicing Final Rules, 78 F.R. 10695 (Regulation X) (February 14, 2013), which became effective on January 10, 2014.

19.     The Loan in the instant matter is a "federally related mortgage loan" as said term is defined by 12 C.F.R. §1024.2(b).

20.     Ocwen is subject to the aforesaid regulations and does not qualify for the exception for "small servicers", as such term is defined in 12 C.F.R. §1026.41(e)(4), nor the exemption for a "qualified lender", as such term is defined in 12 C.F.R. §617.700.

21.     Freeman asserts a claim for relief against Ocwen for breaches of the specific rules under Regulation X as set forth, infra.

22.     Freeman has a private right of action under RESPA pursuant to 12 U.S.C. §2605(f) for the claimed breaches and such action provides for remedies including actual damages, costs, statutory damages, and attorneys' fees.

The Fair Debt Collections Practices Act

23.     Congress enacted the FDCPA to prohibit the "[u]se of abusive, deceptive, and unfair debt collection practices." 15 U.S.C §1692a.

24.     Ocwen is a debt collector as defined by §1692a(6), Freeman is a consumer as defined by § 1692a(3), and the Loan is a debt as defined by the FDCPA.

25.     Freeman has a private right of action under the FDCPA pursuant to 15 U.S.C. §1692k, for Ocwen's willful and deliberately indifferent conduct in connection with collection of the Loan and such action provides for remedies including actual damages, statutory damages, punitive damages, costs, and attorneys' fees.

The Fair Credit Reporting Act

26.     The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting.  Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.  Congress enacted the Fair Credit Reporting Act, 15 U.S.C.A. § 1681 (West) *et seq.* ("FCRA"), to insure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

27.     The Consumer Data Industry Association ("CDIA") is an international  trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection  services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry  standards.

28.     Because consumer credit reporting information is such sensitive data  that has far reaching implications for most, if not all, consumers, the CDIA works to develop, maintain and enhance industry-standard reporting  formats and guidelines.

29.      In cooperation with Trans Union LLC, Equifax Information Services, LLC, Experian Information Solutions, Inc., and Innovis Data Solutions, Inc., the CDIA  publishes the Metro 2 ("Metro 2") reporting standards to assist data furnishers like Ocwen with  their compliance requirements under the FCRA. CDIA's reporting products are used in more than nine billion transactions each year. *See, http://www.cdiaonline.org/about/index.cfm?unItemNumber=515.*

30.     The uniform adoption and implementation of the Metro 2 standards is the  primary vehicle by which CRAs and data furnishers ensure that they are in compliance  with their duties to ensure that they maintain complete and accurate information under  the FCRA.

31.     The Metro 2 standards provide uniformity in the reporting and interpretation

of credit data, including credit risk scoring.

32.     The major national CRAs – Trans Union LLC, Equifax Information Services, LLC, and Experian Information Solutions, Inc., – also collaborated and developed a browser-based software system that allows the CRAs to electronically notify furnishers easily and quickly of disputed credit reporting information, and for furnishers to easily and quickly respond to such disputes following investigation. The system is commonly referred to as e-OSCAR and was designed to be Metro 2 compliant. *See*, ***http://www.e-oscar.org/.***

33.     The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Dataform ("AUD") processing, as well as other various related data reporting processes.

34.     ACDVs are notifications initiated by a CRA, and transmitted to a furnisher, in response to a consumer dispute, and are the primary method the CRAs use to fulfill their statutory obligation to notify furnishers of disputed information of consumers' disputes.

35.     One such entity that regularly reviews consumer reports, and uses the data contained therein, is the Fair Isaac Corporation. The Fair Isaac Corporation credit risk scoring system, commonly referred to as FICO, is the leading credit risk scoring system, and utilizes data reported by credit reporting agencies and furnishers which are, ostensibly, in compliance with Metro 2 standards.

36.     FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and, mix of

accounts/types of credit accounts for 10% of a consumer's FICO score. *See,*

**www.myfico.com/credit-education/whats-in-your-credit-score/.**

37.     The cost of credit (*e.g.,* interest rates, fees, etc.), the availability of credit, and even

unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate,

extended financing periods and lower rate auto loans, and even zero-percent financing credit

offers for in-store credit lines, are all, by and large, driven by a consumer's FICO score.

38.     Inaccurate or incorrect credit reporting often results in a lower FICO score, and thus

higher costs of credit, diminished opportunity, and less purchasing power for consumers. The

improper reporting of a mortgage tradeline has a particularly adverse effect on a consumer like Ms.

Freeman's credit score as it represents the largest and longest active debt obligation in her credit

history.

39.     Ocwen regularly and in the ordinary course of business furnished information to one

or more consumer reporting agencies about Freeman's transactions and is therefore a "furnisher" as

that term is used in 15 U.S.C.A. § 1681s-2 (West).

40.     Freeman asserts a private right of action under the FCRA pursuant to 15 U.S.C.A. §

1681s-2(b) for Ocwen's willful and deliberately indifferent acts and omissions and is therefore

entitled to recover actual damages, statutory damages, punitive damages pursuant to 15 U.S.C.A. §

1681n, costs, and reasonable attorney fees.

<u>Freeman's Ch. 13 Bankruptcy Proceedings</u>

41.     In 2008, Freeman began encountering financial difficulties, a

reverberation of the financial collapse brought on by the mortgage industry.

42.     On April 13, 2009, the Bank of New York Mellon filed a foreclosure action

against Freeman in the Hamilton County Superior Court No. 1 (Cause No. 29D01-0904-MF-000484)(the "First Foreclosure Case").

43.     With her financial situation continuing to be dire, a desperate Freeman sought to stop the foreclosure and forced sale of her home by filing for bankruptcy.

44.     Specifically, Freeman filed a bankruptcy case pursuant to Chapter 13 of the United States Bankruptcy Code on April 23, 2012 in the United States Bankruptcy Court for the Southern District of Indiana, Case No. 12-04713-JKC-13 (hereinafter the "Bankruptcy Case").

45.     The Bankruptcy Case had the effect of staying the First Foreclosure Case.

46.     Freeman filed the Bankruptcy Case to cure all pre-petition defaults on the Loan.

47.     Shortly after filing, Freeman proposed a Chapter 13 Plan [Filing No. 2] (hereinafter the "Chapter 13 Plan") which was confirmed on April 10, 2013 and later modified by Order pursuant to 11 U.S.C. § 1329 on March 15, 2016.

