**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**Indianapolis Division**

| | |
|---|---|
| DEMONA FREEMAN, | ) |
|        *Plaintiff*, | ) |
| | ) |
|    v. | ) **Case No.**    1:18-cv-3844-TWP-DLP |
| | ) |
| OCWEN LOAN SERVICING, LLC, | ) |
| MANLEY DEAS KOCHALSKI LLC, and | ) |
| THE BANK OF NEW YORK MELLON f/k/a | ) |
| THE BANK OF NEW YORK as successor in | ) |
| interest to JPMorgan Chase Bank, N.A., as Trustee | ) |
| for C-BASS Mortgage Loan Asset-Backed | ) |
| Certificates, Series, 2005-RPI | ) |
|        *Defendants*. | ) |

<u>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

Plaintiff, Demona Freeman ("Freeman"), by counsel, complains of Defendants, Ocwen

Loan Servicing, LLC ("Ocwen"), Manley Deas Kochalski, LLC ("MDK") and The Bank of New

York Mellon f/k/a The Bank of New York as successor in interest to JPMorgan Chase Bank, N.A.,

as Trustee for C-BASS Mortgage Loan Asset-Backed Certificates, Series, 2005-RPI ("New York

Mellon"), as follows:

**INTRODUCTION**

1.      Through no fault of her own, Freeman was forced to spend the holiday season in

fear of losing her home to foreclosure.  This occurred despite the fact she timely and adequately

paid every monthly mortgage installment required of her from the middle of 2012 to the end of

2018, when without justification Ocwen began rejecting her payments on her home loan and

mortgage.

## PARTIES, JURISDICTION, AND VENUE

2. Freeman is the owner of real property and improvements located at and commonly known as 17373 Pine Wood Lane, Westfield, Indiana 46074 (the "Home").

3. Freeman purchased the Home on or about December 2, 2003, as her primary, principal residence and financed that purchase by a loan as evidenced by a note (the "Note") and a mortgage on the Home that allegedly secures the Note (the "Mortgage") (collectively referred to hereinafter as the "Loan").

4. The Loan was originated by Sun Mortgage Company, LLC, and subsequently placed in a mortgage-backed security guaranteed by Fannie Mae.

5. Thereafter, ownership of the Note was transferred to New York Mellon.

6. Ocwen is the servicer of the Loan.

7. Ocwen obtained servicing rights from Litton Loan Servicing on or about September 1, 2011, while the Loan was in default.

8. Ocwen is a wholly owned and operated subsidiary of Ocwen Financial Corporation and is a limited liability company incorporated under the laws of the State of Delaware.

9. MDK is an Ohio limited liability company which has members and employees engaged in the practice of law in the State of Indiana.

10. MDK was the agent and attorney for New York Mellon and Ocwen with respect to the conduct described herein.

11. At all times relevant herein, Ocwen acted and acts as the agent of, and loan servicer for, New York Mellon. As a loan servicer, Ocwen is a partial assignee of the Loan.

12.     Jurisdiction of claims against Ocwen is conferred by 28 U.S.C. §1331 as this action arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Real Estate Settlement Procedures Act, 12 U.S.C. §2601, *et seq*. ("RESPA"), the Truth In Lending Act, 15 U.S.C. § 1639 *et seq*. ("TILA"), and the Fair Debt Collection Practices Act, 15 U.S.C. §1692, *et seq.* ("FDCPA").

13.     This action is filed to enforce regulations promulgated by the Consumer Finance Protection Bureau ("CFPB") that became effective on January 10, 2014, specifically, 12 C.F.R. §1024.35 and §1024.36 of Regulation X.

14.     This Court has supplemental jurisdiction to hear all state law claims pursuant to 28 U.S.C. §1367.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the property that is the subject of the action is situated in this district.

## SUMMARY OF FEDERAL CLAIMS

### Claims under RESPA & Reg. X

16.     RESPA, originally enacted in 1974, was designed to ensure that consumers in real estate transactions would receive timely information on the nature and costs of the settlement process and would be protected from abusive practices.

17.     The Cranston-Gonzalez National Affordable Housing Act of 1990 expanded the scope of RESPA by addressing mortgage servicer practices. These amendments to RESPA followed reports of a substantial number of consumer complaints about mortgage servicing problems.

18.	In response to evidence of additional servicer abuses during the preceding mortgage crisis, RESPA was amended in 2010 by the Dodd-Frank Act to expand some of the statute's existing servicer requirements.

19.	RESPA's provisions relating to loan servicing are to be construed liberally so as to carry out the statue's remedial consumer protection purpose. *Medrano v. Flagstaff Bank*, 704 F.3d 661, 665 (9th Cir. 2012).

20.	In January 2013, the CFPB issued a number of final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111- 203, 124 Stat. 1376 (2010).

21.	Specifically, on January 17, 2013, the CFPB issued the RESPA Mortgage Servicing Final Rules, 78 F.R. 10695 (Regulation X) (February 14, 2013), which became effective on January 10, 2014.

22.	The Loan in the instant matter is a "federally related mortgage loan" as said term is defined by 12 C.F.R. §1024.2(b).

23.	Ocwen is subject to the aforesaid regulations and does not qualify for the exception for "small servicers," as such term is defined in 12 C.F.R. §1026.41(e)(4), nor the exemption for a "qualified lender," as such term is defined in 12 C.F.R. §617.700.

24.	Freeman asserts a claim for relief against Ocwen for violations of the specific rules under Regulation X as set forth below.

25.	Freeman has a private right of action under RESPA pursuant to 12 U.S.C. §2605(f) for the claimed violations and such action provides for remedies including actual damages, costs, statutory damages, and attorneys' fees.

<u>Claims under the FDCPA</u>

26.     Congress enacted the FDCPA to prohibit the "[u]se of abusive, deceptive, and unfair debt collection practices." 15 U.S.C §1692a.

27.     The FDCPA applies to debt collectors, not original creditors. Ocwen is a "debt collector" as defined by §1692a (6) because it obtained servicing rights to the Loan after it was in default.

28.     Freeman is a "consumer" as defined by § 1692a (3), and the Loan is a "debt" as defined by 15 U.S.C. § 1692A (4).

29.     Freeman asserts a private right of action under the FDCPA pursuant to 15 U.S.C. §1692k for Ocwen's and MDK's willful and deliberately indifferent conduct in connection with collection of the Loan.

<u>Claims under the FCRA</u>

30.     The United States Congress has found that the banking system is dependent on fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. Congress enacted the FCRA to insure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

31.     The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

32.     Because consumer credit reporting information is such sensitive data that has far reaching implications for most, if not all, consumers, the CDIA works to develop, maintain

and enhance industry-standard reporting formats and guidelines.

33.    In cooperation with Trans Union LLC, Equifax Information Services, LLC, Experian Information Solutions, Inc., and Innovis Data Solutions, Inc., the CDIA publishes the Metro 2 reporting standards ("Metro 2 Standards") to assist data furnishers like Ocwen with their compliance requirements under the FCRA. CDIA's reporting products are used in more than nine billion transactions each year. *See*

*http://www.cdiaonline.org/about/index.cfm?unItemNumber=515.*

34.    The uniform adoption and implementation of the Metro 2 Standards is the primary vehicle by which Credit Reporting Agencies ("CRAs") and data furnishers ensure that they are in compliance with their duties to ensure that they maintain complete and accurate information under the FCRA.

35.    The Metro 2 Standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

36.    The major national CRAs – Trans Union LLC, Equifax Information Services, LLC, and Experian Information Solutions, Inc. – also collaborated and developed a browser-based software system that allows the CRAs to electronically notify furnishers easily and quickly of disputed credit reporting information, and for furnishers to easily and quickly respond to such disputes following investigation. The system is commonly referred to as e-OSCAR and was designed to be Metro 2 compliant. *See http://www.e-oscar.org/.*

37.    The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Dataform ("AUD") processing, as well as other various related data reporting processes.

38.    ACDVs are notifications initiated by a CRA, and transmitted to a furnisher, in

response to a consumer dispute, and are the primary method the CRAs use to fulfill their statutory obligation to notify furnishers of disputed information of consumers' disputes.

39.    One such entity that regularly reviews consumer reports, and uses the data contained therein, is the Fair Isaac Corporation. The Fair Isaac Corporation credit risk scoring system, commonly referred to as FICO, is the leading credit risk scoring system, and utilizes data reported by credit reporting agencies and furnishers which are, ostensibly, in compliance with Metro 2 Standards.

40.    FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and mix of accounts/types of credit accounts for 10% of a consumer's FICO score. *See* [www.myfico.com/credit-education/whats-in-your-credit-score/.](http://www.myfico.com/credit-education/whats-in-your-credit-score/)

41.    The cost of credit (*e.g.,* interest rates, fees, etc.), the availability of credit, and even unsolicited credit offers to refinance a mortgage at a lower interest rate, for extended financing periods, lower rate auto loans, and zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's FICO score.

