**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**Indianapolis Division**

| | |
|---|---|
| DEMONA FREEMAN, | |
| Plaintiffs, | |
| v. | Case No. 1:18-CV-3844-TWP-DLP |
| OCWEN LOAN SERVICING, LLC, *et al.*, | |
| Defendants. | |

**DEFENDANT OCWEN LOAN SERVICING, LLC'S**
**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant Ocwen Loan Servicing, LLC ("Ocwen"), by counsel, respectfully submits this Memorandum in Support of its Motion for Summary Judgment. For the reasons explained below, the undisputed record demonstrates that there is no genuine dispute of material fact, and that Ocwen is entitled to summary judgment on Plaintiff's remaining claims under the Real Estate Settlement Procedures Act ("RESPA") and the Fair Debt Collection Practices Act ("FDCPA").

## I.    INTRODUCTION

According to Plaintiff, what she wants from this lawsuit is "for the foreclosure to be stopped . . . to stay in [her] home, live a satisfied, unstressful life so that [she] can just continue to live and enjoy [her] home." Statement of Undisputed Material Facts ("SUMF") ¶ 22. Tragically, Plaintiff is clearly unaware that her home has <u>not</u> been in a foreclosure action since January 2019. *Id*. at ¶ 27. Plaintiff testified under oath that all of the emotional distress, anxiety, and worry that she alleges is caused by the existence of a pending foreclosure action. *Id*. at ¶ 38-40, 42-44. But no such foreclosure action exists. It hasn't existed for over three years. So why is Plaintiff living in this state of mistaken fear? The undisputed record demonstrates that it is a combination of

1

willful ignorance and an effort by some to use long-resolved issues with her mortgage loan to obtain unwarranted and undeserved attorneys' fees.

Ocwen is not, and has never claimed to be, blameless in this story. In fact, Ocwen admitted to Plaintiff that it had made mistakes in its accounting following the close of her Chapter 13 Bankruptcy. *Id*. at ¶ 10. Ocwen corrected those mistakes as it was required to do under the law. Yet, Plaintiff is seemingly unaware of those corrections, or at least refuses to believe them for inexplicable and unjustifiable reasons. Unfortunately, Plaintiff's lack of knowledge where it matters most is a recurring theme in this litigation – from dismissal of most of her claims to an offer of settlement made by Defendants, she is apparently in the dark. *Id*. at ¶ 49-50. To be clear, however, Plaintiff is not blameless in this story. While she claims that fear of losing her home is her primary – if not only – concern, she has chosen to forego making mortgage payments for nearly three and a half years since the start of this litigation. *Id*. at ¶ 47. But regardless of who is responsible for Plaintiff's mistaken beliefs and the unnecessary prolonging of this lawsuit that has resulted, the undisputed record demonstrates that Defendants are entitled to summary judgment on all of her remaining claims.

Plaintiff's two remaining claims against Ocwen are for alleged violations of the Real Estate Settlement Procedures Act ("RESPA") and Fair Debt Collection Practices Act ("FDCPA"), which the Court has previously narrowed. Specifically, only Plaintiff's claims arising under 12 U.S.C. § 2605 of RESPA and those claims under the FDCPA where the conduct alleged occurred on or after December 6, 2017 and the "allegations [are] not directly tied to the Bankruptcy Case and Discharge." *See* Order on Defs.' Motions to Dismiss, at 27, 29 (ECF No. 133). The undisputed record demonstrates that Ocwen is now entitled to summary judgment on all of the remaining

theories of liability and/or certain claims for relief under RESPA and the FDCPA for the following reasons:

- Plaintiff's RESPA claim fails because the undisputed record demonstrates: (1) Plaintiff could not and did not suffer any actual damages; (2) the responses to the purported Qualified Written Requests ("QWRs") complied with RESPA; (3) Plaintiff cannot recover for the underlying errors alleged in her purported Notices of Error; (4) all but one of the correspondence sent were repetitive, discovery-style documents that do not constitute QWRs; (5) there is no evidence to support a pattern or practice violation; and (6) even if there were a pattern or practice violation, Plaintiff can only recover $2,000.

- Plaintiff's FDCPA claim fails because the undisputed record demonstrates: (1) Plaintiff lacks Article III standing because she cannot demonstrate actual damages cognizable under the FDCPA; (2) the remaining theories of liability are preempted by the Bankruptcy Code; and (3) any violation was the result of a *bona fide* error.

Accordingly, for the reasons explained below, Ocwen respectfully requests the Court grant its Motion for Summary Judgment and enter judgment against Plaintiff and in favor of Ocwen.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    Origination and Ownership of the Loan.

1.    On December 2, 2003, Plaintiff purchased a house located at 17373 Pine Wood Lane, Westfield, Indiana 46240 (the "Property").  In order to finance the purchase of the home, Plaintiff executed an Adjustable Rate Note (the "Note") and Mortgage (the "Mortgage") (collectively the "Loan").  *See* Declaration of Benjamin Verdooren [hereinafter "Verdooren Decl."] ¶ 14, attached to Appendix of Evidence as **Exhibit 1**.

2.    The Loan was subsequently assigned to the Bank of New York Mellon f/k/a the Bank of New York as successor in interest to JPMorgan Chase Bank, N.A., as Trustee for C-BASS Mortgage Loan Asset-Backed Certificates, Series 2005-RP1 ("BONY").  *See* Verdooren Decl. ¶ 15.

### B.    Plaintiff's Chapter 13 Bankruptcy.

3.      In 2008, Plaintiff began experiencing financial difficulties that led to her falling behind on her mortgage payments under the Loan.  *See* Pl.'s Second Amend. Compl. [hereinafter "SAC"] ¶ 56.  As a result, on April 13, 2009, BONY filed a foreclosure action against Plaintiff in the Hamilton County Superior Court, Case No. 29D01-0904-MF-000484 (the "First Foreclosure Case").[1]

4.      Ocwen began servicing the Loan on September 1, 2011.  *See* Verdooren Decl. ¶ 16.

5.      Plaintiff (along with her husband) then filed for Chapter 13 Bankruptcy on April 23, 2012, in the United States Bankruptcy Court for the Southern District of Indiana, Case No. 12-04713-JKC-13.  *See* SAC ¶ 59.

6.      A Proof of Claim was filed on BONY's behalf asserting a secured claim in the amount of $133,064.46 and pre-peititions arrearages of $22,668.03.  *See In re Freeman*, Case No. 12-04713-JKC, Claim No. 8-1 [hereinafter the "Proof of Claim"].  An objection to certain amounts in the Proof of Claim was filed by the Bankruptcy Trustee, which ultimately led to the Bankruptcy Court entering an order that disallowed $10,289.84 from the arrearage amount in BONY's Proof of Claim, leaving arrearages in the amount of $12,378.10.  *See* Order on Trustee's Objection to Claim Number 8, Case No. 12-04713-JKC-13 (ECF No. 53).  The Bankruptcy Court further disallowed a $300 fee claimed on BONY's behalf related to the litigation over the objection to the Proof of Claim.  *See* Order on Trustee's Motion for Determination, Case No. 12-04713-JKC-13 (ECF No. 85).

---

[1] A Final Judgment in favor of BONY was entered on February 8, 2010, but BONY moved to have that Judgment vacated and the First Foreclosure Case dismissed in May 2018 after Plaintiff's Chapter 13 Bankruptcy was completed and closed.  As a result, the Hamilton Superior Court granted the Order on May 2, 2018, vacating the foreclosure judgment and dismissing the First Foreclosure Case.  *See* Order to Vacate Judgment and to Dismiss Case without Prejudice, Case No. 29D01-0904-MF-000484.

