UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DEMONA FREEMAN,                    )
                                   )
            Plaintiff,             )
                                   )
vs.                                ) CAUSE NO. 1:18-cv-03844-TWP-DLP
                                   ) Indianapolis, Indiana
OCWEN LOAN SERVICING, LLC,         ) Monday, March 7, 2022
BANK OF NEW YORK MELLON,           )
                                   )
            Defendants.            )


                        Before the
        HONORABLE MAGISTRATE JUDGE DORIS L. PRYOR


              TRANSCRIPT OF DISCOVERY CONFERENCE



APPEARANCES:
FOR THE PLAINTIFF:      Clark Quinn Moses Scott & Grahn
                        By:  Travis W. Cohron
                        320 North Meridian Street, Suite 1100
                        Indianapolis, Indiana 46204

                        Nick Wooten, LLC
                        By:  Nicholas H. Wooten
                        5125 Burnt Pine Drive
                        Conway, Arizona 72034

FOR THE DEFENDANTS:     Troutman Sanders LLP
                        By:  Carter Randall Nichols and
                        Ethan Ostroff
                        222 Central Park Avenue, Suite 2000
                        Virginia Beach, Virginia 23462

COURT TRANSCRIBER:      Jean A. Knepley, RDR, CRR, CRC, FCRR
                        46 East Ohio Street, Room 301
                        Indianapolis, Indiana 46204


                  PROCEEDINGS TAKEN BY
            ELECTRONIC SOUND RECORDING

1          *(In open court.)*

2                  THE COURT:  Good afternoon, all.  This is Judge Pryor,

3      Cause No. 1:18-cv-3844, Demona Freeman versus Ocwen Loan

4      Servicing, March 7, 2022.  The time is approximately 3:07 p.m.

5      I am United States Magistrate Judge Doris Pryor.  Originally

6      the Court had set this for a settlement conference today.

7      After conferring with the parties on both sides, the Court

8      converted the settlement conference to a discovery conference

9      to talk through the remaining issues that we had following our

10     call a few weeks ago.

11                 With that, the Court has been provided submissions

12     from March 4th from both sides, as well as a supplemental

13     response by Clark Quinn that was submitted yesterday on Sunday.

14     All right.  So with that, we will start, if that is okay.  I do

15     have the outline provided by both sides.

16                 Let me get appearances for the record.  On behalf of

17     Ms. Freeman we have Mr. Wooten, and we have Mr. Cohron.  And on

18     behalf of Ocwen Loan Servicing, Bank of New York Mellon we have

19     Ethan Ostroff, Carter Nichols.  We also have a representative,

20     I believe, from Troutman Sanders on as well.  So if that — go

21     ahead, Counsel.

22                 MR. NICHOLS:  Sorry.  Sorry about that, Judge.  This

23     is Carter Nichols from Troutman Pepper, that is correct.  My

24     colleague, Courtney Hitchcock, is on the line and observing

25     today with the Court's indulgence.

1          THE COURT:  All right.  Any objection, Mr. Wooten?
2     Mr. Cohron?
3          A VOICE:  No, ma'am.
4          A VOICE:  No, Your Honor, not from Plaintiffs.
5          THE COURT:  All right.  Well, that will be the plan as
6     we kind of move forward.  I will take up first, I have the list
7     of outstanding issues that have been presented concerning the
8     privilege log, servicing notes about redactions.  I don't know
9     if the parties — if it would be helpful, the parties have
10    shared with both sides, I am assuming at this juncture, the
11    dated supplemental privilege log.
12          And so let's hear from counsel regarding the objection
13    that you have with the amended privilege log or more — I guess
14    we could start a little more high level, Mr. Wooten,
15    determining whether or not there was a discussion after the
16    privilege log was shared with you.  Go ahead.
17          MR. WOOTEN:  Yes, ma'am.  Thank you, Your Honor.  We
18    did receive an updated privilege log today with — a couple of
19    redactions had been removed.  Our dispute, I think, is a little
20    higher level than, than that.  As we have indicated in the past
21    when these issues have come up, we just simply do not believe
22    that there is any basis for a claim.  Contents of a comments
23    log are appropriately designated as privileged, given their
24    purpose, how they are used, who has access to them, that sort
25    of thing.

1    There is just simply no expectation, any, any

2    information included in, in the notes log, whatever, be

3    confidential, every aspect to be confidential or be maintained

4    confidentially.  You, you have vendors, regulators, investors,

5    as well as thousands upon thousands of what we would generally

6    refer to as line level employees that have complete access to

7    these records on a daily basis.

8    These are the normal everyday business records of a

9    mortgage servicer so that they can document the actions they

10   take with respect to a consumer's mortgage loan account, and

11   certainly, not the notes and records of the decision makers and

12   policy setters and the persons who would make litigation

13   decisions for Ocwen.  So we don't think they fit with the,

14   within the parameters of the definition.

15   And even if they possibly could, as far as who has

16   access to them, confidentiality would be destroyed immediately

17   upon their entry into the record, so — or into the notes log.

18   So that, that has been our position.  We discussed it

19   repeatedly.  Obviously our colleagues disagree.  So I think

20   that this is an issue that I think both sides agree we are just

21   going to have to have Your Honor speak on.

22   THE COURT:  Mr. Ostroff?

23   MR. NICHOLS:  So Judge, this is Carter Nichols from

24   Troutman Pepper.  I will be speaking on behalf of Ocwen today.

25   So a couple points.  First, just to be clear, the second

1    supplemental privilege log was provided to opposing counsel,

2    and the Court was copied on March 3rd as we were ordered at the

3    last discovery conference.

4         Today we have produced a revised comment log that

5    removed several redactions that in the process of revising the

6    privilege log were determined should not be included.  So that,

7    that revised comment log is what was produced today, but the

8    second supplemental privilege log was produced on the 3rd.

9         You know, to Mr. Wooten's point, a couple of things.

10   First and foremost, I think a lot of what we just heard Mr.

11   Wooten talk about are not the issues that are raised in the

12   position statement to the Court that claim that vendors,

13   regulators, and thousands of employees at-large have access or

14   regularly use the comments log is not only not identified as an

15   issue in the position statement but is simply not true.

16        From our perspective, the, the appropriate test in the

17   Seventh Circuit is really what the nature of the, the

18   information or the communication is, not who has access to it

19   within Ocwen, and I think it is important to remember here that

20   Ocwen is the client.  When we talk about the attorney-client

21   relationship, Ocwen is the client.

22        Anybody accessing — any Ocwen employee accessing that

23   comment log is doing so as an employee of Ocwen.  They are not

24   some third party, some stranger, some person that, you know,

25   coming off the street and just looking at what would otherwise

1    be privileged information.  They are acting on behalf of Ocwen.
2    And again, the relevant test here is whether the information
3    itself is, is privileged for, you know, one of the three
4    reasons that we have identified various entries or documents on
5    our privilege log.  And on top of that, the, the fact that
6    other -- that employees have access to it but might not have
7    necessarily been a party when the communication was originally
8    sent does not destroy the privilege.

9         The relevant test here is whether or not the employees
10   need the information to do their job, and they do.  I mean,
11   with respect to the comment log in particular, all of the
12   privileged information that we have identified is relevant to
13   the ongoing servicing as it relates to legal matters with, with
14   respect to this loan.

15        So you know, as I am sure the Court is aware, this,
16   this particular loan has been involved in one type of
17   litigation or another for, for nearly a decade.  It started
18   with a foreclosure action all the way back in 2009, which then
19   led to a bankruptcy.  When the bankruptcy was closed, there was
20   still the pending foreclosure action that had been ongoing at
21   the start of the bankruptcy.  That was ended, and then, a
22   second foreclosure action was filed.  And then, shortly
23   thereafter, this litigation ensued.

24        And so all of the privileged information that we have
25   identified on the comments log is related to work being done in

1    connection with those — with those litigation, those lawsuits,

2    communications directly from counsel and those various

3    litigations to Ocwen, and so we believe that the information is

4    privileged.

5         And more importantly, that we have done exactly what

6    the Court asked us to do at the last discovery conference,

7    which was to identify all of the, the authors, the recipients,

8    the, the capacities of the author or recipients, statement of

9    the subject matter, and the basis for withholding the document

10   or redacting the information as it relates to the privilege

11   log.  And so you know, again, with that, we believe the

12   privilege log is, is proper and that the information contained

13   therein is privileged information for all the reasons stated in

14   the log.

15        THE COURT:  You bring up a good point when we are

16   talking through the precedent here in the Seventh Circuit.  So

17   I would love just a little conversation when looking at the

18   privileged log key, I did have an opportunity to review that in

19   advance of the call.  Can you tell me the distinction that you

20   are making between the attorney work product and prepared in

21   anticipation of litigation and/or trial?

22        I notice there are three kind of categories that you

23   have placed within the privilege log, and so I, I am needing

24   some direction as to how that distinction is being made.

25        MR. NICHOLS:  Of course, Your Honor.

1      So with respect to attorney work product, that would

2 refer to actual work product that an attorney produced.  So for

3 example, if an attorney prepared a memorandum analyzing

4 exposure in a case, that would be attorney work product.

5 Information generated in anticipation of litigation or trial is

6 information that has been generated by Ocwen for the use in

7 either anticipated litigation or ongoing litigation headed

8 towards trial.

9      So for example, if an attorney asked for Ocwen to

10 prepare something specifically for litigation, that information

11 would be considered information generated in anticipation of

12 litigation at trial.  And then, of course, the, the third

13 category that we have identified is simply attorney-client

14 privilege.

