# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### Terre Haute Division

DEMONA FREEMAN,                                  )
                                                 )
      *Plaintiff,*                          )
                                                 )
    v.                                       )  **Case No.**  1:18-cv-3844-TWP-DLP
                                                 )
OCWEN LOAN SERVICING, LLC., and                  )
THE BANK OF NEW YORK MELLON f/k/a                )
THE BANK OF NEW YORK as successor in             )
interest to JPMorgan Chase Bank, N.A., as Trustee )
for C-BASS Mortgage Loan Asset-Backed            )
Certificates, Series, 2005-RPI,                  )
                                                 )
      *Defendants*.                        )

## RESPONSE IN OPPOSITION TO DEFENDANT BANK OF NEW YORK MELLON'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Demona Freeman ("Freeman"), by and through undersigned counsel, and pursuant to Fed. R. Civ. P. 56, L. R. 56-1, and the Honorable Tanya Walton Pratt's Courtroom Procedures and Trial Practice, respectfully submits this Memorandum In Support of Response In Opposition to Bank of New York Mellon's ("BONY") Motion for Motion for Summary Judgment.

## I.     INTRODUCTION

The main thrust and strategy of BONY's Memorandum in Support of its Motion for Summary Judgment (Doc. 271) is focused upon trivializing its conduct and the damage wrought wrought upon Freeman.

## II.     LEGAL STANDARD

A motion for summary judgment is appropriate only if the pleadings, answers to interrogatories, admissions, affidavits and other material show "that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether she is ruling on a motion for summary judgment or for a directed verdict." *Id.* "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The *Anderson* court also noted that this standard mirrored the standard for a directed verdict: "a trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Id.* at 250-51 (internal citations omitted).

## III.    STATEMENT OF MATERIAL FACTS IN DISPUTE

1.      Paragraph 10 of Ocwen's Statement of Undisputed Material Facts proclaims "[a]n error was made during the initial reconciliation after the close of the Bankruptcy in February 2018, and disallowed amounts were not removed from the Loan. This was a human error." (internal citations omitted). This statement is demonstrably false. The Loan was in a manufactured state of delinquency and default before and after any reconciliation. The errors made by Ocwen in relation to the Loan are not at all isolated to disallowed amounts. See Patterson Report. Further, while later attempts to correct servicing errors may be construed as human error, the root cause of these errors were known and widespread deficiencies with its system of record - REALServicing.  Like in Saccameno v. Ocwen Loan Servicing, LLC, 372 F.Supp.3d 609 (N.D. Ill. 2019), Ocwen does not

identify what human failure it contends failed to remove said "disallowed amounts" nor was such an individual identified in its initial disclosures or via discovery.

2.      Paragraph 10 of Ocwen's Statement of Undisputed Material Facts proclaims "[t]his error occurred despite Ocwen's implementation and maintenance of procedures designed to prevent such an error." This is in dispute. As detailed above, and within the Expert Report of Bernard J. Patterson, Ocwen committed numerous servicing errors, not just an "error." Moreover, Ocwen does not identify which procedures it implemented or maintained to prevent such an "error"nor errors.

3.      Paragraph 11 of Ocwen's Statement of Undisputed Material Facts proclaims "Plaintiff did not submit any payment to Ocwen in June 2018." This statement is demonstrably false. Freeman called Ocwen twice in June of 2018 attempting to make a payment. See Ocwen_Freeman 003634 [Filing No. 336-2] and Ocwen_Freeman 003636 [Filing No. 336-2]. Those efforts were each rejected. Despite this, and the fact that her subsequent attempts to make payment via check were unsuccessful, Ocwen received funds from Freeman sufficient to satisfy her June - August of 2018 payment obligations. Patterson Expert Report, ¶ 93.

4.      Paragraph 11 of Ocwen's Statement of Undisputed Material Facts proclaims "Ocwen also did not receive any payments from Plaintiff between July 2018 and December 2018." This is incorrect. Ocwen told Freeman in June 2018 they would only accept payment of the entire reinstatement amount, much more than the single monthly payment she owed. (Verdooren Decl. ¶ 22 [Filing No. 272-1] and Verdooren Dep. 129:18-19 [Filing No. 336-13]). In addition, Freeman submitted payment to Ocwen by check for her monthly payments in July, August, September, October and November 2018. Demona Freeman Dep. 98:6-11 [Filing No. 336-18]. Those checks were neither deposited nor returned. Ocwen's records do not reflect this because its system of

record does not track such information. See CGS-CMS - Cash Rejection Specifics - Q1-2014-001….Ocwen_Freeman006883, attached to Appendix as Exhibit E; Misidentified Payments Are Misapplied or Not Remitted See Ocwen_Freeman006885, attached to Appendix as Exhibit E.

5.      Paragraph 12 of Ocwen's Statement of Undisputed Material Facts states, "As a result of subsequent investigations and corresponding corrections to the Loan - as described below - BONY agreed to voluntarily dismiss the Second Foreclosure Case…" This is incorrect. The decision to dismiss the Second Foreclosure Case was controlled by Ocwen.  Further, there is nothing in the record to support the representation that the Second Foreclosure Case was voluntarily dismissed "as a result of subsequent investigations" versus the filing of the instant lawsuit. The alleged "corrections" to the Loan would not independently justify the dismissal of the Second Foreclosure Case, as Ocwen continued to hold the Loan in a manufactured state of default.

6.      Paragraph 13 of Ocwen's Statement of Undisputed Material Facts states, "As described in Ocwen's July 23 letter, the documents requested (to the extent they were available and/or properly subject to request) were sent to Plaintiff's counsel. Id." This is incorrect. As detailed below, Ocwen did not produce many of the documents requested and all were properly subject to a request. See infra Subsection B.2.