48.     Pursuant to the Chapter 13 Plan, Freeman was to make regular monthly payments of $1,740.00 to Chapter 13 Trustee, from which Ocwen would receive approximately $1,029.00 per month to maintain the monthly payments it was owed, plus an additional sum to address all arrearage (originally estimated by Freeman to be $15,000.00).

49.     Ocwen appeared in the Bankruptcy Case and participated in those proceedings by filing a Proof of Claim (Claim No. 8 dated July 26, 2012) [Claim Filing No. 8-1] on behalf of The Bank of New York Mellon.

50.     The *Proof of Claim* asserted a secured claim in the amount of $133,064.46 and an arrearage claim of $22,668.03 which included: (a) escrow charges of $6,649.43; (b) a transfer fee balance of $2,328.05; (c) property valuation fees of $121.00 (listed twice for a total of $242.00; foreclosure fees of $225.00; foreclosure costs of $695.36; and (f) a proof of claim fee of $150.00.

8

51.     On September 13, 2012, the United States Trustee filed an *Objection to Claim* [Filing No. 47] detailing approximately three pages of errors in Ocwen's *Proof of Claim* including unsubstantiated, and thus objectionable, charges contained within.

52.     Within the *Objection to Claim*, the United States Trustee also states: "Further, based on a review of claims filed by Ocwen Loan Servicing, LLC. in the Southern District of Indiana, the *United States Trustee believes this failure occurs in nearly every proof of claim filed by Ocwen and is systematic in nature*." (emphasis added)

53.     Ocwen did not respond to the *Objection to Claim*.

54.     On October 26, 2012, the Bankruptcy Court entered the *Order On United States Trustee's Objection To Claim Number 8 Filed by Ocwen Loan Servicing, LLC*. [Filing No. 53] disallowing the objected to, and unsubstantiated, fees, expenses, and charges totaling $10,289.84 as well as any fees for preparation of the Proof of Claim or amendments thereto.

55.     The Order allowed the balance of Ocwen's Proof of Claim, arrearage in the amount of $12,378.10.

56.     On November 13, 2013, unwilling to forego collection of the monies previously disallowed, Ocwen filed its Motion to Reconsider and Motion for Leave to File an Amended Claim ("Motion to Reconsider") [Filing No. 57].

57.     On December 5, 2012, the United States Trustee filed her Objection to the Motion to Reconsider [Filing No. 59] highlighting Ocwen's failure to respond to it's original *Objection to Claim* let alone meet the requisite cause to permit the filing of an amended claim.

58.     On January 14, 2013, oral argument for and against the Motion to Reconsider was heard.

59.     Ocwen and the United States Trustee both appeared via counsel.

60.     On January 22, 2013, the Bankruptcy Court entered an Order [Filing No. 69], denying Ocwen's *Motion to Reconsider* ("Reconsideration Order").

61.     On February 22, 2013, still unwilling to forego collection of unsubstantiated fees, Ocwen filed a *Notice of Postpetition Fees, Expenses and Charges* [Filing No. doc] under Claim Number 8 on the Claims Register ("Fee Notice") to supplement its original Proof of Claim, a portion of which had been disallowed.

62.     Within the Fee Notice, Ocwen listed a "Bankruptcy Fee" dated January 17, 2013, in the amount of $300.00. Attached to the Fee Notice was an invoice which provided further detail regarding the "Bankruptcy Fee." The invoice indicates the fee (which was to be assessed to Freeman's account) related to a "Response to Objection to Claim – (Rec from Brwr)."

63.     As set forth above, Ocwen did not file a response to the Trustee's Objection to Claim.

64.     In response to the Fee Notice, the United States Trustee filed a Motion For Determination Of Post-Petition Fees, Expenses, or Charges [Filing No. 80] ("Motion For Determination") stating: "12. A review of the case docket indicates that [Ocwen] failed to respond to the Claim Objection. Thus any fees for a Response to Objection to Proof of Claim" are improper and should be disallowed entirely."

65.     Just as it did not respond to the Trustee's *Objection to Claim*, Ocwen failed to file a response to the Trustee's *Motion for Determination*.

66.     Nonetheless, the Bankruptcy Court set the Motion for Determination for hearing on April 2, 2013.

67.     Proper notice of the hearing was issued to Ocwen.

68.     Ocwen failed to appear at the hearing on April 2, 2013.

69.     On April 8, 2013, the Bankruptcy Court entered its Order Granting The United States Trustee's Motion for Determination [Filing No. 85] disallowing the $300.00 fee described above and stating the following: "All fees relating to the Proof of Claim filed by [Ocwen] in this case ("Proof of Claim"), amendments to the Proof of Claim, or any litigation relation to the Proof of Claim or future matters that relate to the United States Trustee's litigation in this case, including the Motion for Determination, are hereby disallowed and by not be charged to Debtor's mortgage account."

70.     On April 12, 2017, the Chapter 13 Trustee filed a Notice of Final Cure Payment [Filing No. 109] pursuant to FRBP § 3002.1(f) stating the amount to cure the prepetition default ($12,378.19 in arrearage) had been paid in full and that Freeman had completed all payments required under the plan.

71.     On April 24, 2017, Ocwen filed a *Response to Notice of Final Cure Payment* [Filing No. doc] under Claim Number 8 on the Claims Register "[agreeing] that the Debtor(s) have paid in full the amount required to cure the prepetition default on the creditor's claim."

72.     Within the same document, under the penalties for perjury, Ocwen affirmed Freeman was current with all post-petition payments consistent with §1322(b)(5) of the Bankruptcy Code including all fees, charges, expenses, escrow, and costs.

73.     Per the *Response to Notice of Final Cure Payment*, Freeman was to make her next post petition payment on May 1, 2017.

74.     Per the Response to Notice of Final Cure Payment, Freeman was henceforth current on her mortgage obligation and to continue making her regular monthly installment directly to Ocwen beginning on May 1, 2017.

75.     Beginning in May of 2017, Freeman commenced making timely and adequate

monthly installment payments on the Loan to Ocwen via a series of ACH debits as described above.

76.     On November 21, 2017, Freeman obtained an Order of Discharge.

77.     Per Freeman's Chapter 13 Plan, the Order of Discharge, and in light of the Response to Notice of Final Cure Payment, her mortgage was to be reinstated according to the original terms and any right of Ocwen or The Bank of New York Mellon to recover any amounts alleged to have arisen prior to her filing for bankruptcy was thereby distinguished.

78.     On February 21, 2018, despite Freeman being contractually current on the Loan, and having received the aforementioned Order of Discharge, The Bank of New York Mellon filed a Notice Of Relief From Stay And Abandonment in the First Foreclosure Case.