42.    Inaccurate or incorrect credit reporting often results in a lower FICO scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers. The improper reporting of a mortgage tradeline has a particularly adverse effect on a consumer like Freeman's credit score as it represents the largest and longest active debt obligation in her credit history.

43.     Ocwen regularly and in the ordinary course of business furnished information to one or more consumer reporting agencies about Freeman's transactions and is, therefore, a "furnisher" as that term is used in 15 U.S.C.A. § 1681s-2.

44.     Freeman asserts a private right of action under the FCRA pursuant to 15 U.S.C.A. § 1681s-2(b) and 15 U.S.C.A. § 1681c (f) for Ocwen's willful and deliberately indifferent acts and omissions including but not limited to failing to note its reporting was disputed.

Freeman's Ch. 13 Bankruptcy Proceeding

45.     In 2008, Freeman began encountering financial difficulties as a reverberation of the financial collapse brought on by the mortgage industry.

46.     On April 13, 2009, New York Mellon filed a foreclosure action against Freeman in the Hamilton County Superior Court No. 1 (Cause No. 29D01-0904-MF-000484) (the "First Foreclosure Case").

47.     With her financial situation continuing to be dire, Freeman sought to stop the foreclosure and forced sale of her home by filing for bankruptcy.

48.     Specifically, Freeman filed a bankruptcy case pursuant to Chapter 13 of the United States Bankruptcy Code on April 23, 2012, in the United States Bankruptcy Court for the Southern District of Indiana, Case No. 12-04713-JKC-13 (hereinafter the "Bankruptcy Case").

49.     The Bankruptcy Case had the effect of staying the First Foreclosure Case.

50.     Freeman filed the Bankruptcy Case to cure all pre-petition defaults on the Loan.

51.     Shortly after filing, Freeman proposed a Chapter 13 Plan [Filing No. 2] (the "*Chapter 13 Plan*"), which was confirmed on April 10, 2013, and later modified by Order pursuant to 11 U.S.C. § 1329 on March 15, 2016.

52.     Pursuant to the *Chapter 13 Plan*, Freeman was to make regular monthly

payments of $1,740.00 to the Chapter 13 Trustee, from which Ocwen would receive approximately $1,029.00 per month to maintain the monthly payments it was owed, plus an additional sum to address all arrearage (originally estimated by Freeman to be $15,000.00).

53.     Ocwen appeared in the Bankruptcy Case and participated in those proceedings by filing a *Proof of Claim* (Claim No. 8 dated July 26, 2012) [Claim Filing No. 8-1] on behalf of New York Mellon.

54.     The *Proof of Claim* asserted a secured claim in the amount of $133,064.46 and an arrearage claim of $22,668.03, which included: (a) escrow charges of $6,649.43; (b) a transfer fee balance of $2,328.05; (c) property valuation fees of $121.00 (listed twice for a total of $242.00); (d) foreclosure fees of $225.00; (e) foreclosure costs of $695.36; and (f) a proof of claim fee of $150.00.

55.     On September 13, 2012, the United States Trustee filed an *Objection to Claim* [Filing No. 47], detailing approximately three pages of errors in Ocwen's *Proof of Claim* including unsubstantiated, and thus objectionable, charges contained within.

56.     Within the *Objection to Claim*, the United States Trustee also states: "Further, based on a review of claims filed by Ocwen Loan Servicing, LLC. in the Southern District of Indiana, the *United States Trustee believes this failure occurs in nearly every proof of claim filed by Ocwen and is systematic in nature*" (emphasis added).

57.     Ocwen did not respond to the *Objection to Claim*.

58.     On October 26, 2012, the Bankruptcy Court entered the *Order on United States Trustee's Objection to Claim Number 8 Filed by Ocwen Loan Servicing, LLC.* [Filing No. 53], disallowing the objected to, and unsubstantiated, fees, expenses, and charges totaling $10,289.84 as well as any fees for preparation of the *Proof of Claim* or amendments thereto.

59.    The Order allowed the balance of Ocwen's *Proof of Claim*, which was an arrearage in the amount of $12,378.10.

60.    On November 13, 2013, unwilling to forego collection of the monies previously disallowed, Ocwen filed its *Motion to Reconsider and Motion for Leave to File an Amended Claim* ("*Motion to Reconsider*") [Filing No. 57].

61.    On December 5, 2012, the United States Trustee filed an *Objection to the Motion to Reconsider* [Filing No. 59], highlighting Ocwen's failure to respond to the original *Objection to Claim* let alone meet the requisite cause to permit the filing of an amended claim.

62.    On January 14, 2013, the Court conducted oral argument for and against the *Motion to Reconsider*.

63.    Ocwen and the United States Trustee both appeared by counsel.

64.    On January 22, 2013, the Bankruptcy Court entered an Order [Filing No. 69], denying Ocwen's *Motion to Reconsider*.

65.    On February 22, 2013, still unwilling to forego collection of unsubstantiated fees, Ocwen filed a *Notice of Postpetition Fees, Expenses and Charges* under Claim Number 8 on the Claims Register ("*Fee Notice*") to supplement its original *Proof of Claim*, a portion of which had been disallowed.

66.    In the *Fee Notice*, Ocwen listed a "Bankruptcy Fee," dated January 17, 2013, in the amount of $300.00.  Attached to the *Fee Notice* was an invoice that provided further detail regarding the "Bankruptcy Fee."  The invoice indicates the fee (which was to be assessed to Freeman's account) related to a "Response to Objection to Claim – (Rec from Brwr)."

67.    As set forth above, Ocwen did not file a response to the Trustee's *Objection to Claim*.

68.     In response to the *Fee Notice*, the United States Trustee filed a *Motion For Determination of Post-Petition Fees, Expenses, or Charges* [Filing No. 80] ("*Motion For Determination*"), stating: "12. A review of the case docket indicates that [Ocwen] failed to respond to the Claim Objection. Thus any fees for a Response to Objection to Proof of Claim are improper and should be disallowed entirely."

69.     Just as it did not respond to the Trustee's *Objection to Claim*, Ocwen failed to file a response to the Trustee's *Motion for Determination*.

70.     Nonetheless, the Bankruptcy Court set the *Motion for Determination* for hearing on April 2, 2013.

71.     Proper notice of the hearing was issued to Ocwen.

72.     Ocwen failed to appear at the hearing on April 2, 2013.

73.     On April 8, 2013, the Bankruptcy Court entered its Order Granting the Trustee's *Motion for Determination* [Filing No. 85], disallowing the $300.00 fee described above and stating the following: "All fees relating to the Proof of Claim filed by [Ocwen] in this case ("Proof of Claim"), amendments to the Proof of Claim, or any litigation relation to the Proof of Claim or future matters that relate to the United States Trustee's litigation in this case, including the Motion for Determination, are hereby disallowed and by not be charged to Debtor's mortgage account."

74.     On April 12, 2017, the Chapter 13 Trustee filed a *Notice of Final Cure Payment* [Filing No. 109] pursuant to FRBP § 3002.1(f), stating the amount to cure the prepetition default ($12,378.19 in arrearage) had been paid in full and that Freeman had completed all payments required under the plan.

75.     On April 24, 2017, Ocwen filed a *Response to Notice of Final Cure Payment* [Filing No. doc] under Claim Number 8 on the Claims Register "[agreeing] that the Debtor(s) have paid in full the amount required to cure the prepetition default on the creditor's claim."

76.     Within the same document, under the penalties for perjury, Ocwen affirmed Freeman was current with all post-petition payments consistent with §1322(b)(5) of the Bankruptcy Code including all fees, charges, expenses, escrow, and costs.

77.     Per the *Response to Notice of Final Cure Payment*, Freeman was to make her next post-petition payment on May 1, 2017.

78.     Per the *Response to Notice of Final Cure Payment*, Freeman was henceforth current on her mortgage obligation and was to continue making her regular monthly installment directly to Ocwen beginning on May 1, 2017.

79.     Beginning in May of 2017, Freeman commenced making timely and adequate monthly installment payments on the Loan to Ocwen by a series of ACH debits as described above.

80.     On November 21, 2017, Freeman obtained an *Order of Discharge*.

81.     Per the *Chapter 13 Plan*, the *Order of Discharge*, and in light of the *Response to Notice of Final Cure Payment*, her mortgage was to be reinstated according to the original terms and any right of Ocwen or New York Mellon to recover any amounts alleged to have arisen prior to her filing for bankruptcy was thereby extinguished.

82.     On February 21, 2018, despite Freeman being contractually current on the Loan, and having received the aforementioned *Order of Discharge*, New York Mellon filed a *Notice of Relief from Stay and Abandonment* in the First Foreclosure Case ("*Notice of Relief from Stay*").

83.     The decision to file the *Notice of Relief from Stay* was in part based upon information provided to New York Mellon from Ocwen.