7.      Plaintiff's Chapter 13 Bankruptcy proceeded, with the Trustee making payments to Ocwen for the pre-petition arrearages and post-petition mortgage payments.  On April 12, 2017, the Bankruptcy Trustee filed a Notice of Final Cure Payment informing the Court that all of the allowed pre-petition arrearages and fees had been paid, as well as post-petition payments up to that point.  *See* Case No. 12-04713-JKC-13 (ECF No. 109).  Ocwen filed a Response to Notice of Final Cure Payment on April 24, 2017 agreeing with the Trustee's filing and indicating the Loan would be due for its May 1, 2017 payment.  *See* Response to Notice of Final Cure Payment, Case No. 12-04713-JKC-13.

8.      An Order of Discharge was entered in the Chapter 13 Bankruptcy on November 21, 2017.  Case No. 12-04713-JKC-13 (ECF No. 132).  Plaintiff's Bankruptcy was then closed on November 28, 2017, but reopened three days late due to an issue concerning her husband.  A Final Decree was reentered on February 8, 2018, and the Bankruptcy was again closed.  (*See id.* ECF No. 153).

**C.      Ocwen's Servicing of the Loan Post-Bankruptcy.**

9.      Ocwen's initial review of the Bankruptcy records accurately determined that the Proof of Claim had been reduced as a result of the Bankruptcy Court's October 26, 2012 Order, and that those amounts should be removed.  *See* Verdooren Decl. ¶ 17. Ocwen's reconciliation process – the process by which all of the pre- and post-petition would be applied to the account – required the disallowed amounts to be manually removed in order to properly reconcile the account.  *See id.* at ¶ 18; *see also* Deposition of Thomas Muldoon [hereinafter "Muldoon Dep."], at 46:5-24; 49:8-20, attached to Appendix of Evidence as **Exhibit 2**.

10.      An error was made during the initial reconciliation after the close of the Bankruptcy in February 2018, and disallowed amounts were not removed from the Loan.  Verdooren Decl. ¶

20; *see* Muldoon Dep., at 53:11-54:20. This was a human error. *Id*. This error occurred despite Ocwen's implementation and maintenance of procedures designed to prevent such an error. Verdooren Decl. ¶ 20; Muldoon Dep. at 49:8-20.

11.     From May 2017 through May 2018, Ocwen accepted regular monthly payments from Plaintiff. Verdooren Decl. at ¶ 21. However, after the reconciliation was completed and because of the error that occurred, the due date on the Loan was incorrect in Ocwen's records. *Id*. This resulted in Plaintiff's Loan appearing to be delinquent when it was not. *Id*. The delinquency led to the Loan to being considered in default, which triggered property inspections and the beginning of the foreclosure process in May 2018. *Id*. Because of the default status on the Loan, Ocwen informed Plaintiff in a June 2018 phone call that it would only accept a full reinstatement payment as opposed to a regular monthly payment. *Id*. at ¶ 22. Plaintiff did not submit any payment to Ocwen in June 2018. *Id*. Ocwen also did not receive any payments from Plaintiff between July 2018 and December 2018. *Id*.

12.     On August 15, 2018, a Complaint on Promissory Note and to Foreclose Mortgage was filed on behalf of BONY in Hamilton Superior Court, Case No. 29D03-1808-MF-007526 (the "Second Foreclosure Case"). On October 31, 2018, Plaintiff filed an Answer and Counterclaim in the Second Foreclosure Case. *See* Ans. and Counter Claim, Case No. 29D03-1808-MF-007525. Plaintiff's counterclaim alleged a breach of contract. *Id*. As a result of subsequent investigations and corresponding corrections to the Loan – as described below – BONY agreed to voluntarily dismiss the Second Foreclosure Case, and the order dismissing BONY's claim and Plaintiff's counterclaim was entered on January 23, 2019. *See* Order Dismissing Second Foreclosure Case, Case No. 29D03-1808-MF, attached to Appendix of Evidence as **Exhibit 3**.

**D.     Plaintiff's Purported Qualified Written Requests, Investigations and Responses, and Corrections to the Loan.**

13.    On July 12, 2018, Plaintiff's counsel sent correspondence to Ocwen purporting to be a Request for Information under the Real Estate Settlement Procedures Act ("RESPA") [hereinafter "purported RFI No. 1"].  *See* Verdooren Decl. ¶ 9.  Ocwen received the purported RFI No. 1 on July 17, 2018.  *Id*.  The correspondence did not include any allegations of servicing errors or explain why the information was being sought.  *Id*.  On July 20, 2018, Ocwen sent correspondence to Plaintiff's counsel acknowledging receipt of the purported RFI No. 1.  *Id*.  It also sent separate correspondence identifying the owner of the Loan on the same day.  *Id*.  On July 23, 2018, Ocwen sent Plaintiff's counsel correspondence substantively responding to the purported RFI No. 1, explaining what documents were being sent and, if documents were not being sent, why.  *Id*.  As described in Ocwen's July 23 letter, the documents requested (to the extent they were available and/or properly subject to request) were sent to Plaintiff's counsel.  *Id*.

14.    On October 29, 2018, Plaintiff's counsel sent correspondence to Ocwen purporting to be a Notice of Error under RESPA [hereinafter "purported NOE No. 1"].  *Id*. at ¶ 10.  The purported NOE No. 1 was received by Ocwen on November 1, 2018.  *Id*.  The correspondence alleged two errors: (1) the Ocwen had failed to accept payments as contractually obligated, and (2) Ocwen failed to provide an accurate payoff statement.  *Id*.

15.    After receipt, Ocwen retained outside counsel to conduct the investigation and prepare the response to Purported NOE No. 1.  *Id*. at ¶ 10.  On November 6, 2018, the law firm retained by Ocwen, Bryan Cave Leighton Paisner LLP ("Bryan Cave"), sent correspondence to Plaintiff's counsel acknowledging receipt of the purported NOE No. 1.  *See* November 6, 2018 Acknowledgement Letter, attached to Appendix of Evidence as **Exhibit 4**.

16.    On November 13, 2018,  Plaintiff's counsel sent correspondence purporting to be a Second Notice of Error under RESPA [hereinafter "purported NOE No. 2"].  *See* Verdooren

7

Decl. ¶ 11. The purported NOE No. 2 was received by Ocwen on November 17, 2018. *Id*. The correspondence alleged seven errors: (1) that Ocwen failed to send monthly periodic billing statements for the previous six months; (2) that Ocwen failed to perform an accurate escrow analysis, calculate proper escrow payments, or "refund an escrow shortage"; (3) Ocwen failed to comply with the October 26, 2012 Order on the Trustee's Objection to Claim Number 8; (4) Ocwen failed to accept timely and adequate payments from Plaintiff between July and November 2018; (5) Ocwen improperly imposed fees or placed money into suspense; (6) Ocwen failed to provide a payoff statement within seven days of Plaintiff's purported RFI No. 1; and (7) Ocwen failed to adequately respond to Plaintiff's purported RFI No. 1 by not sending copies of credit reporting documents or the previous two escrow analyses. *Id*. On November 20, 2018, Ocwen's outside counsel, Maria Vathis of Bryan Cave, sent a letter to Plaintiff's counsel acknowledging receipt of the purported NOE No. 2. *See* November 20, 2018 Acknowledgement Letter, attached to Appendix of Evidence as **Exhibit 5**.

17.     Plaintiff's counsel also sent a purported Request for Information under RESPA on November 13, 2018 [hereinafter "purported RFI No. 2"]. *See* Purported RFI No. 2, attached to Appendix of Evidence as **Exhibit 6**. Ocwen received the purported RFI No. 2 on November 17, 2018. *See* Verdooren Decl. ¶ 12.