15      THE COURT:  Hold on a second, Mr. Nichols.  Maybe just

16 slow it down for me.  When you say "anticipation of

17 litigation," you're characterizing that as different from

18 attorney work product because the information was generated by

19 Ocwen at the request of counsel for purposes of litigation?

20      MR. NICHOLS:  That is one example, Your Honor.

21 Certainly, if there was threatened litigation or anticipated

22 litigation, there could be information that was generated by

23 Ocwen on its own accord that might fall under that, that

24 category, but I think for the purposes of our privilege log,

25 when we talk about information generated in anticipation of

1    litigation or trial, we are really just talking about
2    information that Ocwen had been asked to generate or is
3    generating for counsel as part of threatened or ongoing
4    litigation.
5         THE COURT:  And I am trying to kind of make sure that
6    it is parallel with when that work product privilege can be
7    utilized, and so that is why I just needed a little bit more
8    clarity around your definition.  So I appreciate it.  You go
9    right ahead.
10        MR. NICHOLS:  Right.  So again, you know, I think when
11   we talk about work product as it relates to how we have
12   identified information on our privilege log when we say "work
13   product," we are talking about information or, or a product of
14   work that has been created by an attorney of Ocwen, not
15   meaning — not meaning, like, general counsel or anything like
16   that but outside counsel hired for the purpose of handling
17   litigation, whether it be foreclosure or bankruptcy or the,
18   this District Court litigation.
19        THE COURT:  Now, which category is that, Mr. Nichols?
20        MR. NICHOLS:  So again — that would be work product,
21   WP.
22        THE COURT:  Okay.  Got it.
23        MR. NICHOLS:  And then, alternatively when we talk —
24   when we use information generated in anticipation of litigation
25   or trial, we are talking about information that has been

1    generated by Ocwen in anticipation of litigation or trial.

2    And, you know, I — I don't think I am mistaken by saying with

3    respect to this privilege log that, that occurs exclusively

4    where Ocwen has been asked to generate information by counsel

5    in connection with the various — the various matters that went

6    on during the, the time frame covered by this privilege log,

7    which goes all the way back to the earliest date of 2011 up to

8    the end of 2018.

9         THE COURT:  Is it for information that has been —

10   that Ocwen has been asked to create?  Is it information and —

11   based on a pending litigation or a, an anticipated litigation

12   coming?

13        MR. NICHOLS:  So in this, in this case, there is

14   really only a six-month period of time between 2011 and the end

15   of 2018 where this loan was not involved in active litigation.

16   And that, that time period was early 2018, like, May of 2018 to

17   November of 2018.

18             The rest of the seven and a — sorry.  I apologize.

19        THE COURT:  No, no, no, no.  You are using that time

20   period when the foreclosure was dismissed, and Bank of New York

21   acknowledged the first foreclosure should close.  I think the

22   Court granted that on May 5th.

23        MR. NICHOLS:  Yes, Your Honor.

24        THE COURT:  Okay.  All right.

25        MR. NICHOLS:  And so any time outside of that

1    six-month period, there is active litigation going on with

2    respect to this loan, either the first foreclosure action,

3    Plaintiff's bankruptcy, or this District Court litigation which

4    started in December of 2018.

5              THE COURT:  All right.

6              MR. NICHOLS:  And then, with respect to that time

7    period in between when the, the first foreclosure was closed in

8    May 2018 and when this lawsuit was filed in December of 2018,

9    as you know, Ocwen received its first notice of error in

10   October of 2018, which threatened litigation.

11             THE COURT:  Right.  October 29th, right?

12             MR. NICHOLS:  Correct.

13             THE COURT:  Got it.  Okay.  Did you have another point

14   concerning the privilege log?  I had interjected my questions.

15             MR. NICHOLS:  No, Your Honor.  I am happy to address

16   any particular point, but I, I don't have anything else

17   affirmatively to share.

18             THE COURT:  Well, I am looking here at the privilege

19   log.  Thank you for providing it, and I only have the one — I

20   don't have the most recent.  So I have been operating off of

21   the one that was submitted in advance.  It is about 11 pages,

22   and so I see for the first time going past, through the list,

23   when you get down, it might be your page 4 and/or 5, and it

24   starts THCL, 3230, February 6, 2012, outside counsel, Ocwen,

25   entry of THCL, documenting information received from

1  foreclosure counsel.  Do you see where I am, Mr. Nichols?

2       MR. NICHOLS:  I, I know where that entry is.  I, I

3  guess you mentioned that the document you are looking at is 11

4  pages, but the, the second supplemental privilege log, which

5  was produced to — or sent to opposing counsel and copies to

6  the court on the 3rd is a total of 42 pages.

7       THE COURT:  That is the one I have.  Uh-huh.

8       MR. NICHOLS:  Okay.  Yes.  Then, I am, I am tracking,

9  and I am on — I see that entry that you are referring to.

10      THE COURT:  Okay.  So walk me through the distinction

11 between what we have seen here, and I think that is where it

12 starts, right?  Right before — it is like — it is Document

13 3249 where I see it for the first — or it is not in

14 conjunction with attorney-client privilege.

15      MR. NICHOLS:  Sure.  I see.  So that 3230 just has

16 attorney-client privilege but does not have generated in

17 anticipation of litigation or trial.

18      THE COURT:  Uh-huh.  3249, uh-huh.

19      MR. NICHOLS:  3249.

20      THE COURT:  Yes, sir.

21      MR. NICHOLS:  Okay.  One second.  Let me get there.

22      THE COURT:  This is one that would have fallen within

23 the time that the case was —I guess, the mortgage itself was

24 being litigated in bankruptcy.

25      MR. NICHOLS:  Yes.  Yes, Your Honor.  So here —

1    THE COURT:  Oh, not actually.  I am sorry, it would

2    have been the foreclosure action around that time.  I

3    apologize.  I believe the, the foreclosure — the bankruptcy

4    was actually filed April 23rd of 2012, about a week later.

5    MR. NICHOLS:  So I am looking at 3249, and the date of

6    that entry is April 25, 2012.  I just want to make sure we are

7    looking at the same thing.

8    THE COURT:  Yes, sir.  We are.

9    MR. NICHOLS:  Okay.  So that entry, the first one on

10    3249, which is just attorney-client privilege is — there is an

11    entry on the THCL that includes or copies correspondence from

12    the, from foreclosure counsel into the THCL.

13    THE COURT:  Okay.

14    MR. NICHOLS:  And then, if we go to 32, the second

15    3249, which is just information generated in anticipation of

16    litigation or trial, there is — that is an entry describing

17    the status of actions being taken based on the advice of

18    counsel in the preceding entry.

19    THE COURT:  And I think this is where we — and so

20    that description that you just gave, that would be my

21    understanding of something that would fall under — it is at

22    the direction.  If the communication from counsel, what you

23    just — what you just represented to the Court at the direction

24    of counsel, that is not captured in, in the privilege log

25    itself.

1          MR. NICHOLS:  You are saying that the entry, the

2     second 3249 entry doesn't, doesn't capture that, that entry or

3     the action being taken as being done at the direction or with

4     the advice of counsel?

5          THE COURT:  Yes, sir.

6          MR. NICHOLS:  I understand your point, Your Honor.

7          THE COURT:  We have somewhat created this wall between

8     work privilege, work product and this ALT and this — within

9     the privilege log.  And so it — if we use the example that we

10    just went through the exercise there, that is where I am not

11    able to — looking at the privilege log itself, I would not be

12    able to articulate to the other side.

13         It is kind of what we discussed a week ago or a week

14    ago, being able to — just being able to disclose to decide why

15    it was not provided, right?  And so that was helpful.  Thank

16    you.

17         Mr. Wooten, I will hear from you.

18         MR. WOOTEN:  Your Honor, there, there is two pieces of

19    this that need to be broken out, and I think Mr. Cohron needs

20    to handle a portion of it; and then, I need to handle a portion

21    of it with respect to this particular entry.  First of all, Mr.

22    Cohron's portion of this is that he has the specific details

23    about specific problems with the structure and contents of the

24    privilege log itself.

25         As to my initial point on — kind of like what Your

1    Honor is just citing to, this is a classic example of what I
2    was just discussing.  Ocwen was required to take certain
3    actions in any foreclosure in any bankruptcy.  Those actions
4    are generally referred to as milestones.  You and I would refer
5    to them as steps in the process.
6         They are required to document that they took each of
7    those steps in that process, both within a certain time frame
8    and whether or not it was completed, and they have to do that
9    to comply with their servicing obligations for GSE loans, for
10   Fannie and Freddie, as well as their servicing agreements
11   between themselves and anyone else they might be servicing for.
12   They have to do that for regulators to be able to determine
13   that they follow the appropriate process in foreclosure, and
14   then, they have to document these records for their investors
15   so that they can prove that they handle loss mitigation
16   correctly.
17        This e-mail that is for (inaudible), as referenced, is
18   communicated to Ocwen Loan Servicing.  It is not communicated
19   to any person.  It is communicated as reference to a specific
20   milestone in a process that Ocwen is required to handle with or
21   without the advice of counsel, period.
22        And they document that process in their notes log for
23   their own recordkeeping purposes for many reasons other than
24   documenting something that an attorney may or may not have been
25   involved in.  These steps are, at this point, automated.  In

1    2012 this entry, most likely is an Altisource employee and not,

2    not even an Ocwen employee.  Because Altisource was handling

3    Ocwen's loss mitigation steps as part of its services bundle it

4    was providing Ocwen.