7.      Paragraph 15 of Ocwen's Statement of Undisputed Material Facts states, "After receipt, Ocwen retained outside counsel to conduct the investigation and prepare the response to Purported NOE No. 1." This is incorrect.  While true Ocwen retained outside counsel, Maria Vathis, it provides no evidence to support the scope or purpose of her engagement. Its policies and procedures also do not contain any language providing guidance about the retention of outside counsel for purposes of responding to notices of error. The record suggests she was retained to merely prepare written responses to NOE No. 1, NOE. No. 2, and NOE No. 3. She had no role in

the corresponding investigations or in guiding any search for responsive documents. See Vathis Dep. 11:6-13 [Filing No. 336-33]. Any changes made in response to Freeman's Notices of Error, and why these changes were made, were made internally by Ocwen. Vathis Dep. 23:22-25; 24:1 [Filing No. 336-33]. Her response was required to be confirmed and approved by Ocwen. Vathis Dep. 11:14-17 [Filing No. 336-33]. She could not speak to the nature or extent of Ocwen's own internal investigative efforts or responses to Freeman's notices of errors. Vathis Dep. 12:6-11 [Filing No. 336-33]. She did not have access to Ocwen's servicing system of record or the ability to access any information or documents directly. Vathis Dep. 14:7-14 [Filing No. 336-33]. As of March 9, 2022, Ms. Vathis did not even know if Ocwen had a specific department responsible for investigating or responding to notices of error under RESPA. Vathis Dep. 14:19-15:2 [Filing No. 336-33]. Per Ms. Vathis, the people most knowledgeable about the conclusions found within Ocwen's responses to Freeman's notices of error are Wendy Mclaughlin, Tom Burton, and Alex Gross. Vathis Dep. 9:19-11:5; 15:7-11 [Filing No. 336-33]; Vathis Dep. 9:19-24 [Filing No. 336-33]. Most of her work for Ocwen involves litigating cases; her work in responding to Freeman's Notices of Error was "really sort of a one-off." Vathis Dep. 17:16-24 [Filing No. 336-33].

8.      Paragraph 20 of Ocwen's Statement of Undisputed Material Facts states, "Ocwen's counsel Maria Vathis was tasked with investigating and responding to Plaintiff's purported Notices of Error." As set forth in detail above, there is nothing in the record to support what Maria Vathis was "tasked with" but she certainly did not play any substantive role in investigating Freeman's Notices of Error. Ms. Vathis relied entirely on what Ocwen told her. Vathis Dep. 25:1-5 [Filing No. 336-33].

9.      Paragraph 20 of Ocwen's Statement of Undisputed Material Facts also states, "Ms. Vathis worked with Ocwen to gather information in order to prepare responses to each purported Notice

of Error." This is incorrect. As detailed above, Ms. Vathis prepared responses to each Notice of Error based only upon the information provided to her by Ocwen. She did nothing more than take Ocwen's investigation and formulate a written response. See Vathis Dep. 55:11-16 [Filing No. 336-34]. She does not recall personally requesting any documents from Ocwen. See Vathis Dep. 56:1-3 [Filing No. 336-34]. A question of fact exists as to whether Ms. Vathis even prepared the responses to Freeman's Notices of Error herself or whether they were merely typed by someone at her office. See Vathis Dep. 59:16-25 [Filing No. 336-34].

10. Paragraph 21 of Ocwen's Statement of Undisputed Material Facts states, "As a result of the investigations into Plaintiff's purported Notices of Error, between November 23, 2018 and January 3, 2019, several changes were made to the Loan in order to correct the previous failure to remove disallowed amounts from the Loan." This is incorrect. There is nothing in the record to support the assertion changes were made to the Loan as a result of investigations into Freeman's Notices of Error versus in response to the filing of the instant matter. Likewise, Ocwen did not "fail[] to remove disallowed amounts from the Loan", it paid itself amounts that were disallowed, then refunded them via its payment reversals and reapplications. See Patterson Expert Report ¶¶ 25(d), 42(d), 59, and 60 [Filing No. 336].

11. Paragraph 21 of Ocwen's Statement of Undisputed Material Facts also states, "Following these changes, the only reason why the loan was not current was because Plaintiff had not made any payments since May 2018." This is incorrect. The Loan remained in default because Ocwen rejected payments, misapplied funds to escrow, continued to assess fees and charges, did not decelerate the Loan until much later, never notified Freeman she could resume making her monthly payments.

12.     Paragraph 22 of Ocwen's Statement of Undisputed Material Facts states, "During the process of the investigation and while changes were being made to the Loan, Ocwen also began taking steps to decelerate the Loan so that the Second Foreclosure Case could be stopped." This is incorrect. The Loan was not decelerated until after Ocwen responded to Freeman's Notices of Error. See Ocwen_Freeman 004894 [Filing No. 336]. During the "process" of the investigation, Ocwen continued to pursue foreclosure even going so far as to file a Motion to Dismiss Freeman's counterclaims. [Filing No. 336]

13.     Paragraph 24 of Ocwen's Statement of Undisputed Material Facts proclaims "Plaintiff had not submitted any payment that was rejected, returned, or otherwise held without application after the close of her Chapter 13 Bankruptcy." This statement is incorrect. Payment for June of 2018 was expressly rejected. See Ocwen_Freeman 003634 [Filing No. 336]; Verdooren Dep. 129:18-19 [Filing No. 336] . Despite this, Plaintiff submitted payment to Ocwen by check for her monthly payments in July, August, September, October and November 2018. Demona Freeman Dep. 98:6-11 [Filing No. 336]. Freeman's payment obligations for June, July, and August of 2018 were satisfied. Patterson Expert Report ¶ 93-95 [Filing No. 336]. Freeman's efforts to continue making her monthly payment obligation is corroborated by her husband: "We tried more than once [to make mortgage payments] and they wouldn't do it, period, not just once. We tried to get them to accept it more than once, I know that." See Allen Freeman Dep. 29:21-23 [Filing No. 336]; see also Allen Freeman Dep. 30:1-2 [Filing No. 336] ("[T]here are mortgage payments [Ocwen] didn't accept."). Also, other payments following her exit from bankruptcy were held in suspense without application. See Life of Loan History [Filing No. 84-1] and the Patterson Expert Report ¶ 89 [Filing No. 336].