79.     The decision to file the Notice Of Relief From Stay And Abandonment was in part based upon information provided to The Bank of New York Mellon from Ocwen.

80.     Within the aforementioned Notice Of Relief From Stay And Abandonment, The Bank Of New York Mellon states: "Further, the property at issue has been abandoned from the bankruptcy estate under 11 U.S.C. § 554."

81.     The property at issue referenced in the Notice Of Relief From Stay And Abandonment, had not been abandoned from the bankruptcy estate.

82.     The filing of the Notice Of Relief From Stay And Abandonment had the effect of restarting the First Foreclosure Case.

83.     On March 6, 2018, following receipt of one or more messages from Freeman's bankruptcy counsel, a senior paralegal with Manley Deas Kochalski, LLC. (counsel for The Bank of New York Mellon in the First Foreclosure Case) stated: "After review, the attorney has determined that our foreclosure case should be closed, as you said."

84.    On May 2, 2018, almost two (2) months after the correspondence described above, The Bank of New York Mellon (by and through its counsel, Ms. Amanda L. Krenson of Manley Deas Kochalski, LLC.) filed a Motion To Vacate Judgment and To Dismiss Case Without Prejudice.

85.    On May 5, 2018, the First Foreclosure Case was dismissed.

Freeman's Loan, and Ocwen's Servicing Misconduct, During and Post-Bankruptcy

86.    Sometime in June of 2018, Freeman obtained an exact reproduction of the life of loan mortgage transactional history ("Life of Loan History") for her loan from the system of record used by Ocwen. The Life of Loan History reflects the current mortgage balance, the date of receipt and application of all payments, the date of assessment for any late fees or charges, and the recording of any corporate advances for any legal fees or charges including but not limited to property inspection fees, legal fees, escrow fees, processing fees or any other collateral charge

87.    A review of Freeman's Life of Loan History reveals a myriad of unexplainable and errant servicing conduct.

88.    A true and accurate copy of Freeman's Life of Loan History is attached hereto as "Exhibit A".

89.    During the course of the Bankruptcy Case, Ocwen assessed fees and expenses, some applied to Freeman's mortgage account as a debit, others applied then reversed.

90.    Ocwen did not provide notice of these claims to the Bankruptcy Court as required by FRBP § 3002.1.

91.    The fees and expenses applied to Freeman's mortgage (*i.e.,* fees and expenses actually paid by Ocwen to Ocwen from funds that should have been applied to principal, interest,

or escrow.) include $6,649.43 in escrow charges *specifically disallowed* by United States

Bankruptcy Judge James K. Coachys on October 26, 2012 [Filing No. 53].

92.     In addition, the Life of Loan History reflects that during Freeman's Bankruptcy

Case and thereafter, Ocwen maintained a large surplus balance in Suspense. The highest

balances include $5,860.92 on October 7, 2013, $4,452.41 on February 7, 2014, $3,479.00 on

June 2, 2014, $4,020.39 on September 4, 2014, $3,588.37 on December 21, 2017, $2,092.96 on

February 6, 2018, and $84,910.53 on April 27, 2018.

93.     Ocwen's retention of funds in excess of a regular payment amount in Suspense,

instead of properly applying these funds to principal, interest, and escrow as contractually and

legally obligated, caused it to charge Freeman with fees and additional interest without basis.

94.     Ocwen's retention of funds in Suspense in excess of her regular monthly payment

amount for the extended periods of time deprived Freeman of the time value of that money as

Ocwen did not pay interest towards the balance.

95.     At all relevant times, Freeman continued to make timely and adequate payments

each month as obligated.

96.     In addition, the Life of Loan History reflects that Ocwen's illegal conduct

included, or otherwise caused, a manufactured negative escrow balance to exist almost

continuously throughout Freeman's Bankruptcy Case and thereafter. The most negative balances

include -$8,492.21 on December 31, 2013, -$6,458.15 on May 6, 2014, -$7,396.71 on September

4, 2014, -$6,599.27 on April 7, 2015, -$5,099.73 on June 30, 2015, -$10,124.00 on December

21, 2017, and -$23,288.85 on or about February 6, 2018.

97.     An escrow account is a form of trust account. Ocwen had no right or authority to

debit funds in this manner or outside the requirements of the Loan.

98.     In addition, pursuant to the Loan, if the amount withheld in the escrow account for insurance and taxes were insufficient, Ocwen was required to notify Freeman of the shortage as proscribed by RESPA, 12 U.S.C. § 2601 *et seq.*

99.     Ocwen failed to provide Freeman with notice of the shortage or explanation for the activities underpinning the negative escrow balances set forth above.

100.    By maintaining a negative escrow balance, Ocwen caused Freeman to incur fees, penalties and/or interest that she would not have otherwise.

101.    In addition, by maintaining a negative escrow balance following the conclusion of Freeman's  Bankruptcy Case, Ocwen violated the discharge injunction ordered therein and deprived her of the fresh start she was entitled to.

102.    By maintaining a negative escrow balance during the course of Freeman's Bankruptcy Case, Ocwen failed to provide notice to the court of those alleged charges as required by FRBP § 3002.1.

103.    At all relevant times, Freeman continued to make timely and adequate payments each month as obligated.

104.    On or around April 26, 2017, despite the Notice of Cure declaring her current and requiring her to begin making payments to directly to Ocwen starting with the May 2017 installment, Ocwen rejected Freeman's attempt to make a payment telling her she was eight (8) months behind. Ocwen later accepted the May 2017 payment.

105.    On or around December 19, 2017, despite never having missed or made an inadequate payment during or following her Bankruptcy Case, Freeman received a call from Ocwen during which an Ocwen representative alleged she was nine (9) months behind on her mortgage payments.

106.    On or around February 8, 2018, despite never having missed or made an inadequate payment during or following her Bankruptcy Case, Freeman received a call from Ocwen during which an Ocwen representative alleged she was approximately $8,000.00 behind on her mortgage payments.

107.    In or around May of 2018, despite her never having missed or made an inadequate payment during or following her Bankruptcy Case, and simultaneous with the dismissal of the First Foreclosure Case as described above, Ocwen stopped accepting Freeman's  payments.

108.    On or about May 30, 2018, Freeman received a thirty (30) day pre-foreclosure notice letter via certified mail.

109.    A true and accurate copy of Letter is attached hereto as "Exhibit B".

110.    But for Ocwen's refusal to accept her May payment, Freeman was contractually current on the Loan.

111.    On July 5, 2018, Ocwen applied a $20.00 "Property Inspection (Exterior)" fee to Freeman's Mortgage without appropriate cause or necessity.