84.     In the *Notice of Relief from Stay*, New York Mellon states: "Further, the property at issue has been abandoned from the bankruptcy estate under 11 U.S.C. § 554."

85.     The property at issue referenced in the *Notice of Relief from Stay* had not been abandoned from the bankruptcy estate.

86.     The filing of the *Notice of Relief from Stay* had the effect of restarting the First Foreclosure Case.

87.     On March 6, 2018, following receipt of one or more messages from Freeman's bankruptcy counsel, a senior paralegal with counsel for New York Mellon in the First Foreclosure Case stated: "After review, the attorney has determined that our foreclosure case should be closed, as you said."

88.     On May 2, 2018, almost two months after the correspondence described in the immediately preceding paragraph, New York Mellon, by counsel, filed a *Motion To Vacate Judgment and To Dismiss Case Without Prejudice*.

89.     On May 5, 2018, the First Foreclosure Case was dismissed.

Freeman's Loan, and Ocwen's Servicing Misconduct, during and Post-Bankruptcy

90.     Sometime in June of 2018, Freeman obtained an exact reproduction of the life of loan mortgage transactional history ("Life of Loan History") for the Loan from the system of record used by Ocwen.  The Life of Loan History reflects the current mortgage balance, the date of receipt and application of all payments, the date of assessment for any late fees or charges, and the recording of any corporate advances for any legal fees or charges, including without

limitation property inspection fees, legal fees, escrow fees, processing fees and any other collateral charges.

91.     A review of the Life of Loan History reveals a myriad of unexplainable and errant servicing conduct.

92.     A true and accurate copy of Freeman's Life of Loan History is attached hereto as "Exhibit A."

93.     During the course of the Bankruptcy Case, Ocwen assessed fees and expenses, some of which were applied to Freeman's mortgage account as a debit and others that were applied and then reversed.

94.     Ocwen did not provide notice of the charging of these fees and expenses to the Bankruptcy Court as required by FRBP § 3002.1.

95.     Those fees and expenses applied to Freeman's mortgage (*i.e.,* fees and expenses paid by Ocwen to Ocwen from funds that should have been applied to principal, interest, or escrow.) include $6,649.43 in escrow charges ***specifically disallowed*** in the Bankruptcy Case by the October 26, 2012 *Order on United States Trustee's Objection to Claim Number 8 Filed by Ocwen Loan Servicing, LLC*. [Filing No. 53].

96.     In addition, the Life of Loan History reflects that during Freeman's Bankruptcy Case and thereafter, Ocwen maintained a large surplus balance in Suspense.  The highest balances were $5,860.92 on October 7, 2013; $4,452.41 on February 7, 2014; $3,479.00 on June 2, 2014; $4,020.39 on September 4, 2014; $3,588.37 on December 21, 2017; $2,092.96 on February 6, 2018; and $84,910.53 on April 27, 2018.

97.     Ocwen's retention of funds in excess of a regular payment amount in Suspense, instead of properly applying these funds to principal, interest, and escrow as contractually and legally obligated, caused it to charge Freeman with fees and additional interest without basis.

98.     Ocwen's retention of funds in Suspense in excess of her regular monthly payment amount for the extended periods of time deprived Freeman of the time value of that money as Ocwen did not pay interest towards the balance.

99.     At all relevant times, Freeman continued to make timely and adequate payments each month as obligated.

100.    In addition, the Life of Loan History reflects that Ocwen's unlawful conduct included, or otherwise caused, a manufactured negative escrow balance to exist almost continuously throughout Freeman's Bankruptcy Case and thereafter.  The larges negative balances were -$8,492.21 on December 31, 2013; -$6,458.15 on May 6, 2014; -$7,396.71 on September 4, 2014; -$6,599.27 on April 7, 2015; -$5,099.73 on June 30, 2015; -$10,124.00 on December 21, 2017; and -$23,288.85 on or about February 6, 2018.

101.    An escrow account is a form of trust account.  Ocwen had no right or authority to debit funds in this manner or outside the requirements of the Loan.

102.    In addition, pursuant to the Loan, if the amount withheld in the escrow account for insurance and taxes were insufficient, Ocwen was required to notify Freeman of the shortage as proscribed by RESPA, 12 U.S.C. § 2601 *et seq*.

103.    Ocwen failed to provide Freeman with notice of the shortage or explanation for the activities underpinning the negative escrow balances set forth above.

104.    By maintaining a negative escrow balance, Ocwen caused Freeman to incur fees, penalties and/or interest that she would not have otherwise.

105.    In addition, by maintaining a negative escrow balance following the conclusion of the Bankruptcy Case, Ocwen violated the discharge injunction ordered therein and deprived her of the fresh start to which she was entitled.

106.    By maintaining a negative escrow balance during the course of the Bankruptcy Case, Ocwen failed to provide notice to the Court of those alleged charges as required by FRBP § 3002.1.

107.    On or about April 26, 2017, despite the *Notice of Cure* declaring her current and requiring her to begin making payments to directly to Ocwen starting with the May 2017 installment, Ocwen rejected Freeman's attempt to make a payment, telling her she was eight months behind in her payments.  Ocwen later accepted the May 2017 payment.

108.    On or about December 19, 2017, despite never having missed or made an inadequate payment during or following her Bankruptcy Case, Freeman received a call from Ocwen during which an Ocwen representative alleged she was nine months behind on her mortgage payments.

109.    On or about February 8, 2018, despite never having missed or made an inadequate payment during or following her Bankruptcy Case, Freeman received a call from Ocwen during which an Ocwen representative alleged she was approximately $8,000.00 behind on her mortgage payments.

110.    In or about May of 2018, despite her never having missed or made an inadequate payment during or following her Bankruptcy Case, and simultaneous with the dismissal of the First Foreclosure Case as described above, Ocwen stopped accepting Freeman's  payments on the Loan.

111.    On or about May 30, 2018, Freeman received a thirty-day pre-foreclosure notice letter by certified mail.

112.    A true and accurate copy of the pre-foreclosure notice letter is attached hereto as "[Exhibit B](#)."

113.    But for Ocwen's refusal to accept her May payment, Freeman was contractually current on the Loan.

114.    On July 5, 2018, Ocwen applied a $20.00 "Property Inspection (Exterior)" fee to Freeman's Mortgage without appropriate cause or necessity.

115.    By information and belief, Ocwen continues to apply fees and expenses to Freeman's Mortgage without basis.

<u>Freeman's Efforts to Seek Information from Ocwen and have Errors Corrected</u>

116.    Within 45 days of the conclusion of the Bankruptcy Case, Ocwen began making weekly collection calls inquiring about how she intended to cure the "default" status of her mortgage.

117.    During many of the aforementioned calls, Freeman notified the Ocwen representative, or their supervisor, that she was current, had made adequate and timely monthly payments as required, and that any alleged delinquency was an error.

118.    Ocwen's calls, and Freeman's attempts to notify Ocwen of their error in treating her as if she was in default, continued until sometime in late May of 2018.

119.    Recognizing that Ocwen had made an egregious error with respect to the servicing of her Loan, fearing foreclosure, and unable to resolve the issue by paying amounts she knew to be correct or by means of her conversations with Ocwen's representatives, Freeman was forced to seek the assistance of legal counsel.

120.     By letter dated July 12, 2018, Freeman directed correspondence captioned "Request for Information Pursuant to Section 1024.36 of Regulation X" ("RFI No. 1) in hopes of obtaining documents necessary to ascertain the cause of the alleged default.

121.     A true and accurate copy of RFI No. 1 is attached hereto as "Exhibit C."

122.     Ocwen received RFI No. 1 on July 17, 2018, as evidence by USPS Certified Mail Tracking No. 9414810699945032726816.

123.     In response, although not requested, Ocwen provided Freeman with a Mortgage Reinstatement Quote, sought the immediate payment of $6,587.05 (including an Escrow Payment tied to an alleged deficiency in the amount of $2,409.48) and notified her "[w]e may refer this mortgage to foreclosure if the account is not reinstated and the payments fall farther behind or if the account is already in foreclosure, we may continue with the foreclosure proceedings."

124.     A true and accurate copy of the Mortgage Reinstatement Quote is attached hereto as "Exhibit D."

125.     The Mortgage Reinstate Quote had the following deceptive, false, misleading and oppressive items: (i) misrepresentations of the status of the debt; (ii) attempts to collect illegal fees and costs not authorized by law or the contract; (iii) misrepresentations of the amounts owed for escrow; (iv) declaring the loan in delinquent or default status; (v) threatening foreclosure; (vi) assessing illegal foreclosure fees; and (vii) assessing improper corporate advances, fees, and/or costs that were specifically disallowed by the *Order* dated October 26, 2012 [Filing No. 53].