18.     On December 4, 2018, Plaintiff's counsel sent correspondence purporting to be a Third Notice of Error under RESPA [hereinafter "purported NOE No. 3"]. *Id*. at ¶ 13. Ocwen received the purported NOE No. 3 on December 7, 2018. *Id*. The correspondence alleged that Ocwen had committed two errors: (1) that Ocwen had failed to accept payment tendered for Plaintiff's December installment, and (2) that Ocwen failed to provide an accurate payoff statement within seven days of the request in the purported NOE No. 2. *Id*. On December 10,

2018, Ocwen's outside counsel sent correspondence to Plaintiff's counsel acknowledging receipt of the purported NOE No. 3.  *See* December 10, 2018 Acknowledgement Letter, attached to Appendix of Evidence as **Exhibit 7**.

19.     On December 10, 2018, Ocwen's counsel sent correspondence to Plaintiff's counsel notifying him that Ocwen would be utilizing the statutory extension for time to respond to a Notice of Error under RESPA with respect to the purported NOE No. 1.  *See* December 10, 2018 Extension Letter, attached to Appendix of Evidence as **Exhibit 8**.  On December 20, 2018, Ocwen's counsel sent correspondence to Plaintiff's counsel notifying him that Ocwen would utilize the statutory extension period under RESPA with respect to the purported NOE No. 2.  *See* December 20, 2018 Extension Letter, attached to Appendix of Evidence as **Exhibit 9**.  On January 7, 2019, Ocwen counsel sent correspondence to Plaintiff's counsel notifying him Ocwen would utilize the statutory extension period under RESPA with respect to the purported NOE No. 3.  *See* January 7, 2019 Extension Letter, attached to Appendix of Evidence as **Exhibit 10**.

20.     Ocwen's counsel Maria Vathis was tasked with investigating and responding to Plaintiff's purported Notices of Error.  *See* Verdooren Decl. ¶ 23; *see also* Deposition of Maria Vathis [hereinafter "Vathis Dep."], at 46:10-48:18; 60:20-61:5, attached to Appendix of Evidence as **Exhibit 11**.  Ms. Vathis worked with Ocwen to gather information in order to prepare responses to each purported Notice of Error.  Verdooren Decl. ¶ 23; Vathis Dep., at 46:10-48:18; 60:20-61:5. Because of the rapid succession in which the purported Notices of Error were sent, the investigation, research, and efforts to address the allegations made by Plaintiff overlapped. Verdooren Decl. ¶ 23.

21.     As a result of the investigations into Plaintiff's purported Notices of Error, between November 23, 2018 and January 3, 2019, several changes were made to the Loan in order to correct

the previous failure to remove disallowed amounts from the Loan.  *Id*. at ¶ 24; Muldoon Dep. 53:11-54:20.  Specifically, Ocwen removed disallowed fees and escrow amounts, and made retroactive adjustments to the escrow charge on the Loan.  *Id*.  After the changes were made, another reconciliation was performed that caused the Loan to be paid through July 1, 2018, with an escrow surplus of $2,491.29.  Verdooren Decl. at ¶ 24.  With the escrow surplus applied to outstanding payments, the Loan would be current through October 1, 2018, and due for its November 1, 2018 payment.  *Id*.  Following these changes, the only reason why the Loan was not current was because Plaintiff had not made any payments since May 2018.  *Id*.

22.     During the process of the investigation and while changes were being made to the Loan, Ocwen also began taking steps to decelerate the Loan so that the Second Foreclosure Case could be stopped.  *Id*. at ¶ 25.

23.     On January 7, 2019, Ocwen's counsel sent a response on Ocwen's behalf to Plaintiff's purported NOE 1.  *See* January 7, 2019 Correspondence Responding to Purported NOE No. 1 [hereinafter "Response to Purported NOE No. 1"], attached to Appendix of Evidence as **Exhibit 12**.  In the response, Ocwen's counsel explained that the lack of detail in the purported NOE No. 1 made a response difficult.  *Id*. at 1.  However, in regard to the alleged failure to provide an accurate payoff quote, the response explained the changes that had been made to the Loan.  *Id*. at 2.  The response also enclosed a payment history showing the reconciliation of Plaintiff's payments and an updated payoff quote.  *Id*. at 3-9 (Bates Nos. Ocwen_Freeman000103-000109). The payoff quote showed that there were no longer any fees sought by Ocwen.  *Id*. at 5 (Bates No. Ocwen_Freeman000105).

24.     The response to the purported NOE No. 1 also explained that after conducting an investigation, Ocwen determined there was no error with respect to the allegation that it had failed

to accept payments. *Id.* at 2. Specifically, Ocwen's records did not reflect that any payments submitted had not been applied to the Loan. *Id.* And indeed, Plaintiff had not submitted any payment that was rejected, returned, or otherwise held without application after the close of her Chapter 13 Bankruptcy. Verdooren Decl. ¶ 26.

25.    On January 22, 2019, Ocwen's counsel sent correspondence to Plaintiff's counsel responding to the purported NOE No. 2. *See* January 22, 2019 Correspondence Responding to Purported NOE No. 2 [hereinafter "Response to Purported NOE No. 2"], attached to Appendix of Evidence as **Exhibit 13**. The response addressed the errors alleged in the purported NOE No. 2 and provided dozens of documents regarding those alleged errors. *Id.* As part of the overarching investigation into the purported Notices of Error, as detailed in the response, there were fees removed from the Loan, including a late fee and two property inspection fees. *See id.* at 3.

26.    Ocwen's counsel also provided a response to Plaintiff's purported NOE No. 3 on January 22, 2019. *See* January 22, 2019 Correspondence Responding to Purported NOE No. 3 [hereinafter "Response to Purported NOE No. 3"], attached to Appendix of Evidence as **Exhibit 14**. The response explains that there was no record of refusing a payment from Plaintiff in December 2018 – assuming that was the year counsel was referring to. *Id.* at 2. And indeed, Ocwen did not receive any payment from Plaintiff in December 2018, so there was no refusal to accept it. Verdooren Decl. ¶ 27. The response also pointed Plaintiff's counsel to the payoff quote previously provided on January 7, 2019. *See* Response to Purported NOE No. 3, at 2.

27.    Despite the information provided in response to the purported Notices of Error and the fact that the Second Foreclosure Case was dismissed, Plaintiff had not reviewed the documents showing the changes to her Loan. *See* Deposition of Demona Freeman [hereinafter "D. Freeman Dep."], at 87:1-88:3 (admitting she never looked at the updated payment history sent with the

Response to Purported NOE No. 1); 97:4-21 (unaware of changes made in response to the purported Notices of Error); 112:11-21 (admitting she did not look at the updated payment history); 115:17-116:13 (admitting to receiving the updated payment history but that she "didn't review it because I didn't understand it."); 117:7-20 (admitting that she did not review the information about fees being removed as described in the Response to Purported NOE No. 2), attached to Appendix of Evidence as **Exhibit 15**.  In fact, as of the date of her deposition on March 11, 2022, Plaintiff was still under the impression that there is an active foreclosure action pending against her.  *See id.* at 21:1-5 (expressing a belief there is still an active foreclosure case); 21:13-22 (expressing the her goal in this lawsuit is to stop the foreclosure); 24:4-10 (explaining she believes there is an ongoing foreclosure that was started after the dismissal of the Second Foreclosure Case); 25:8-10 (stating she believes there was another foreclosure action filed after the initiation of this lawsuit); 52:20-25 (stating she believes there were three separate foreclosures filed after she completed her Chapter 13 Bankruptcy); 90:1-25 (stating that although the January 23, 2019 Order dismissing the Second Foreclosure Case would take the Loan out of foreclosure, Ocwen never took the Loan out of foreclosure); 91:1-22 (stating that a foreclosure action was immediately refiled after the dismissal of the Second Foreclosure Case).  In reality, there is no pending foreclosure action against Plaintiff or the Property, and no foreclosure action was filed against her after the January 23, 2019 dismissal of the Second Foreclosure Case.  *See* Verdooren Decl. ¶ 28.