5            So there is a tremendous amount of unbundling in the

6    way Ocwen was doing business at this time and the way this

7    business was done across mortgage servicings, period, that is

8    not contained in this and that Court would never know without

9    actual testimony on the subject from the people that were

10   allegedly involved or the people that run these departments.  I

11   mean, this is simply a person who is sitting on the production

12   assembly line of foreclosure and bankruptcy, Ocwen stamping a

13   part when it passes by.

14           It is rote.  It does not require special instruction.

15   It is routine.  It is every day.  It is another brick in the

16   wall.  There, there is nothing unique about any of what is

17   happening here.  It happens with any loan that goes into

18   bankruptcy or any loan that passes through the foreclosure

19   process.  These are boxes to be checked factually, and it, it

20   is — and within this, that is all this is.

21           THE COURT:  Are you suggesting that they would have

22   made this irrespective of there being an ongoing bankruptcy

23   foreclosure litigation?  Let's use 3249.  This is — is it your

24   suggestion that —

25           MR. WOOTEN:  So, so —

1          THE COURT:  Let me —

2          MR. WOOTEN:  I am sorry, Your Honor.

3          THE COURT:  — they would have, they would have been

4   required to do this irrespective of a lawyer directing these

5   actions?

6          MR. WOOTEN:  Yes, exactly what I am saying.  Most of

7   the communications of this nature are — mundane is polite.  It

8   is things like, did this document get filed?  Or what day was

9   this step completed, or you know, is a claim on file?  Has the

10  bankruptcy plan been reviewed?  It, it is like, yes or no, a

11  fact.  Has this occurred or not?  It is not — we have a

12  question about whether or not we can enforce the mortgage loan

13  in this particular case because there is a problem with

14  recording.  Please give me advice on this specific issue.

15         The people that are making these entries don't even

16  have the authority to ask these questions, and these are people

17  that, that, you know, a common analogy would be the people that

18  ask you, "Do you want fries with that?"  They literally are at

19  the entry level, ants in the Army, not decision makers, and

20  they are checking boxes.

21         MR. COHRON:  Your Honor, if I may add to that?  Sorry

22  if I am interrupting.

23         MR. WOOTEN:  No.  Go ahead.

24         MR. COHRON:  One of the, the larger issues here — and

25  dovetails on your comments about this ALT designation and

1   something we continue to struggle with is that, you know,

2   obviously our position is no such designation exists or is

3   appropriate.  It is like a gray area that Ocwen is using to

4   insulate communications that are neither tangible items, you

5   know, they, they are clearly not work product.

6          You know, yes they may have been created, you know,

7   you know, entered at a time when litigation, you know, assuming

8   that is the case for sake of argument.  But the, the entry, the

9   communications themselves are not tangible things that would

10  fall under the work product category.  If you were to use that

11  as a foundation, the argument would be that the entire comments

12  log, which clearly, that is a business record.  You know, it is

13  not work product in and of itself, and then, you flip over to

14  the attorney-client privilege designation.  And again, using

15  3249 as an example and kind of highlight the concerns and the

16  problems we continue to have with this, is that -- and you look

17  at who is involved in these communications.

18         I mean, I understand what Carter is describing about

19  how these relate to some communication, but the privilege log

20  says that, you know, for example, the, the second 3249, and my

21  apologies in advance of her name.  But you know, Latha Lokonde,

22  you know, is an Ocwen employee, and the recipients are Ocwen

23  Loan Servicing.  You know, that in and of itself, you know,

24  raises some concern and suspicion because it doesn't state, you

25  know, specific people in terms of the recipients, nor does it

1   state in the description category, you know, that it is any
2   relation to the advice of counsel.  I mean, I see — we see
3   repeatedly in here things like status, you know, status of
4   action, things that we interpret as being facts that, you know,
5   I don't think anybody here would disagree or not going to be
6   covered by any protection.
7       So we kind of have this confluence of problems that we
8   don't see how we can get through without either, you know,
9   further amendment or the Court performing a review of these
10  specific entries in making this determination.
11      THE COURT:  Have you had an opportunity to talk?  Just
12  like I just highlighted 3249 and the April 26, 2012, ALT
13  designation and talking through.  I don't know if there has
14  been an opportunity before the Court engages in this in camera
15  review where the parties have been able to talk through this
16  42-page document.
17      A VOICE:  Judge, we have.  We spoke this morning for a
18  period of time about these issues generally, but to kind of
19  convey to you the scope of the problem here and why, you know,
20  the hurdle that it would have, you know, entailed going through
21  that is that, you know, we, as I am sitting here, a document —
22  I have drawn in front of me a highlight with a highlighter —
23  each entry that I believe is insufficient, you know, with
24  respect to each document.
25      It is every single one.  I mean, it, it is — there

1   are, you know, we have concerns, again, with the, in general,

2   the, the — the stating of Ocwen Loan Servicing without some

3   specific person, you know, because that goes into us being able

4   to qualify the appropriateness of the designation.

5          The next column, you know, we have got descriptions

6   that include, you know, not, you know, not a document or a

7   tangible thing that would fall under work product but also not,

8   you know, a communication with counsel or contemporaneous, you

9   know, contemporaneous conversation with counsel or following

10  counsel's instructions.  We have got documenting, you know,

11  instructions to foreclosure counsel on several, but others,

12  again, you know, I want to say this.  It is status, status, you

13  know, conversations made that I just don't — you know, it

14  seems to be impossible to connect the dots here.

15         MR. WOOTEN:  Your Honor?  Again —

16         THE COURT:  Just so that I am not, as the Court,

17  right, having to walk through line item by line item through a

18  42-page privilege log, which is, in essence, what I would be

19  required to do at this juncture, but that, I guess that is my

20  question more so understand Mr. Cohron's request from the

21  submission that was provided, as well as Mr. Nichols' position

22  regarding the modifications that have been made thus far.

23         Mr. Wooten?  Did I cut you off?  I apologize.

24         MR. WOOTEN:  I am sorry, Your Honor.  I, I was just

25  going to point out, too, you know, that to take the position

1    that the note log, any entry in itself is privileged.  The, the

2    expansiveness of the reading of privilege, and Ocwen does, is

3    that literally any employee of Ocwen, from the, the people who

4    take out the trash to the CEO are all covered under a claim of

5    privilege if they, if they have access to this material.

6          And quite frankly, that, that position expresses such

7    a profound broad view of privilege that is simply punching a

8    clock at Ocwen means everything you view that, you know, is in

9    a wildly distributed document is subject to the claim of

10   privilege.  There is no acknowledgment of any limitation on the

11   privilege to what we traditionally think of in the context of

12   control group, and even people in management, most of these

13   people that are listed are not even managers or supervisors.

14   Their entries are normally documented specifically that they

15   are, in fact, managers or supervisors.

16          So that was, you know, one way to factually get to the

17   bottom of it, and I hate to propose anything that takes you

18   more time because we have literally run out of time, that they

19   designated their corporate representative.  The Court could

20   authorize a short deposition by Zoom over the facts related to

21   these issues so that Your Honor could have testimony from Ocwen

22   related to how this actually works and functions and who has

23   access to it and whether it is shielded from anyone in any way.

24   But I, I literally just got through deposing their witness in

25   another case and usually ask in every mortgage servicing case,

1   pretty much anyone who is employed with Ocwen in servicing has

2   full access to the contents of the notes log.

3          So I, I mean, it, it — when I am explaining, Your

4   Honor, what I know about factually how these situations work,

5   it is usually based on the testimony I have taken in other

6   cases, and in this case specifically from Ocwen, in other

7   situations.  So it is, you know, it, it, it is an expansive

8   offering of privilege that doesn't seem to consider the

9   possibility of any limits on privilege under any scenario.

10          MR. COHRON:  Also, Judge, just again to take us back

11  to a higher level view, you know, we are still dealing with,

12  again, there was no privilege log provided initially.  And

13  there was the, you know, the first privilege log; and then, you

14  know, supplemental privilege log.  We are still, after all that

15  time and energy, at a point where we have got entries on here

16  that say things like the author is the bankruptcy business

17  unit, and the recipient is Ocwen Loan Servicing.

18          And then, the designation is a, you know, a, a hybrid

19  creation, you know, between attorney-client privilege and work

20  product.  You know, I, I guess what I would ask or propose, I

21  mean, in the event that deposing, you know, Nick's proposal —

22  the Court decides it is not appropriate or necessary would be

23  that we just simply have the Court's leave to seek and file a

24  motion explaining this and seeking a rule for compliant

25  privilege log because, you know, without burdening the Court

1   with doing an in-camera review, we can't, like, fully develop

2   these conversations or arguments until they meet their

3   obligations.  And I think we have set out the material in

4   advance is they, you know, at least some of the ways that we

5   believe that has not been done.

6            THE COURT:  Let me hear lastly from Mr. Nichols.

7            MR. NICHOLS:  Yes, Your Honor.  Thanks.

8            A lot to unpack there.  So I mean, first, with respect

9   to Mr. Wooten's initial comments, you know, we heard a lot of

10  hypothesizing about what the information could be, and then, a

11  suggestion that the Court take a deposition to find out if all

12  of those hypotheses were true.  I mean, you know, frankly, it

13  is easy to be hyperbolic on the phone and suggest that

14  everybody from the trash man to the CEO could look at this, but

15  it just simply has no basis in reality and is unhelpful, not to

16  mention that none of these issues that Mr. Wooten is discussing

17  are -- is in Plaintiff's position statement to the Court.