14. Paragraph 27 of Ocwen's Statement of Undisputed Material Facts proclaims "Plaintiff had not reviewed the documents showing the changes to her Loan." This is incorrect. Freeman did look at the documents response, she merely did not spend time reviewing the cryptic reconciliation history. Demona Freeman Dep. 76:17-78:18 [Filing No. 336]. The responses also contained no indication Ocwen had removed all inappropriate fees and costs or that it would begin accepting her monthly payments.

15. Paragraph 27 of Ocwen's Statement of Undisputed Material Facts proclaims "[i]n fact, as of the date of her deposition on March 11, 2022, Plaintiff was still under the impression that there is an active foreclosure action pending against her." This is incorrect and a product of wordsmithing. Plaintiff was and remains under the impression her home is in a state of default, that Ocwen will not accept single monthly payments from her, and will immediately seek to foreclose upon her home. Demona Freeman Dep. 103:19-104:14 [Filing No. 336].

16. Paragraph 27 of Ocwen's Statement of Undisputed Material Facts also states, "In reality, there is no pending foreclosure action against Plaintiff or the Property, and no foreclosure action was filed against her after the January 23, 2019 dismissal of the Second Foreclosure Case. See Verdooren Decl. ¶ 28." This is incorrect. While true no foreclosure action has been filed against Freeman after the January 23, 2019 dismissal, there is most certainly a pending foreclosure action. The Loan remains in a manufactured state of default. Ocwen will not accept Freeman's monthly payments. As of December of 2019, Ocwen seeks to collect $44,462.99 from Freeman, an amount far greater than the payments it alleges she has missed. See Ocwen_Freeman 004832 [Filing No. 336-4].

17. Paragraph 28 of Ocwen's Statement of Undisputed Material Facts states, "Plaintiff was diagnosed with high blood pressure by Dr. Valerie Beard in May 2019." This is incorrect. As

reflected in Dr. Beard's own records, Freeman presented with high blood pressure in October of 2018. See Dr. Beard / Riverview Medical Records at p. 4, attached hereto as Exhibit DD.

18.     Paragraph 28 of Ocwen's Statement of Undisputed Material Facts also proclaims "[t]here is no evidence in the record that any potential causes of the high blood pressure were discussed by Plaintiff with Dr. Beard at the time of this diagnosis." This is incorrect. Dr. Beard testified she made a note that Demona mentioned "...stressful things going on in her life that could be contributing to her elevated blood pressure" and "[s]he may have mentioned something about financial issues…" Beard Dep. 10:19-11:14, 11:21-22 [Filing No. 336]. Dr. Beard also testified that Demona kept using the word "stressed" during her visits. Beard Dep. 20:11-14 [Filing No. 336]. Other than the stress caused by Ocwen, Freeman experienced no other stressful events in 2018 or 2019. Freeman Declaration ¶ 52 [Filing No. 336].  Freeman only began experiencing high blood pressure in 2018. Freeman Declaration ¶ 53 [Filing No. 336].

19.     Paragraph 28 of Ocwen's Statement of Undisputed Material Facts also states, "Plaintiff had first sought treatment from Dr. Beard in April 2018 for a respiratory issue, and was treated by Dr. Beard a total of five times between April 2018 and December 2020 for various issues." This is incorrect. Beard Dep. 14:13-16:2 [Filing No. 336]. Freeman first sought treatment from Dr. Beard as a primary care physician after her previous physician (Reeta Bhargava) left for another practice. See Freeman Declaration ¶ 50 [Filing No. 336]. Dr. Beard took over all her patients. Id. [Filing No. 336]. The only respiratory issue she has ever had was a mild case of pneumonia with symptoms lasting 2-3 weeks.

20.     Paragraph 28 of Ocwen's Statement of Undisputed Material Facts also states, "Plaintiff was prescribed medication for her blood pressure by Dr. Beard, and it was under control as of December 2020." This is incorrect. Freeman continues to take medication for her blood pressure,

and it was not under control as of September 2020. See Dr. Beard / Riverview Medical Records at p. 5, attached hereto as Exhibit DD; see also Freeman Declaration ¶ 58 [Filing No. 336].

21.     Paragraph 28 of Ocwen's Statement of Undisputed Material Facts also states, "Plaintiff never discussed Ocwen, BONY, or her Loan … [or] foreclosure with Dr. Beard." This is incorrect. As detailed above, Dr. Beard didn't recall specifics yet testified that Demona mentioned "...stressful things going on in her life that could be contributing to her elevated blood pressure" and "[s]he may have mentioned something about financial issues…" Beard Dep. 10:19-11:14, 11:21-22 [Filing No. 336].  Freeman had no other "financial issues" or unusual stressors outside those caused by Ocwen. Freeman Declaration ¶ 52 [Filing No. 336]. When Freeman discussed experiencing stress and stressful financial issues with Dr. Beard, Freeman was referring to Ocwen's collection efforts, allegations that she had missed payments and owed fees and costs, since her exit from bankruptcy. Freeman Declaration ¶ 52 [Filing No. 336]. When discussing her stress and "financial issues" with Dr. Beard, Freeman did not mention Ocwen by name or go into great detail, because she is a private person and was embarrassed. Freeman Declaration ¶ 51 [Filing No. 336]; see also Newton Dep. 45:12-16 [Filing No. 336] (indicating Freeman is a private person who would not share details about the lawsuit against Ocwen with others).

22.     Paragraph 28 of Ocwen's Statement of Undisputed Material Facts also states, "Plaintiff last saw Dr. Beard on December 23, 2020, with a complaint of back pain." This is incorrect. Beard Dep. 14:13-16:2 [Filing No. 336]; see also Exhibit D to Freeman Declaration [Filing No. 336].