112.    By information and belief, Ocwen continues to apply fees and expenses to Freeman's Mortgage without basis.

<u>Freeman's Efforts to Seek Information from Ocwen and have Errors Corrected</u>

113.    Within forty-five (45) days of the conclusion of Freeman's Bankruptcy Case, Ocwen began making weekly collection calls inquiring about how she intended to cure the "default" status of her mortgage.

114.    During many of the aforementioned calls, Freeman notified the Ocwen representative, or their supervisor, that she was current, had made adequate and timely monthly payments as required, and that any alleged delinquency was an error.

115.    Ocwen's calls, and Freeman's attempts to notify Ocwen of their error in treating her as if she was in default, continued until sometime in late May of 2018.

116.    Recognizing that Ocwen had made an egregious error with respect to the servicing of her Loan, fearing foreclosure, and unable to resolve the issue by paying amounts she knew to be correct, or via her conversations with their representatives, Freeman was forced to seek the assistance of legal counsel.

117.    By letter dated July 12, 2018, Freeman directed correspondence captioned "Request for Information Pursuant to Section 1024.36 of Regulation X" ("RFI No. 1) in hopes of obtaining documents necessary to ascertain the cause of the alleged default.

118.    A true and accurate copy of RFI No. 1 is attached hereto as "Exhibit C".

119.    Ocwen received RFI No. 1 on July 17, 2018 via certified mail tracking number 9414810699945032726816.

120.    In response, although not requested, Ocwen provided Freeman with a Mortgage Reinstatement Quote seeking the immediate payment of $6,587.05 (including an Escrow Payment tied to an alleged deficiency in the amount of $2,409.48) and notifying her "[w]e may refer this mortgage to foreclosure if the account is not reinstated and the payments fall farther behind or if the account is already in foreclosure, we may continue with the foreclosure proceedings."

121.    A true and accurate copy of the Mortgage Reinstatement Quote is attached hereto as "Exhibit D".

122.    The Mortgage Reinstate Quote had the following deceptive, false, misleading and oppressive items: (i) misrepresentations of the status of the debt; (ii) attempts to collect illegal fees and costs not authorized by law or the contract; (iii) misrepresentations of the amounts owed

for escrow; (iv) declaring the loan in delinquent or default status; (v) threatening foreclosure; (vi) assessing illegal foreclosure fees; and (vii) assessing improper corporate advances, fees, and/or costs that were specifically disallowed by Order dated October 26, 2012 [Filing No. 53].

123.    In response to RFI No. 1, Ocwen provided Freeman with a copy of the Life of Loan History described above.

124.    Ocwen did not, and still has not, provide Freeman with the requested copies of: (i) its servicing notes (ii) its last two escrow analyses; (iii) the insurance policy it is presently assessing to her mortgage account; (iv) an accurate payoff statement; or (v.) all credit reporting date and e-Oscar AUD's provided to any credit bureau.

125.    Ocwen's failure to provide the documents set forth above have caused Freeman an information injury and distress.

126.    Specifically, if Freeman had been provided the documents she requested and was legally entitled to receive, she would have been better able to respond to the default claims by relaying information contained therein as a defense in her foreclosure proceedings and/or provide Ocwen with a more detailed description of its errors before its initiation.

127.    In response to Ocwen's failures, and refusal to accept Freeman's monthly payments, Freeman, by and through counsel, sent correspondence captioned "Notice of Errors under 12 C.F.R. §1024.35(b)(11)" ("NOE No. 1"), and dated October 29, 2018, for: (i) failing to accept payments as contractually obligated, a defined error as set forth in 12 C.F.R. § 1024.35(b)(1) and; (ii) failing to provide an accurate payoff statement as required by 1026.36(c) of Reg. Z and 12 C.F.R. 1024.35(b)(6).

128.    A true and accurate copy of NOE No. 1 is attached hereto as "Exhibit E".

129.    By and through NOE No. 1, her attempts to make payment, and her other communications with Ocwen representatives, Freeman brought the aforementioned errors to Ocwen's attention and requested that the errors be corrected.

130.    Ocwen received NOE No. 1 on November 1, 2018.

131.    A true and accurate copy of the Acknowledgement Letter is attached hereto as "Exhibit F".

132.    By letter dated November 13, 2018, and in hopes of obtaining additional information to provide to counsel for The Bank of New York Mellon in her foreclosure proceedings, Freeman directed correspondence to Ocwen captioned "Request for Information Pursuant to Section 1024.36 of Regulation X" ("RFI No. 2) seeking: (i) copies of the servicing notes not previously provided; (ii) copies of all collection letters and notices forward in the previous six (6) months; and (iii) copies of all foreclosure correspondence forwarded in the previous six (6) months.

133.    A true and accurate copy of RFI No. 2 is attached hereto as "Exhibit G".

134.    Ocwen received RFI No. 2 on November 17, 2018 via certified mail tracking number 70172620000078866554.

135.    Following a more thorough review of the Life of Loan described above, and with the hope of stopping the still pending foreclosure proceedings, Freeman directed correspondence to Ocwen captioned "Second Notice of Errors under 12 C.F.R. §1024.35(b)(11)" ("NOE No. 2") for: (i) failing to perform an escrow analysis accurately, calculate proper escrow payments, or refund an escrow surplus in violation of 12 CFR 1024.17(c) and 12 USC 2609(a); (ii) failing to comply with the Order entered by Judge James K. Coachys of the United States Bankruptcy Court for the Southern District of Indiana dated October 26, 2012; (iii) continuing to fail to

accept timely and adequate payments as contractually obligated by refusing payments tendered in July, August, September, October, and November 2018; (iv) imposing fees for which it had no reasonable basis to impose and for improperly placing and leaving funds in suspense on at least fifty-six (56) different occasions; (v) failing to provide a payoff statement within seven (7) business days; and (vi) failing to adequately respond to Freeman's RFI No. 1 within thirty business days when it refused to provide copies of its last two escrow analysis and information pertaining to the reporting of Freeman's loan to the credit bureaus.

136.   A true and accurate copy of NOE No. 2 is attached hereto as "Exhibit H".

137.   The correspondence also disputed any information or reporting previously made by Ocwen to any credit bureau suggesting she was delinquent or had an unpaid balance.

138.   Ocwen received NOE No. 2 on November 17, 2018. A true and accurate copy of the Acknowledgement Letter, dated November 20, 2018, is attached hereto as "Exhibit I".