126.     In response to RFI No. 1, Ocwen provided Freeman with a copy of the Life of Loan History described above.

127.     Ocwen did not provide Freeman with the requested copies of: (i) its servicing

notes (ii) its last two escrow analyses; (iii) an accurate payoff statement; or (iv.) all credit reporting date and e-Oscar AUD's provided to any credit bureau.

128.    Ocwen's failure to provide the documents set forth above caused Freeman an information injury and distress.

129.    Specifically, if Freeman had been provided the documents she requested and was legally entitled to receive, she would have been better able to respond to the default claims by relaying information contained therein as a defense in her foreclosure proceedings and/or provide Ocwen with a more detailed description of its errors before its initiation.

130.    On October 29, 2018, Freeman directed correspondence captioned "Notice of Errors under 12 C.F.R. §1024.35(b)(11)" ("NOE No. 1"), and dated, for: (i) failing to accept payments as contractually obligated, a defined error as set forth in 12 C.F.R. § 1024.35(b)(1) and; (ii) failing to provide an accurate payoff statement as required by 1026.36(c) of Reg. Z and 12 C.F.R. 1024.35(b)(6).

131.    NOE No. 1 also requested Ocwen provide all documents it relied upon if it were to determine no error had occurred, per Reg. X, 12 C.F.R. §§ 1024.35(e)(1).

132.    A true and accurate copy of NOE No. 1 is attached hereto as "Exhibit E."

133.    By and through NOE No. 1, and her other communications with Ocwen representatives, Freeman brought the aforementioned errors to Ocwen's attention, made them aware of the false default status on the Loan, and requested that the errors be investigated and corrected.

134.    Ocwen received NOE No. 1 on November 1, 2018, as evidenced by USPS Certified Mail Tracking No. 70172620000078861221.

135. Ocwen took no action to reasonably investigate or correct the distinct errors identified in NOE No. 1, the false default status of the Loan, or any others.

136. On January 7, 2019, over a month after the *Complaint* herein was filed [Doc. 1], and beyond its deadline to do so, Ocwen responded to NOE No. 1 by stating: (i) "The October 29 Letter provides no detail regarding any specific error made by Ocwen in connection with servicing the Loan" (ii) "Ocwen made changes to the Loan payment history by applying funds in escrow to the principal balance and by removing certain charges"; and (iii) "Ocwen conducted a reasonable investigation and determined that no error occurred with respect to the acceptance of payments, because its records do not show any payments that have not been applied to the Loan."

137. If Ocwen had performed a reasonable investigation into any alleged error, it would have determined the Loan was not in default and that the Second Foreclosure Case (discussed below) had been filed in error. This is particularly true given Ocwen was already in receipt of the *Complaint* [Doc. 1].

138. Likewise, if Ocwen had conducted a reasonable investigation it would have determined that it had been and continued to reject Freeman's mortgage payments because it held the account in a false state of default and was actively foreclosing on the Home.

139. A true and accurate copy of Ocwen's response to NOE No. 1 is attached hereto as "Exhibit F."

140. In addition, Ocwen's response to NOE No. 1 that no errors were found or that insufficient detail had been provided is contradicted by its decision to unilaterally apply funds held in escrow to the principal balance and remove "certain charges." *See Guccione v. JPMorgan Chase Bank*, 2015 WL 1968114 (N.D. Cal. May 1, 2015)(servicer's response that

there was no error with escrow account contradicted by three documents sent to the borrower each stating that a different escrow amount was owed); *see, also, Wilson v. Bank of Am.*, 48 F. Supp. 3d 787 (E.D. Pa. 2014)(Plaintiff sufficiently alleged that servicer did not conduct a reasonable investigation of her notices of error where the servicer sent her response with contradictory explanations for why the actions she requested were not taken).

141. Any reasonable investigation into the errors alleged by NOE No. 1, even without the benefit of additional communications from Freeman or a copy of the *Complaint*, would have uncovered the errors alleged and resulted in some action being taken to address them.

142. In addition, Ocwen did not provide the requested documents or information it relied on in reaching its apparent determination that no error occurred within fifteen business as required by Reg. X, 12 C.F.R. § 1024.36(e)(4).

143. By letter dated November 13, 2018, Freeman directed correspondence to Ocwen captioned "Second Request for Information Pursuant to Section 1024.36 of Regulation X" ("RFI No. 2") seeking: (i) copies of the servicing notes not previously provided; (ii) copies of all collection letters and notices forward in the previous six months; and (iii) copies of all foreclosure correspondence forwarded in the previous six months.

144. A true and accurate copy of RFI No. 2 is attached hereto as "Exhibit G."

145. Ocwen received RFI No. 2 on November 17, 2018, as evidenced by USPS Certified Mail Tracking No. 70172620000078866554.

146. Also on November 13, 2018, Freeman directed correspondence to Ocwen captioned "Second Notice of Errors under 12 C.F.R. §1024.35(b)(11)" ("NOE No. 2") for: (i) failing to send monthly period billing statements; (ii) failing to perform an escrow analysis accurately, calculate proper escrow payments, or refund an escrow surplus in violation of 12

CFR 1024.17(c) and 12 USC 2609(a); (iii) failing to comply with the Order of October 26, 2012 in the Bankruptcy Case; (iv) continuing to fail to accept timely and adequate payments as contractually obligated by refusing payments tendered in July, August, September, October, and November 2018; (v) imposing fees for which it had no reasonable basis to impose and for improperly placing and leaving funds in suspense on at least fifty-six different occasions; (vi) failing to provide a payoff statement within seven business days; and (vii) failing to adequately respond to Freeman's RFI No. 1 within thirty business days when it refused to provide copies of its last two escrow analysis and information pertaining to the reporting of Freeman's loan to the credit bureaus.

147.    A true and accurate copy of NOE No. 2 is attached hereto as "Exhibit H."

148.    NOE No. 2 also disputed any information or reporting previously made by Ocwen to any credit bureau suggesting she was delinquent or had an unpaid balance.

149.    NOE No. 2 also requested that Ocwen take specific actions to correct the errors identified therein.

150.    Ocwen received NOE No. 2 on November 17, 2018 as evidenced by USPS Certified Mail Tracking No. 70172620000078866561.

151.    Ocwen took no action to correct the distinct errors identified in NOE No. 2 or remove the false default status on the Loan.

152.    Instead, by letter dated January 22, 2019, Ocwen responded to NOE No. 2 by stating: (i) "Ocwen conducted a reasonable investigation and determined that no error occurred with respect to the alleged failure to send billing statements for six months prior to the November 13 Letter"; (ii) "Please note that the escrow funds are available to refunded to Ms. Freeman if she so requests"; (iii) "With respect to the fees and costs assessed to the Loan in connection with the

bankruptcy, Ocwen has determined that an error occurred.  The removal of the fees and costs at issue are shown in the payment history provided on January 7, 2019" ; (iv) "Ocwen conducted a reasonable investigation and determined that no error occurred with respect to the alleged refusal of payments tendered by Ms. Freeman in July, August, September, October, and November 2018." (v) "As for your inquiry regarding the late fee in the amount of $25.87 on May 30, 2018, the Property Inspection fee of $20.00 on July 5, 2018…….we determined that those fees were assessed in error in light of the updated payment history that we provided you on January 7, 2019.  As a result, those fees *will be* removed from the Loan" (emphasis added); and (vi) "Please note that you may request the documents that Ocwen relied upon in reaching this determination through the undersigned whose contact information is contained in this correspondence."

153.    Ocwen's response to NOE No. 2 occurred over a month after the filing of the *Complaint* herein.

154.    If Ocwen had performed a reasonable investigation into the errors set forth in Paragraph 2 of NOE No. 2 relative to Freeman's escrow account it would have refunded the escrow surplus not just notified her, "that the escrow funds are available to be refunded to Ms. Freeman if she so requests."

155.    In NOE No. 2, Freeman already requested all surplus escrow funds be refunded to her.

156.    Likewise, if Ocwen had conducted a reasonable investigation into the errors set forth in NOE No. 2, it would have refunded fees as described therein not just those reflected "in the payment history provided on January 7, 2019."

157.    Ocwen's response to NOE No.2 does not state the exact amount of fees it purports to have removed.

158.     In addition, if Ocwen had conducted a reasonable investigation into the errors set forth in Paragraph 5 of NOE No. 2 relative to the property inspection fees, it would have removed the fees from the Loan not just promised to do so in the future.

159.     In addition, if Ocwen had conducted a reasonable investigation into the errors set forth in Paragraph 4 of NOE No.2 relative to the rejection of Freeman's payments, it would have ceased doing so in the future, acknowledged that it had done so in the past because it held the Loan in a false default status and because it does not accept payments on homes on which it is actively foreclosing.

160.     In addition, if Ocwen had conducted a reasonable investigation into the errors set forth in Paragraph 5 of NOE No. 2, it would have determined that funds had been wrongly placed in suspense for various times since the start of the Bankruptcy Case.