**E.    Plaintiff's Medical Treatment**

28.    Plaintiff was diagnosed with high blood pressure by Dr. Valerie Beard in May 2019. *See* Deposition Testimony of Valerie Beard [hereinafter "Dr. Beard Dep."], at 18:2-13, attached to Appendix of Evidence as **Exhibit 16**.  There is no evidence in the record that any potential

causes of the high blood pressure were discussed by Plaintiff with Dr. Beard at the time of this diagnosis. *Id.* Plaintiff had first sought treatment from Dr. Beard in April 2018 for a respiratory issue, and was treated by Dr. Beard a total of five times between April 2018 and December 2020 for various issues. *Id.* at 17:21-18:1; 14:13-18. Plaintiff was prescribed medication for her blood pressure by Dr. Beard, and it was under control as of December 2020. *See* Dr. Beard Dep., at 23:18-21. Over the course of her treatment, Plaintiff never discussed Ocwen, BONY, or her Loan with Dr. Beard. *Id.* at 9:22-10:6. Plaintiff also never discussed foreclosure with Dr. Beard. *Id.* at 11:23-25. Dr. Beard did not recall ever evaluating Plaintiff for depression, anxiety, or any mental condition. *Id.* at 20:4-7. Plaintiff last saw Dr. Beard on December 23, 2020, with a complaint of back pain. *Id.* at 16:15-22. An MRI was ordered which revealed Plaintiff had severe disc disease. *Id.* at 24:3-16.

29.     Plaintiff has also been treated by Alta Skelton, N.P. for various issues. Plaintiff first sought treatment from Ms. Skelton in February 2020 and has been seen a total of four times. *See* Deposition of Alta Skelton [hereinafter "Skelton Dep."], at 11:17-23; 11:24-12:3, attached to Appendix of Evidence as **<u>Exhibit 17</u>**. Plaintiff's first appointment with Ms. Skelton was regarding weight loss, high blood pressure, and sciatica. *Id.* at 12:7-21. Specifically, Plaintiff reported to Ms. Skelton that she had been trying to lose weight for years, that her blood pressure had gotten worse with stress in the past year because her daughter had cancer and issues with her son, and that her sit-down job had caused sciatica on her left side. *Id.* at 12:9-21. Ms. Skelton had no record or recollection of ever discussing Plaintiff's Loan, any lawsuit, or foreclosure during that visit. *Id.* at 12:22-13:3. A series of blood tests were run to investigate Plaintiff's complaints, and as a result of those tests, Ms. Skelton diagnosed Plaintiff with pre-diabetes. *See id.* at 13:15-14:2; 19:5-11. Ms. Skelton next saw Plaintiff in person on July 20, 2021, at which time Plaintiff's blood pressure

was under control. *Id*. at 18:8-10; 21:20-25.  During the July 2021 visit Plaintiff also complained of lower back pain and lumbar radiculopathy, which is a pinched nerve in the lumbar spine causing radiating pain into the lower extremity. *Id*. at 20:6-18.  Ms. Newton did not discuss any stress factors, Plaintiff's Loan, foreclosure, or lawsuit during the July 2021 visit. *Id*. at 21:1-10.  Ms. Skelton opined that Plaintiff's sciatica was related to the pinched nerve in her lumbar spine, and that it is a physical ailment that is not caused by any mental condition. *Id*. at 23:15-22.  Plaintiff's most recent appointment with Ms. Skelton was in January 2022 regarding Plaintiff's sciatica. *Id*. at 23:3-11.  There was no discussion of Plaintiff's stress factors, her Loan, foreclosure, or the lawsuit. *Id*. at 24:6-15.  Ms. Skelton described Ms. Freeman as always being pleasant, did not consider her anxious, and had not noticed any change in her personality over the course of her treatment. *Id*. at 25:1-8, 11-4.

30.    There is no evidence in the record that any medical professional or treatment provider has diagnosed or concluded that Plaintiff's high blood pressure is a result of or exacerbated by the acts and/or omissions of Ocwen or BONY despite what she alleges in this lawsuit.

31.    There is no evidence in the record that any medical professional or treatment provider has ever diagnosed or concluded that any physical or mental condition, ailment, and/or symptom purportedly experienced by Plaintiff is a result of the acts and/or omissions of Ocwen or BONY despite what she alleges in this lawsuit.

32.    At no point prior to this lawsuit has Plaintiff sought medical or psychological treatment for anxiety, depression, emotional distress, or any other similar mental condition.  She testified that she has not seen a therapist. D. Freeman Dep., at 50:19-20.

**F.    Damages Sought by Plaintiff**

14

33.     Plaintiff testified that she applied for credit with two roofing companies, but was not given any documents showing a credit denial.  *See id*. at 167:24-168:4; 170:17-20.  Instead, she said she spoke with them and they said they were not able to lend to her.  *Id*. at 168:3-4. Plaintiff does not have documents showing that the companies ever sought to or did obtain her credit report.

34.     Plaintiff claims that she cannot repair her roof due to ongoing litigation, but acknowledges she commenced this litigation.  *Id*. at 138:15-17, 22-25; 139:8-22.

35.     Plaintiff testified that she has interviewed for multiple jobs, and has been offered at least one job, but that she chose not to take it.  *Id*. at 139:23-141:9.

36.     Plaintiff does not know when her alleged sleep troubles began.  *Id.* at 145:16-22.

37.     Plaintiff testified that she wakes up every day frustrated because this litigation has not ended, but she also acknowledged she caused the litigation.  *Id.* at 146:17-147:3.

38.     Plaintiff testified that if there was no pending foreclosure action, she would not be frustrated.  *Id*. at 151:24-152:4.

39.     Plaintiff testified that if there was no pending foreclosure action, she would not be nervous or anxious with respect this matter.  *See id*. at 153:21-25.

40.     Plaintiff testified that if there was no pending foreclosure action, she would not be mentally distressed.  *Id.* at 154:1-21.

41.     No one has ever expressed to Plaintiff that they think she cannot manage her finances.  *Id*. at 156:7-15.

42.     Plaintiff testified that if there was no pending foreclosure action, her quality of life would improve.  *Id*. at 159:20-23.

15

43.     Plaintiff testified that if there was no pending foreclosure action, she should not feel embarrassed.  *Id*. at 159:24-160:10.

44.     Plaintiff testified that if there was no pending foreclosure action, there would be no tension in her relationship with her husband.  *Id*. at 161:21-162:3.

**F.     Current Status of the Loan and Plaintiff's Lawsuit**

45.     Servicing transferred from Ocwen to PHH Mortgage Services ("PHH")[2] effective June 1, 2019.  Verdooren Decl. ¶ 29.

46.     PHH sent Plaintiff, through her counsel, correspondence on June 7, 2019, notifying Plaintiff of the service transfer, informing her where her monthly payments should be made, and providing a Mortgage Account Record – FDCPA Validation of Debt.  *See* June 7, 2019 Correspondence to Travis Cohron, attached to Appendix of Evidence as **Exhibit 18**.  This correspondence informed Plaintiff there were no late charges, collection costs, escrow advances, or non-sufficient funds fees on the account.  *Id*. at 8.  There was an escrow surplus in the amount of $1,839.46.  *Id*.  The total unpaid debt amount of $7,177.33 represents the principal and interest amounts from the eleven monthly payments (August 2018 through June 2019) that had not been paid.  *Id*. at 5; Verdooren Decl. ¶ 30.