18            You know, I think another fundamental problem with Mr.

19  Wooten's position is that his analysis is based off of an

20  antiquated and inapplicable standard for determining privilege.

21  This idea that there is a control group of employees, that is

22  not the test in the Seventh Circuit.  I, I believe it, it

23  was -- I want to make sure I get the case right, *Harper & Row*

24  *Publishers v. Decker*, 423 F.2d 487, which is a Seventh Circuit

25  case in 1970 affirmed by the Supreme Court in 1971 disposed of

1   the control group analysis.

2        Again, the relevant test in what matters the most when

3   considering whether information is privileged is, was the

4   purpose of the communication or the privileged information is

5   and whether those who have access to it have a need to have

6   access to it.  And the people that are accessing the, the

7   comments log are those people tasked with servicing this loan,

8   and so information about what is happening with Plaintiff's

9   bankruptcy or what is happening with her foreclosure is

10  relevant and necessary to every single person who, who touches

11  the loan to service it.

12       And, and so, you know, I, I think that, again, the,

13  the sort of hyperbolic talk about, you know, anybody and

14  everybody or the suggestion that vendors or third parties have

15  access, access to this is just simply not true.  And I mean, in

16  particular, with respect to the entry that we were

17  discussing -- and the, the author is literally identified as an

18  Ocwen employee in the bankruptcy department.  So I mean, the

19  suggestion Mr. Wooten made that this could be somebody from

20  Altisource, it, it has no basis in reality.

21       With respect to Mr. Cohron's arguments, again, I

22  believe that we have now served a second supplemental privilege

23  log that provides each of the elements that the Court

24  identified were necessary.  I understand that the parties have

25  a fundamental disagreement that, for example, Ocwen Loan

1   Servicing can be the recipient of the information, but I

2   believe that we are correct that it can be.

3          Again, Ocwen Loan Servicing is the client.  It is the

4   entity involved here.  You know, there is a reason why

5   Plaintiff has sued Ocwen Loan Servicing and not 1,000 people

6   that work for Ocwen.  And so the idea that you can dismiss

7   Ocwen as an entity when it comes to privilege just doesn't

8   comport with how privileges effect in this corporate setting.

9   So I think, you know, again, we have provided where the

10   privilege is, is being asserted, meaning whether or not it is a

11   document or a redaction from a, a larger document.

12          And it seems like today we are solely focused on, at

13   least with respect to the privilege log and the redactions,

14   solely focused on this comments log.  So we have identified

15   where these redactions are being made in the comments log, when

16   those communications or the information was generated, who the

17   author of that was, who the recipient was, the explanation of

18   what the information is, and the basis for the privilege

19   assertion.

20          And so, you know, when Mr. Cohron talks about, you

21   know, trying to get a, a, a rule compliant privilege log, I, I

22   just don't think that — I don't understand that.  Because we

23   have provided each element that the Court has asked for and

24   that the law requires.

25          THE COURT:  A suggestion that we are at the point now,

1    I guess, where we have had two attempts, and the objections

2    were made that the privilege log is not compliant and that the

3    parties have requested at this juncture at least the

4    opportunity to formally brief this issue and present that

5    before the Court and identify what portions of the privilege

6    log remain insufficient.

7              MR. COHRON:  We would welcome that opportunity, Judge.

8              MR. NICHOLS:  Your Honor, this is Carter Nichols.  I

9    think that the briefing of the issue is the appropriate next

10   steps, particularly because the fundamental disagreement over

11   how privilege works in the context of an entity like Ocwen

12   seems to be the root cause of — at least as I see it, the root

13   cause of the disagreement that, between the parties with

14   respect to Mr. Cohron's points about recipients or the, the

15   capacities of the individuals.

16             THE COURT:  Without that kind of institutional

17   knowledge that you both share, both sides, I think that would

18   be premature for the Court to make the determination that the

19   privilege log is insufficient.  More importantly, to give the

20   parties an opportunity to lay that context out for the Court

21   and so that the Court can formally rule on the sufficiency of

22   the privilege log would be the next step.

23             The Court is going to — counsel, to present that

24   motion to compel formally before the Court on the issues

25   outlined as well as the request, if need be, for in-camera

1   review.

2            A VOICE:  Thank you, Judge.

3            MR. WOOTEN:  Your Honor?  This — does this Court have

4    any opinion as whether it would make sense factually to have

5    testimony on these topics with respect to where this

6    information comes from, you know, who these people are, and who

7    has access to these records?

8            THE COURT:  I don't, I don't want to, to invite that

9    until I have seen it in the written context to see if that need

10   is there, and if so, the Court will pick it up; if needing for

11   supplemental, the Court will request that at that juncture.

12           MR. WOOTEN:  Would the Court consider other testimony

13   from Ocwen and other servicing cases on this point?

14           THE COURT:  I don't think you would be limited in

15   presenting that argument.

16           MR. WOOTEN:  I just wanted to make sure I understood

17   the parameters on that, Your Honor, if we (inaudible).

18           THE COURT:  As long as you don't require me to give

19   you a page limit, then, I am fine.

20           MR. WOOTEN:  I don't think we need a page limit, Your

21   Honor.  There was testimony, it would be offered, it would be

22   no more than two or three questions that covered the waterfront

23   on a number of these points.

24           THE COURT:  Oh, now I understand.  I think that is

25   fine.

1          Now — the servicing conversation, I think, Mr.

2    Cohron, we addressed as far as next steps.  I would like to

3    take up the written discovery responses that you had submitted.

4          MR. WOOTEN:  Yes, ma'am.  Mr. Cohron is going to speak

5    on these specific issues with these answers, Your Honor.

6          MR. COHRON:  I did not hear the end of your comments,

7    Your Honor.  My apologies.  It is cutting out.

8          THE COURT:  Oh, it is fine.  I was asking if we could

9    move in your, in your submission.  Your have Item 2, which were

10   the written discovery responses concerning requests for

11   answers, requests for production, and interrogatories.  I was

12   asking if we could transition to that topic now.

13         MR. COHRON:  Absolutely, Judge.

14         So I think the best way to articulate our concerns and

15   disputes here are, are two layers.  The first is more of a high

16   level discussion (inaudible) privilege log about the

17   appropriateness of the written responses themselves

18   (inaudible).  And then, the second aspect of this is issues

19   that relate to certain requests within that general umbrella.

20         Initially, you know, we have taken issue (inaudible),

21   the responses that have been provided by Ocwen with respect to

22   the request for production that was set out in summaries and

23   also request for admission and interrogatories.  Again, from

24   the high level perspective in responses, the responses lay out

25   a number of objections that we feel strongly that are, you

1   know, amount to boilerplate objections that are inappropriate

2   in that the Defendant has failed to follow specific guidance

3   about how, how these responses are to be handled.  Without

4   obtaining clarity they have the effect of clouding in not

5   getting the appropriate responses, but the privilege log has

6   the effect of clouding what documents have been produced versus

7   whether and what has been withheld on what basis or on what

8   objections.

9        So I am happy to go through on a request-by-request

10  basis and then, talk about this, but you know, I think some of

11  the communication breakdown last time was that these are

12  issues.  You know, the boilerplate objections, the objections

13  based on the various (inaudible) unduly burdensome and

14  (inaudible) detail about how or why.  And the fact that, you

15  know, the effect of these objections (inaudible) what exactly

16  it is at issue, or something is found within each and every one

17  of the responses that we have provided for in the summary.

18       THE COURT:  Do you think it is best, then, for us to

19  take, I don't know, maybe take the first look at the privilege

20  log service notes before we go line item by line item?  What

21  would be the most effective in your opinion?

22       MR. COHRON:  Well, Judge, thinking within the

23  discovery responses, you know, I think that, you know, to kind

24  of — if you are asking the Plaintiff what he would like, we

25  would like for the Court to summarily overrule some of these

1  objections because I, I think that the Defense counsel is going
2  to have a very difficult time justifying their continued
3  presence in the responses.  But in terms of making this
4  manageable, you know, we would suggest starting with the
5  summaries, going through the specific responses.  And, and I am
6  happy to lay out with respect to each response, you know, what
7  we find to be efficient and why.

8          THE COURT:  What are your thoughts, Mr. Nichols or Mr.
9  Ostroff?

10         MR. NICHOLS:  Yes, Your Honor.  This is Carter Nichols
11  again.  So a couple of things, you know, just backing up first
12  to sort of level check where we are, at the last discovery
13  conference on the 24th, you ordered Plaintiff to provide a
14  written list of every written discovery response, response and
15  issue that Plaintiff had —

16         THE COURT:  I did.

17         MR. NICHOLS:  — by February 25th, that Friday.  We
18  did not receive that correspondence until Sunday the 27th, and
19  that correspondence includes a number of requests, some of —
20  and interrogatories, RFAs, some of which are highlighted in red
21  and some of which are just normal in black typeface.  And in
22  Plaintiff's position statement submitted on the 4th, Plaintiff
23  indicates that they are only seeking leave to file a motion to
24  compel with respect to the requests that are set out in red.