23.     Paragraph 29 of Ocwen's Statement of Undisputed Material Facts states, "Specifically, Plaintiff reported to Ms. Skelton that she had been trying to lose weight for years, that her blood pressure had gotten worse with stress in the past year because her daughter had cancer and issues with her son, and that her sit-down job had caused sciatica on her left side." This is incorrect.

Freeman does not even have a son. Freeman Declaration ¶ 57 [Filing No. 336]. Further, Freeman's daughter has been cancer-free since several years before Freeman began seeing Alta Skelton as a patient. Freeman Declaration ¶ 57 [Filing No. 336]. Further, the cancer Freeman's daughter experienced was cured after she underwent a hysterectomy and thus, her risk of remission is extremely low. Freeman Declaration ¶ 57 [Filing No. 336]. Accordingly, Freeman has not experienced any stress in 2020, 2021, or 2020 related to her daughter having cancer. Freeman Declaration ¶ 57 [Filing No. 336]. The overwhelming cause of her stress was Ocwen.

24.     Paragraph 30 of Ocwen's Statement of Undisputed Material Facts states, "There is no evidence in the record that any medical professional or treatment provider has diagnosed or concluded that Plaintiff's high blood pressure is a result of or exacerbated by the acts and/or omissions of Ocwen or BONY dispute what she alleges in this lawsuit." This is incorrect. See Newton Dep. 18:21-24 [Filing No. 336]; see also Newton Dep. 32:13-34:5; 34:13-25 [Filing No. 336]. Also, there is no evidence in the record that Freeman's high blood pressure could be the result of any other cause besides the acts or omissions of Ocwen or BONY. Freeman has no other financial issues and remains gainfully employed.  Freeman has no history of high blood pressure in the family. Freeman Declaration ¶ 20 [Filing No. 336]. Further, Freeman has exercised regularly and consistently since the time she began experiencing issues with her blood pressure in 2018. Freeman Declaration ¶ 59 [Filing No. 336].

25.     Paragraph 31 of Ocwen's Statement of Undisputed Material Facts proclaims "[t]here is no evidence in the record that any medical professional or treatment provider has ever diagnosed or concluded that any physical or mental condition, ailment, and/or symptom purportedly experienced by Plaintiff is a result of the acts and/or omissions of Ocwen or BONY despite what she alleges in this lawsuit." This is incorrect.  Dr. Newton concluded her condition and symptoms

were in part a product of psychosomatic issues caused by stress related to Ocwen. Newton Dep. 18:21-24 [Filing No. 336]; Newton Dep. 32:13-34:5; 34:13-25 [Filing No. 336]; Allen also testified Freeman began suffering from loss of sleep after Ocwen's servicing misconduct began following her discharge from bankruptcy. Allen Freeman Dep. 45:3-11 [Filing No. 336].

26.     Paragraph 47 of Ocwen's Statement of Undisputed Material Facts proclaims "With the exception of one payment made in August 2019 , Plaintiff has not made a mortgage payment on the Loan since May 2018 - a total of forty-five (45) months without a payment." This is incorrect. First, Ocwen began rejecting Freeman's payments in June of 2018. Demona Freeman Dep. 98:6-11 [Filing No. 336]; Verdooren Dep. 129:18-19 [Filing No. 336]. Freeman attempted to make payments to Ocwen on a monthly basis between June 2018, when Ocwen began rejecting her payments, and November 2018. Demona Freeman Dep. 98:6-11 [Filing No. 336]. Second, as a matter of policy Ocwen will not accept single monthly payments on a loan it considers to be in default. Verdooren Dep. 129:18-19 [Filing No. 336]; see also Ocwen_Freeman004907 [Filing No. 336]. Instead, Ocwen would demand a "full reinstatement amount." Verdooren Dep. 129:1-19, and 129:20-131:12 [Filing No. 336]. Regarding the "one payment made in August 2019," Ocwen's own research of its records fails to indicate when that payment (applied to the August 1, 2018 payment due) was actually received. See supra fn.3.

27.     Paragraph 48 of Ocwen's Statement of Undisputed Material Fact states, "[a] payoff quote provided to Plaintiff on August 7, 2019 shows that none of the disallowed fees, fees associated with the Second Foreclosure Case, or late charges were being sought from Plaintiff several months after servicing transferred to PHH." While true this is what the payoff quote says, this is otherwise incorrect. On September 26, 2019, Ocwen directed money received from Freeman to compensate itself for fees and costs totaling $299.43. See Ocwen_Freeman004832 [Filing No. 336].  As of

December 31, 2019, PHH was seeking fees and costs totaling $44,462.89 as set forth in its advance balance. Id. [Filing No. 336].

## IV.    STATEMENT OF ADDITIONAL MATERIAL FACTS NOT IN DISPUTE

1.    Freeman is the owner of real property and improvements located at and commonly known as 17373 Pine Wood Lane, Westfield, Indiana 46074 (the "Home"). Freeman purchased the Home on or about December 2, 2003, as her primary, principal residence and financed that purchase by a loan as evidenced by a note (the "Note") and a mortgage on the Home that allegedly secures the Note [Filing No. 84-15] (the "Mortgage") (collectively referred to hereinafter as the "Loan").

1.    On July 31, 2018, the Loan was assigned to BONY [Filing No. 84-15 at p.19].

2.    On September 9, 2011, Ocwen began servicing the Loan and acted at all relevant times thereafter as the agent of BONY and within the scope of its responsibilities pursuant thereto. *See* Verdooren Dep. 31:13-16; 32:4-7; and 34:17-35:25 [Filing No. 336].

3.    Ocwen attempted to reconcile Freeman's mortgage loan account multiple times but each time failed to properly apply the payments made by Freeman. *See* Patterson Report Paragraphs 88-95 [Filing No. 336].