139.   Ocwen has failed to respond within the required seven days (excluding legal public holidays, Saturdays, and Sundays) to the portions of NOE No. 1 and NOE No. 2 relative to the errors asserted under 1024.35(b)(6), ie. failure to provide an accurate payoff statement.

140.   Thus, having waited in excess of four months (since Ocwen's receipt of RFI No. 1 on July 17, 2018) to obtain an accurate payoff statement and/or reinstatement quote, Freeman directed correspondence to Ocwen captioned "Third Notice of Errors under 12 C.F.R. §1024.35(b)(11)" ("NOE No. 3"), dated December 4, 2018, for: (i) continuing to fail to accept timely and adequate payments as contractually obligated when it rejected Freeman's December 2018 payment; (ii) continuing to fail to intercede and stop the wrongful foreclosure proceeding; and (iii)  failing to provide an accurate payoff statement within seven (7) business days or

appropriately investigate the errors identified in NOE No. 1 and NOE No. 2 relative to the inaccurate payoff statement and inaccurate reinstatement quote within seven (7) business days.

141.    To date, Ocwen has failed to respond to provide a sufficient response to RFI No. 1 or RFI No. 2, and has failed to properly investigate, correct, and/or respond to NOE No. 1, NOE No. 2, or NOE No. 3.

142.    By entirely ignoring, failing to acknowledge and failing to respond or provide much of the information requested by Freeman, failing to adequately respond and investigate her notices of errors, refusal to accept her timely and adequate payments as obligation, and refusal to intervene to stop the wrongful foreclosure proceedings described below, Ocwen not only broke the law but also frustrated Freeman's earnest attempts to live without fear of losing the home she worked, and continues to work, so hard for. All the above during the holiday season.

### Second(Wrongful) Foreclosure Case and Continued Attempts To Have Errors Corrected

143.    After improperly refusing to accept and apply payments as required by law, and despite Freeman's attempts to notify Ocwen of its errors, Ocwen and The Bank of New York Mellon wrongfully declared Freeman to be in default.

144.    On August 15, 2018, The Bank of New York Mellon filed a second foreclosure case in Hamilton County Superior Court No. 1 (Cause No. 29D03-1808-MF-007526)(the "Second Foreclosure Case"). A true and correct copy of the Complaint for Foreclosure is attached hereto as "Exhibit J".

145.    The Second Foreclosure Case was filed when Freeman's mortgage account was less than 120 days delinquent, in violation of Regulation X, 12 C.F.R. § 1024.41(f)(1).

146.    In addition, the Second Foreclosure Case was filed less than one hundred (100) days after the dismissal of the First Foreclosure Case.

147.    The Second Foreclosure Case was filed by the same firm and the same attorney who filed the Motion To Vacate Judgment And To Dismiss Case Without Prejudice in the First Foreclosure Case on May 2, 2018.

148.    Within the Motion To Vacate Judgment And To Dismiss Case Without Prejudice filed on May 2, 2018, The Bank of New York Mellon  (by and though counsel Amanda L. Krenson of Manley Deas Kochalski, LLC.) states: "A Notice of Final Cure was filed making the loan due and current as of 5/2017."

149.    Freeman made timely and adequate payments to Ocwen from May of 2017 to May of 2018, when Ocwen began rejecting them.

150.    In the still pending Second Foreclosure Case, Ocwen and The Bank of New York Mellon assert that the Loan is in default and that Freeman owes a principal balance of $88,039.35, plus other foreclosure related fees.

151.    On October 26, 2018, The Bank of New York Mellon was directly informed that Freeman was current but for the payments recently rejected by Ocwen.

152.    On October 31, 2018, undersigned counsel appeared and filed an answer denying default, raising certain affirmative defenses including Ocwen's errors, and a counterclaim for breach of contract. A true and correct copy of the Answer is attached hereto as "Exhibit K".

153.    The Answer again notified Ocwen and The Bank of New York Mellon of their errors yet they took no immediate action to either dismiss the foreclosure proceedings or address the errors identified above.

154.     The erroneous default status was also reiterated directly to both Ocwen and The Bank of New York Mellon on November 8, 2018.

155.     Later on November 8, 2018, seemingly in response, counsel for Ocwen provided a Loss Mitigation Packet for Freeman to complete.

156.     On November 12, 2018, Ocwen and/or The Bank of New York Mellon were again notified that Freeman had made all requisite payments, was distraught out of fear of losing her home, and that the Second Foreclosure Case should be dismissed immediately.

157.     On November 13, 2018, counsel for The Bank of New York Mellon responded he did not have authority to dismiss the case.

158.     On November 19, 2018, Ocwen and The Bank of New York Mellon were provided a partial payment history by Freeman evidencing her timely and adequate payments for every month from May of 2017 (two payments) to December of 2017.

159.     A true and correct copy of the partial payment history is attached hereto as "Exhibit L".

160.     No corrective action was taken by Ocwen or The Bank of New York Mellon in response to receiving the partial payment history.

161.     On December 4, 2018, Freeman directed correspondence to Ocwen and The Bank of New York Mellon seeking a list of documents she could provide that would be sufficient to dismiss the Foreclosure Case without further delay.

162.     As of the date of this filing, the Foreclosure Case remains active.

<u>Impact On, And Damage To, Freeman</u>

163.     Due to the actions of Ocwen, Freeman remains in a wrongful and false "default" status under the Loan and continues to be forced to actively defend an unlawful attempt to take her home, despite her upholding her end of the Loan.

164.     Throughout this entire ordeal, Freeman has merely wanted to pay what she is obligated to pay and live her life without fear of losing her Home to foreclosure. Even though she has made timely mortgage payments and correct escrow deposits, she finds herself in default, allegedly owing nearly $40,000.00 and on the brink of foreclosure.

165.     The impact of Ocwen's conduct on Freeman has been severe emotionally, financially, and even physically.

166.     For months, Freeman faced this hardship alone, without the assistance of counsel, yet continued to do her best to uphold her end of her mortgage responsibilities.

167.     By wrongfully filing the Foreclosure Case, and/or neglecting to intervene to halt the Bank of New York Mellon from proceeding, Ocwen caused Freeman to suffer great emotional distress driven by the fear that she might lose and be forced to leave her Home. This fear has resulted in loss of sleep, anxiety, embarrassment, and other significant emotional distress.

168.     The aforementioned emotional distress was magnified by the events set forth herein occurring during the holiday season and after what she believed was  to be a fresh start following the conclusion of her bankruptcy proceedings.

169.     In addition, Ocwen, via the false information it provided to the Bank of New York Mellon, who in turn used that information as a basis for initiating foreclosure proceedings, has created an adverse public record – a scarlet letter if you will – that can never be removed.