161.     A true and accurate copy of Ocwen's response to NOE No. 2 is attached hereto as "Exhibit I."

162.     Ocwen's response to NOE No. 2 is contradicted by the escrow documents it provided and the payment history it references.  *See Guccione v. JPMorgan Chase Bank*, 2015 WL 1968114 (N.D. Cal. May 1, 2015)(servicer's response that there was no error with escrow account contradicted by three documents sent to the borrower each stating that a different escrow amount was owed); *see, also, Wilson v. Bank of Am.*, 48 F. Supp. 3d 787 (E.D. Pa. 2014)(Plaintiff sufficiently alleged that servicer did not conduct a reasonable investigation of her notices of error where the servicer sent her response with contradictory explanations for why the actions she requested were not taken).

163.     Ocwen's response to NOE No. 2 failed to take actions necessary to correct the errors identified in NOE No. 2 and requested therein.  This included: (i) [r]eversing all payments

and reapply them pursuant the Loan's terms; (ii) "[a]cknowledging in writing to the Borrower that the Loan is current with no outstanding amounts"; (iii) "[r]emove any and all disallowed fees per the October 26, 2016 Order in the Bankruptcy Case"; and (iv) "[c]ease rejecting payments from Freeman and begin appropriately applying them."

164.    Despite being requested in NOE No. 2, Ocwen did not provide the documents or information it relied upon in reaching its apparent determination, as required by Reg. X, 12 C.F.R. § 1024.36(e)(4).

165.    On December 4, 2018, Freeman directed correspondence to Ocwen captioned "Third Notice of Errors under 12 C.F.R. §1024.35(b)(11)" ("NOE No. 3") notify it of its error in: (i) continuing to reject Freeman's payments in violation of 12 C.F.R. 1024.35(b)(1); and (ii) failing to provide an accurate payoff statement (or Mortgage Reinstatement Quote) within seven business days as required by 12 C.F.R. 1024.36(d)(2) following Ms. Freeman's request in NOE No. 2 dated Nov. 17, 2018.

166.    A true and accurate copy of NOE No. 3 is attached hereto as "Exhibit J."

167.    NOE No. 3 also specifically disputed the reporting of any delinquency or missed payments since June of 2012.

168.    NOE No. 3 also contained the following language: "If you determine that no error occurred please provide us all documents you relied upon, per Reg. X, 12 C.F.R. §§ 1024.35(e)(1)."

169.    Ocwen received NOE No. 3 on December 7, 2018, as evidenced by USPS Certified Mail Tracking No. 70172620000078866837.

170.    Ocwen did not take the corrective actions requested within NOE No. 3 including

but not limited to: (i) "[a]knowledge in writing to the Borrower that that her loan is current with no outstanding amounts; (ii) "[c]ease rejecting payments from Ms. Freeman and begin appropriately applying them; and (iii) "[i]ntervene to stop the wrongful foreclosure proceedings now pending against Ms. Freeman, as she did not miss payments" as alleged therein.

171.    Instead, by letter dated January 22, 2019, Ocwen responded to NOE No. 3 by stating: (i) The December Letter fails to provide sufficient detail regarding the alleged error made by Ocwen in connection with servicing the loan identified by the loan number ending in 2406 (the "Loan").  Specifically, the December Letter fails to identify the year of the alleged December payment that you claim was refused." (ii) "Ocwen conducted a reasonable investigation and determined that no error occurred with respect to the alleged refusal of a payment tendered by Ms. Freeman in December of 2018 (as assumed)." and (iii) "Please note that you may request the documents that Ocwen relied upon in reaching this determination through the undersigned whose contact information is contained in this correspondence or through counsel for the Federal Lawsuit."

172.    A true and accurate copy of Ocwen's response to NOE No. 3 is attached hereto as "Exhibit K."

173.    Any reasonable investigation into the errors alleged by and through NOE No. 3 would have resulted in Ocwen ceasing to reject Freeman's payments, an acknowledgment that Freeman was current on the Loan, the provision of documents it relied upon in reaching its determination, and/or the immediate dismissal of the Second Foreclosure Case (described below).

174.    Ocwen did not provide the requested documents or information it relied upon in

reaching its determination that no error occurred, let alone within fifteen business as required by Reg. X, 12 C.F.R. § 1024.36(e)(4).

175.    To date, Ocwen has failed to reasonably investigate, correct, and/or respond to NOE No. 1, NOE No. 2, or NOE No. 3.

176.    By entirely ignoring, failing to acknowledge and failing to respond or provide much of the information requested by Freeman, failing to adequately respond and investigate her notices of errors, refusing to accept her timely and adequate payments as obligation, and refusing to intervene to stop the wrongful foreclosure proceedings described below, Ocwen not only broke the law but also frustrated Freeman's earnest attempts to live without fear of losing the Home for which she works so hard.

<u>Second Foreclosure Case and Continued Attempts to Have Errors Corrected</u>

177.    After improperly refusing to accept and apply payments as required by law, and despite Freeman's attempts to notify Ocwen of its errors, Ocwen and New York Mellon wrongfully declared Freeman to be in default.

178.    On August 15, 2018, New York Mellon filed a second foreclosure case in Hamilton County Superior Court No. 1 (Cause No. 29D03-1808-MF-007526) (the "Second Foreclosure Case").

179.    A true and correct copy of the *Complaint for Foreclosure* in the Second Foreclosure Case is attached hereto as "Exhibit L."

180.    The Second Foreclosure Case was filed even though Freeman's mortgage account was purportedly less than 120 days delinquent, which is a violation of Regulation X, 12 C.F.R. § 1024.41(f)(1).

181. In addition, the Second Foreclosure Case was filed less than 100 days after the dismissal of the First Foreclosure Case.

182. The Second Foreclosure Case was filed by the same firm and the same attorney who filed the *Motion To Vacate Judgment And To Dismiss Case Without Prejudice* in the First Foreclosure Case on May 2, 2018.

183. In the *Motion To Vacate Judgment And To Dismiss Case Without Prejudice*, New York Mellon states: "A Notice of Final Cure was filed making the loan due and current as of 5/2017."

184. Freeman made timely and adequate payments to Ocwen from May of 2017 to May of 2018, when Ocwen began rejecting her payments.

185. In the Second Foreclosure Case, Ocwen and New York Mellon alleged the Loan was in default and that Freeman owed a principal balance of $88,039.35, plus other foreclosure related fees.

186. On October 26, 2018, New York Mellon was directly informed that Freeman was current but for the payments recently rejected by Ocwen.

187. On October 31, 2018, Freeman's counsel filed an answer denying any default, raising certain affirmative defenses including Ocwen's errors, and a counterclaim for breach of contract.

188. A true and correct copy of the *Answer* in the Second Foreclosure Case is attached hereto as "Exhibit M."

189. The *Answer* again notified Ocwen and New York Mellon of their errors, yet they took no immediate action to either dismiss the foreclosure proceedings or address the errors identified above.

190. The erroneous default status was also reiterated directly to both Ocwen and New York Mellon on November 8, 2018.

191. On November 12, 2018, Ocwen and/or New York Mellon were again notified that Freeman had made all requisite payments, was distraught out of fear of losing her home, and that the Second Foreclosure Case should be dismissed immediately.

192. On November 13, 2018, counsel for New York Mellon responded he did not have authority to dismiss the case.

193. On November 19, 2018, Ocwen and New York Mellon were provided a payment history by Freeman evidencing her timely and adequate payments for every month from May of 2017 (two payments) to December of 2017.

194. A true and correct copy of this payment history is attached hereto as "Exhibit N."

195. No corrective action was taken by Ocwen or New York Mellon in response to receiving this payment history.

196. On December 4, 2018, Freeman directed correspondence to Ocwen and New York Mellon seeking a list of documents she could provide that would be sufficient to dismiss the Foreclosure Case without further delay.

197. On January 23, 2019, over five months after its filing, the Second Foreclosure Case was finally dismissed without prejudice.

198. Had Freeman not taken action, including but not limited to retaining counsel, she would have likely lost the Home.

<u>Impact on, and Damage to, Freeman</u>

199. Due to the actions of Ocwen, Freeman remains in a wrongful and false "default" status under the Loan and was forced to defend a second unlawful attempt to take her home, despite upholding her end of the Loan.

200. Throughout this entire ordeal, Freeman only wanted to pay what she is obligated to pay and live her life without fear of losing the Home to foreclosure. Even though she has made timely mortgage payments and correct escrow deposits, she finds herself in a falsely manufactured state of default.

201. The impact of Ocwen's conduct on Freeman has been severe emotionally, financially and even physically.

202. For months, Freeman faced this hardship alone, without the assistance of counsel, yet continued to do her best to uphold her end of her mortgage responsibilities.

203. By wrongfully filing two foreclosures, and/or neglecting to intervene to halt New York Mellon from proceeding, Ocwen caused Freeman to suffer great emotional distress driven by the fear that she might lose and be forced to leave her Home. This fear has resulted in loss of sleep, anxiety, embarrassment, and other significant emotional distress.