47.     With the exception of one payment made in August 2019, Plaintiff has not made a mortgage payment on the Loan since May 2018 – a total of forty-five (45) months without a payment.  Verdooren Decl. ¶ 22.

48.     A payoff quote provided to Plaintiff on August 7, 2019 shows that none of the disallowed fees, fees associated with the Second Foreclosure Case, or late charges were being

---

[2] PHH is the successor by merger to Ocwen Loan Servicing, LLC.

sought from Plaintiff several months after servicing transferred to PHH.  *See* August 7, 2019 Payoff Quote, attached to Appendix of Evidence as **Exhibit 19**.

49.    As of March 11, 2022, Plaintiff was unaware that her attorneys had made a settlement demand to Defendants on her behalf in this case. *Id*. at 163:6-9.  Plaintiff also was unaware that Defendants had made a settlement offer to her in this case. *See* D. Freeman Dep., at 25:11-18.

50.    Plaintiff was unaware that certain claims in her Second Amended Complaint had been dismissed.  *Id.* at 21:6-12.

### III.    LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate when there are no genuine issues of material fact, leaving the moving party entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  The moving party must show there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A factual issue is material only if resolving the factual issue might change the suit's outcome under the governing law.  *Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992).  A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### IV.    ARGUMENT

**A.    Ocwen is Entitled to Summary Judgment on Plaintiff's Entire RESPA Claim and/or Certain Relief Sought.**

1.    Plaintiff's RESPA claims fail as to her three purported Notices of Error and purported RFI No. 2 because she lacked standing at the filing of the original Complaint.

Plaintiff must be able to show she had standing at the time the original Complaint was filed. *Pennell v. Glob. Tr. Mgmt. LLC*, 990 F.3d 1041, 1044 (7th Cir. 2021) ("The plaintiff must establish standing at the time suit is filed and cannot manufacture standing afterwards. The Article III standing inquiry remains open to review at all stages of the litigation.").  "Article III standing asks whether the complaint clearly allege[s] facts demonstrating that [the plaintiff] has (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Nettles v. Midland Funding LLC*, 983 F.3d 896, 899 (7th Cir. 2020) (internal quotations omitted).  In so far as her RESPA claim concerns the three purported Notices of Error and purported RFI No. 2, Plaintiff did not have standing.

The undisputed record shows that on December 6, 2018, Plaintiff filed her original Complaint alleging violations of RESPA with respect to the three purported Notices of Error and purported RFI No. 2 *before* the statutory deadline to respond.  *See* Compl. ¶¶ 141, 201 (ECF No. 1).  In other words, Plaintiff could not – as a simple matter of timing – have suffered any injury *as a result of* the purported Notices of Error or purported RFI No. 2 because the 30-day (excluding weekends and legal holidays)[3] had not expired.  *See Perron v. J.P. Morgan Chase Bank, N.A.*, 845 F.3d 852, 857 (7th Cir. 2017) (observing that injury under RESPA must be *as a result of* a violation of 12 U.S.C. 2605).

Plaintiff sent purported NOE No. 1 on October 29, 2018, and it was received on November 1, 2018.  *See* SUMF ¶ 14.  Under § 2605(e)(2), Ocwen's response to purported NOE No. 1 was due on December 14, 2018 (i.e., thirty days after November 1, 2018 excluding weekends and legal holidays), which was *after* the filing of the original Complaint on December 6, 2018.  Thus,

---

[3] *See* 12 U.S.C. § 2605(e)(2).

Plaintiff could not have been damaged by a failure to investigate and respond to purported NOE No. 1 when the time to do so had not expired.[4]  The same is true for purported NOE No. 2 (sent on November 13, 2018, SUMF ¶ 16), purported NOE No. 3 (sent on December 4, 2018, SUMF ¶ 18), and purported RFI No. 2 (sent on November 13, 2018), SUMF ¶ 17).  The substantive response to each of these correspondences was due thirty days (excluding weekends and legal holidays) after it was received, all dates which fall after the filing of Plaintiff's original Complaint.

Accordingly, because Plaintiff could not have suffered a concrete injury in fact given that her original Complaint alleged violations of 12 U.S.C. § 2605(e) for failure to investigate and respond to her correspondence before the time period under § 2605(e)(2) to do so had expired, she lacks Article III standing and her RESPA claim with respect to purported the three purported Notices of Error and purported RFI No. 2 must be dismissed.

2.    <u>Ocwen is entitled to summary judgment with respect to four of the five purported Qualified Written Requests because the undisputed record demonstrates that Ocwen complied with RESPA.</u>

The undisputed record demonstrates that Ocwen is entitled to summary judgment on Plaintiff's RESPA claim with respect to the three purported Notices of Error and purported RFI No. 1 because it fully complied with the statute's requirements.  "If a loan servicer receives a valid qualified written request, RESPA requires it to take the following actions, but only 'if applicable': (A) 'make appropriate corrections in the account of the borrower'; (B) after investigating the account, 'provide the borrower with a written explanation or clarification' explaining why the account is correct; or (C) 'provide the borrower with ... [the] information requested by the

---

[4] Ocwen's outside counsel also sent correspondence invoking the extension under 12 U.S.C. § 2605(e)(4), *see* SUMF ¶ 19, which provided an additional 15 business days to respond (*see* 12 C.F.R. § 1024.35(e)(3)(ii)), meaning Ocwen's response was not due until January 8, 2019.  The Response to purported NOE No. 1 was sent on January 7, 2019.  SUMF ¶ 23.

borrower' or explain why it is 'unavailable.'" *Perron*, 845 F.3d at 857.  With respect to purported RFI No. 1 and the three purported Notices of Error, Ocwen met its statutory obligations.

Specifically, the undisputed record shows that Ocwen fully responded to purported RFI No. 1 by providing the documents requested and related to the servicing of Plaintiff's Loan.  SUMF ¶ 13.  Ocwen also investigated and fully responded to each of the three purported Notices of Error. In each response, Ocwen either explained that an error had occurred and what changes had been made, or it explained that no error had occurred and how that conclusion was reached.  *See id.* at ¶¶ 23-26.  All of the technical requirements, such as acknowledgement letters and notices of extension, where applicable, were sent to Plaintiff's counsel.  *Id.* at ¶¶ 13-26.  More importantly, the investigations that resulted from Plaintiff's purported Notices of Error are precisely what led to the underlying error at issue in this case being fixed.  *Id.* at ¶¶ 22-25.  Had Plaintiff's counsel waited until at least the expiration of the statutory time to investigate and respond to the purported Notices of Error before filing this lawsuit all of Plaintiff's underlying grievances would have been resolved.

The undisputed record demonstrates that Ocwen's responses fully complied with RESPA requirements with respect to purported RFI No. 1 and the three purported Notices of Error.  As a result, Ocwen is entitled to summary judgment.