25         And then, last night at 8:00 p.m., we receive a, a

1  supplemental position statement that adds issues with the

2  written discovery that was not included within the

3  correspondence that was served on the 27th; but again,

4  Plaintiff is apparently only seeking leave for a motion to

5  compel on what is in red.  So I, I just — I bring all that up

6  to, to try to understand exactly what Plaintiff wants to

7  discuss or what is still at issue because like, like we talked

8  about last time, the ground is continuously shifting here.

9         We have a meeting with the Court, Plaintiff says one

10  thing, commits to doing one thing, and then, as soon as the

11  hearing is over, things change.  Or the Court set a deadline to

12  do something, Plaintiff misses it, or they submit something.

13  And then, at the eleventh hour before the parties are getting

14  ready to convene with the Court again, there is new information

15  or new issues brought up.

16         With all that said, I am prepared to discuss anything

17  the Court would like to discuss, but I mean, I, I just — I am

18  trying to, like we, like we discussed at the hearing last week,

19  I am trying to get some clarity on what the point or what the

20  end goal here is with all of these shifting issues and the

21  inability from our perspective of Plaintiff to identify a

22  position and maintain it at least for a week.

23         MR. COHRON:  Your Honor, may I respond?

24         THE COURT:  You may.

25         MR. COHRON:  I think it is clear within the summary

1    and without getting into the weeds once again, you know, to, to

2    paraphrase Mr. Nichols' previous comments about hyperbole, I

3    think once again, it is easy to make comments and frankly,

4    misrepresentations over the phone that one wouldn't make in

5    person.  But with respect to what is at issue, again, Judge,

6    what is at issue is we want the Defendant to do their job and

7    follow their ethical obligation to respond to discovery in an

8    appropriate way and follow the rules.  We think that is an

9    entirely reasonable request.

10         I have set out in excruciating detail in these

11   summaries exactly every single response that we feel

12   confidently and passionately, quite frankly, are wholly and

13   wildly deficient that amount to an attempt by the Defendant to

14   cloak and conceal documents that should be produced.  Until we

15   are able to work through these and obtain appropriate written

16   responses, we cannot go -- and Mr. Nichols is very well aware

17   of this.  We are all seasoned and experienced lawyers here,

18   that we cannot dial down and address the things that should be

19   produced until we know and they meet their obligations to

20   respond in an appropriate way and indicate whether things have

21   been (inaudible).

22         One thing I do agree with that Mr. Nichols stated was

23   that, you know, we did not intend to seek a motion to compel on

24   requests outside of those that are laid out in red.  That is

25   because we are confident that those are things where documents

1    exist and are more substantive in nature.

2           For our purposes of today, our conversation generally,

3    we still seek, again, responses, appropriate responses to many

4    other requests.  Those include various versions, for example,

5    of the first request for production and No. 17, where we have

6    been through this charade on several different occasions.  I

7    mean, we received a response, the first supplemental response,

8    a second supplemental response; and yet, the same objections,

9    baseless objections continue to permeate through all the

10   responses.

11          So you know, I, I disagree, again, with this moving

12   target type thing.  There are things that are focused on at

13   different times versus trying to get compliant generally.  If

14   the Court wants to focus, you know, the rest of these

15   discussions on things that we think are more of a priority,

16   i.e., things that we think is appropriate to allow us to file a

17   motion to compel on, we are happy to do that.  I just don't

18   want to lose sight of the fact that we still continue to seek

19   rule compliant responses and feel that we are entitled to them,

20   i.e., responses that are not littered with boilerplate

21   objections that, if parties were working in good faith with one

22   another, would be able to dispatch with very, very quickly.

23          And you know, I understand that, you know, the timing

24   and oh, you know, we can do this or that.  But there are

25   objections in here that should not be there, and until we, we

1    can make our way through that, we, ourselves, cannot make

2    appropriate determination about whether or not we want to push

3    forward and file a full blown motion to compel.  That is kind

4    of the purpose.

5         I mean, for example, you know, FRCP 34(b)(2)(C) about

6    whether documents are being held is a pretty fundamental thing

7    with respect to request for production of documents.  We

8    anticipate the need and desire to file a motion to compel with

9    respect to these, but we can't have an intelligent conversation

10   on our side about what that entails or what we are looking for

11   because we don't know.  And this comes up again and again in

12   different versions, particularly with respect to the RCRs,

13   whether or not there is documents that are existing and that

14   are responsive to this.

15        So until the litter is cleaned out, you know, and we

16   are having an honest conversation about what is fair and what,

17   if it is being withheld, why, we — it would be our preference,

18   and you know, to not waste the Court's time and just filing a

19   motion to compel on every single response that is still at

20   issue.

21        THE COURT:  So now that I think that was the question

22   that had been presented as to where do we go from what we have

23   in front of us, and what has been presented to me is walking

24   through, Mr. Nichols, those items that have been identified in

25   red, where Plaintiffs are in this position, wanting to file a

motion to compel might be most helpful.

MR. COHRON:  Yes, Your Honor.  Judge, if I may direct your attention to the summary of outstanding —

THE COURT:  Mr. Cohron, give me just a second here, okay?  All right, Mr. Nichols?  Is that agreeable to you regarding next steps?

MR. NICHOLS:  Yes, Your Honor, happy to go through everything.

THE COURT:  Okay.  The first one that I pulled up, Mr. Cohron, is the request for admissions.

MR. COHRON:  Okay.

THE COURT:  I believe the first highlighted is request for admission No. 1.

MR. COHRON:  That is correct, Judge.

THE COURT:  Did you have something regarding the objection, Mr. Nichols?

MR. NICHOLS:  So Your Honor, I am happy to talk through each part of this.  So as you know, one of the things that was ordered at the last discovery conference was for us to submit a brief supplemental briefing on the issue of a statement of reasonable inquiry.  We did submit that on March 4th.  I am happy to talk about that, although I don't want to belabor the point of going through the written submission.

THE COURT:  You go ahead.  You are fine.

1          MR. NICHOLS:  So you know, in short, we don't believe

2     that any of these requests for admission that have been

3     identified or objections thereto require a statement of

4     reasonable inquiry.  The rule is explicitly clear that a, that

5     a statement of reasonable inquiry is only required when a party

6     states that it cannot answer based off of the lack of

7     information, and with respect to these requests for admissions

8     that have been identified, Ocwen simply objected on multiple

9     grounds and did not state that it could not respond because it

10    lacks information.  And so, you know, as set out in our

11    briefing and the case law that we cited to, it is totally

12    appropriate under the rules for us to have raised the

13    objections we did.  And the statement of reasonable inquiry is

14    not implicated or triggered by the objections we have served

15    here.

16          THE COURT:  Mr. Cohron?

17          MR. COHRON:  Your Honor, just to clarify, the issue,

18    the question about statement of reasonable inquiry was based

19    upon a reading of the responses, the fact that the Defendant

20    had neither provided an admission or denial, and because of the

21    nature of the response, that it was a natural interpretation to

22    presume that their response was, you know, an assertion of lack

23    of knowledge or information.  I am glad that Mr. Cohron has

24    clarified that that is not, in fact, the case and Ocwen has the

25    possession of the availability and the information to

1    appropriately answer these.

2           However, notwithstanding that one small issue, there

3    are numerous other deficiencies associated with this response.

4    Plaintiff disagrees that these objections are appropriate.  For

5    example, you know, this is discovery, and we have got

6    evidentiary based objections as if we are moving to admit these

7    into the record.  I think that kind of speaks for itself.

8    Maybe that is something that is designed to support a relevancy

9    argument, I don't know; but otherwise, you know, there, there

10   is this objection on the basis of ambiguity.

11          You know, this case law is clear that, you know, when

12   there is any, any doubt about, you know, the interpretation of

13   the language, a reasonable interpretation should be utilized.

14   So I, you know, I think our position is set out pretty much in

15   detail, detail below, and at the end of the day we believe we

16   are entitled to admission or denial.

17          THE COURT:  Now, you have the last point.  Your

18   objection, Mr. Nichols?

19          MR. NICHOLS:  Yes, Your Honor.  So the case law in the

20   Seventh Circuit is clear.  A party can either answer, they can

21   object, they can state that they are unable to answer or deny

22   or admit or deny, I should say, based off of a lack of

23   information.  There are three options available, essentially,

24   and here, there are four, I should say:  Admit, deny, explain

25   that they cannot admit or deny based off of a lack of

1    information, or object.  Ocwen has objected here.

2          So with respect to the specific point about a

3    statement of reasonable inquiry, that rule is not triggered

4    because Ocwen has objected here.  I think the case law we cited

5    makes clear that that was appropriate; and moreover, I mean,

6    getting — as a practical matter, the Seventh Circuit has also

7    said that it is only when a party fails to admit — or excuse

8    me, answer or object that a request for admission can be deemed

9    admitted.

10         And so as a practical matter, the Seventh Circuit has

11   recognized that it is appropriate to raise objections to a

12   request for admission.  And so again, with respect to that

13   aspect of Plaintiff's dispute, we believe that we have complied

14   with the Federal Rules of Civil Procedure.

15         I disagree wholeheartedly that our objections are

16   boilerplate, and we will go through, obviously, more of these.

17   But again, you know, I think that we have clearly stated why

18   the — why we are objecting, the basis that we are objecting

19   on.  I don't believe they are boilerplate; and frankly, I think

20   it, I think the fact that some — that there is a pattern of

21   severely overbroad and burdensome requests may, may lead

22   Plaintiff's counsel to believe that there are boilerplate

23   objections, because the, the same objections can be made to so

24   many of these discovery requests.  But that does not make them

25   boilerplate.