4.    Because of Ocwen's failure to properly apply Freeman's payments, Ocwen sent Freeman a foreclosure letter in February of 2018. *See* Verdooren Dep. 71:8-16 [Filing No. 336].

5.    Because of Ocwen's failure to properly apply Freeman's payments, Ocwen's system of record treated Freeman's loan as being severely delinquent and due for foreclosure

activity. *See* Verdooren Dep. 72:24-75:17, 76:15-77:13, 77:18-78:24, and 79:8-14 [Filing No. 336].

6.    Because of Ocwen's failure to properly apply Freeman's payments, Ocwen's system of record charged Freeman fees that should not have been charged to her account. *See* Verdooren Dep. 105:16; 108:4; and 110:8-22 [Filing No. 336].

7.    Because of Ocwen's failure to properly reconcile Freeman's account and properly apply Freeman's payments, Ocwen treated Freeman's loan as being five months delinquent after its April 27 and May 8, 2018 reconciliations. *See* Verderoon Dep. 111:10-112:25, 113:2-24, 115:7-25 [Filing No. 336].

8.    Because of Ocwen's failure to properly account for and properly apply Freeman's payments, Ocwen continued to treat Freeman as being in default and pursue pre-foreclosure and foreclosure actions. *See* Verdooren Dep. 122:8-123:14 [Filing No. 336].

9.    Because Ocwen failed to properly administer Freeman's escrow account, Ocwen maintained a surplus of $3,190.52 which it failed to credit against Freeman's alleged delinquency under Ocwen's flawed accounting. *See* Verdooren Dep. 125:5-126:21 [Filing No. 336].

10.    Fixing this singular error would have taken Freeman's loan out of default and allowed her to continue making normal monthly payments. *Id.* [Filing No. 336].

11.    Failing to fix the escrow error caused Ocwen to assess fees to Freeman's account and push her loan into foreclosure. *See* Verderoon Dep. 128:9-25 [Filing No. 336].

12.    Failing to credit the escrow surplus also triggered Ocwen to demand Freeman make a full reinstatement payment to Ocwen and refuse any regular monthly payments. *See* Verderoon Dep. 129:1-19; and 129:20-131:12 [Filing No. 336].

13.    Freeman filed suit on December 6, 2018. *See* [D.E. 1].

14.     Ocwen had failed to refund any of its wrongful charges or correct its misapplication of Freeman's payments as of the date Freeman filed suit. *See*, Verderoon Dep. 158:12-162:18 [Filing No. 336].

15.     Ocwen had also failed to dismiss its wrongfully filed foreclosure case until after Freeman had filed suit. *See*, Verdooren Dep. 165:25-167:24 [Filing No. 336].

16.     Even after Ocwen attempted to correct its misapplication of Freeman's payments, Ocwen still showed Freeman as being many months delinquent. Verdooren Dep. 170:11-171:17 [Filing No. 336]; Verdooren Dep. 186:12-187:10 [Filing No. 336].

17.     Under Ocwen's own operating rules, the fact that Ocwen still showed Freeman as five months delinquent in February of 2019 meant that Ocwen would not accept normal monthly payments from Freeman. *See* Verdooren Dep. 129:1-19-131:12 [Filing No. 336].

18.     Ocwen accelerated Freeman's loan the second time in May of 2018. Verdooren Dep. 122:12-123:18 [Filing No. 336].

19.     Ocwen did not dismiss the foreclosure until February of 2019. Verdooren Dep. 169:20-24 [Filing No. 336].

20.     There are nine months between May of 2018 and February of 2019.

21.     During the time between May of 2018 and February of 2019, Ocwen would not have accepted a regular monthly payment from Freeman because Ocwen had accelerated her loan. *See* Verdooren Dep. 167:12-168:15 [Filing No. 336].

22.     Ocwen's accounting failures caused Ocwen to wrongfully accelerate Freeman's indebtedness. *See* Patterson Report Paragraphs 91-92 [Filing No. 336] and Paragraphs 9-11 *supra*.

## V. ARGUMENT

A.      **The Question of Whether BONY has breached its Contract with Freeman Should go to the Jury**

1.      **BONY's Breach of Contract Is Clear**

The Mortgage requires Freeman's payments to be applied as follows:

3. Application of Payments. All payments under Paragraphs 1 and 2 shall be applied by Lender as follows: First, to the mortgage insurance premium to be paid by Lender to the Secretary or to the monthly charge by the Secretary instead of the monthly mortgage insurance premium; Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required; Third, to interest due under the Note: Fourth, to amortization of the principal of the Note; and Fifth, to late charges due under the Note.

BONY, through the actions of Ocwen, its agent[1], conducted an erroneous reconciliation of Freeman's payment history and misapplied payments made by Freeman. *See* Patterson Report Paragraphs 75 and 83 [Filing No. 336]. BONY then wrongfully declared Freeman's loan to be in default and failed to credit an escrow surplus to the amount wrongfully claimed due, inflating the false delinquency amount. This inflation of the delinquency caused the system of record, RealServicing, to raise a flag on the account preventing Freeman from paying anything other than the entire amount BONY claimed was due. Based on this cascade of errors, BONY then accelerated the mortgage loan account and instituted foreclosure. When BONY took these actions, Freeman was actually current or ahead, had her payments been correctly applied in accordance with the terms of the contract.

BONY's actions in this regard caused Freeman to incur liabilities to defend the foreclosure action and to lose time from work trying to correct BONY's errors and stop the foreclosure on her home. In addition, because BONY treated Freeman's home as being in default, BONY has

---

[1] As noted above, once Ocwen began servicing the Loan, it acted at all relevant times thereafter as BONY's agent. *See* Verdooren Dep. 31:13-16; 32:4-7; and 34:17-35:25 [Filing No. 336]. References to BONY and its conduct herein include Ocwen's actions within the scope of the agency.

wrongfully retained insurance proceeds meant to repair Freeman's roof. BONY retained these funds only because BONY wrongfully treated Freeman as being in default in breach of the loan agreement.