170.     For the rest of her life, Freeman must endure that Foreclosure record and engage in painful and embarrassing discussions and explanations as to why that record exists.

171.    In addition, Ocwen's pattern and practice of misapplying payments to Freeman's mortgage, instead placing them in suspense, has resulted in, and will continue to result in, her paying more interest.

172.    Furthermore, the actions of Ocwen have caused Freeman to incur additional actual damage in the form of time away from work, travel expenses, attorney's fees to defend the Foreclosure Case, the investigation and assistance in preparing Notices of Errors, and the preparation and prosecution of this action.

173.    Because of the wrongful and false "default" status on the Loan, Ocwen has imposed a number of unwarranted fees on the Loan including improper late fees and improper default service fees, such as fees for property inspection, and corporate advances, that they have failed to remove.

174.    In addition, the actions of Ocwen, in wrongfully and falsely claiming that the Loan is in default and causing the initiation of Foreclosure proceedings, have caused Freeman to suffer harm to her credit.

175.    By information and belief, Ocwen has improperly and incorrectly reported to various Credit Reporting Agencies that the Loan was and/or is "90-119 Days Late."

176.    This reporting was disputed by Freeman, but no correction is known to have been made in response.

177.    This false and misleading reporting has resulted in a reduction to Freeman's credit rating, a diminishment of the credit available to her, and an increase in costs of insurance.

<u>Ocwen's Pattern & Practice of Illegal Conduct</u>

178.    Ocwen has engaged in a pattern and practice of mistreating mortgage loan borrowers and violating provisions of the Real Estate Settlement Procedure Act, 12 U.S.C.

25

§§2605, 2617, and the regulations promulgated thereunder at Regulation X, 12 C.F.R. part 1024 ("RESPA").

179.   Herein, that pattern and practice entails dozens of servicing errors and a continued refusal to correct those errors.

180.   In addition, at the time of the filing of this Complaint, Ocwen has had at least Eleven Thousand Seventy-Five (11,075) consumer complaints lodged against it nationally, specifically concerning the issue identified on the CFPB's consumer complaint database as "loan modification, collection, foreclosure" related to mortgage products. Each such complaint is filed and cataloged in the CFPB's publicly accessible online database, which can be located at the following hyperlink: http://www.consumerfinance.gov/ complaintdatabase/.

181.   On April 20, 2017, the CFPB filed suit against Ocwen in the Federal District Court for the Southern District of Florida (Case No. 9:17-cv-80495) ("CFPB Lawsuit").

182.   The CFPB Lawsuit alleges in Paragraph 33 a possible explanation for the travails of Brian and Jessica and clearly demonstrates that Ocwen's behavior in this case is part of a larger pattern and practice:

> "As set forth in greater detail below, Ocwen has serviced loans and collected upon debts based on inaccurate and incomplete borrower loan information. Ocwen has often input inaccurate and incomplete information, or failed to input accurate or complete information, about borrowers' loans into its REALServicing system of record. Even when the information in REALServicing has been accurate, REALServicing has generated inaccurate information about borrowers' loans due to system deficiencies. Because of these system deficiencies, Ocwen has had to rely upon manual processes and workarounds that have themselves resulted in errors in borrowers' loan information."

183.   And at Paragraph 69 of the CFPB Complaint more indication that the problems the plaintiffs have encountered was part of a larger pattern and practice:

> "Ocwen's use of inaccurate and incomplete information resulting from its boarding of inaccurate and incomplete information into REALServicing,

REALServicing's deficiencies, and Ocwen's error-prone manual processes has caused or is likely to have caused borrowers substantial harm, and resulted in Ocwen communicating, orally and in writing, information to borrowers that it knew or had a reason to know was inaccurate."

184.    On February 5, 2015, Ocwen was sued by Ms. Monette E. Saccameno in the United States District Court for the Northern District of Illinois (Case No. 1:15-cv-01164) under nearly identical facts as set forth herein. That case, concluded on June 21, 2018, resulted in punitive damages being assessed against Ocwen.

185.    Based on the actions of Ocwen, Freeman seeks recovery for the claims alleged, infra.

## COUNT I: Breach of Contract

186.    Freeman restates and incorporates all of the statements and allegations contained in paragraphs 1 through 185, in their entirety, as if fully rewritten herein.

187.    The Loan, is an enforceable contract between Freeman Ocwen, and The Bank of New York Mellon.

188.    Ocwen paid itself funds to which it was not entitled and caused the initiation offoreclosure proceedings without cause.

189.    The Bank of New York Mellon and Ocwen is in further material breach of contract for their: (i) failure to accept Freeman's mortgage payments; (ii) failure to credit and apply Freeman's payments as contractually obligated; (iii) assessment of unauthorized late fees, legal fees, costs, and property inspection fees; (iv) failure to dismiss the foreclosure action upon receiving notice of the facts alleged herein; (v) placing the loan in default and inaccurately reporting to credit bureaus said status: (vi) converting funds towards fees or costs specifically

disallowed by Order dated October 26, 2012; and (vii) their general failure to conduct their affairs in good faith.

190.     Freeman has fully performed her obligations pursuant to the Loan by tendering payments due and by otherwise meeting each and every obligation imposed by the Loan or the rights inherent thereto.

191.     Implied in the Loan is a covenant of good faith and fair dealing. By their conduct as alleged supra, Ocwen breached that covenant and thus breach their contractual obligations under the Loan.

192.     Ocwen failed to exercise discretion in the servicing of the Loan  and owed Freeman a fiduciary duty to handle escrow properly, to adjust payments to recover escrow shortage and to provide her notice of any such shortage.  Ocwen breached that duty to Freeman and exercised their discretion in an oppressive and abusive manner by declining to apply Freeman's tender of payments unfairly, in bad faith and without reason and by otherwise misapplying those payments.

193.     Ocwen's actions have caused Freeman concrete injury as set forth above.

194.     The foregoing conduct is a breach underpinned by malice, wantonness, and oppressive conduct. Therefore, the issue of punitive damages should be submitted to the trier of fact.

### COUNT II: Ocwen's Failure to Properly Acknowledge and Respond to Requests for Information in Violation of 12 C.F.R. § 1024.36 and  Failure to Properly Respond to Notices of Error in Violation of 12 C.F.R. § 1024.35(e)

195.     Freeman restates and incorporates all of their statements and allegations contained in paragraphs 1 through 185, in their entirety, as if fully rewritten herein.

196.     12 C.F.R. § 1024.35(a) provides that a "servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

197.     Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. §1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower."