204. The aforementioned emotional distress was magnified by the events set forth herein occurring during the holiday season and after what she believed was to be a fresh start following the conclusion of her bankruptcy proceedings.

205. In addition, Ocwen because of the false information it provided to the New York Mellon, which in turn used that information as a basis for initiating foreclosure proceedings, has created an adverse public record – a scarlet letter if you will – that can never be removed.

206. For the rest of her life, Freeman must endure that Foreclosure record and engage in painful and embarrassing discussions and explanations as to why that record exists.

207. In addition, Ocwen's pattern and practice of misapplying payments to the Loan, instead placing them in suspense, has resulted in, and will continue to result in, her paying more interest.

208. Furthermore, the actions of Ocwen have caused Freeman to incur additional actual damage in the form of time away from work, travel expenses, attorney's fees to defend the Foreclosure Cases, the investigation and assistance in preparing Notices of Errors, and the preparation and prosecution of this action.

209. Because of the wrongful and false "default" status on the Loan, Ocwen has imposed a number of unwarranted fees on the Loan including improper late fees and improper default service fees, such as fees for property inspection, and corporate advances, that they have failed to remove.

210. In addition, the actions of Ocwen, in wrongfully and falsely claiming that the Loan is in default and causing the initiation of proceedings, have caused Freeman to suffer harm to her credit.

211. On information and belief, Ocwen has improperly and incorrectly reported to various CRAs that the Loan was and/or is "90-119 Days Late."

212. This reporting was disputed by Freeman on several occasions, but no correction is known to have been made in response.

213. This false and misleading reporting has resulted in the unlawful suppression of Freeman's credit rating, a diminishment of the credit available to her, and an increase in costs of insurance.

<u>Ocwen's Pattern & Practice of Illegal Conduct</u>

214.     Ocwen has engaged in a pattern and practice of mistreating mortgage loan borrowers and violating provisions of RESPA and the regulations promulgated thereunder at Regulation X.

215.     That pattern and practice entails dozens of servicing errors and a continued refusal to correct those errors in the present case.

216.     In addition, at the time of the filing of her *Complaint*, Ocwen has had at least 27,500 consumer complaints lodged against it nationally, specifically concerning the issue identified on the CFPB's consumer complaint database as "loan modification, collection, foreclosure" related to mortgage products.  Each such complaint is filed and cataloged in the CFPB's publicly accessible online database, which can be located at the following hyperlink: http://www.consumerfinance.gov/complaintdatabase/.

217.     On April 20, 2017, the CFPB filed suit against Ocwen in the Federal District Court for the Southern District of Florida (Case No. 9:17-cv-80495) ("CFPB Lawsuit").

218.     The CFPB Lawsuit alleges in Paragraph 33 a possible explanation for the travails of persons like Freeman and clearly demonstrates that Ocwen's behavior in this case is part of a larger pattern and practice:

> "As set forth in greater detail below, Ocwen has serviced loans and collected upon debts based on inaccurate and incomplete borrower loan information. Ocwen has often input inaccurate and incomplete information, or failed to input accurate or complete information, about borrowers' loans into its REALServicing system of record. Even when the information in REALServicing has been accurate, REALServicing has generated inaccurate information about borrowers' loans due to system deficiencies. Because of these system deficiencies, Ocwen has had to rely upon manual processes and workarounds that have themselves resulted in errors in borrowers' loan information."

219.     And at Paragraph 69 of the CFPB Complaint more indication that the problems the plaintiffs have encountered was part of a larger pattern and practice:

"Ocwen's use of inaccurate and incomplete information resulting from its boarding of inaccurate and incomplete information into REALServicing, REALServicing's deficiencies, and Ocwen's error-prone manual processes has caused or is likely to have caused borrowers substantial harm, and resulted in Ocwen communicating, orally and in writing, information to borrowers that it knew or had a reason to know was inaccurate."

220.    On February 5, 2015, Ocwen was sued by Monette E. Saccameno in the United States District Court for the Northern District of Illinois (Case No. 1:15-cv-01164) under nearly identical facts as set forth herein. That case, concluded on June 21, 2018, resulted in punitive damages being assessed against Ocwen. *See Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1247-48 (11th Cir. 2016) ("A plaintiff may establish a pattern or practice of noncompliance by showing that the servicer has repeated the same violation against different borrowers").

221.    Based on the actions of Ocwen, Freeman seeks recovery for the claims alleged below.

### COUNT I: Breach of Contract
### [Against New York Mellon]

222.    Freeman incorporates by reference and restates as though fully set forth herein all previous allegations of the First Amended Complaint.

223.    The Loan, is an enforceable contract between Freeman and New York Mellon.

224.    A true and accurate copy of the Note and Mortgage are attached hereto as "Exhibit O."

225.    At all times herein, Ocwen acted at the direction of, and as the agent of, New York Mellon.

226.    New York Mellon is in material breach of contract for its: (i) failure

to accept Freeman's timely and adequate mortgage payments as contractually obligated; (ii) failure to credit and apply Freeman's payments as contractually obligated; (iii) assessment of unauthorized late fees, legal fees, costs, and property inspection fees; (iv) failure to dismiss the foreclosure action upon receiving notice of the facts alleged herein; (v) placing the loan in default and inaccurately reporting to credit bureaus said status: and (vi) converting funds towards fees or costs specifically disallowed by Order dated October 26, 2012.

227.     Freeman has fully performed her obligations pursuant to the Loan by tendering payments due and by otherwise meeting each and every obligation imposed by the Loan or the rights inherent thereto.

228.     New York Mellon, by and through its agent Ocwen, failed to exercise due care in the servicing of the Loan and violated its fiduciary duty to Freeman to handle escrow funds properly and to adjust payments to recover escrow shortage and to provide her notice of any such shortage.  New York Mellon, by and through its agent Ocwen, breached these duties to Freeman in an oppressive and abusive manner by declining to apply Freeman's tender of payments unfairly, in bad faith and without reason and by otherwise misapplying those payments.

229.     New York Mellon's actions have caused Freeman concrete injury as set forth above.

230.     The foregoing breaches are underpinned by malice, wantonness, and oppressive conduct.  Therefore, the issue of punitive damages should be submitted to the trier of fact.

**COUNT II: Violations of the RESPA**
**(Against Ocwen)**

231.     Freeman incorporates by reference and restates as though fully set forth herein all previous allegations of the First Amended Complaint.

232.    By its acts and omissions, Ocwen has numerous times and in numerous different ways violated the RESPA with respect to the Loan, including, but in no way limited to, those of which it was notified, each time it did any of the following: (i) failing to accept payments as contractually obligated; (ii) failing to provide an accurate payoff statement as required by 1026.36(c) of Reg. Z and 12 C.F.R. 1024.35(b)(6); (ii) failing to send monthly period billing statements; (iv) failing to perform an escrow analysis accurately, calculate proper escrow payments, or refund an escrow surplus in violation of 12 CFR 1024.17(c) and 12 USC 2609(a); (v) failing to comply with the Order of October 26, 2012 in the Bankruptcy Case; (vi) imposing fees for which it had no reasonable basis to impose and for improperly placing and leaving funds in suspense; (vii) failing to adequately respond to Freeman's RFI No. 1 within thirty business days when it refused to provide copies of its last two escrow analysis and information pertaining to the reporting of Freeman's loan to the credit bureaus.

233.    12 C.F.R. § 1024.35(a) provides that a "servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

234.    Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. §1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower."

235.    12 C.F.R. § 1024.35(e)(1) provides that a servicer must respond to a notice of error by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance" or "[c]onducting a

reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance."

236.    Ocwen failed to correct the identified errors or conduct a reasonable investigation.

237.    NOE No. 1, NOE No. 2, and NOE No. 3 each meet the requirements of a notice of error as defined by 12 C.F.R. § 1024.35(a).

238.    Freeman has alleged by and through NOE No. 1, NOE No. 2 and NOE No. 3 that Ocwen committed in excess of sixty distinct errors pursuant to 12 C.F.R. §1024.35(b)(2) by failing to reasonably investigate identified errors, provide documentation requested, and failure to correct the multiple servicing errors raised therein.

239.    Each failure exacerbated the emotional distress caused by the previous.

240.    Ocwen's actions are a pattern and practice of behavior in conscious disregard for the Freeman' rights.

**COUNT III: Violation of the FDCPA, 15 U.S.C. §1692k**
**(Against Ocwen)**

241.    Freeman incorporates by reference and restates as though fully set forth herein all previous allegations of the First Amended Complaint.

242.    Ocwen took the actions described above in an attempt to collect a debt represented by the Loan.

243.    Ocwen violated 15 U.S.C. §1692(e)(2) when they repeatedly and continuously misrepresented the character, amount, or legal status of the Loan.  Ocwen misrepresented to

Freeman that she was in default on the Loan and that she was obligated to maintain an escrow account for the Loan in an incorrect amount that Ocwen knew or had reason to know was in contravention of the terms of the Loan.