3.    <u>Plaintiff's claims fail as a matter of law to the extent she is seeking to impose liability via the underlying errors alleged in the purported Notices of Errors, and she can only obtain emotional damage after demonstrating financial loss *as a result of* a violation of § 2605(e).</u>

One of the most persistent and fundamental flaws in Plaintiff's RESPA claim – one undoubtedly cooked up in the same lab as the plan to send a purported Notice of Error two days before filing a lawsuit alleging RESPA had been violated with respect to that two-day old Notice of Error – is the idea that Plaintiff can recover either pecuniary or non-pecuniary damages for the

underlying errors alleged in her purported Notices of Error. That is incorrect. Plaintiff can only recover damages that *a result of* a violation of RESPA – in her case, a violation of 12 U.S.C. § 2605(e). *Perron*, 845 F.3d at 857. Not for damages related to the underlying servicing error she alleges. *See Burke v. Nationstar Mortg., LLC*, Case No. 21-cv-1549, 2022 U.S. Dist. LEXIS 54765, *27 (N.D. Ill. Mar. 25, 2022) ("the Burkes cannot recover the stolen $35,531.43 from Nationstar under RESPA, even if Nationstar failed to respond to the QWRs in a manner that complied with the Act. The reason is simple. The theft took place more than four months before the Burkes sent the letter. A failure to respond appropriately in *August* 2020 could not cause a loss in *April* 2020"). Thus, the allegations of hundreds of distinct errors in Plaintiff's purported Notices of Error entitling her to recovery for each error, or any claim of recovery predating Ocwen's responses to the purported Notices of Error cannot be recoverable under RESPA.

Moreover, Plaintiff must first suffer a financial loss from a RESPA violation before pursuing emotional distress damages. *See Golbeck v. Johnson Blumberg & Assocs., LLC*, 2017 U.S. Dist. LEXIS 112493, 2017 WL 3070868, at *10 (N.D. Ill. 2017) (collecting cases); *see also Aiello v. Providian Fin. Corp.*, 239 F.3d 876, 881 (7th Cir. 2001) (holding that a plaintiff must first show that she suffered a financial loss before being "permitted to piggyback a claim for damages for incidental emotional distress"). Thus, Plaintiff must demonstrate some financial loss as a result of Ocwen's failure to properly respond to her purported Notices of Error or purported Requests for Information *before* she could claim any emotional damage that *resulted thereafter*. Simply put, even assuming Plaintiff can overcome all of the reasons that justify the dismissal of her RESPA claim, she could not recover for any damages prior to Ocwen's first response to a Qualified Written Request.

4.  Purported RFI No. 2 and the three purported Notices of Error do not constitute Qualified Written Requests because they were repetitive, discovery-style documents sent during active litigation, and the timing evidences an intent to simply generate potential claims.

"Rambling, repetitive" letters posing "discovery-style document demands and interrogatories" do not constitute "Qualified Written Requests" ("QWRs") within the meaning of RESPA. *See Ekundayo v. PNC bank, Nat. Ass'n*, Case No. A-14-CA-142-SS, 2014 WL 5092625, at *5 (W.D. Tex. Oct. 9, 2014). Similarly, subsequent letters that "raise[] essentially the same dispute" as previous letters do not require a response under RESPA. *See Hawkins-El v. First American Funding, LLC*, 891 F.Supp.2d 402, 408 (E.D.N.Y. 2012); *see also Ruegsegger v. Caliber Home Loans, Inc.*, No. SA CV 17-0907-DOC (KESx), 2018 U.S. Dist. LEXIS 226567, at *71 (C.D. Cal. Apr. 30, 2018) (repeated requests for the same information, or multiple follow-ups, do not constitute separate actionable QWRs).

The correspondence, prepared by Plaintiff's counsel and sent by them to Ocwen between July 2018 and December 2018, can only be described as "rambling, repetitive" letters posing "discovery-style document demands and interrogatories." *See Ekundayo*, Case No. A-14-CA-142-SS, 2014 WL 5092625, at *5. Indeed, within the span of 36 calendar-days (October 29, 2018 to December 4, 2018), Plaintiff's counsel sent all three purported Notices of Error before the statutory deadline for Ocwen's response to the First Notice of Error (January 8, 2019). *See* SUMF ¶¶ 14-16, 18. In that same time period, Plaintiff's counsel also sent a second purported Request for Information. *See id*. at ¶ 17. In addition, these letters were all sent during an active foreclosure action in state court and this federal lawsuit. The correspondence raises the same issues multiple times, and also alleged errors regarding previous requests

For example, purported Notices of Error 1, 2, and 3 all alleged an error with accepting payments. *See* SUMF ¶¶ 14-16, 18. Had Plaintiff and her counsel waited for Ocwen's January 7,

2019, response to the first Notice of Error, they would see that Ocwen had no record of rejecting payments from Plaintiff and was seeking additional information with respect to the allegations. *See id.* at ¶ 24. Similarly, had Plaintiff and her counsel waited for Ocwen's response, they would have seen that Ocwen made corrections to the payment history by "applying funds held in escrow to the principal balance and by removing certain charges." *Id*. at ¶ 23. All three purported Notices of Error claim Ocwen failed to provide a reinstatement quote within seven business days of the correspondence. *Id.* at ¶¶ 14-16, 18. And all three Notices of Error claimed errors with the calculation and handling of Plaintiff's escrow. *Id.*

It is blatantly obvious what opposing counsel was trying to achieve by sending five separate purported Qualified Written Requests in little over a month: to drum up as many possible claims as possible for the litigation that was filed ***before any response to the purported Qualified Written Requests were required*.** The undisputed record is clear, these repetitive, discover-style, claim-chasing letters were not legitimate attempts to resolve issues with the servicing of Plaintiff Loan. Ironically, and tragically for Plaintiff, while Ocwen's investigation did lead to corrections on Plaintiff's Account, she has remained an unwitting pawn in protracted litigation where her counsel does not share settlement offers (SUMF ¶ 49), makes demands without Plaintiff's knowledge (*Id.*), and otherwise allows Plaintiff to live under the mistaken belief she is in a pending foreclosure action (SUMF ¶ 29). The Court should not indulge such antics by considering the purported RFI No. 2 and purported Notices of Error to be legitimate Qualified Written Requests.

5.    <u>There is no evidence in the record to support a pattern or practice violation.</u>

The undisputed record is devoid of any evidence of a pattern or practice of non-compliance under RESPA. The Seventh Circuit has held that in order to show a "pattern or practice" under RESPA, there must be more than random examples of similar behavior. Instead, there must be

some evidence of "coordination." *See Perron*, 845 F.3d at 858.  Other circuit courts have held that, to establish a pattern and practice, the alleged violations must be a part of "the company's standard operating procedure – the regular rather than the unusual practice." *Wirtz v. Specialized Loan Servicing, LLC*, 886 F.3d 713, 720 (8th Cir. 2018); *Gorbaty v. Wells Fargo Bank, N.A.*,  No. 10-CV-3291, 2012 WL 1372260, at *5 (E.D.N.Y. April 18, 2012) (finding that "pattern or practice" means a standard or routine way of doing things, and that alleging four examples of RESPA violations does not qualify as a standard or routine way of doing things.).

The first and most fundamental flaw with Plaintiff's pattern or practice claim is that, as explained above, Ocwen did not violate RESPA.  Indeed, there can be no pattern or practice claim against Ocwen in this case if it is not part of said pattern or practice.  The second fundamental flaw with Plaintiff's claim is that she has developed no evidence demonstrating that there is any pattern or practice with respect to a particular violation of RESPA.  In this case, the only claim Plaintiff has is under 12 U.S.C. § 2605(e).  Thus, in order to survive summary judgment, Plaintiff must demonstrate there is at least a dispute of fact regarding whether Ocwen has engaged in a pattern or practice of violating the error resolution procedures set for in § 2605(e).  But there is no such evidence in the record, nor has Plaintiff ever articulated how a violation that happened in this case demonstrates coordination or is part of a standard or routine way of doing things for Ocwen.  At most, she has cited to one-off cases where there was a RESPA violation without any connection to an alleged violation in this case, let alone evidence of coordination or a standard/routine way of doing things.   The inescapable fact remains here that, to the extent Plaintiff's various correspondences constitute Qualified Written Requests, Ocwen fully complied with its requirements under RESPA by providing documents, investigating alleged errors, making corrections, or explaining why no error had occurred.  *See* SUMF ¶¶ 13, 21-26.