1    It is simply a nature of the request that many of

2  their requests that have been made, and in each instance,

3  again, our objections are fully explained.  And so we believe

4  that we have complied with the rules here and obviously are

5  happy to more fully brief the matter if the Court desires.

6    THE COURT:  I am sorry, I was muted.

7    I know that that has been the request, to be able to

8  brief these out individually, at least the points that are

9  highlighted in red.  Both sides have presented their argument

10  as to -- I believe for all three categories that we talked

11  through, the RSPs, as well as the interrogatories, and the

12  answers.  It might be a better use of resources to -- unless

13  there is a position that is not presented here, I guess, to

14  formally ask the question, Mr. Cohron, to you, regarding a need

15  to formally brief this out.

16    MR. COHRON:  Yes, Judge.  I would welcome that

17  opportunity and ask the Court to respectfully (inaudible) to

18  brief all of the issues that are set out in red within the

19  summaries.  We will defer to the Court about a proposal for

20  addressing, you know, the other outstanding issues.  Perhaps if

21  the Court is so inclined we can take that up on another day or

22  talk about them individually, but certainly --

23    THE COURT:  I think that might be the best path

24  forward so that this objection that, the ruling is changing,

25  whether the argument is changing, it is best if we lay it on

paper and allow the parties to be able to formally brief it
might be the best path, only limiting, of course, to those
issues that are highlighted in red in the three summaries that
were provided.

MR. COHRON:  Thank you, Your Honor.

THE COURT:  Moving to Mr. Nichols' submission on
March 4th, there will be an objection filed regarding the risk
convergence report and the production of those risk convergence
reports to Judge Pratt that have been identified here and
compliant would be monitored reports.  Mr. Nichols, did you
want to turn to that next?

MR. NICHOLS:  Yes.  Thank you, Your Honor.  So with
respect to the risk convergence reports, we would ask that the
Court stay the order for production while we brief and the
District Court addresses what we have set out as an objection,
but I understand might be properly termed as a motion for
reconsideration.  And that with respect to the risk convergence
reports, that is what we would ask today.

THE COURT:  So that we have it on the docket, if you
will follow up with a formal motion to stay production until
there is a ruling on your either motion for reconsideration or
appeal, that would be, that would be best going forward just so
that we are communicating on the docket where we are.

MR. NICHOLS:  Of course, Your Honor.  We will do that
right away.

1          THE COURT:  Okay.

2          MR. NICHOLS:  With respect to the compliance monitor

3    reports, I apologize if I am misspeaking on behalf of opposing

4    counsel, but I don't believe that the request for production

5    related to the compliance monitor reports, which are also known

6    as the StoneTurn reports have been identified as one of the

7    RFPs in red.  But even if it were, this is an issue that the

8    Court took up over a year ago and gave very — Your Honor gave

9    very explicit instructions about what was to happen if

10   Plaintiff wanted to obtain these compliance monitor reports.

11         Specifically, Plaintiff was instructed to keep these

12   documents from StoneTurn in the appropriate venue, and at the

13   same time was ordered to withdraw a motion to modify the

14   protective order that had been filed in the *Todd v. Ocwen Loan*

15   *Servicing* case.  That motion to modify the protective order was

16   withdrawn.  I don't know that there has been any follow-up

17   activity or attempt by Plaintiff's counsel to obtain the

18   documents from StoneTurn, but there had been renewed

19   conversation or overtures from Plaintiff's counsel attempting

20   to obtain those documents from Ocwen.

21         And so Ocwen's position is simply that the Court has

22   addressed this issue and has given Plaintiffs explicit

23   instructions, and if Plaintiff desires to obtain those

24   documents, they should follow the Court's direction in

25   attempting to do so.

1          MR. COHRON:  Your Honor, may I respond?

2          THE COURT:  You may.

3          MR. COHRON:  It is Plaintiff's position that that is

4    not, in fact, the case.  I think this came up in an informal

5    discussion about, you know, how, what was the best way to reach

6    a consensus on this.  You know, as Carter is well aware, it

7    would be inappropriate for us to go to StoneTurn if Ocwen is in

8    possession of those documents.  My guess is that Carter is not

9    in a position today to state whether or not his client has

10   these documents, despite the fact that we all know that they

11   do.  But notwithstanding that, we have these documents.  We

12   intend to use these documents.

13         We recognize that it is the Defendant's position that

14   they are subject to a protective order.  We disagree, and we

15   would certainly welcome a challenge on those grounds to the

16   extent necessary.  So I, I think that we can bring this to a

17   head, you know, very quickly and painlessly that, you know, we

18   don't need to take any further steps to get the documents from

19   StoneTurn or Ocwen.  You know, Mr. (inaudible) is better able

20   to detail that we have these documents.  There is no need to

21   burden anybody else.

22         MR. NICHOLS:  Your Honor, this is Mr. Nichols.  If I

23   might be heard on that point?

24         THE COURT:  Left's see.  Let's make sure that Mr.

25   Cohron was done.

1        MR. COHRON:  Yeah.  I think Nick can talk about the

2    contents of the documents where we are at, but that was my

3    final thought, Judge.

4        THE COURT:  All right.  Go ahead, Mr. Nichols.

5        MR. NICHOLS:  Your Honor, so Mr. Cohron just mentioned

6    that they think it would be inappropriate to have to go to

7    StoneTurn.  Just so we are clear, there has already been a

8    third party subpoena served by Plaintiff on StoneTurn for the

9    documents.  StoneTurn objected to that subpoena, did not

10   produce documents, and it was after those objections that the

11   discovery conference was held on January 15, 2021, where Your

12   Honor instructed Plaintiff to attempt to obtain those documents

13   from StoneTurn in the appropriate jurisdiction.

14       I am not misremembering that.  It is precisely what

15   happened; and so again, you know, I think that the Court has

16   addressed this issue, and the Court's prior instructions should

17   stand.  With respect to the comments about the protective

18   order, I believe Your Honor was the Magistrate Judge assigned

19   in the _Todd_ case, and so you are well aware of the terms of the

20   stipulated protective order, which unequivocally limits the use

21   of documents designated confidential to that case.

22       And so again, Plaintiff attempted to modify that

23   protective order a year ago and was, again, instructed by Your

24   Honor to withdraw that motion.  So we are treading the same

25   ground on multiple fronts here; and again, Ocwen's position is

1    simply that the Court has addressed this issue, has given

2    explicit instructions, and those instructions should be

3    followed if Plaintiff intends to seek these documents.

4              MR. COHRON:  Your Honor, may I respond?

5              MR. WOOTEN:  Mr. Cohron?  I would like to address the

6    800-pound gorilla in the room if I may, Your Honor.  This is

7    Mr. Wooten.

8              I need to take a step back from this and talk about

9    what Ocwen is asking here.  We made specific requests for

10   documents that everyone on this call knows exists, made

11   specific requests for documents that have already been produced

12   in litigation against Ocwen.  It was founded on factually

13   identical conduct; that is, just totally foul enough to

14   handling of the Chapter 13 bankruptcy and then trying to take

15   somebody's house afterwards.

16             The same issues in this case, as well as the *Saccameno*

17   case that I litigated all the way to the United States Supreme

18   Court, and Ocwen is invoking a protective order, which is

19   usually negotiated to keep third parties from accessing

20   documents, not litigants, in an attempt to shield the use of

21   documents Ocwen has already produced multiple times in other

22   litigations.

23             And that seems very, very far afield of the purpose of

24   Rule 1; and quite frankly, I just confronted this in another

25   case that went to trial in arbitration against Ocwen where we

1   were running short on time.  We were arguing about whether this
2   document exists or not, and Ocwen is sitting in the trial
3   saying it doesn't.  And I have got a copy of it from another
4   case; and in that case, the arbitrator said, it has never been
5   produced by Ocwen to you in any other case, has an Ocwen Bates
6   label on it, you can use it.

7          Now, our — obviously, different rules apply.  It is
8   more of a summary procedure in arbitration, but I think the
9   point is the same.  When you are denying, you know, a document
10  exists or you are denying the documents exist or you are
11  refusing to produce documents that are produced by the
12  corporation, as Mr. Nichols said earlier, I mean, if you put it
13  in my context, Your Honor, if I went down the road driving
14  100 miles an hour and plowed into four people and had to have a
15  blood test run, I couldn't get a protective order in the first
16  case and explain that the blood test couldn't be produced in
17  the other three cases.  Because it is my discovery material,
18  but Ocwen wants to shield from discovery, documents that we
19  already had, they have already been produced, and it is, it is
20  a little bit disconcerting, given that Your Honor was involved
21  in *Todd*.

22         And we litigated that case from start to conclusion in
23  about, you know, about a year or so.  We covered all of this
24  ground and had these briefings and had these arguments, and
25  Your Honor saw these documents and made decisions and issued

1    rulings; and now, we are being asked to do all that again just
2    because there was a, a consent, a confidentiality agreement in
3    the other case where Ocwen didn't want the documents disclosed
4    to third parties.

5          And now Ocwen wants to shield itself from discussing
6    those documents again because it was, you know, under the
7    premise that that confidentiality, those documents can only be
8    used in that case.  I think the parties made those types of
9    agreements, they tend to expect that once you burnt that bridge
10   the first time, you don't have to scoop up the ashes and
11   reconstruct the bridge and burn it again in the next case
12   because that battle has been fought, but that is not the case
13   here.