After BONY allegedly corrected its errors on Freeman's account in February of 2019, it then demanded that Freeman pay the monthly installments that would have been due between May of 2018 and February of 2019 had her loan not been accelerated. BONY did not place Freeman back into the position she would have been but for its errors, and BONY now claims that Freeman owes 45 months of payments. During the entire time, BONY has treated Freeman as being more than 90 days delinquent and therefore, by its own policy, would not accept a single installment payment but required a full reinstatement of all amounts BONY claimed due for the entire period of time since its initial errors triggered this event in May of 2018.

Under general contract principles, even the slightest breach of the contract, no matter how trivial or unintended, may be the basis for an action for breach of contract. Restatement of Contracts §§ 314 & 317 (1932) (cited in *Miller Brewing Co. v. Best Beers of Bloomington, Inc.*, 608 N.E.2d 975, 980 (Ind. 1993)).

The Seventh Circuit has concluded that a lender is not entitled to summary judgment on a borrower's breach of conduct claim under these circumstances. In *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676 (7th Cir. 2011), GMAC Mortgage argued that its refusal of two payments and failure to apply them to the plaintiffs' debt did not amount to a breach of contract because nothing in the contract specifically required GMAC Mortgage to apply the payments according to any sort of schedule. The Seventh Circuit stated:

> To swallow GMAC Mortgage's argument, we would have to accept, as a matter of law, that a lender is free to refuse a tendered payment and then to hold the borrower responsible for having failed to make the payment. We would have to accept, as a matter of law, that it does not matter if a holder of a promissory note without a

specified time period for its own performance performs its obligations under the contract in a *reasonable* time, so long as the party performs its obligations ... eventually. We do not accept that argument.

*Id.* at 690 (emphasis in original). Like GMAC Mortgage, BONY has refused to apply Freeman's payments as required by paragraph 3 of the Mortgage while wrongly claiming that Freeman is in default. This plainly raises an issue of material fact that precludes summary judgment for BONY on the breach of contract claim. *Accord Weiner v. Ocwen Fin. Corp.*, 2015 WL 4599427 (E.D. Cal. July 29, 2015) (allegation that servicer misapplied escrow payments sufficient basis for breach of contract claim); *Holt v. Ocwen Loan Servicing, LLC.*, 2013 WL 7211759 (S.D. Tex., Dec. 12, 2013) (involving claims re servicer failing to credit payments, declaring loan in default, and attempting to foreclose).

### 2. There Is a Genuine Issue of Material Fact Regarding Freeman's Damages Due to BONY's Breach of Contract

Freeman has produced tangible evidence of pecuniary loss flowing from BONY's contractual breaches that is sufficient to raise a material issue of fact. Damages need not be proved with absolute or mathematical certainty, particularly at the summary judgment stage. At trial, evidence is sufficient so long as it enables the jury to make a "fair and reasonable finding" as to the proper damages. *I.C.C. Protective Coatings, Inc. v. A.E. Staley Manufacturing Co.*, 695 N.E.2d 1030, 1037 (Ind. Ct. App. 1998); *Jerry Alderman Ford Sales, Inc. v. Bailey*, 291 N.E.2d 92, 106 (Ind. Ct. App. 1972). And summary judgment is inappropriate if "there is admissible evidence that creates a genuine issue of material fact—a triable issue." *Hoosier Envtl. Council v. Nat. Prairie Indiana Farmland Holdings, LLC*, 564 F. Supp. 3d 683, 697, (N.D. Ind. 2021) (citing *Luster v. Ill. Dept. of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011)). The plaintiff need not prove the exact amount of damages to survive summary judgment but rather must simply demonstrate "a sensible basis" for her claim. *Blue Book Servs., Inc. v. Amerihua Produce, Inc.*, 337 F. Supp. 3d 802, 815 (N.D.

Ill. 2018) (citing *Transp. & Transit Assocs., Inc. v. Morrison Knudsen Corp.*, 255 F.3d 397, 401 (7th Cir. 2001)). If there is doubt as to the exact proof of damages, "'such uncertainty must be resolved against the wrongdoer.'" *McLean v. Trisler*, 161 N.E.3d 1259, 1271 (Ind. Ct. App. 2020) (quoting *Babson Bros. Co. v. Tipstar Corp.*, 446 N.E.2d 11, 15 (Ind. Ct. App. 1983)).

> i. **Fees and charges improperly assessed to Freeman's account are recoverable under Indiana law.**

BONY argues that Freeman has not paid any money that was not owed under the terms of the Mortgage because any amounts that were "initially applied incorrectly" due to an "accounting error" have been corrected, and Freeman "has not actually paid any unauthorized fees or costs." (BONY Brief [D.E. XXX] at 18). This is demonstrably false–BONY has improperly collected at least one fee since it allegedly reconciled her account and corrected its errors. Moreover, additional improper fees and charges remain on the account as reflected in the advance balance.

Specifically, on September 26, 2019, via its agent, Ocwen, BONY collected an unauthorized fee from Freeman in the amount of $299.43. (*See* Customer Account Activity Statement). This was plainly in violation of the agreement. In addition, foreclosure fees and costs (for a foreclosure that should never have been filed) that were assessed to the Loan from August 1, 2018 through August 29, 2018, remain on Freeman's account. *See* Patterson Report Paragraphs 75 and 83 [Filing No. 336]. And BONY, through Ocwen, continues to assess other improper fees and charges as reflected in the advance balance, maintaining the Loan in a manufactured state of default. As of Dec. 31, 2019, the advance balance was $44,462.98.

The fact that Freeman has not yet paid the amounts reflected in the advance balance does not preclude their treatment as consequential damages. *Belle City Amusements, Inc. v. Doorway Promotions, Inc.*, 936 N.E.2d 243, 251 (Ind. Ct. App. 2010). In *Belle City*, a carnival operator breached an agreement with an event promoter to provide and run the midway at a county festival.