198.     12 C.F.R. § 1024.35(e)(1) provides that a servicer must respond to a notice of error by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance" or "[c]onducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance."

199.     Ocwen failed to correct the identified errors or conduct a reasonable investigation.

200.     NOE No. 1, NOE No. 2, and NOE No. 3 each meet the requirements of a notice of error as defined by 12 C.F.R. § 1024.35(a).

201.     Freeman has alleged by and through NOE No. 1, NOE No. 2 and NOE No. 3 that Ocwen committed in excess of sixty (60) distinct errors pursuant to 12 C.F.R. §1024.35(b)(2) by failing to provide all of the information and/or documentation requested by and through the RFI

No. 1, RFI No. 2, and RFI No. 3, and its failure to correct the multiple servicing errors raised therein.

202.    Ocwen's actions are a pattern and practice of behavior in conscious disregard for the Freeman' rights.

## COUNT III: Violation of the FDCPA, 15 U.S.C. §1692k
### (Against Ocwen)

203.    Freeman restates and incorporates all of the statements and allegations contained in paragraphs 1 through 202, in their entirety, as if fully rewritten herein

204.    Ocwen took the actions described, supra, in an attempt to collect a debt represented by the Loan.

205.    Ocwen violated 15 U.S.C. §1692(e)(2) when they repeatedly and continuously misrepresented the character, amount, or legal status of the Loan. Ocwen misrepresented to Freeman that she was in default on the Loan and that she was obligated to maintain an escrow account for the Loan in an incorrect amount that Ocwen knew or had reason to know was in contravention of the terms of the Loan.

206.    Ocwen violated 15 U.S.C. §1692(e)(5), allegedly accelerating the Loan and threatening to take an action - commence foreclosure proceedings against Freeman - that cannot legally be taken as Freeman has fully satisfied any and all obligations under the terms of the Loan.

207.    Ocwen violated 15 U.S.C. §1692(e)(10) when they used false representations, through false Loan statements that the Loan was past-due and in default and deceptive means to attempt to collect the Loan.

208.    Ocwen violated 15 U.S.C. §1692f(1) by attempting to collect and collecting amounts (including interest, fees, charges, or expenses incidental to the principal obligation) that

were not expressly authorized by the Loan or permitted by law via the Bankruptcy Case or Chapter 13 Discharge by (i) misrepresenting the status of the debt; (ii) attempting to collect illegal fees and costs specifically disallowed in the Bankruptcy Case; (iii) misrepresenting amounts owed for escrow; (iv) declaring the loan in delinquent or default status; (v) threatening a foreclosure sale; (vi) assessing illegal foreclosure fees; (vii) assessing escrow overdraft charges and improper corporate advances in restatement letters and payoff letters; and (viii) reporting false information by reporting the loan delinquent to the credit bureaus.

209.    Ocwen violated 15 U.S.C. §1692(d) by employing an unfair and unconscionable means to collect the subject debt.

210.    As pled, supra, Freeman has been harmed by, and continues to suffer from harm resulting from, the unfair and deceptive practices of Ocwen in wrongfully breaching the Loan and in making misrepresentations to further effectuate their wrongdoing.

211.    Freeman was compelled to retain counsel send the various requests for information and notices of errors described hereinabove, and once Freeman had exercised all reasonable options at her disposal, the filing of the instant proceeding.

212.    To date, the potential of a foreclosure action against Freeman remains as a looming threat.

**COUNT IV: Violation of 12 C.F.R. §1026.41 [Violation of TILA - failure to send periodic billing statements and misapplication of payments]**

213.    Freeman restates and incorporates all of the statements and allegations contained in paragraphs 1 through 212 in their entirety, as if fully rewritten herein.

214.    12 C.F.R. §1026.41(a) requires that a servicer must provide the consumer a periodic statement meeting the requirements of 12 C.F.R. §1026.41 for each billing cycle of the transaction.

215.    12 C.F.R. §1026.41(d) provides that the required periodic billing statements shall include information including the amount due, an explanation of the amount due, delinquency information, and account information including the current outstanding principal balance and interest rate.

216.    Freeman is a consumer.

217.    From approximately November of 2017 through today, Ocwen acting on behalf of The Bank of New York Mellon, failed to provide periodic billing statements to Freeman.

218.    The knowing failure to transmit information through the periodic billing statements wholly defeated the purpose of such statements, that is, to properly provide accurate disclosures to Freeman of her obligation on the Loan. This caused Freeman an informational injury and potentially of a reasonable opportunity to have Ocwen correct its own errors and avoid the humiliation and distress caused by the initiation of foreclosure proceedings.

219.    The Bank of New York Mellon's actions in causing or otherwise facilitating these monthly statements to be sent out with facially inaccurate information is a violation of TILA.

220.    The Bank of New York Mellon's actions are a pattern and practice in conscious disregard of Plaintiffs' rights.

221.    Freeman alleges twelve (12) separate and distinct violations of TILA.

### COUNT V:   Violation of the Fair Credit Report Act
### [15 U.S.C.A. § 1681c-1)]

222.    Freeman restates and incorporates all of the statements and allegations contained in paragraphs 1 through 221 in their entirety, as if fully rewritten herein.

223.    Ocwen willfully and/or negligently violated 15 U.S.C.A. § 1681s-2(b) by failing to conduct a reasonable investigation upon receiving notice of Freeman's dispute from one or more consumer reporting agencies, and/or by failing to review all relevant information provided by the

32

consumer reporting agencies, and/or by failing to appropriately report the results of its investigations, and/or by failing to appropriately modify, and/or delete the inaccurate information.

224.    As a result of Ocwen's violations of 15 U.S.C.A. § 1681s-2(b), Freeman has suffered actual damage including but not limited to emotional distress (including aggravation, anxiety, and loss of rest), the unjust suppression of her FICO credit score, the payment of increased costs of credit and insurance, loss of time, loss of credit opportunity, informational injury, certain out of pocket expenses, and a guaranteed of further future financial harm if the information is not corrected. Therefore, Freeman is entitled to recover actual damages under 15 U.S.C.A. § 1681n and 1681o.

225.    Ocwen's actions and omissions were willful, and caused Freeman concrete injury as set forth above, rendering it liable for punitive damages and statutory damages pursuant to 15 U.S.C.A. § 1681n.