244. Ocwen violated 15 U.S.C. §1692(e)(5), allegedly accelerating the Loan and threatening to take an action - commence foreclosure proceedings against Freeman - that cannot legally be taken as Freeman has fully satisfied any and all obligations under the terms of the Loan.

245. Ocwen violated 15 U.S.C. §1692(e)(10) when they used false representations, through false Loan statements that the Loan was past-due and in default and deceptive means to attempt to collect the Loan.

246. Ocwen violated 15 U.S.C. §1692f(1) by attempting to collect and collecting amounts (including interest, fees, charges, or expenses incidental to the principal obligation) that were not expressly authorized by the Loan or permitted by law in the Bankruptcy Case or Chapter 13 Discharge by: (i) misrepresenting the status of the debt; (ii) attempting to collect illegal fees and costs specifically disallowed in the Bankruptcy Case; (iii) misrepresenting amounts owed for escrow; (iv) declaring the loan in delinquent or default status; (v) threatening a foreclosure sale; (vi) assessing illegal foreclosure fees; (vii) assessing escrow overdraft charges and improper corporate advances in restatement letters and payoff letters; and (viii) reporting false information by reporting the loan delinquent to the credit bureaus.

247. Ocwen violated 15 U.S.C. §1692(d) by employing an unfair and unconscionable means to collect the subject debt.

248.     Freeman has been harmed by, and continues to suffer from harm resulting from the unfair and deceptive practices of Ocwen in wrongfully breaching the Loan and in making misrepresentations to further effectuate their wrongdoing.

249.     Freeman was compelled to retain counsel to send the various requests for information and notices of errors described hereinabove, and once Freeman had exercised all reasonable options at her disposal, the filing of the instant proceeding.

### COUNT IV: Violation of the Truth In Lending Act, 15 U.S.C. § 1601, et seq.
### (Against New York Mellon)

250.     Freeman incorporates by reference and restates as though fully set forth herein all previous allegations of the First Amended Complaint.

251.     Freeman asserts a private right of action under 15 U.S.C. § 1640(a) for: (i) Ocwen's breach of its duty to send interest rate and payment change notices pursuant to 15 U.S.C. § 1638a and Reg. Z, 12 C.F.R. § 1026.20(c) and (d); (ii) Ocwen's breach of its duty to promptly credit payments pursuant to 15 U.S.C. § 1639f and Reg. Z, 12 C.F.R. § 1026.36(c)(1); (iii) Ocwen's breach of its duty to send periodic mortgage statements pursuant to 15 U.S.C. § 1638(f) and Reg. Z, 12 C.F.R. § 1026.41; and (iv) Ocwen's breach of its duty to provide a timely payoff statement pursuant to 15 U.S.C. § 1639g and Reg. Z, 12 C.F.R. §1026.36(c)(3).

Failure to Provide Periodic Mortgage Statements

252.     12 C.F.R. §1026.41(a) requires that a servicer must provide the consumer a periodic statement meeting the requirements of 12 C.F.R. §1026.41 for each billing cycle of the transaction.

253.     From approximately November of 2017 through today, Ocwen acting on behalf of New York Mellon, failed to provide periodic billing statements to Freeman in violation of 15 U.S.C. § 1639f .

## Failure to Promptly Credit Payments

254.     15 U.S.C. § 1639f (a) provides that, "[i]n connection with a consumer credit transaction secured by a consumer's principal dwelling, no servicer shall fail to credit a payment to the consumer's loan account as of the date of receipt, except when a delay in crediting does not result in any charge to the consumer."

255.     Ocwen has failed to credit payments (made directly and via disbursements made by the Trustee) to the Loan as of the date of receipt and its delay has resulted in charges to Freeman.

256.     12 C.F.R. §1026.36(c)(1)(ii) provides that if a servicer retains a partial payment in a suspense or unapplied funds account (rather than credits or returns it), then the servicer must (1) disclose on the periodic statement the total amount retained in such suspense or unapplied funds account and (2) when sufficient funds accumulate to cover a full payment, promptly credit the retained funds to the oldest outstanding payment

257.     Ocwen has failed to properly disclose amounts held in suspense or, when sufficient funds accumulated to cover one of his full payments, promptly credit the retained funds to the oldest outstanding payment.

258.     The Loan was deemed current by an order of the Bankruptcy Court in the Bankruptcy Case, she has made every payment after that, yet Ocwen has refused to acknowledge that her loan is current or appropriately apply her payments. "[Freeman has] also alleged that the amounts that [Ocwen] told her would cure her "defaults" ranged from [$3,345.95] in October of [2017] to [$7,000] as of August of [2018]. *See In re Cawood*, 577 B.R. 538 (Bankr. E.D. Tenn., Sept. 29, 2017).

## Failure to Send Payment Change and Interest Rate Notices

259.     15 U.S.C.A. § 1638b states, "During the 1-month period that ends 6 months before the date on which the interest rate in effect during the introductory period of a hybrid adjustable rate mortgage adjusts or resets to a variable interest rate or, in the case of such an adjustment or resetting that occurs within the first 6 months after consummation of such loan, at consummation, the creditor or servicer of such loan shall provide a written notice, separate and distinct from all other correspondence to the consumer, that includes the following: (1) Any index or formula used in making adjustments to or resetting the interest rate and a source of information about the index or formula; (2) an explanation of how the new interest rate and payment would be determined, including an explanation of how the index was adjusted, such as by the addition of a margin; (3) a good faith estimate based on accepted industry standards, of the creditor or servicer of the amount of the monthly payment that will apply after the date of the adjustment or reset, and the assumptions on which this estimate is based; (4) a list of alternatives consumers may pursue before the date of adjustment or reset, and descriptions of the actions consumers must take to pursue these alternatives, including – (A) refinancing, (B) renegotiation of loan terms, (C) payment forbearances and (D) pre-foreclosure sales; (5) the names, addresses, telephone numbers, and Internet addresses of counseling agencies or programs reasonably available to the consumer that have been certified or approved and made publicly available by the Secretary of Housing and Urban Development or a State housing finance authority (as defined in section 1441a-1 of Title 12); and (6) the address, telephone number, and Internet address for the State housing finance authority (as so defined) for the State in which the consumer resides.

260.     12 C.F.R. § 1026.20(c) requires that a creditor, assignee, or servicer of an adjustable-rate mortgage shall provide consumers with disclosures, as described in this paragraph

(c), in connection with the adjustment of interest rates pursuant to the loan contract that results in a corresponding adjustment to the payment.

261.    Section 1026.20(c)(1)(i) defines an adjustable rate mortgage as, "a closed-end consumer credit transaction secured by the consumer's principal dwelling in which the annual percentage rate may increase after consummation."

262.    The Home is Freeman's principal dwelling.

263.    The Loan is an adjustable rate mortgage.

264.    New York Mellon, by and through its agent Ocwen, failed to provide Freeman with notice before making changes to the principal and interest portions of his monthly payment obligations as further described herein.

265.    New York Mellon's actions are a pattern and practice in conscious disregard of the rule of law and Freeman's rights as a borrower.

266.    New York Mellon's failure to provide notice caused Freeman emotional distress, including but not limited to confusion, an informational injury, and deprived him of the benefit of portions of his monthly payments made in excess of what was owed to pay down his principal balance.

### COUNT V:    Violation of the Fair Credit Report Act [15 U.S.C.A. § 1681c-1)]
### (Against Ocwen)

267.    Freeman incorporates by reference and restates as though fully set forth herein all previous allegations of the First Amended Complaint.

268.    Ocwen willfully and/or negligently violated 15 U.S.C.A. § 1681s-2(b) by failing to conduct a reasonable investigation upon receiving notice of Freeman's dispute from one or more consumer reporting agencies, and/or by failing to review all relevant information provided by the

consumer reporting agencies, and/or by failing to appropriately report the results of its investigations, and/or by failing to appropriately modify, and/or delete the inaccurate information.

269.     As a result of Ocwen's violations of 15 U.S.C.A. § 1681s-2(b), Freeman has suffered actual damage including but not limited to emotional distress (including aggravation, anxiety, and loss of rest), the unjust suppression of her FICO credit score, the payment of increased costs of credit and insurance, loss of time, loss of credit opportunity, informational injury, certain out of pocket expenses, and a guaranteed of further future financial harm if the information is not corrected.  Therefore, Freeman is entitled to recover actual damages under 15 U.S.C.A. § 1681n and 1681o.

270.     Ocwen's actions and omissions were willful, and caused Freeman concrete injury as set forth above, rendering it liable for punitive damages and statutory damages pursuant to 15 U.S.C.A. § 1681n.