Because the record is devoid of any facts demonstrating either that Ocwen violated RESPA or that there were coordinated or routine violations of the same nature in other instances, Plaintiff will not be able to prove a pattern or practice violation. As a result, Ocwen is entitled to summary judgment.

6.     <u>Even if Plaintiff's pattern or practice claim could survive summary judgment, her recovery is limited to $2,000.</u>

Under her RESPA claim, Plaintiff seeks "statutory damages of $2,000 against Ocwen for *each and every violation* contained in Count II." *See* Pl.'s Second Amend. Compl., at 50 (emphasis added). She also argues that "Ocwen committed in excess of sixty distinct errors. . . ." *Id.* at ¶ 249. In other words, Plaintiff claims she is entitled to $2,000 for each separate alleged violation and estimates statutory damages to the tune of $120,000 or more under her RESPA claim. This is legally erroneous.

As a matter of law, Plaintiff is not entitled to $2,000 for each alleged violation of RESPA. Rather, RESPA caps statutory damages at a **<u>total</u>** of $2,000 regardless of the number of violations:

> (f) Damages and costs. Whoever fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts:
>
> > (1) Individuals. In the case of any action by an individual, an amount equal to the sum of –
> >
> > > (A) any actual damages to the borrower as a result of the failure; and
> > >
> > > (B) any additional damages, as the court may allow, ***in the case of pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000***.

12 U.S.C. § 2605(f) (emphasis added).

A plain reading of this language demonstrates that while an individual is entitled to *actual damages* for each failure, *statutory damages*, "in the case of a pattern or practice of noncompliance" are limited to "an amount not to exceed $2,000." *See id.* at (f)(1)(B). Indeed, if

Congress had intended $2,000 in statutory damages for each violation, it would not have inserted the "pattern and practice" language, nor would it have expressly stated statutory damages are limited to "an amount ***not to exceed*** $2,000." *Id.* (emphasis added).

Courts in the Seventh Circuit have expressly rejected the idea that statutory damages are available on a per violation basis. *See, e.g., Ploog v. HomeSide Lending*, *Inc.*, 209 F.Supp.2d 863, 869 (N.D. Ill. 2002). In *Ploog*, the court considered whether the statute's plain, unambiguous language permitted a statutory damages per violation, or a total cap regardless of the number of individual violations.[5] In addressing the "for each such failure" language in the introductory paragraph, the court concluded that this language meant a borrower is entitled to only "***actual*** damages for each violation of the act." *Id.* (emphasis added). Thus, the court concluded that "a plaintiff can recover actual damages for each violation of the act and statutory damages no greater than $1,000 by proving a pattern or practice of noncompliance." *Id.* Other courts have outside the Seventh Circuit have reached the same conclusions. *See, e.g., Katz v. The Dime Savings Bank*, 992 F. Supp. 250, 257 (W.D.N.Y. 1997) (holding that RESPA statutory damages are capped at $1,000 not available on a "per violation" basis).

Accordingly, the proper interpretation of Section 2605(f) limits statutory damages to $2,000, regardless of the number of violations, and any statutory damages Plaintiff seeks under RESPA are so limited.

**B.    Ocwen is Entitled to Summary Judgment on Plaintiff's Entire FDCPA Claim.**

      1.    <u>Plaintiff's claims under the FDCPA Fail because she Lacks Article III Standing</u>.

---

[5] At the time of the *Ploog* decision, the statutory damages were capped at $1,000 rather than $2,000. The change is the amount is irrelevant to the issue of whether the figure is a cap versus *per violation* award.

Ocwen is entitled to summary judgment because Plaintiff lacks standing under the FDCPA. The Seventh Circuit's take on FDCPA standing "is simple—the violation of an FDCPA provision, whether 'procedural' or 'substantive,' does not necessarily cause an injury in fact." *Markakos v. Medicredit, Inc.*, No. 20-2351, 2021 WL 1937267 (7th Cir. May 14, 2021) (finding lack of standing where plaintiff "ha[d] not paid a dime, and she ha[d] properly disputed her debt."). Under the FDCPA, a plaintiff cannot establish standing simply by pointing to a mere procedural violation of a statute. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016), as revised (May 24, 2016); *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019). Rather, she "must show that the violation harmed or 'presented an "appreciable risk of harm." *Casillas*, 926 F.3d at 333 (quoting *Groshek v. Time Warner Cable*, Inc., 865 F.3d 884, 887 (7th Cir. 2017)). It is not enough for a plaintiff to be "annoyed" or "intimidated" by a violation. *Gunn v. Thrasher, Buschmann & Voelkel, P.C.*, 982 F.3d 1069, 1071 (7th Cir. 2020); *see also Larkin v. Finance System of Green Bay, Inc.*, 982 F.3d 1060 (7th Cir. 2020) (finding plaintiffs lacked standing despite a statutory violation) ("Statutory violation or not, there was no concrete harm. Neither plaintiff paid a debt she did not owe or otherwise acted to her detriment in response to the letter."). Similarly, a state of confusion is not itself an injury. *See, e.g.*, *Trichell v. Midland Credit Management, Inc.*, 964 F.3d 990 (11th Cir. 2020); *Brunett v. Convergent Outsourcing, Inc.*, 982 F.3d 1067, 1068 (7th Cir. 2020), *reh'g denied* (Jan. 11, 2021) ("the state of confusion itself is not an injury . . . If it were, then everyone would have standing to litigate about everything.") (citation omitted). As the Seventh Circuit noted in *Pierre*, "standing must be established 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Pierre*, 29 F.4th at 938 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).). Here, Plaintiff needs to establish standing

with "evidence offered at summary judgment, and her standing must remain adequately supported in the face of any adverse evidence introduced at trial." *Pierre*, 29 F.4th at 939.

Ultimately, regardless of any mistake, misrepresentation, or misstatement made as a result of the reconciliation error and subsequent servicing of Plaintiff's Loan, one simple truth remains: Plaintiff has not paid a single dollar to Ocwen that she was not legally obligated to pay under the terms of the Loan. Ocwen does not deny there was a brief period of time where the reconciliation error caused payments to be applied to the wrong months. *Id.* at ¶ 10. Ocwen does not deny that the reconciliation error led to an erroneous default status on the Loan. *Id.* at ¶ 11. But at the end of the day, none of those mistakes caused Plaintiff to pay more money. *See Larkin* , 982 F.3d 1060 ("Statutory violation or not, there was no concrete harm. Neither plaintiff paid a debt she did not owe or otherwise acted to her detriment in response to the letter."). The same principle applies in this case. Plaintiff did not act to her detriment in response to any alleged violation of the FDCPA. She did not pay any monies that were not owed above what she would have already been paying. In fact, as of today, Plaintiff has not made forty-five (45) months' worth of mortgage payments. SUMF ¶ 47. At most she expresses vague emotional damages, many of which are apparently directly linked to a non-existent foreclosure action. *Id.* at ¶¶ 38-44.

Simply put, under the Seventh Circuit's standing requirements for the FDCPA, Plaintiff cannot demonstrate that she has standing because she cannot demonstrate she has suffered a concrete injury in fact. Accordingly, Ocwen is entitled to summary judgment.

2.    All alleged FDCPA Violations Preempted

The undisputed record now establishes that all of Plaintiff's theories of liability under the FDCPA are preempted by the Bankruptcy Code because all of the alleged conduct either occurred during the pendency of her Chapter 13 Bankruptcy or arose out of the Bankruptcy proceeding.