14         THE COURT:  Okay.  The Court has already directed
15   Plaintiff to pursue these documents through StoneTurn.

16         MR. COHRON:  Judge, may I respond?

17         THE COURT:  Uh-huh.

18         MR. COHRON:  That decision, Judge, which was not an
19   order, was based on the representation that, and this is
20   actually evident in discovery responses.

21         THE COURT:  Uh-huh.

22         MR. COHRON:  A representation about whether or not the
23   documents have been withheld.  So to Carter's point, if they
24   follow the rules and do what they are supposed to, in response
25   to that RSP, it would state those documents are being withheld,

1    that they have them.  There would never be an instance where we

2    would ever go to StoneTurn.  We cannot enforce a subpoena

3    against StoneTurn without first, you know, and I forget the

4    standard, without pursuing them from Ocwen.

5         So what Mr. Nichols is proposing is once again, a

6    slight of hand/misdirection.  He wants us to go and try to get

7    these from StoneTurn knowing that, one, we already have them;

8    but two, that they have a valid objection on the basis that

9    you, a party in interest, the Defendant in the case in which

10   you were litigating has these documents.  You shouldn't be

11   coming a third party for them, and then, what will happen

12   assuredly, is we will spend that time and energy pursuing them

13   from StoneTurn and unlikely be successful on that basis.

14        And then, we will be right back here before Your Honor

15   having a discussion about, well, Ocwen still has these

16   documents, Judge.  We, we have issued a valid request for

17   production, and they have not, you know, they have not provided

18   them or indicated whether or not they are being withheld,

19   which, again, is a legal fiction because we now know that they

20   have the documents and should, should have produced them

21   already in response to one of our requests for production.

22        Final point with respect to, you know, us already

23   having the documents, the Court's instructions before, this is

24   an issue we have researched and we feel strongly that the

25   appropriate mechanism here would be for, if the Defendant

1   believes that these documents are protected.  There is a valid

2   reason for them to be protected, and then, they should be

3   required to move to enforce that protective order because we

4   don't think that is the case.

5          We think that we have a strong argument that, that the

6   documents, their production was not, you know, limited to just

7   that particular matter and/or that the party producing them was

8   not a party to it.  So that is just our view, certainly not the

9   fault, the Court's guidance and proceed accordingly, but I

10  can't stress enough this is what we would call, where I am

11  from, a fool's errand.

12         MR. NICHOLS:  Your Honor, this is Carter Nichols.  May

13  I be heard?

14         THE COURT:  Thank you, Mr. Nichols.

15         MR. NICHOLS:  Thank you, Your Honor.

16         So a couple of points.  You know, we first heard from

17  Mr. Cohron that the Court hadn't made a ruling, and then, it

18  switched to the Court did make a ruling, but it was based off

19  of some representation that was made by Ocwen at the time.  We

20  have also heard that there is some rule apparently that

21  requires Plaintiff to seek the documents from Ocwen before it

22  can go to StoneTurn, which is a little confusing to me because

23  the third party subpoena served on StoneTurn in this case was

24  done before any request for production regarding the compliance

25  monitor reports was served on Ocwen.

1    And finally, we heard that from, I think, both Mr.

2    Wooten and Mr. Cohron that Ocwen produced these documents in

3    the *Todd* case when, in fact, it was StoneTurn that produced the

4    documents.  I, I am looking at the, I am looking at the docket

5    right now, entering 178 on September 11, 2020, where the Court

6    ordered counsel for StoneTurn to produce the documents in *Todd*.

7    So again, you know, it is really easy to, to talk, you

8    know, give analogies about hitting people with cars or, you

9    know, trying to recollect what happened.  But the order from

10   *Todd* is clear, both the docket entry ordering StoneTurn to

11   produce the documents and the terms of the stipulated

12   protective order in that case, which binds the parties in that

13   case.

14   It, it is not Ocwen's responsibility in a separate

15   litigation to try to enforce the obligations put on Plaintiff

16   by this Court in another matter, and again, you know, finally,

17   and I apologize for sounding like a broken record.  But the

18   Court has addressed this issue and has issued a directive to

19   Plaintiff; and so again, we would ask that the Court simply

20   stick with what it previously instructed Plaintiff to do and

21   have them go to StoneTurn in order to try to obtain these

22   documents, which Ocwen, Ocwen maintains are not relevant in any

23   way to this case.

24   MR. COHRON:  Your Honor, if I may.  If we have the

25   documents, I don't see why we would go to StoneTurn with all

1   due respect to previous discussions.  I mean, I, I have them

2   both up on my screen.  We have the documents.  If, if

3   Mr. Cohron wants to allege that we have breached the protective

4   order in a different matter, no different than the parties

5   alleging that somebody has breached a contract or some other

6   agreement between them, that is their burden to show.  We have

7   the documents.  I, I don't — you know, this is all great and,

8   you know, this legal fiction, you know.

9         Frankly, you know, we believe kind of borderlines

10  fraud upon the Court, that we are going to play this game of

11  these documents may exist, they may not exist, they may come

12  from here when we have the documents, Your Honor.  We have

13  them.  There is no need to burden any other party.  If

14  Mr. Cohron, Ocwen feels that we have violated a protective

15  order, then, they have, they are well within their rights to

16  pursue that avenue.

17        THE COURT:  I guess where I am trying to get clarity

18  around is the production of the compliance monetary reports.

19  Is it your contention, Mr. Nichols, that the compliance monitor

20  reports are not relevant in this case or more — on, I am

21  trying to flesh out the nature of your objection.

22        MR. NICHOLS:  So Your Honor, it, it is multifaceted.

23        THE COURT:  Okay.

24        MR. NICHOLS:  Correct.  They are not relevant in this

25  case whatsoever, but on top of that, the procedure for

1  attempting to obtain them and use them in this case is

2  unequivocal and clear based off of the Court's stipulated

3  protective order in *Todd* and the Court's prior ruling.  You

4  know, I take issue with the suggestion that I am engaging in a

5  fraud on the Court when it — Plaintiff's counsel is discussing

6  disobeying a Court's stipulated protective order in the *Todd*

7  case, which states again, explicitly, that documents either

8  produced by either party or a third party and designated

9  confidential can only be used in that matter, meaning the *Todd*

10 matter.

11      So again, you know, our objection is that they are not

12 relevant among others, and additionally, that the process here

13 is very clear and has been laid out by the Court.  And that

14 Plaintiff, if they want to attempt to use them in this case,

15 should have to follow the proper process for obtaining them and

16 using them in this litigation.

17      MR. COHRON:  Your Honor, may I respond?

18      THE COURT:  One second.  Give me one second.  You can

19 in just a moment.  Mr. Nichols, so it is the idea of here it is

20 the usage that we are objecting to, Mr. Nichols?

21      MR. NICHOLS:  It is both the usage of the documents in

22 this case and also — let me back up.

23      THE COURT:  Okay.

24      MR. NICHOLS:  Yes.  It, it is the objection to the

25 usage based off of relevance and other objections, the

1   objections that we raised in a response to the request for

2   production.  But it is also the fact that that request for

3   production was served, and the issue is being brought before

4   the Court after the Court has already ruled, essentially, on

5   the matter.

6        I mean, we have this conversation over a year ago, and

7   you gave explicit instruction.  And so it, it is multifaceted.

8   It is both the use, the relevance, all of the reasons that we

9   objected to the documents in the request for production that

10  was served after Plaintiff attempted — after Plaintiff served

11  the subpoena on StoneTurn and after the Court ruled that they,

12  that Plaintiff needed to obtain the documents from this matter

13  from StoneTurn in the appropriate jurisdiction.  And then, on

14  the other hand, the, the relitigating of this issue that the

15  Court has already decided.

16       THE COURT:  Okay.  Now I understand.  Go ahead, Mr.

17  Cohron.  You wanted to add?

18       MR. COHRON:  Yes.  Thank you.

19       THE COURT:  You wanted to respond.

20       MR. COHRON:  Thank you, Judge.  I would just point out

21  that, you know, this stuff about relevancy, you know, we are

22  dealing with discovery here in the production of documents.

23  You know, to the extent these documents are going to be used at

24  a hearing, trial is for another day.  They, you know, I have no

25  doubt that counsel for Ocwen will argue at a later date that

1   these documents are, in fact, relevant for admission purposes.

2   I think that is kind of, you know, again, a slight of hand.

3            With respect to, you know, the documents themselves,

4   if the Court were to ask Carter here today or their client, you

5   know, summary proceeding, do you have the documents?  And the

6   answer to that question is yes, then, that response alone would

7   eliminate any discussion that the Court has ever had or we have

8   ever had about going to a third party to obtain them.  If they

9   have them, the correct procedure for talking about, you know,

10  correct procedural steps would be to, you know, to, to brief

11  here and to move to compel their production.

12           But again, you know, I have to stress that, you know,

13  that argument, those, you know, the reasons of why the

14  documents shouldn't be produced, you know, it is not tied or

15  not relevant in a situation that we already have the documents.

16  So I appreciate Mr. Nichols' burden, and certainly, we disagree

17  what the Court did or didn't do before.  You know, we readily

18  acknowledge that there was that discussion, and the Court was

19  of the opinion that given the facts that were known and based

20  on our belief that StoneTurn –– or that Ocwen did not have the

21  documents, that that was the, was a, you know, a, you know, an

22  appropriate way to proceed.