The breach prevented the promoter from holding the event, but he remained obligated for rent that he had not yet paid for the festival venue. The Indiana Court of Appeals held the rent that the promoter was "contractually bound" to pay was an appropriate element of consequential damage arising from the operator's breach. *Id*.

This is consistent with the rule, often applied in construction contract disputes, that "a party who suffers damage due to the refusal of the other party to perform under a contract has a right to recover his expenses if he completes the work at his own expense." *Ethyl Corp. v. Forcum-Lannom Associates, Inc.*, 433 N.E.2d 1214, 1221–22 (Ind. Ct. App. 1982) (citing *Ogle v. Wright*, 360 N.E.2d 240 (Ind. Ct. App. 1977)). The purpose of damages for breach of contract is to make the non-breaching party whole or to afford her the benefit of her bargain; thus, the measure of damages may include the reasonable cost of curing the defects in the defendant's performance of the contract. *Clark's Pork Farms v. Sand Livestock Sys., Inc.*, 563 N.E.2d 1292, 1297 (Ind. Ct. App. 1990) (citing *Sanborn Electric v. Bloomington Athletic Club*, 433 N.E.2d 81 (Ind. Ct. App. 1982)); *see also L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1043 (Ind. Ct. App. 2012).

By rejecting Freeman's payments and maintaining the Loan in a manufactured state of default, BONY is refusing to perform its obligations under the contract. It is disingenuous for BONY to argue that Freeman has not realized any harm while BONY continues to maintain charges on Freeman's account that it has no right to collect, effectively holding Freeman hostage under a continuing threat of wrongful foreclosure. Freeman is entitled to be made whole, including the cost to cure BONY's continuing refusal to perform its contractual obligations, which would include reversal of all charges improperly assessed to Freeman's account. Since those charges remain pending and are reflected as amounts that Freeman is contractually bound to pay, they are properly treated as consequential damages under Indiana law.

### ii. Freeman has incurred out-of-pocket expenses and other pecuniary losses that are proper elements of damage under Indiana law.

Consequential damages may be awarded if "'the non-breaching party's loss flows naturally and probably from the breach'" and was reasonably foreseeable to the parties when the contract was made. *Belle City*, 936 N.E.2d at 251 (quoting *Rockford Mut. Ins. Co. v. Pirtle*, 911 N.E.2d 60, 67 (Ind. Ct. App. 2009) (internal citations omitted)).

BONY, through its agent, Ocwen, failed to properly account for payments made by Freeman and failed to properly apply funds paid by Freeman on multiple occasions. *See* Patterson Expert Report, para. 88-97 [Filing No. 336]. More specifically, BONY's failure to properly apply payments made by Freeman during a reconciliation of her account on April 27, 2018 and May 8, 2018 caused BONY to declare Freeman's loan to be in default at a time when she was current on her loan. *Id*. para. 91, 92 [Filing No. 336]. As discussed in greater detail below, the reconciliations occurred long after Freeman's successful completion of her bankruptcy proceedings.

BONY's failures on April 27, 2018 and May 8, 2018 led it to declare Freeman in default and to initiate foreclosure against her. Freeman was required to retain counsel to attempt to halt the wrongful foreclosure proceedings and to have her loan reinstated. Freeman owes $12,067.50 to Clark, Quinn, Moses, Scott, and Grahn, LLP for this work. Freeman also had to take time away from work to address BONY's breach of contract. Freeman Declaration, para. 18 [Filing No. 336].

The expenses Freeman has paid and continues to owe, including additional attorney fees associated with defending the wrongful foreclosure action, are recoverable as consequential damages arising from BONY's breach. In *Ball v. Versar, Inc*., 454 F.Supp.2d 783, 809 (S.D. Ind. 2006), this court noted that it was "eminently foreseeable that a breach of [a forum selection] clause may require the expenditure of attorney fees and other costs to enforce it by securing the dismissal or transfer of a lawsuit or other proceeding." The court also assumed that there was "no

legal obstacle to an award of damages" for such a breach. *Id*. Freeman's costs to defend the wrongful foreclosure action are analogous. Fees and costs are a natural and foreseeable consequence of defending a wrongful foreclosure.

In addition, Ocwen issued a Form 1098 Mortgage Interest Statement [Filing No. 336] to Freeman reflecting interest paid in 2018 in the amount of $2,056.38 when in fact she paid more. As a result, she will incur costs to amend her 2018 tax return. *See* Patterson Report [Filing No. 336].

### iii. Indiana law recognizes harm to an individual's credit and reputation, notwithstanding specific proof of rejection.

BONY's refusal to accept Freeman's payments and its maintenance of the Loan in a manufactured state of default also cause continuing harm to Freeman's credit and reputation. With the exception of BONY's rejection of Freeman's payments and BONY's continued efforts to hold Freeman in a manufactured state of default, Freeman has maintained a perfect payment history from the start of her bankruptcy to today. Freeman Declaration, para. 30 [Filing No. 336].

Under Indiana law, if a bank wrongfully dishonors its customer's business check, a presumption arises that the customer's credit and business standing are thereby harmed. *American Fletcher Nat. Bank & Trust Co. v. Flick*, 252 N.E.2d 839, 845-46 (Ind. Ct. App. 1970). This presumption removes "from the customer the duty of going forward with the evidence on this particular injury or harm," thereby avoiding a directed verdict against him "if evidence on the issue is not produced." *Id*. at 846. The Indiana Court of Appeals justified "the recognition of this presumption" on the grounds "that a wrongful dishonor renders the existence of some harm to the customer's credit and business standing so probable that it makes legal sense as well as common sense to assume the existence of such harm unless and until the adversary comes forward with some evidence to the contrary." *Id*. "Additional harms, injuries or losses" may be more

"susceptible of evidentiary proof, both as to their actual existence and as to their extent." *Id*. Nevertheless, the law presumes that nominal damages, at least, flow from such harm. *Id*.