**COUNT VI: Violation of the Discharge Injunction (11 U.S.C. § 524) and FRBP § 3002.1**

226.    Freeman restates and incorporates paragraphs 1-225 as though fully set forth herein.

227.    On XX, Ocwen filed a Response to the Notice of Final Cure Payment.

228.    The contents of Ocwen's Response to the Notice of Final Cure Payment and entry of the Order of Discharge on November 21, 2017, caused Freeman to be contractually current pursuant to 11 U.S.C. § 524, Federal Rule of Bankruptcy Procedure 3002.1 and the language of her Chapter 13 Plan.

229.    Ocwen is now seeking to collect pre-petition debts from Freeman which were paid through her Chapter 13 bankruptcy proceedings in violation of the discharge injunction.

230.    Ocwen is now seeking to collect amounts for which requisite notice was not provided to the Bankruptcy Court in violation of FRBP § 3002.1.

231.     Ocwen's actions are a willful and ongoing attempt to collect a discharged debt and otherwise frustrate the purpose of the Order of Discharge.

232.     Ocwen's conduct constitutes a gross violation of the discharge injunction as it had actual knowledge that Freeman was previously involved in bankruptcy, was to be deemed contractually current, that certain fees were disallowed, and thereafter protected from any direct or indirect collection actions for discharged debts.

233.     Ocwen's actions were willful, and caused Freeman concrete injury as set forth above, rendering it liable for punitive damages. *See, e.g.* Romanucci & Blandin, LLC. v. Lempesis, 2017 WL 4402643, at 6-7 (N.D. Ill. May 4, 2017); *see also* 3 William L. Norton Jr. & William L. Norton III, Norton Bankrutpcy Law and Practice § 58:2 (3d ed. 2017) ("A majority of courts also allow punitive damages in appropriate cases for a violation of the discharge injunction although, unlike the statue governing violations of the automatic stay, punitive damages are not specifically mentioned in Code § 524.6").

234.     Freeman alleges that in order to carry out this provision of the Bankruptcy Code and maintain its integrity, vital to the protection of Chapter 13 debtors who have paid as required, this Court must permit a punitive damage instruction and impose other sanctions against Ocwen for its willful, blatant, and continued disregard for the rule of law and the authority of the United States Bankruptcy Court.

**COUNT VII: Violation of Orders dated October 26, 2012 and April 8, 2013**

235.     Freeman restates and realleges all prior paragraphs as though fully set forth herein.

236.     Ocwen has applied costs to Freeman's mortgage account that were specifically

34

disallowed by United States Bankruptcy Judge James K. Coachys on October 26, 2012 and April 8, 2013.

237.    The aforementioned Orders occurred following Ocwen's: (i) attempt to assess unsubstantiated fees, etc. to Freeman's mortgage via their Proof of Claim, (ii) failure to respond to the United States Trustee's objection to said unsubstantiated fees, etc. (iii) renewed attempt to collect said unsubstantiated fees, etc. via a Motion to Reconsider after they were specifically disallowed; (iv) attempt to assess additional unsubstantiated fees (for services never rendered) via its Notice of Postpetition Fees; and (v) failure to respond to, and failure to appear at oral argument on, the United States Trustee's Motion for Determination objecting to said additional unsubstantiated fees.

238.    Ocwen's actions represent a pattern of wanton disregard for the rule of law sufficient for a finding of contempt and an application of sanctions.

239.    Freeman alleges that in order to maintain its integrity, vital to the protection of debtors who have received a discharge, the foregoing is further evidence of why the Court must permit a punitive damage instruction and impose other sanctions as it deems just and proper.

**COUNT VIII: Violation of Indiana's Crime Victim's Relief Act § 34-24-3-1.**
**(Conversion)**

240.    Freeman restates and realleges all prior paragraphs as though fully set forth herein.

241.    The Indiana Crime Victim's Relief Act ("ICVRA") provides relief to persons who suffer a pecuniary loss based on violation(s) of the provisions of Article 43 of Indiana's Criminal Code. A criminal conviction, however, is not necessary to maintain an action under the ICVRA; rather, the plaintiff need only prove a violation of the relevant criminal prohibition by a

preponderance of evidence in order to pursue civil penalties against the defendant under the act. *See Meridian Financial Advisors, Ltd. v. Pence*, 763 F. Supp. 2d 1046, 1060 (S.D. Ind. 2011).

242.    "A person who knowingly or intentionally exerts unauthorized control over property of another person" commits Conversion under Indiana Code § 35-43-4-2(b).

243.    Ocwen has knowingly or intentionally exerted unauthorized control over funds rightfully belonging to Freeman when it paid itself $6,649.23 in escrow charges (from funds to be held in trust on behalf of Freeman) and $300.00 for legal fees that were both specifically disallowed by United States Bankruptcy Judge James K. Coachys on October 26, 2012.

244.    Ocwen had no legal right or claim to the $6,649.23 or $300.00 as described above.

245.    As a result of Ocwen's conversion, Freeman was damaged and seeks an award of actual damages, treble damages, costs and attorney's fees as set forth by the Indiana Crime Victim's Act, Indiana Code § 34-24-3-1.

### PRAYER FOR RELIEF

WHEREFORE, Freeman prays for the entry of judgment in her favor and against Ocwen for the following:

A.    For actual damages, including interest, plus all costs and reasonable attorney fees against Defendant Ocwen for the allegations contained in Counts I through VIII;

B.    For treble damages against Defendant Ocwen relative to the converted funds ($6,649.23 and $300.00) described in Count VIII.

C.    For statutory damages of Two Thousand Dollars ($2,000.00) against Defendant Ocwen for each and every violation contained in Count II;

D.    For statutory damages of One Thousand Dollars ($1,000.00) against

Defendant Ocwen for each and every violation contained in Count III;

      E.     For statutory damages of Four Thousand Dollars ($4,000.00) against

Defendant Ocwen for each and every violation contained in Count IV;

      F.     For statutory damages of One Thousand Dollars ($1,000.00) against

Defendant Ocwen for each and every violation contained in Count V;

      G.     For punitive damages against Ocwen for the violations set forth in Counts

I, III, V, VII, and VIII.

      H.     For an Order of Contempt;

      I.     For all other relief deemed just and proper.

## JURY DEMAND

Plaintiff Demona Freeman, by and through undersigned counsel, hereby respectfully

demands a trial by jury on all such claims that may be so tried.

Respectfully submitted,

*/s/ Travis W. Cohron*
Mike P. Maxwell, Jr. No. 10875-49
Travis W. Cohron, No. 29562-30
**CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP**
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204
Telephone: (317) 637-1321
Fax: (317) 687-2344
mmaxwell@clarkquinnlaw.com
tcohron@clarkquinnlaw.com
***Counsel for the Plaintiff***