### COUNT VI: Violation of the Discharge Injunction (11 U.S.C. § 524) and FRBP § 3002.1 (Against Ocwen)

271.     Freeman incorporates by reference and restates as though fully set forth herein all previous allegations of the First Amended Complaint.

272.     On April 24, 2017, Ocwen filed a *Response to the Notice of Final Cure Payment*.

273.     The contents of Ocwen's *Response to the Notice of Final Cure Payment* and entry of the *Order of Discharge* on November 21, 2017, caused Freeman to be contractually current pursuant to 11 U.S.C. § 524, Federal Rule of Bankruptcy Procedure 3002.1 and the language of her *Chapter 13 Plan*.

274.     Ocwen is now seeking to collect pre-petition debts from Freeman, which pre-petition debts were paid through her Chapter 13 bankruptcy proceedings in violation of the discharge injunction.

275.     Ocwen is now seeking to collect amounts for which requisite notice was not provided to the Bankruptcy Court in violation of FRBP § 3002.1.

276.     Ocwen's actions are a willful and ongoing attempt to collect a discharged debt and otherwise frustrate the purpose of the Order of Discharge.

277.     Ocwen's conduct constitutes a gross violation of the discharge injunction as it had actual knowledge that Freeman was previously involved in bankruptcy, was to be deemed contractually current, that certain fees were disallowed, and thereafter protected from any direct or indirect collection actions for discharged debts.

278.      Ocwen's actions were willful, and caused Freeman concrete injury as set forth above, rendering it liable for punitive damages. *See, e.g.*, *Romanucci & Blandin, LLC. v. Lempesis*, 2017 WL 4402643, at 6-7 (N.D. Ill. May 4, 2017); *see, also,* 3 William L. Norton Jr. & William L. Norton III, Norton Bankruptcy Law and Practice § 58:2 (3d ed. 2017) ("A majority of courts also allow punitive damages in appropriate cases for a violation of the discharge injunction although, unlike the statue governing violations of the automatic stay, punitive damages are not specifically mentioned in Code § 524.6").

279.     Freeman alleges that in order to carry out this provision of the Bankruptcy Code and maintain its integrity, vital to the protection of Chapter 13 debtors who have paid as required, this Court must permit a punitive damage instruction and impose other sanctions against Ocwen for its willful, blatant, and continued disregard for the rule of law and the authority of the United States Bankruptcy Court.

### COUNT VII: Violation of Orders dated October 26, 2012 and April 8, 2013

280.     Freeman incorporates by reference and restates as though fully set forth herein all previous allegations of the First Amended Complaint.

281.     Ocwen has applied costs to Freeman's mortgage account that were specifically disallowed by the Bankruptcy Court in the Bankruptcy Case on October 26, 2012, and April 8, 2013.

282.     These Orders were entered following Ocwen's: (i) attempt to assess unsubstantiated fees, *etc*. to Freeman's mortgage by their *Proof of Claim*; (ii) failure to respond to the United States Trustee's objection to said unsubstantiated fees, *etc.*; (iii) renewed attempt to collect said unsubstantiated fees, *etc*. by a *Motion to Reconsider* after they were specifically disallowed; (iv) attempt to assess additional unsubstantiated fees (for services never rendered) by its *Notice of Postpetition Fees*; and (v) failure to respond to, and failure to appear at, oral argument on the Trustee's *Motion for Determination*, objecting to said additional, unsubstantiated fees.

283.     Ocwen's actions represent a pattern of wanton disregard for the rule of law sufficient for a finding of contempt and an application of sanctions.

284.     Freeman alleges that in order to maintain its integrity, vital to the protection of debtors who have received a discharge, the foregoing is further evidence of why the Court must permit a punitive damage instruction and impose other sanctions as it deems just and proper.

### COUNT VIII: Violation of Indiana's Crime Victim's Relief Act § 34-24-3-1.
### (Against Ocwen)

285.     Freeman incorporates by reference and restates as though fully set forth herein all previous allegations of the First Amended Complaint.

286.     The Indiana Crime Victim's Relief Act ("ICVRA") provides relief to persons who suffer a pecuniary loss based on violations of the provisions of Article 43 of Indiana's Criminal Code.  A criminal conviction is not necessary to maintain an action under the ICVRA; rather, the plaintiff need only prove a violation of the relevant criminal prohibition by a preponderance of

evidence in order to pursue civil penalties against the defendant under the act. *See Meridian Financial Advisors, Ltd. v. Pence*, 763 F. Supp. 2d 1046, 1060 (S.D. Ind. 2011).

287. "A person who knowingly or intentionally exerts unauthorized control over property of another person" commits Conversion under Indiana Code § 35-43-4-2(b).

288. Ocwen has knowingly or intentionally exerted unauthorized control over funds rightfully belonging to Freeman when it paid itself $6,649.23 in escrow charges (from funds to be held in trust on behalf of Freeman) and $300.00 for legal fees that were both specifically disallowed by the Bankruptcy Court on October 26, 2012.

289. Ocwen had no legal right or claim to the $6,649.23 or $300.00 as described above.

290. As a result of Ocwen's conversion, Freeman was damaged and seeks an award of actual damages, treble damages, costs and attorney's fees as set forth by the Indiana Crime Victim's Act, Indiana Code § 34-24-3-1.

## COUNT IX: Violation of the FDCPA, 15 U.S.C. §1692k
### (Against MDK)

291. Freeman incorporates by reference and restates as though fully set forth herein all previous allegations of the First Amended Complaint.

292. MDK is a debt collect.

293. Freeman is a consumer as define above.

294. The Loan is a consumer debt within the meaning of the FDCPA because it was incurred for household purposes – the purchase of the Home.

295. The Loan was in "default" at the time MDK attempted to collect the debt by means of the Second Foreclosure Case and its various foreclosure related correspondence.

296. MDK violated 15 U.S.C. § 1692(e)(2) when it misrepresented the character,

amount, or legal status of the Loan. MDK represented to Freeman that she was in default, that she owed sums which were not in fact due, and that the Home would be foreclosed upon when foreclosure proceedings should not have even been initiated.

297. The correspondence sent to Freeman from MDK was false and deceptive.

298. MDK knew or had reason to know that the sums claimed by Ocwen and New York Mellon were not in fact due, that the Loan was not in default, that payments had been properly and timely made, that Ocwen had repeatedly misapplied payments, and that the Second Foreclosure Case had been improperly filed and maintained for over six months.

299. MDK violated 15 U.S.C. § 1692(e)(5) when it threatened to take an action – the collection of amounts not due and the foreclosure of the home – it legally could not take.

300. MDK violated 15 U.S.C. § 1692(f) as its conduct as outline herein constitutes an unconscionable means to collect or to attempt to collect a debt.

## PRAYER FOR RELIEF

WHEREFORE, Freeman prays for the entry of judgment in her favor and against Ocwen and New York Mellon for the following:

a. For actual damages, including emotional distress, interest, costs and reasonable attorney fees against Ocwen for the claims made in Counts II, III, V, VI, and VII;

b. For actual damages, including emotional distress, interest, costs and reasonable attorney fees against New York Mellon for the claims made in Counts I and IV;

c. For actual damages, including emotional distress, interest, costs and reasonable attorney fees against MDK for the claims made in Count IX;

d. For treble damages and attorney fees against Ocwen for the claims made in Count VIII.

e.  For statutory damages of $2,000.00 against Ocwen for each and every violation contained in Count II;

f.  For statutory damages of $1,000.00 against Ocwen for the violations contained in Count III;

g.  For statutory damages of $4,000.00 against New York Mellon for each and every violation contained in Count IV;

h.  For statutory damages of $1,000.00 against Ocwen for each and every violation contained in Count V;

i.  For statutory damages of $1,000.00 against MDK for the violations contained in Count IX;

j.  For punitive damages against Ocwen for the violations set forth in Counts V, VI, and VII.

A.  For an Order of Contempt against Ocwen;

B.  For all other relief deemed just and proper.

## JURY DEMAND

Plaintiff, Demona Freeman, by counsel, hereby respectfully demands a trial by jury on all such claims that may be so tried.

Respectfully submitted,

/s/ *Travis W. Cohron*
Mike P. Maxwell, Jr. No. 10875-49
Travis W. Cohron, No. 29562-30
**CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP**
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204
Telephone: (317) 637-1321
Fax: (317) 687-2344
mmaxwell@clarkquinnlaw.com
tcohron@clarkquinnlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2019, a copy of the foregoing was filed electronically. Notice of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

**Ethan G. Ostroff**
**TROUTMAN SANDERS, LLP**
ethan.ostroff@troutman.com
*Attorneys for Ocwen Loan Servicing, Inc.*

*/s/ Travis W. Cohron*
Travis W. Cohron, No. 29562-30
Michael P. Maxwell, Jr., No. 10875-49

**CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP**
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204
Telephone: (317) 637-1321
tcohron@clarkquinnlaw.com
mmaxwell@clarkquinnlaw.com