This Court has held that the "the Bankruptcy Code precludes Plaintiff's FDCPA claim based on Defendant's attempt to collect a debt discharged in bankruptcy." *Wehreheim*, No. IP 00-1328-C-T/K, 2002 WL 31242783, at *9. Preemption is not limited to "only conduct that occurs during the pendency of a bankruptcy case." *Id*. at 8. Rather, it is the remedial structure of 11 U.S.C. § 524 that preempts all claims arising out of attempted collection of a debt discharged by Bankruptcy. *See id*.

The undisputed record in this case demonstrates that absent the Bankruptcy Code – specifically the Bankruptcy Court's power to disallow and deem unrecoverable certain amounts in BONY's Proof of Claim – none of the events following the close of Plaintiff's Bankruptcy Case would have occurred and/or constituted a violation of the FDCPA. Specifically, it is undisputed that an error in Ocwen's reconciliation of Plaintiff's Loan following the close of her Bankruptcy caused disallowed amounts to remain on the Loan. *See* SUMF ¶ 10. This caused an erroneous delinquency to exist on the Loan after the Bankruptcy was closed, leading to the misapplication of payments and eventual default status in May 2018. *See id*. at ¶ 11. The error also resulted in the mistaken imposition of a single late fee in May 2018, the imposition of two property inspection charges after preservation efforts were initiated due to the default status, and caused Ocwen to insist on a full reinstatement amount rather than an ordinary monthly mortgage payment in June 2018.[6] *See id*. But for the existence of disallowed amounts on Plaintiff's Loan, which would not exist absent the October 26, 2012 Order that rendered them disallowed, none of these events would have occurred. Put differently, to the extent these events are characterized as violations of the FDCPA, they are a direct result of the failure to remove disallowed amounts from the Loan.

---

[6] The undisputed record shows that Ocwen did not refuse, return, or otherwise hold without application any other monthly mortgage payments. *See* SUMF ¶ 24.

Because those disallowed amounts could not exist outside the context of the Bankruptcy Court's authority under the Bankruptcy Code, so too can the alleged FDCPA violations could not exist outside the context of the Bankruptcy. The two are inextricably linked.

For example, if there was a legitimate default, Ocwen's request for payment of a reinstatement amount would not violate the FDCPA. Thus, accepting that the certain amounts remained on the Loan after the close of the Bankruptcy, whether the events that occurred constitute a violation of the FDCPA is *wholly dependent* on the existence of the October 26, 2012 Bankruptcy Court Order and the provisions of Bankruptcy Code that provide the means to enforce it, without which the removal of the disallowed amounts would not have been required and Ocwen's handling of the Loan would not be erroneous.

> 3.  Any violation was the result of a *bona fide* error

The FDCPA "excludes from liability violations that were the result of bona fide errors." *Russell v. Absolute Collection Servs.*, 763 F.3d 385, 389 (4th Cir. 2014) (citing 15 U.S.C. § 1692k(c)). "To qualify for the bona-fide-error defense, a defendant is required to show, by a preponderance of the evidence, that (1) it unintentionally violated the FDCPA; (2) the violation resulted from a bona fide error; and (3) it maintained procedures reasonably adapted to avoid the violation." *Id.*

> i.  It is undisputed that any FDCPA violation by Ocwen was unintentional.

 "The starting point for proving the bona fide error defense is proving that the violation was unintentional." *Christopher v. RJM Acquisitions LLC*, No. CV-13-02274-PHX-JAT, 2015 U.S. Dist. LEXIS 12452, at *14 (D. Ariz. Feb. 3, 2015) (citing 15 U.S.C. § 1692k(c)). To satisfy such "first prong, the bona fide error defense requires only the negation of specific intent to violate the FDCPA." *Rose v. Roach*, No. 6:12-cv-00061, 2013 U.S. Dist. LEXIS 53120, at *10 (W.D. Va. Apr. 12, 2013) (citing *Johnson v. Riddle*, 443 F.3d 723, 728 (10th Cir. 2006)).

In this case, the underlying reconciliation error was a human error. *See* SUMF ¶ 10. That mistake was contrary to what Ocwen's procedures were. *Id*. It was also contrary to Ocwen's initial review of the Loan prior to the close of Plaintiff's Bankruptcy, which did recognize that the October 26, 2012 Order resulted in the Proof of Claim being reduced, requiring removal of disallowed amounts. *Id*. at ¶ 9. Moreover, Ocwen admitted that it had committed an error after investigating the issues with the Loan. *Id*. at ¶¶ 21-23.

There is no evidence whatsoever that this human error was intentional, or that it was anything other than that: human error. Any subsequent violations of the FDCPA that stemmed from the reconciliation error were an unintentional consequence of that mistake, and there is no evidence in the record to the contrary.

> ii.    *Any mistake by Ocwen made regarding Plaintiff's Loan was made in good faith.*

Again, the underlying reconciliation error that led to any violations of the FDCPA was a human error that was unintentional, and made despite procedures implemented to prevent it. *Id.* at ¶ 10. Ocwen did not intend to violate the Bankruptcy Court's Order by continuing to collect disallowed amounts, or service the Loan in a way that was inaccurate. There is no evidence to the contrary. When Ocwen was alerted to the mistake through the purported Notices of Error, it took prompt steps to investigate and correct the error. And indeed, the error was corrected.

> iii.    *Ocwen maintains procedures reasonably adapted to avoid the alleged FDCPA violations.*

In order to satisfy the third prong of the *bona fide* error defense, Ocwen must satisfy, by a preponderance of the evidence, the following "two-step test: first, [that] the [defendant] 'maintained'— *i.e.*, actually employed or implemented—procedures to avoid errors; and second, [that] the procedures were 'reasonably adapted' to avoid the specific error at issue." *Johnson*, 443 F.3d at 729 (citations omitted). "In order to establish the *bona fide* error defense, a [defendant] is

not required to prove that it had procedures in place to guard against the unknown or *potential* errors of others–instead, the [defendant] has to take prompt steps to correct any errors *once it received notice*." *Alston v. Central Credit Services, Inc.*, 2013 WL 4543364, at *4 (D. Md. 2013) (citing *In re Creditrust Corp.*, 283 B.R. 826, 832 (Bankr. D. Md. 2002)).

During the one-year preceding the filing of this lawsuit, Ocwen maintained written policies and procedures concerning the collection of debts, including debts that had been involved in or discharged in Chapter 13 Bankruptcy. Verdooren Decl. ¶ 31. Ocwen's written policies and procedures always required Ocwen and its employees to only seek collection of debts that were lawfully owed. *Id*. These written policies and procedures are meant to comply with the Fair Debt Collection Practice Act ("FDCPA") and comparable state laws. *Id*.

Accordingly, because the undisputed facts demonstrate that any FDCPA violation by Ocwen were unintentional and in good faith and occurred despite Ocwen's policies and procedures reasonably adapted to avoid the alleged FDCPA violation, PHH is entitled to summary judgment.

## V.    CONCLUSION

Based on the foregoing, Defendant Ocwen Loan Servicing, LLC, respectfully requests the Court grant its Motion for Summary Judgment, enter judgment in favor of Ocwen and against Plaintiff, dismiss Plaintiff's remaining claims with prejudice, and grant such further relief the Court deems just.

Dated: April 25, 2022                    Respectfully submitted,

By: */s/ Ethan G. Ostroff*

Ethan G. Ostroff
John C. Lynch
Carter R. Nichols
TROUTMAN PEPPER HAMILTON SANDERS LLP
222 Central Park Avenue, Suite 2000

Virginia Beach, VA 23454
Telephone: (757) 687-7500
E-mail: ethan.ostroff@troutman.com
E-mail: john.lynch@troutman.com
E-mail: carter.nichols@troutman.com

*Counsel for Defendants Ocwen Loan Servicing, LLC*