23           But again, you know, in closing, don't want to beat a

24  dead horse here.  We still feel that the proper procedure,

25  given that we already have the documents and we have laid out

1  the position and a number of prior conversations, we are happy

2  to brief it, is, that if Ocwen believes that this protective

3  order covers these documents, then, it is their obligation and

4  burden to enforce that.  That, you know, it -- what he is

5  suggesting is akin to two parties, you know, a contractual

6  dispute, and you know, just as a matter of fact because there

7  was a quote, unquote contract that, you know, that the Court

8  would deem it summarily to be enforceable or enforce it, but

9  that is not how this works.

10       We disagree about the contents in the application and

11  the basis of the privilege of the protective order.  We are

12  happy to litigate and brief that issue; but again, I can't

13  stress enough that we have the documents.  All this stuff is

14  quite silly, quite frankly.  We have the documents.

15       THE COURT:  I will require, at least at this juncture,

16  without that briefing in place, to permit or require Mr.

17  Nichols to produce the compliance monitor reports.  It says

18  that the Plaintiffs were pushing for the production of the

19  compliance monetary reports in your discovery submission to me,

20  Mr. Nichols, in front of me, at least to what I have, as far as

21  context.

22       I am not going to require that on this call, but if

23  there is a need for additional briefing on that issue, then, we

24  would take that up.  I tend to agree that if there is a desire

25  to use the compliance monitor report from the previous case,

then, there would need to be a request made for — to be able
to use those in this case.

MR. NICHOLS:  Your Honor, this is Carter Nichols.
There was, there was a request to modify that protective order
in *Todd*, which we don't, by the way, have to hypothesize about
or analogize about.  We can pull it up and read it.  It is very
clear what it said can and cannot be done with documents
produced and designated as confidential in that litigation.

It is not Ocwen's burden for Plaintiff to comply with
the court order.  Plaintiff is bound by that court order
regardless of what Ocwen does; and so again, there was a
request to modify that protective order, and the Court ordered
Plaintiff to withdraw that motion, and it was withdrawn.

So you know, again, we are, of course, happy to brief
anything the Court wants, but you know, frankly, it is just —
we are, we are treading the same ground over and over again,
and —

THE COURT:  I am not requiring briefing on the —

MR. NICHOLS:  I apologize, Your Honor.

THE COURT:  I am not requiring briefing, and I am not
requesting briefing.

MR. NICHOLS:  Understood.

THE COURT:  What I wanted, what I was — the point
that I was making, or I guess, what I was wanting to flesh out,
as Mr. Cohron alluded to, he has those documents in hand from

1    the prior case in the *Todd* case.  If there was a request, of
2    course, to use them in this case, then, that — regarding that,
3    he said if there was briefing necessary on that issue he would
4    be welcome to do that.  And so what I — my ruling, my
5    preliminary ruling from what I have seen in the briefing, I
6    don't, from what you have submitted to me on March 4th, I am
7    not requesting, and I don't think you are requesting to
8    formally brief this issue of the compliance monitor report.

9         In the highlighted red section of what is going to be
10   briefed, I did not see the compliance monitor report requested
11   by Mr. Cohron.  So I don't anticipate that that is coming.  Am
12   I misreading that, Mr. Wooten — I am sorry, Mr. Cohron?  I
13   apologize.

14        MR. COHRON:  Judge, I do not have (inaudible) no.
15   This issue was not one that was, was contained in there, and we
16   don't seek to compel the document.  We already have them.  Our
17   briefing that we discussed today and the Court has granted us
18   leave to pursue will not include a motion for leave or a motion
19   to compel StoneTurn documents from Ocwen.  Again, we have got
20   them.

21        Final thought also that the Court didn't order us to
22   withdraw the motion to modify.  We did so voluntarily, but it
23   is neither here nor there.  No, to answer your question
24   directly, no.  This is not going to be part of this briefing
25   here.

1              THE COURT:  Okay.  All right.

2              MR. WOOTEN:  Your Honor, this is Mr. Wooten.  One, one

3    last point.

4              THE COURT:  Before we do that I need to be cognizant

5    of the time, Mr. Wooten, and I do want to give Mr. Nichols the

6    opportunity to get through the last ten minutes that we have.

7    And so, I will move back to you, Mr. Wooten, in a moment, okay?

8    I do want to make sure that I get all of the points highlighted

9    here.  The risk convergence trackers risk mitigation documents.

10   Mr. Nichols.

11             MR. NICHOLS:  Yes, Your Honor.  I, I think that these

12   documents raised here are part of the categories in red on the

13   RFPs that you have already granted leave for — yes, Your

14   Honor.  So while we obviously stand by our objections, and we,

15   we recognize the Court's ruling that these issues will be part

16   of Plaintiff's motion to compel, and we will brief our

17   arguments accordingly.

18             THE COURT:  Okay.  I think that you had a fourth issue

19   to the various written discovery, and I think that might be

20   captured in your responses to the limited motion to compel.

21             MR. NICHOLS:  That's correct, Your Honor.  We covered

22   everything from that fourth point during the conversation about

23   the written discovery.

24             THE COURT:  All right.  Let me loop back to Mr.

25   Wooten.  Go right ahead, Mr. Wooten.

1    MR. WOOTEN:  Your Honor, a separate issue but related
2    so I might as well bring it now.  We will be officially
3    notifying our colleagues this evening that we are withdrawing
4    our consent to the stipulated protective order in this case.
5    We extended that as a courtesy, and it no longer exists.  We
6    will be withdrawing it in that case, and I will be withdrawing
7    my consent to any protective order in any other Ocwen case I
8    have going forward.

9        From here on out I will put them to the burden to
10   prove anything they assert confidentiality over is confident.
11   I try to do this the way lawyers normally handle these things
12   when they are involved with multiple cases against the same
13   party, but you know, I, I will no longer play this game over
14   what can be hidden behind consent decrees and confidentiality
15   orders.  So we will file formal notice within and challenge the
16   designations they have already made and put them to their proof
17   of the confidentiality.

18       THE COURT:  All right.

19       MR. OSTROFF:  Your Honor, this is Ethan Ostroff.  If I
20   am hearing Mr. Wooten correctly, what he is essentially saying
21   is for the umpteenth time in this case a representation is made
22   to us and to the Court that they are backtracking on it and
23   they are walking away from.  I don't — I have been silent in
24   this matter, Your Honor, today, despite the fact that, you
25   know, in my experience, the first time I have ever heard in

1    federal court two lawyers for the same party argue on the same
2    issue.
3              I don't understand what Mr. Wooten just said.  We, we
4    have a stipulated protective order, and I don't know what he
5    means by he is withdrawing his consent to the protective order.
6    The Court has entered an order.  It governs the case.
7              A VOICE:  I think it is with regard to a designation
8    of confidentiality, Judge.  I think that —
9              MR. OSTROFF:  That is not what he said.  He didn't say
10   I am going to challenge every confidentiality issue had.  He
11   said, I am going to withdraw my agreement to the protective
12   order and send notice of that tonight.  I don't even know what
13   that means because there is a court order, and a party can't
14   simply decide they are not going to abide by it anymore.
15             MR. WOOTEN:  Your Honor, I, I —
16             THE COURT:  The Plaintiff is entertaining this and
17   allowing this to escalate.  I think it is best for us to wait
18   and to see what filings or what communications happen so that
19   we — the Court is not answering hypothetical or hyperbole.  So
20   let's allow the process, allow the parties — if they would
21   like to continue to engage after this conversation as to next
22   steps, then, the Court will, then, take the necessary steps and
23   respond.
24             There is a protective order in place that was ordered
25   by the Court, and so I don't want to prematurely rule or

1    identify how the Court would rule as what I would call a sneak
2    peek.  So I think it is best for us to allow that to lay until
3    it is appropriate for the Court to take that up.

4         We have several issues coming down the pipeline with
5    regards to compel motions to compel that the Court is
6    permitting privilege logs, requests for in camera review as
7    well.  That is going to take up a significant amount of time
8    and, on both sides of this case, as well as Court resources and
9    necessary for us to continue to allow this case to move
10   forward.  So I don't want to put an expedited briefing schedule
11   in place for either side as to when these issues will be
12   appropriately teed up, but I think it is best for us at this
13   juncture to allow the parties to formally brief and the Court
14   be given the opportunity to review argument on both sides, all
15   right?

16        A VOICE:  Thank you, Judge.

17        A VOICE:  Thank you, Your Honor.

18        THE COURT:  Those are the issues that were brought
19   forth in the discovery statements in advance of the call.  I
20   think we have outlined and gone through and have a discovery
21   plan moving forward.  When necessary, the Court will set
22   another status conference, but we are not able to do that at
23   this juncture.  But the Court intends to do that in the coming
24   weeks.

25        I want to appreciate both sides for your time and your

1   effort this afternoon, and the Court will wait the motions that

2   are forthcoming so that we can continue to move the case

3   forward.  Thank you for your time this afternoon.

4             A VOICE:  Thank you, Your Honor.

5             A VOICE:  Thank you, Your Honor.

6             THE COURT:  Thank you.

7             A VOICE:  Thank you.

8             THE COURT:  Thank you.

9             (Hearing concluded.)

10                        - - -

11              CERTIFICATE OF COURT TRANSCRIBER

12

13             I, court-approved transcriber, certify that the

14   foregoing is a correct transcript from the official electronic

15   sound recording of the proceedings in the above-entitled

16   matter.

17

18

19   s/s Jean A. Knepley_____        April 25, 2022
     Signature of Approved Transcriber          Date
20

21

22

23

24

25