The court further recognized "that the amount of damages appropriate for harm to credit and business standing is difficult to prove." *Id*. at 847. This fact does not, however, justify denying relief. If "a harm has been caused and the only uncertainty is as to the dollar value of the harm, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever." *Id*. (citing *Wakeman v. Wheeler & Wilson Mfg. Co.*, 4 N.E. 264 (N.Y. 1886); 11 Williston on Contracts (3rd ed., 1968), §1345)). In *Flick*, the plaintiff was unable to present sufficient evidence of a causal connection between the wrongful dishonor of his checks and negative financial consequences he suffered. Nevertheless, the court held that he was entitled to recover nominal damages.

Likewise, BONY's designation of Freeman's account as being in default renders the existence of some harm to her credit so probable that, despite uncertainty as to the dollar value of the harm, there is no good reason for refusing damages altogether. In other words, the burden is on BONY to demonstrate that Freeman's credit wasn't harmed, and Freeman is entitled to at least nominal damages.

### iv. Freeman has incurred medical expenses due to physical injuries.

Freeman has also produced tangible evidence of physical injuries, which are recoverable as breach of contract damages. It is true that emotional distress is not a recoverable element of damage under a pure breach of contract theory. *Holloway v. Bob Evans Farms, Inc.*, 695 N.E.2d 991, 995 (Ind. Ct. App. 1998) (citing *Plummer v. Hollis,* 11 N.E.2d 140 (Ind. 1937)). "Rather, the proper measure of damages for breach of contract is the loss actually suffered as a result of the breach." *Id*. Therefore, monetary loss associated with physical ailments is recoverable if the

defendant's breach of contract was a "substantial factor" contributing to that loss. *Id.* (citing *Fowler v. Campbell,* 612 N.E.2d 596, 602 (Ind. Ct. App. 1993)).

In *Holloway*, the plaintiff's deposition testimony that she suffered physical illness resulting from the defendant's breach of contract, including doctor visits, medications prescribed by her doctors, and absence from work, was sufficient to support her contention that she sustained damages other than emotional distress. The Indiana Court of Appeals held that the plaintiff's testimony raised a genuine issue of material fact whether the defendant's breach was a substantial factor contributing to those damages and that the trial court had erred when it granted summary judgment to the defendant on her breach of contract claim. *Id.; see also Merrillville Conservancy Dist. ex rel. Bd. of Directors v. Atlas Excavating, Inc.,* 764 N.E.2d 718, 724 (Ind. Ct. App. 2002) ("Actual damages include those reasonable expenses that are a natural consequence of the breach").

Here, it was entirely foreseeable that Freeman would incur medical expenses as a consequence of BONY's egregious conduct. Contrary to BONY's argument, Freeman testified in her deposition regarding her physical illnesses stemming from its acts, multiple doctor visits, the medications prescribed by her doctors and her absence from work. Thus, the designated evidence supports Freeman has sustained damages notwithstanding the question of emotional distress.

**B.      Freeman's Breach of Contract Claim Is Not Preempted by the Bankruptcy Code**

Despite the Court rejecting this argument previously, BONY again argues Freeman's breach of contract claim is preempted by the Bankruptcy Code. As before, this argument is based on a gross mischaracterization of the conduct at issue, and plainly inapplicable authority. In *Cox v. Zale Delaware, Inc.,* 239 F. 3d 910, 913 (7th Cir. 2001), the plaintiff's claim sought rescission

of a debt-reaffirmation agreement and recovery of amounts paid pursuant to the agreement because the creditor had violated the requirement of Section 524(c) of the Bankruptcy Code that to be enforceable the debt-reaffirmation agreement had to be filed with the bankruptcy court. *Cox* at 913. Likewise, in *Carter v. HSBC Mortgage Services, Inc.*, NO. 1:15-cv-01938-TWP-MPB, 2016 WL 5121984, at *6 (S.D. Ind. Sept. 21, 2016), plaintiff's state law claims of actual fraud, constructive fraud and unjust enrichment were based solely on the defendant filing a false proof of claim in plaintiff's bankruptcy proceeding. *Carter*, 2016 WL 5121984, at *6.

Here, BONY's creation of a manufactured state of default, wrongful failure to accept Freeman's timely and adequate mortgage payments, inaccurate credit reporting, and continued assessment of fees and costs stemming from said manufactured state of default, all occurred post Bankruptcy and completely independent from it. Thus, preemption of these claims by the Bankruptcy Code does not occur. *See, e.g., In re Laskowski* 384 B.R. 518 (Bankr. N.D. Ind. 2008) (holding that claims based on conduct allegedly violating RESPA and claims based on conduct allegedly violating state breach of contract law are not preempted by the Bankruptcy Code even though the conduct in question related to the defendant's failure to abide by the Chapter 13 Plan).

## VI.    CONCLUSION

WHEREFORE, Plaintiff Demona Freeman respectfully requests BONY's Motion for Summary Judgment be denied in all respects, and for all other relief just and proper.

Respectfully submitted,

*/s/ Travis W. Cohron*
Travis W. Cohron, No. 29562-30
Olivia Hess, No. 36166-49
Clark, Quinn, Moses, Scott & Grahn, LLP
320 N. Meridian Street, Suite 1100

Indianapolis, IN 46204
Telephone: (317) 637-1321
Fax: (317) 687-2344
tcohron@clarkquinnlaw.com
*Attorney for Plaintiff*

/s/ *Nicholas H. Wooten*
Nicholas H. Wooten, No. ASB-1870-o77n
NICK WOOTEN, LLC
5125 Burnt Pine Drive
Conway, AR 72034
Telephone: (833)-937-6389
nick@nickwooten.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Travis W. Cohron*