**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**Terre Haute Division**

| | |
|---|---|
| DEMONA FREEMAN, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) **Case No.** 1:18-cv-3844-TWP-DLP |
| | ) |
| OCWEN LOAN SERVICING, LLC., and | ) |
| THE BANK OF NEW YORK MELLON f/k/a | ) |
| THE BANK OF NEW YORK as successor in | ) |
| interest to JPMorgan Chase Bank, N.A., as Trustee | ) |
| for C-BASS Mortgage Loan Asset-Backed | ) |
| Certificates, Series, 2005-RPI | ) |
| | ) |
| *Defendants*. | ) |

**RESPONSE IN OPPOSITION TO DEFENDANT OCWEN LOAN SERVICING,
LLC.'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

**TABLE OF AUTHORITIES** ………………………………………….. **4**

**I. INTRODUCTION**…………………………………………………… **9**

**II. LEGAL STANDARD**……………………………………………... **9**

**III. STATEMENT OF MATERIAL FACTS IN DISPUTE**……………………… **10**

**IV. STATEMENT OF ADDITIONAL MATERIAL FACTS NOT IN DISPUTE**……………………………………………………………... **21**

**V. ARGUMENT**…………………………………………………… **26**

A. Freeman's RESPA Claims Should Go to the Jury………………………….. **26**

1. Freeman's correspondence constitute RFIs and NOEs……………………… **26**

2. Ocwen failed to appropriately respond to each of Freeman's RFIs ………… **27**

3. Ocwen failed to correct errors and appropriately investigate or respond to Freeman's NOEs ……………………………………………………… **27**

   a. *Ocwen failed to correct errors, appropriately investigate and respond to NOE No. 1.* …………………………………………………………... **28**

   b. *Ocwen failed to correct errors, appropriately investigate and respond to NOE No. 2* …………………………………………………..…… **30**

4. Freeman has Article III standing to pursue her RESPA claims …………….. **30**

   a. Freeman has Article III standing regarding Ocwen's failure to appropriately respond to Freeman's RFI's ………………………………... **31**

   b. Freeman has Article III standing regarding Ocwen's failure to appropriately investigate or respond to Freeman's NOE's ………………….. **34**

5. Pattern and Practice **36**

6. Freeman's Recovery under RESPA is not Limited to $2,000 ………………. **37**

B. Freeman's FDCPA Claims Should Go to the Jury ……………………………. **39**

1. Ocwen has violated numerous sections of the FDCPA via its various debt collection activities ……………………………………………………… **39**

   a. Ocwen's foreclosure related filings were in violation of § 1692f, § 1692e(8), and § 1692d(5) ……………………………………………… **39**

b. Ocwen's Collection Calls, both manual and automated, were in violation of § 1692f, § 1692e(8), and § 1692c(a)(2) …………………………….. **39**

c. Ocwen's Statements & Default Letters were in violation of §1692f, § 1692e(2), (4), (5), (6) and (10) ……………………………………………… **40**

d. Ocwen's Credit Reporting was in violation of FDCPA § 1692f…………... **40**

e. Ocwen's door knocks and door tags were in violation of § 1692f and § 1692e ……………………………………………………………………… **41**

2. Freeman has Article III standing to pursue her FDCPA claims …………….. **41**

a. Freeman suffered a concrete injury traceable to Ocwen's violations of the FDCPA in relation to its foreclosure filings ………………………………… **42**

b. Freeman suffered a concreted injury traceable to Ocwen's violations of the FDCPA in relation to its collection calls ………………………………… **49**

c. Freeman suffered a concrete injury traceable to Ocwen's violations of the FDCPA in relation to its statements, default letters, and credit reporting …... **51**

d. Freeman suffered a concrete injury traceable to Ocwen's violations of the FDCPA in relation to its door knocks/tags ………………………………… **52**

3. Ocwen's violations of the FDCPA are not preempted ……………………… **55**

4. Ocwen's Bona Fide Error Defense 15 U.S.C. § 1592k(c) Presents Questions of Fact ………………………………………………………………………….. **56**

**VI. CONCLUSION…………………………………………………............... 58**

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page**

*A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054 (7th Cir. 2018) ............................ **38**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................ **10**

*Andrews v. Cty. of Hawaii*, Cv. No. 10-00749 DAE-KSC, 2012 WL 425167 (D. Haw. Feb. 9, 2012) …………………………..…………………………………… **33, 36, 48**

*Baglini v. Lauletta*, 338 N.J.Super. 282, 768 A.2d 825 (2001)............................ **47**

*Bertero v. Nat'l Gen. Corp.*, 13 Cal.3d 43, 118 Cal.Rptr. 184, 529 P.2d 608 (1974)..................................... .................................................................. **47**

*Booth v. Collection Experts, Inc.*, 969 F. Supp. 1161 (E.D. Wis. 1997) ............... **58**

*Brady v. Credit Recovery Co.*, 160 F.3d 64 (1st Cir. 1998) ................................. **41**

*Brown v. I.C. Sys., Inc.*, No. 16 C 9784, 2019 WL 1281972 (N.D. Ill. Mar. 20, 2019) ……………………………………………………………………………… **49**

*Buckley v. Afni, Inc.*, 133 F. Supp. 3d 1140 (S.D. Ind. 2016) ................................ **57**

*Canady v. Wisenbaker Law Offices, P.C.*, 372 F. Supp. 2d 1379 (N.D. Ga. 2005) **57**

*Carter v. Oster*, 134 Mo. App. 146, 112 S.W. 995 (Mo. 1908) ............................ **47**

*Casillas v. Madison Avenue Associates, Inc.*, 926 F.3d 329 (7th Cir. 2019) ......... **31, 42**

*Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676 (7th Cir. 2011) ............................. **20 n.2**

*Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75 (2d Cir. 2018) ............... **47, 48, 51**

*Currier v. First Resolution Inv. Corp.*, 762 F.3d 529 (6th Cir. 2014) ................... **57**

*Darst v. Interstate Brands Corp.*, 512 F.3d 903 (7th Cir. 2008) ........................... **10**

*Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685 (8th Cir. 2017) ......................... **47, 48**

*Evans v. Portfolio Recovery Assocs., LLC*, 889 F.3d 337 (7th Cir. 2018) ............. **41, 57**

*Ewing v. MED-1 Solutions, LLC*, 24 F.4th 1146 (7th Cir. 2022) ......................... **45, 46, 51 n.10, 57 n.11**

*Fleming v. ProVest Cal. L.L.C.*, Case No. 21-CV-04462-LHK, 2021 WL 6063565 (N.D. Cal. Dec. 22, 2021)............................................................... **43**

*Freedom From Religion Foundation, Inc. v. Obama*, 641 F.3d 803 (7th Cir.

2011) ................................................................................................... **43**

*Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458 (7th Cir. 2020) (Barrett, J.)…… **49-52, 54**

*Gilbert v. TrueAccord Corp.*, No. 21-CV-485, 2022 WL 2257126 (N.D. Ill. June 23, 2022)........................................................................................... **35, 36, 43, 44, 49, 50, 52, 53**

*Gritters v. Ocwen Loan Servicing, L.L.C.*, No. 14 C 00916, 2014 WL 7451682 (N.D. Ill. Dec. 31, 2014)........................................................................... **39**

*Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884 (7th Cir. 2017) ................... **31, 42**

*Hammer v. Residential Credit Sols.*, Inc., No. 13 C 6397, 2015 WL 7776807 (N.D. Ill. Dec. 3, 2015)............................................................................ **29**

*Howard v. Wal-Mart Stores, Inc.*, 160 F.3d 358 (7th Cir. 1998) ........................... **38**

*In re Laskowski*, 384 B.R. 518 (Bankr. N.D. Ind. 2008)....................................... **27**

*Johnstone v. Bank of Am., N.A.*, 173 F. Supp. 2d 809 (N.D. Ill. 2001)................... **38 n.9**

*Katz v. The Dime Savings Bank*, 992 F. Supp. 250 (W.D.N.Y. 1997) ................... **38**

*Keisler v. Encore Receivable Mgmt.*, No. 1:06-cv-0912-LJM-WTL, 2008 U.S. Dist. LEXIS 31987, 2008 WL 1774173 (S.D. Ind. April 17, 2008) ...................... **56**

*Kesten v. Ocwen Loan Servicing, L.L.C.*, No. 11 C 6981, 2012 WL 426933 (N.D. Ill. Feb. 9, 2012)................................................................................ **30**

*Kort v. Diversified Collection Servs.*, 394 F.3d 530 (7th Cir. 2005) ..................... **56**

*Lako v. Portfolio Recovery Assoc.*, 20-cv-355-wmc, 2021 WL 3403632 (W.D. Wis. Aug. 4, 2021)..................................................................................... **43**

*Larkin v. Fin. Sys. of Green Bay, Inc.*, 982 F.3d 1060 (7th Cir. 2020) ................... **42**

*Lavallee v. Med-1 Solutions*, 932 F.3d 1049 (7th Cir. 2019) ................................ **32-33**

*Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963 (7th Cir. 2016) .............. **43**

*Loewe v. Weltman, Weinberg & Reis Co., L.P.A.*, No. 19-12187, 2020 WL 409655 (E.D. Mich. Jan. 24, 2020)........................................................... **43**

*Long v. Se. Pennsylvania Transportation Auth.*, 903 F.3d 312, 324 (3d Cir. 2018) **46, 54**

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) **31**

*Lupia v. Medicredit, Inc.*, 8 F.4th 1184 (10th Cir. 2021) ....................................... **50-52, 54**

*Markakos v. Medicredit, Inc.*, 997 F.ed 778, 780 (7th Cir. 2021) ......................... **31, 42**

*McCusker v. Ocwen Loan Services, L.L.C.*, Civil Action No. 14-13663-MGM, 2015 WL 4529986 (D. Mass. July 27, 2015) ......................................... **40**

*McGahey v. Fed. Nat'l Mortg. Ass'n*, 266 F. Supp. 3d 421 (D. Me. 2017) ........... **28**

*Mills v. First Fed. S & L Ass'n*, 83 F.3d 833 (7th Cir. 1996) ................................ **10**

*Moon v. GMAC Mortg. Corp.*, No. C08-969Z, 2009 WL 3185596 (W.D. Wash. Oct. 2, 2009) ........................................................................................... **27**

*Moore v. Caliber Home Loans, Inc.*, Case No. 1:14-cv-852, 2015 WL 5162482 (S.D. Ohio Sept. 3, 2015) .......................................................... **38**

*Moore v. Wells Fargo Bank*, 908 F.3d 1050 (7th Cir. 2018) ................................ **33**

*Nettles v. Midland Funding LLC*, 530 F. Supp. 3d 706 (E.D. Mich. 2021) ........... **43**

*Obazee v. Bank of NY Mellon*, Civil Action No. 3:15-CV-1082-D, 2015 WL 8479677 (N.D. Tex. Dec. 10, 2015) .................................................... **37**

*Owens v. LVNV Funding, LLC*, No. 1:14-cv-02083-JMS-TAB, 2015 WL 1826005 (S.D. Ind. Apr. 21, 2015), aff'd, 832 F.3d 726 (7th Cir. 2016) ............... **56**

*Pennell v. Global Trust Management*, 990 F.3d 1041 (7th Cir. 2021) .................. **36, 44**

*Persinger v. Southwest Credit Systems, L.P.*, 20 F.4th 1184 (7th Cir. 2021) ........ **55**

*Ploog v. Homeside Lending, Inc.*, 209 F. Supp. 2d 863 (N.D. Ill. 2002) ............... **38**

*Proescher v. Security Collection Agency*, NO. 3:17-CV-1052-J-32PDB, 2018 WL 3432737 (M.D. Fla. June 8, 2018) .................................................... **51 n.10**

*Puryer v. HSBC Bank*, 391 Mont. 361 (Mont. May 18, 2018)............................... **39**

*Randolph v. IMBS, Inc.*, 368 F.3d 726 (7th Cir. 2004)........................................... **55**

*Rosado v. Taylor*, 324 F. Supp. 2d 917 (N.D. Ind. 2004) ...................................... **56**

*Ross v. Carter*, No. 1:20-cv-00876-JPH-MPB, 2020 WL 3104374 (S.D. Ind. June 10, 2020).......................................................................................... **34-35**

*Ruvalcaba v. Ocwen Loan Servicing, L.L.C.*, Case No. 15-cv-744-BAS,DHB, 2016 WL 7178855 (S.D. Cal. Dec. 9, 2016)........................................... **39**

*Saccameno v. Ocwen Loan Servicing, LLC*, 372 F.Supp.3d 609 (N.D. Ill. 2019)................................................................................................ **10, 37, 58**

*Sierra Club v. Franklin County  Power of Illinois, LLC*, 546 F.3d 918 (7th Cir. 2008)............................................................................................ **36**

*Smith v. GC Servs. Ltd. P'ship*, 986 F.3d 708 (7th Cir. 2021)............................ **9**

*Spokeo Inc. v. Robins*, 578 U.S. 330, 136. S. Ct. 1540, 194  L.Ed. 23 635 (2016) **31, 33, 42, 49, 54**

*Spuhler v. State Collection Services*, 983 F.3d 282 (7th Cir. 2020)...................... **31**

*Tabb v. Ocwen Loan Servicing, L.L.C.*, 798 Fed. Appx. 726 (3d Cir. 2020).......... **40**

*TransUnion LLC v. Ramirez*, 141 S.Ct. 2190 (2021)................................................. **31, 36, 45, 46, 50**

*VanHuss v. Rausch, Sturm, Israel, Enerson & Hornik*, 16-cv-372-slc, 2017 WL 1379402 (W.D. Wis. Apr. 14, 2017) ........................................................ **57**

*Wagner v. Chiari & Ilecki, L.L.P.*, 973 F.3d 154 (2d Cir. 2020) ........................ **58**

*Webster v. Receivables Performance Mgmt., LLC*, 473 F. Supp. 3d 861 (S.D Ind. 2020).............................................................................................................. **57 n.11**

*Wehrheim v. Secrest*, No. IP 0-1328-C-T/K, 2002 WL 31242783 (S.D. Ind. Aug. 16, 2002)...................................................................................................... **55**

*Wilson v. Bank of Am.*, 48 F. Supp. 3d 787 (E.D. Pa. 2014) ................................ **28**

**Statutes**

12 C.F.R.§  1024.35(b)(6) ........................ **28**

12 C.F.R.§  1024.35(d)(1) ........................ **27, 27 n.5**

12 C.F.R. § 1024.35(e)(1)(ii) ........................ **29**

12 C.F.R. § 1024.35(e)(3)(ii) ........................ **28**

12 C.F.R. § 1024.35(i) ........................ **29**

12 C.F.R. § 1024.35 ........................ **38**

12 U.S.C. § 2605 ........................ **38**

12 U.S.C. § 2605(f) ........................ **37, 38, 38 n.9, 39**

15 U.S.C. § 1692(a) ........................ **47, 49, 51**

15 U.S.C. § 1692c(a)(2) ........................ **40**

15 U.S.C. § 1692d(5) ................................................................................ **39**

15 U.S.C. § 1692e(2) ................................................................................ **40**

15 U.S.C. § 1692e(4) ................................................................................ **40**

15 U.S.C. § 1692e(5) ................................................................................ **40**

15 U.S.C. § 1692e(6) ................................................................................ **40**

15 U.S.C. § 1692e(8) ................................................................................ **39-41**

15 U.S.C. § 1692e(10) ............................................................................... **40**

15 U.S.C. § 1692f ................................................................................ **39-41**

47 U.S.C. § 227(b)(3)(A) ................................................................................ **39**

**Other Authorities**

Restatement (Second) of Torts § 652A(2)(a)-(d) (1977)........................ **46, 50, 54**

Restatement (Second) of Torts § 652D (1977)........................................ **55**

Restatement (Second) of Torts § 652E (1977) ...................................... **46, 47, 55**

Restatement (Second) of Torts § 674 ...................................................... **48**

Restatement (Second) of Torts §§ 681 ..................................................... **48**

Restatement (Second) of Torts § 693 (1977) .......................................... **33-34**

Plaintiff Demona Freeman ("Freeman"), by and through undersigned counsel, and pursuant to Fed. R. Civ. P. 56, L. R. 56-1, and the Honorable Tanya Walton Pratt's Courtroom Procedures and Trial Practice, respectfully submits this Memorandum In Support of Response In Opposition to Defendant Ocwen Loan Servicing, LLC's ("Ocwen") Motion for Summary Judgment.

## I.    INTRODUCTION

If she ever even existed, Ocwen cannot lay blame for its conduct at the feet of another "Marla's mistake" or isolated human error. Ms. Freeman's mortgage loan is far from the first Ocwen has placed in a manufactured state of default, initiated all manner of collection activities in relation to, or unlawfully sought to foreclose upon. As a result, Freeman has experienced emotional distress, physical manifestations of that stress, marital instability, damage to her credit, invasion of privacy and peace of mind, loss of time, and expense. *See Smith v. GC Servs. Ltd. P'ship,* 986 F.3d 708, 710 (7th Cir. 2021) (finding that abusive debt-collection practices lead to "marital instability," and "invasions of individual privacy").[1] Despite this, and its recent admission of error, Ocwen seeks summary judgment on all outstanding claims and, astoundingly, argues its actions caused Freeman no harm. In doing so, it goes so far as to belittle Freeman for being unable to understand or use legal terminology to accurately convey the status of her loan. *See, e.g.,* [D.E. 269 at 1, 12]; *see also* Newton Dep. 32:13-34:25 [Filing No. 336-32].   For these reasons and those detailed below, summary judgment should be denied.

## II.    LEGAL STANDARD

---

[1] Further, Ocwen's conduct created and continues to create an appreciable risk of future harm because it still seeks to collect amounts it is not entitled to (including an inexplicable advance balance of $44,462.89 as of December 31, 2019). It will also assuredly reinitiate foreclosure proceedings absent judicial intervention. *See* Ocwen_Freeman 004832 [Filing No. 336-4].

Summary judgment is only appropriate where "no reasonable jury could find for the party opposing the motion." *Mills v. First Fed. S & L Ass'n*, 83 F.3d 833, 840 (7th Cir. 1996). "[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986). In reaching a determination about whether summary judgment should be granted, a court is to construe the cited evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).

### III.    STATEMENT OF MATERIAL FACTS IN DISPUTE

1.       Paragraph 10 of Ocwen's Statement of Undisputed Material Facts proclaims "[a]n error was made during the initial reconciliation after the close of the Bankruptcy in February 2018, and disallowed amounts were not removed from the Loan. This was a human error." (internal citations omitted). This statement is demonstrably false. The Loan was in a manufactured state of delinquency and default before and after any reconciliation. The errors made by Ocwen in relation to the Loan are not at all isolated to disallowed amounts. *See generally* Patterson Report [Filing No. 336-28]. While it may be true later failed attempts to correct servicing errors may be construed as human error, the root cause of these issues were known and widespread deficiencies with its system of record - REALServicing. *See* Ocwen_Freeman 011126 - 011133, attached to Appendix as ***Exhibit G***. Like in *Saccameno v. Ocwen Loan Servicing, LLC*, 372 F.Supp.3d 609 (N.D. Ill. 2019), Ocwen does not identify the human it contends failed to remove said "disallowed amounts", in its motion or in any other discovery response, nor what exactly they did.

2.      Paragraph 10 of Ocwen's Statement of Undisputed Material Facts proclaims "[t]his error occurred despite Ocwen's implementation and maintenance of procedures designed to prevent such an error." This is assertion is in dispute. As detailed above, and within the Expert Report of Bernard J. Patterson, Ocwen committed numerous servicing errors, not just an "error." *See, e.g.*, Patterson Expert Report*, paras 84-97 [Filing No. 336-28]. Moreover, Ocwen does not identify any specific procedure or procedures designed to prevent the servicing "error" it admits to, let alone the countless other errors identified here and within the Expert Report of Bernard J. Patterson.

3.      Paragraph 11 of Ocwen's Statement of Undisputed Material Facts proclaims "Plaintiff did not submit any payment to Ocwen in June 2018." This statement is demonstrably false. Freeman called Ocwen twice in June of 2018 attempting to make her payment. *See* Ocwen_Freeman 003634 [Filing No. 336-2] and Ocwen_Freeman 003636 [Filing No. 336-2]. Ocwen told Freeman they would only accept payment of the entire reinstatement amount, much more than the single monthly payment, and an amount she did not in fact owe. Verdooren Decl. para 22 [Filing No. 272-1] and Verdooren Dep. 129:18-19 [Filing No. 336-13].  Despite this, and the fact that her subsequent attempts to make payment via check were unsuccessful, Freeman's June 2018 payment obligation was satisfied via funds already received from her. Patterson Expert Report*, para 93 [Filing No. 336-28].

4.      Paragraph 11 of Ocwen's Statement of Undisputed Material Facts proclaims "Ocwen also did not receive any payments from Plaintiff between July 2018 and December 2018." This is incorrect. Freeman submitted payment to Ocwen by check for her monthly payments in July, August, September, October and November 2018. Demona Freeman Dep.

98:6-11 [Filing No. 336-18]. Those checks were neither deposited nor returned. Ocwen's records do not reflect this because its system of record does not track such information. *See* Ocwen_Freeman 006883, "CGS-CMS - Cash Rejection Specifics - Q1-2014-001", attached to Filing No. 337-1 as ***Exhibit E***; Ocwen_Freeman 006885, "Misidentified Payments Are Misapplied or Not Remitted", attached to Filing No. 337-1 as ***Exhibit E***.

5.    Paragraph 12 of Ocwen's Statement of Undisputed Material Facts states, "As a result of subsequent investigations and corresponding corrections to the Loan - as described below - BONY agreed to voluntarily dismiss the Second Foreclosure Case…" This is incorrect. The decision to dismiss the Second Foreclosure Case was controlled by Ocwen.  Further, there is nothing in the record to support the representation the Second Foreclosure Case was voluntarily dismissed "as a result of subsequent investigations" versus the filing of the instant lawsuit. The alleged "corrections" to the Loan would not independently justify the dismissal of the Second Foreclosure Case, as Ocwen continued to hold the Loan in a manufactured state of default.

6.    Paragraph 13 of Ocwen's Statement of Undisputed Material Facts states, "As described in Ocwen's July 23 letter, the documents requested (to the extent they were available and/or properly subject to request) were sent to Plaintiff's counsel. *Id*." This is incorrect. As detailed and evidenced below, Ocwen did not produce many of the documents requested and all were properly subject to a request. *See infra* Section V, Subsection B.2.

7.    Paragraph 15 of Ocwen's Statement of Undisputed Material Facts states, "After receipt, Ocwen retained outside counsel to conduct the investigation and prepare the response to Purported NOE No. 1." This is incorrect.  While true Ocwen retained outside counsel, Maria Vathis, it provides no evidence to support the scope or purpose of her

engagement. Its policies and procedures also do not contain any language providing guidance about the retention of outside counsel for purposes of responding to notices of error. The record suggests she was retained to merely prepare written responses to NOE No. 1, NOE. No. 2, and NOE No. 3. She had no role in the corresponding investigations or in guiding any search for responsive documents. *See* Vathis Dep. 11:6-13 [Filing No. 336-33]. Any changes made in response to Freeman's Notices of Error, and why these changes were made, were made internally by Ocwen. Vathis Dep. 23:22-25; 24:1 [Filing No. 336-33]. Her response was required to be confirmed and approved by Ocwen. Vathis Dep. 11:14-17 [Filing No. 336-33]. She relied entirely on what Ocwen told her. Vathis Dep. 25:1-5 [Filing No. 336-33]. She could not speak to the nature or extent of Ocwen's own internal investigative efforts or responses to Freeman's notices of errors. Vathis Dep. 12:6-11 [Filing No. 336-33]. She did not have access to Ocwen's servicing system of record or the ability to access any information or documents directly. Vathis Dep. 14:7-14 [Filing No. 336-33]. As of March 9, 2022, Ms. Vathis did not even know if Ocwen had a specific department responsible for investigating or responding to notices of error under RESPA. Vathis Dep. 14:19-15:2 [Filing No. 336-33]. Per Ms. Vathis, the people most knowledgeable about the conclusions found within Ocwen's responses to Freeman's notices of error are Wendy Mclaughlin, Tom Burton, and Alex Gross. Vathis Dep. 9:19-11:5; 15:7-11 [Filing No. 336-33]; Vathis Dep. 9:19-24 [Filing No. 336-33]. Most of her work for Ocwen involves litigating cases; her work in responding to Freeman's Notices of Error was "really sort of a one-off." Vathis Dep. 17:16-24 [Filing No. 336-33].

8.     Paragraph 20 of Ocwen's Statement of Undisputed Material Facts also states, "Ms. Vathis worked with Ocwen to gather information in order to prepare responses to each

purported Notice of Error." This is incorrect. As detailed above, Ms. Vathis prepared responses to each Notice of Error based only upon the information provided to her by Ocwen. She did nothing more than take Ocwen's investigation and formulate a written response. *See* Vathis Dep. 55:11-16 [Filing No. 336-34]. She does not recall personally requesting any documents from Ocwen. *See* Vathis Dep. 56:1-3 [Filing No. 336-34]. A question of fact exists as to whether Ms. Vathis even prepared the responses to Freeman's Notices of Error herself or whether they were merely typed by someone at her office. *See* Vathis Dep. 59:16-25 [Filing No. 336-34].

9.      Paragraph 21 of Ocwen's Statement of Undisputed Material Facts states, "As a result of the investigations into Plaintiff's purported Notices of Error, between November 23, 2018 and January 3, 2019, several changes were made to the Loan in order to correct the previous failure to remove disallowed amounts from the Loan." This is incorrect. There is nothing in the record to support the assertion changes were made to the Loan as a result of investigations into Freeman's Notices of Error versus in response to the filing of the instant matter. Likewise, Ocwen did not "fail[] to remove disallowed amounts from the Loan", it paid itself amounts that were disallowed, then refunded them via its payment reversals and reapplications. *See* Patterson Expert Report paras. 25(d), 42(d), 59, and 60 [Filing No. 336-28].

10.     Paragraph 21 of Ocwen's Statement of Undisputed Material Facts also states, "Following these changes, the only reason why the loan was not current was because Plaintiff had not made any payments since May 2018." This is incorrect. The Loan remained in default because Ocwen rejected payments, misapplied funds to escrow, continued to assess fees and charges, did not decelerate the Loan until much later, never notified Freeman

she could resume making her monthly payments. *See* Patterson Expert Report paras. 25(d), 42(d), 59, and 60 [Filing No. 336-28].

11.      Paragraph 22 of Ocwen's Statement of Undisputed Material Facts states, "During the process of the investigation and while changes were being made to the Loan, Ocwen also began taking steps to decelerate the Loan so that the Second Foreclosure Case could be stopped." This is incorrect. The Loan was not decelerated until after Ocwen responded to Freeman's Notices of Error. *See* Ocwen_Freeman 004894 [Filing No. 336-4]. During the "process" of the investigation, Ocwen continued to pursue foreclosure even going so far as to file a Motion to Dismiss Freeman's counterclaims and affirmative defenses. [Filing No. 336-42]

12.      Paragraph 24 of Ocwen's Statement of Undisputed Material Facts states "Plaintiff had not submitted any payment that was rejected, returned, or otherwise held without application after the close of her Chapter 13 Bankruptcy." This statement is incorrect. Payment for June of 2018 was expressly rejected. *See* Ocwen_Freeman 003634 [Filing No. 336-2]; Verdooren Dep. 129:18-19 [Filing No. 336-13]. Despite this, Plaintiff submitted payment to Ocwen by check for her monthly payments in July, August, September, October and November 2018. Demona Freeman Dep. 98:6-11 [Filing No. 336-18]. Freeman's payment obligations for June 2018 and July 2018 were satisfied. Patterson Expert Report paras. 93-95 [Filing No. 336-28]. Freeman's efforts to continue making her monthly payment obligation is corroborated by her husband: "We tried more than once [to make mortgage payments] and they wouldn't do it, period, not just once. We tried to get them to accept it more than once, I know that." *See* Allen Freeman Dep. 29:21-23 [Filing No. 336-26]; *see also* Allen Freeman Dep. 30:1-2 [Filing No. 336-26]

("[T]here are mortgage payments [Ocwen] didn't accept."). Also, other payments following her exit from bankruptcy were held in suspense without application. *See* Life of Loan History [[Filing No. 84-1] and the Patterson Expert Report para. 89 [[Filing No. 336-28].

13.     Paragraph 27 of Ocwen's Statement of Undisputed Material Facts states "Plaintiff had not reviewed the documents showing the changes to her Loan." This is incorrect. Freeman did look at the documents response, she merely did not spend time reviewing the cryptic reconciliation history. Demona Freeman Dep. 76:17-78:18 [Filing No. 336-17]. The responses also contained no indication Ocwen had removed all inappropriate fees and costs or that it would begin accepting her monthly payments.

14.     Paragraph 27 of Ocwen's Statement of Undisputed Material Facts also states, "In reality, there is no pending foreclosure action against Plaintiff or the Property, and no foreclosure action was filed against her after the January 23, 2019 dismissal of the Second Foreclosure Case. *See* Verdooren Decl. para 28." This is incorrect. While true no foreclosure action has been filed against Freeman after the January 23, 2019 dismissal, there is most certainly a pending foreclosure action. The Loan remains in a manufactured state of default. Ocwen will not accept Freeman's monthly payments. As of December of 2019, Ocwen seeks to collect $44,462.99 from Freeman, an amount far greater than the payments it alleges she has missed. *See* Ocwen_Freeman 004832 [Filing No. 336-4].

15.     Paragraph 28 of Ocwen's Statement of Undisputed Material Facts states, "Plaintiff was diagnosed with high blood pressure by Dr. Valerie Beard in May 2019." This is incorrect. As reflected in Dr. Beard's own records, Freeman presented with high blood pressure for the very first time in October of 2018.  *See* Dr. Beard / Riverview Medical Records at p. 4, attached to Filing No. 337-4 as ***Exhibit DD***.

16.     Paragraph 28 of Ocwen's Statement of Undisputed Material Facts also states "[t]here is no evidence in the record that any potential causes of the high blood pressure were discussed by Plaintiff with Dr. Beard at the time of this diagnosis." This is incorrect. Dr. Beard testified she made a note that Demona mentioned "...stressful things going on in her life that could be contributing to her elevated blood pressure" and "[s]he may have mentioned something about financial issues…" Beard Dep. 10:19-11:14, 11:21-22 [Filing No. 336-29]. Dr. Beard also testified that Demona kept using the word "stressed" during her visits. Beard Dep. 20:11-14 [Filing No. 336-29]. Other than the stress caused by Ocwen, Freeman experienced no other stressful events in 2018 or 2019. Freeman Declaration para. 52 [Filing No. 336-23].  Freeman only began experiencing high blood pressure in 2018. Freeman Declaration para. 53 [Filing No. 336-23].

17.     Paragraph 28 of Ocwen's Statement of Undisputed Material Facts also states, "Plaintiff had first sought treatment from Dr. Beard in April 2018 for a respiratory issue, and was treated by Dr. Beard a total of five times between April 2018 and December 2020 for various issues." This is incorrect. Beard Dep. 14:13-16:2 [Filing No. 336-29]. Freeman first sought treatment from Dr. Beard as a primary care physician after her previous physician (Reeta Bhargava) left for another practice. *See* Freeman Declaration para. 50 [Filing No. 336-23]. Dr. Beard took over all her patients. *Id*. The only respiratory issue she has ever had was a mild case of pneumonia with symptoms lasting 2-3 weeks.

18.     Paragraph 28 of Ocwen's Statement of Undisputed Material Facts also states, "Plaintiff was prescribed medication for her blood pressure by Dr. Beard, and it was under control as of December 2020." This is incorrect. Freeman continues to take medication for her blood pressure, and it was not under control as of September 2020. *See* Dr. Beard /

Riverview Medical Records at p. 5, attached to Filing No. 337-4 as ***Exhibit DD***; *see also* Freeman Declaration para. 58 [Filing No. 336-23].

19.     Paragraph 28 of Ocwen's Statement of Undisputed Material Facts also states, "Plaintiff never discussed Ocwen, BONY, or her Loan … [or] foreclosure with Dr. Beard." This is incorrect. As detailed above, Dr. Beard didn't recall specifics yet testified that Demona mentioned "...stressful things going on in her life that could be contributing to her elevated blood pressure" and "[s]he may have mentioned something about financial issues…" Beard Dep. 10:19-11:14, 11:21-22 [Filing No. 336-29]. Freeman had no other "financial issues" or unusual stressors outside those caused by Ocwen. Freeman Declaration para. 52 [Filing No. 336-23]. When Freeman discussed experiencing stress and stressful financial issues with Dr. Beard, Freeman was referring to Ocwen's collection efforts, allegations that she had missed payments and owed fees and costs, since her exit from bankruptcy. Freeman Declaration para. 52 [Filing No. 336-23]. When discussing her stress and "financial issues" with Dr. Beard, Freeman did not mention Ocwen by name or go into great detail, because she is a private person and was embarrassed. Freeman Declaration para. 51 [Filing No. 336-23]; *see also* Newton Dep. 45:12-16 [Filing No. 336-32] (indicating Freeman is a private person who would not share details about the lawsuit against Ocwen with others).

20.     Paragraph 28 of Ocwen's Statement of Undisputed Material Facts also states, "Plaintiff last saw Dr. Beard on December 23, 2020, with a complaint of back pain." This is incorrect. Beard Dep. 14:13-16:2 [Filing No. 336-29]; *see also* Exhibit D to Freeman Declaration [Filing No. 336-23].

21.    Paragraph 29 of Ocwen's Statement of Undisputed Material Facts states, "Specifically, Plaintiff reported to Ms. Skelton that she had been trying to lose weight for years, that her blood pressure had gotten worse with stress in the past year because her daughter had cancer and issues with her son, and that her sit-down job had caused sciatica on her left side." This is incorrect. Freeman does not even have a son. Freeman Declaration para. 57 [Filing No. 336-23]. Further, Freeman's daughter has been cancer-free since several years before Freeman began seeing Alta Skelton as a patient. Freeman Declaration para. 57 [Filing No. 336-23]. Further, the cancer Freeman's daughter experienced was cured after she underwent a hysterectomy and thus, her risk of remission is extremely low. Freeman Declaration para. 57 [Filing No. 336-23]. Accordingly, Freeman has not experienced any stress in 2020, 2021, or 2022 related to her daughter having cancer. Freeman Declaration para. 57 [Filing No. 336-23]. The overwhelming cause of her stress was Ocwen. Freeman Declaration para. 52 [Filing No. 336-23].

22.    Paragraph 30 of Ocwen's Statement of Undisputed Material Facts states, "There is no evidence in the record that any medical professional or treatment provider has diagnosed or concluded that Plaintiff's high blood pressure is a result of or exacerbated by the acts and/or omissions of Ocwen or BONY dispute what she alleges in this lawsuit." This is incorrect. *See* Newton Dep. 18:21-24 [Filing No. 336-31]; *see also* Newton Dep. 32:13-34:5; 34:13-25 [Filing No. 336-32]. Also, there is no evidence in the record that Freeman's high blood pressure could be the result of any other cause besides the acts or omissions of Ocwen or BONY. Freeman had no other financial issues or inordinate stressors in 2018 or 2019. Freeman Declaration para. 52 [Filing No. 336-23]. Freeman has no history of high blood pressure in the family. Freeman Declaration para. 20 [Filing No. 336-23].

Further, Freeman has exercised regularly and consistently since the time she began experiencing issues with her blood pressure in 2018. Freeman Declaration para. 59 [Filing No. 336-23].

23.     Paragraph 31 of Ocwen's Statement of Undisputed Material Facts states "[t]here is no evidence in the record that any medical professional or treatment provider has ever diagnosed or concluded that any physical or mental condition, ailment, and/or symptom purportedly experienced by Plaintiff is a result of the acts and/or omissions of Ocwen or BONY despite what she alleges in this lawsuit." This is incorrect.[2] Dr. Newton concluded her condition and symptoms were in part a product of psychosomatic issues caused by stress related to Ocwen. Newton Dep. 18:21-24 [Filing No. 336-31]; Newton Dep. 32:13-34:5; 34:13-25 [Filing No. 336-32]. Allen also testified Freeman began suffering from loss of sleep after Ocwen's servicing misconduct began following her discharge from bankruptcy. Allen Freeman Dep. 45:3-11 [Filing No. 336-27].

24.     Paragraph 47 of Ocwen's Statement of Undisputed Material Facts states "With the exception of one payment made in August 2019[3], Plaintiff has not made a mortgage payment on the Loan since May 2018 - a total of forty-five (45) months without a payment." This is incorrect. Ocwen began rejecting Freeman's payments in June of 2018. Demona Freeman Dep. 98:6-11 Filing No. 336-18]; Verdooren Dep. 129:18-19 [Filing No.

_____

[2] This assertion is also entirely irrelevant. *See Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676 (7th Cir. 2011) (rejecting servicer's argument that borrowers' "self-serving" testimony about their emotional distress was insufficient to support an award of damages).

[3] In his deposition, Verdooren testified that he was "still in the process of researching this. I haven't gotten a definitive answer. There was one payment that was accepted in August of 2019. I don't know the – where that payment came from, but it was applied to the loan, or to the account….I'm still researching this topic. ***That's the only payment I've seen that's come in. Since June of 2018, there was one payment applied to the account in August of 2019.***" (Emphasis added). Verdooren Dep. 145:7-16 [Filing No. 336-14]. In preparation of his Declaration, Verdooren stated that he "reviewed the Rule 30(b)(6) deposition testimony given by myself as a corporate representative on behalf of Ocwen on March 23, 2022." *See* D.E. 272-1, page 3 of 193, ¶ 7. In paragraph 22 of his Declaration, Verdooren states that "Ocwen informed Plaintiff in a June 2018 phone call that it would only accept a full reinstatement payment as opposed to a regular monthly payment. Regardless, Plaintiff did not submit any payment at all to Ocwen in June 2018. Ocwen also did not receive any payments between July 2018 and December 2018. ***With the exception of one payment made in August 2019***, Plaintiff has not made a mortgage payment on the Loan since May 2018…." (Emphasis added.) *Id.* at 272-1, page 7 of 193.

336-13]. Freeman attempted to make payments to Ocwen on a monthly basis between June 2018, when Ocwen began rejecting her payments, and November 2018. Demona Freeman Dep. 98:6-11 [Filing No. 336-18]. Ocwen will not accept single monthly payments on a loan it considers to be in default. Verdooren Dep. 129:18-19 [Filing No. 336-13]; *see also* Ocwen_Freeman 004907 [Filing No. 336-4]. Instead, Ocwen would demand a "full reinstatement amount." Verdooren Dep. 129:1-19 and 129:20-131:12 [Filing No. 336-13]. Ocwen has never provided any indication Freeman could recommence making her monthly mortgage payments. Freeman Declaration para. 62 [Filing No. 336-23]. Regarding the "one payment made in August 2019," Ocwen's own research of its records fails to indicate when that payment (applied to the August 1, 2018 payment due) was actually received. *See supra* fn.3.

25.     Paragraph 48 of Ocwen's Statement of Undisputed Material Fact states, "[a] payoff quote provided to Plaintiff on August 7, 2019 shows that none of the disallowed fees, fees associated with the Second Foreclosure Case, or late charges were being sought from Plaintiff several months after servicing transferred to PHH." While true this is what the payoff quote says, this is otherwise incorrect. On September 26, 2019, Ocwen directed money received from Freeman to compensate itself for fees and costs totaling $299.43. *See* Ocwen_Freeman 004832 [Filing No. 336-4].  As of December 31, 2019, PHH was seeking fees and costs totaling $44,462.89 as set forth in its advance balance. *Id.*

#### IV. STATEMENT OF ADDITIONAL FACTS NOT IN DISPUTE

1.     Freeman is the owner of real property and improvements located at and commonly known as 17373 Pine Wood Lane, Westfield, Indiana 46074 (the "Home"). Freeman purchased the Home on or about December 2, 2003, as her primary, principal

residence and financed that purchase by a loan as evidenced by a note (the "Note") and a mortgage on the Home that allegedly secures the Note [Filing No. 84-15] (the "Mortgage") (collectively referred to hereinafter as the "Loan").

2.    On November 1, 2017, despite it being legally and factually current, Ocwen's records reflected the Loan nine (9) payments delinquent. *See* Patterson Expert Report, para. 28(a) [[Filing No. 336-28].

3.    On January 7, 2018, Ocwen reported the Loan to the Credit Bureaus as 180+ days delinquent and with a past due balance of $9,109. *See* Ocwen_Freeman 003568 [Filing No. 336-2]. The Loan was not delinquent, nor did it have a past due balance. *See* Patterson Expert Report, paras. 89-90 [[Filing No. 336-28].

4.    On January 21, 2018, Freeman applied for but was denied a loan from OneMain Financial Services, Inc. in the amount of $10,000.00. *See* OneMain Nonparty Responses 000548 [Filing No. 336-36].  At that time, Ocwen was the only one of Freeman's creditors reporting to the Credit Bureaus that her account with them was severely delinquent.  Freeman Declaration, para. 33 [Filing No. 336-23]. At that time, Freeman was current on all of her outstanding payment obligations. *Id*.

5.    On February 21, 2018, Ocwen directed the filing of a Notice of Relief from Stay and Abandonment ("Notice of Relief") in Cause No. 29D01-0904-MF-000484, asserting the property at issue had been abandoned and that it was "permitted to proceed with this foreclosure action." A true and accurate copy of the Notice for Relief from Stay and Abandonment is attached as [Filing No. 336-37]. On February 21, 2018, the Loan was current and Ocwen had no right to "proceed with [the] foreclosure action." *See* Patterson Expert Report, paras. 90-91 [Filing No. 336-28].

6.     On February 24, 2018, Quicken Loans obtained Freeman's credit file from Trans Union, LLC. *See* TU-000101 and TU-000119 [[Filing No. 336-35](#)]. It contained Ocwen's inaccurate reporting.

7.     On May 10, 2018, nearly a month after the deadline for her to file her taxes, and after she had in fact done so, Ocwen generated and mailed Freeman a corrected 1098 to account for its previous payment misapplications. *See* Ocwen_Freeman 003626 [[Filing No. 336-2](#)].

8.     On May 12, 2018, Chase Card obtained Freeman's credit file from Trans Union, LLC. *See* TU-000101 and TU-000105 [[Filing No. 336-35](#)].

9.     On May 25, 2018, Ocwen concluded Freeman's Loan was in default because "...payments [for] 11/15, 1/16, 3/16, 9/16, 3/17 were not made…" *See* Ocwen_Freeman 003627 [[Filing No. 336-2](#)]. Freeman made each of these payments. *See* Patterson Expert Report, paras. 88-97 [[[Filing No. 336-28](#)].

10.    On June 4, 2018, Ocwen self-identified it had been over collecting, misapplying funds to, escrow from Freeman resulting in an escrow surplus of $3,190.52. *See* Ocwen_Freeman 003632 [[Filing No. 336-2](#)].

11.    On June 8, 2018, Ocwen began rejecting Freeman's payments. *See* Ocwen_Freeman 003634 [[Filing No. 336-2](#)]; and Freeman Declaration, para 62 [[Filing No. 336-23](#)]; Verdooren Dep. 129:14-19 [[Filing No. 336-13](#)]*;* Verdooren Dep. 129:8-9 [[Filing No. 336-13](#)]; *see also* Ocwen_Freeman 004907 [[Filing No. 336-4](#)]. Despite this, Freeman continued submitting payments to Ocwen by check through November of 2018. *See* Demona Freeman Dep. 98:6-11 [[Filing No. 336-18](#)].

12.     On August 15, 2018, Ocwen directed the filing of a Complaint for Foreclosure in the Hamilton County Superior Court under Cause No. 29D03-1808-MF-007526 ("Second Foreclosure Action"). Filing No. 84-12. The Loan was not in default (90+ days delinquent) on August 15, 2018. *See* Patterson Expert Report para. 93 [Filing No. 336-28].

13.     On October 4, 2018, Ocwen reported the Loan to the Credit Bureaus as being 180+ days delinquent with a past due balance of $8,161.00. *See* Ocwen_Freeman 003719 [Filing No. 336-2].

14.     On October 17, 2018, Freeman applied for a loan from OneMain Financial Services, Inc. to fix her transmission. *See* OneMain Nonparty Responses 000544 [Filing No. 336-36]. This application was denied. *See* Freeman Declaration para. 33 [Filing No. 336-23].

15.     On December 18, 2018, twelve days after the initiation of these proceedings, Ocwen made its third attempt at completing a payment reconciliation, reversing and reapplying all prior payments made by Freeman and refunding amounts it had previously collected. *See* Ocwen_Freeman 003799 [Filing No. 336-2].

16.     On January 3, 2019, Ocwen waived the previously assessed foreclosure costs and fees, but on January 8, 2019, Ocwen reassessed those fees and costs associated with the foreclosure filings that it had previously reversed. *See* Patterson Expert Report paras. 83 and 97 [Filing No. 336-28]. Those fees and costs, as well others, remain.

17.     On February 1, 2019, weeks after responding to Freeman's notices of error, Ocwen continued to treat the Loan as if it were in an active bankruptcy proceeding, awaiting

reconciliation. Ocwen_Freeman 004881 [Filing No. 336-4]; *see also* Ocwen_Freeman 004890 [Filing No. 336-4].

18.     From December 1, 2017 to December 6, 2018 (the date this cause of action was filed), Ocwen collected $2,341.81 in new fees and costs unrelated to any "disallowed amounts." In addition, Ocwen assessed $1,370.36 in previously waived fees and costs. Patterson Expert Report paras. 74-75 and 82-83 [[Filing No. 336-28].

19.     On September 26, 2019, Ocwen directed money received from Freeman to compensate itself for fees and costs totaling $299.43. These fees and costs stem from the manufactured state of default Ocwen created. *See* Ocwen_Freeman 004832 [Filing No. 336-4].

20.     Ocwen continues to seek collection of improper fees and costs to the Loan as demonstrated by its advance balance. As of December 31, 2019, this advance balance was $44,462.89. Ocwen_Freeman 004832 [Filing No. 336-4].

21.     On May 13, 2022, nearly four years after it was filed, Ocwen admitted ***for the very first time*** the Second Foreclosure Action was initiated in error. *See* Ocwen's Fourth Supplemental Answer to Plaintiff's First Set of Interrogatories No. 9 [Filing No. 336-38]. This only occurred after Court intervention.

22.     Ocwen has long known of its failings, the specific type of errors and conduct encountered by Freeman in relation to the Loan. Ocwen tracked these failings, risk areas, in spreadsheets it refers to as Risk Convergence Reports ("RCRs"). The RCRs are produced monthly and track risk items by an issue number and issue name. *See, e.g,* Ocwen_Freeman 006925, attached to Filing No. 337-2 as ***Exhibit F***.

23.     The RCRs identify numerous long standing systemic issues relevant to every aspect of Ocwen's handling of Freeman's mortgage loan account and the issues in dispute. There is nothing in the evidentiary record to suggest these "risks" were ever resolved by Ocwen before it ceased to utilize RealServicing in mid 2019.[4] They include without limitation those pertaining to inconsistencies in payment application used by cashiering on BK loans (*see* Ocwen_Freeman 006925, attached to Filing No. 337-2 as ***Exhibit F***); inaccurate credit reporting (*see* Ocwen_Freeman 006925, attached to Filing No. 337-2 as ***Exhibit F***);  flags being raised to prevent the collection of a single payment or full reinstatement  (*see* Ocwen_Freeman 0006925, attached to Filing No. 337-2 as ***Exhibit F***); and problems associated with the requirement that monthly credit reporting be suppressed when disputed by the customer (*see* Ocwen_Freeman 006193, attached to Filing No. 337-1 as ***Exhibit E***).

24.     In March of 2015, Goldin Associates, LLC. ("Goldin") was appointed as Operations Monitor. The purview of the Operations Monitor extended "to all matters directly affecting New York borrowers, including matters that affect borrowers in all states or in multiple states…" Thereafter, Goldin prepared four reports ("Goldin Reports") that identify deficiencies in Ocwen's servicing operations and detailing recommended corrective measures. A true and accurate copy of the fourth Goldin Report is attached hereto as Ocwen_Freeman 011045-011203, attached to Appendix as ***Exhibit G***.

25.     One of the many issues discussed in the Goldin Reports pertain to inaccuracies about amounts claimed to be due and internal conflicts over the continued use of REALServicing. *See* Ocwen_Freeman 009579, attached to Filing No. 337-3 as ***Exhibit***

---

[4] The RCRs also include a detailed description of the source of these risk areas. Contrary to Ocwen's assertion that "human error" was the cause of the issues plaguing Freeman's loan, the RCRs contain numerous findings pointing to deficient programing associated with REALServicing as the culprit.

***G***; Ocwen_Freeman 010728, attached to Filing No. 337-3 as ***Exhibit G***; Ocwen_Freeman 009894, attached to Filing No. 337-3 as ***Exhibit G***; Ocwen_Freeman 009897, attached to Filing No. 337-3 as ***Exhibit G***.

## V. ARGUMENT

### A. Freeman's RESPA Claims Should Go to the Jury

#### 1. Freeman's correspondence constitutes RFIs and NOEs

Contrary to the inappropriate imputation that it was Plaintiff's counsel's motive to generate more RESPA claims, RESPA expressly permits a borrower's lawyer to serve as the borrower's agent for these purposes. *See, e.g., Moon v. GMAC Mortg. Corp.*, No. C08-969Z, 2009 WL 3185596, at *4 (W.D. Wash. Oct. 2, 2009) (finding that letter sent by borrower's attorney that was not signed by the borrower and did not contain an authorization was a qualified written request); *In re Laskowski*, 384 B.R. 518, 531 (Bankr. N.D. Ind. 2008) (finding that chapter 13 bankruptcy trustee, as agent of the consumer debtor, and the debtor each have standing to send a qualified written request). The Notices and Requests in this case were prepared with Freeman's understanding and consent, and plainly meet the requirements for such correspondence.

#### 2. Ocwen failed to appropriately respond to Freeman's RFIs

Freeman directed RFI No. 1 on July 12, 2018 and it was received by Ocwen on or about July 17, 2018. [Filing No. 84-3]. Ocwen responded via correspondence dated July 20, 2018 and July 23, 2018. A true and accurate copy of Ocwen's combined responses are attached hereto as [Filing No. 336-39]. In addition, a table reflecting the documents requested and whether they were provided is attached hereto as ***Exhibit QQ***. As set forth therein and as reflected in the documents themselves, Ocwen did not respond to Freeman's

RFI No. 1 or RFI No. 2 in accordance with 12 CFR § 1024.36(d)(1).[5] *See* [Filing No. 336-39]; *see also **Exhibit QQ*** The documents and information requested were appropriate and readily available to Ocwen yet it declined to provide them. It provides nothing by way of specific evidence to support the contrary.

     3.       <u>Ocwen failed to correct errors and appropriately investigate or respond to Freeman's NOEs</u>

A servicers requirement to conduct a reasonable investigation "imposes a substantive obligation that is not satisfied by the mere procedural completion of some investigation followed by a written statement of reasons." *Wilson v. Bank of Am.*, 48 F. Supp. 3d 787, 804 (E.D. Pa. 2014); *see also McGahey v. Fed. Nat'l Mortg. Ass'n*, 266 F. Supp. 3d 421, 440 (D. Me. 2017) (finding "it is reasonable to interpret the regulation's added qualification that investigations be 'reasonable' as expanding the substantive obligations of servicers under RESPA.").

     a. *Ocwen failed to correct errors, appropriately investigate and respond to NOE No. 1.*

Freeman directed NOE No. 1 on October 29, 2018 and it was received by Ocwen on November 1, 2018 [Filing No. 84-5], acknowledgment letter dated November 6, 2018. Ocwen provided a written response to NOE No. 1 on January 7, 2019. [Filing No. 84-6]. In addition, a summary of Ocwen's response to NOE No.1 is set forth in ***Exhibit RR*** attached hereto and incorporated herein.

---

[5] Per 12 CFR § 1024.36(d)(1), Ocwen had options in responding: (i) Providing the borrower with the requested information and contact information, including a telephone number, for further assistance in writing; or (ii) Conducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance.

Despite its claims, Ocwen did not correct errors or appropriately investigate and respond to NOE No.1. Foremost, the response itself is cryptic and largely boilerplate. It rationalizes its finding of no error in relation to whether it has rejected payments from Freeman by claiming its records do not reflect any payments not being "applied." The response is equally cryptic, and untimely, in relation to Freeman's notice of error under Reg. X 1024.35(b)(6). *See* 12 C.F.R. § 1024.35(e)(3)(ii). It also fails to provide Freeman with written notification describing the "other" errors its records plainly evidence were known to it at this time, or written notification of the actions to be taken to correct these errors. *See* 12 CFR § 1024.35(e)(1)(ii).[6]

In addition, Ocwen failed in its duty to refrain from reporting Freeman's account as past due for a period of sixty days following its receipt of NOE No. 1 as required by 12 C.F.R. § 1024.35(i). *See, e.g.*, *Hammer v. Residential Credit Sols., Inc.*, No. 13 C 6397, 2015 WL 7776807, at *23–25 (N.D. Ill. Dec. 3, 2015). Despite its counsel's exhaustive efforts to steer discovery away from anything credit reporting related, Ocwen's own records confirm it continued to report the Loan in default in November and December of 2018. *See* Ocwen_Freeman 003795 [Filing No. 336-2]. Worse, it went so far as to remove any dispute coding from its reporting six days after it received NOE No. 1. *See* Ocwen_Freeman 003746 [Filing No. 336-2].

Further, as detailed above, the investigation conducted in response to NOE No. 1 (as well as NOE No. 2 and NOE No. 3) was unreasonable if not wholly deficient. Despite no produced policy or procedure providing guidance, Ocwen claims to have retained attorney Maria Vathis to fulfill its investigative responsibilities in relation to Freeman's notices of

---

[6] These same deficiencies plague Ocwen's response to Freeman's NOE No. 2.

errors. The only problem is Maria Vathis seems to have missed the memo explaining the scope of her engagement in this regard. She had no role in the corresponding investigations or in guiding any search for responsive documents. *See* Vathis Dep. 11:6-13 [Filing No. 336-33]. Any changes made in response to Freeman's Notices of Error, and why these changes were made, were made internally by Ocwen. Vathis Dep. 23:22-25; 24:1 [Filing No. 336-33]. She could not speak to the nature or extent of Ocwen's own internal investigative efforts or responses to Freeman's notices of errors. Vathis Dep. 12:6-11 [Filing No. 336-33]. She did not have access to Ocwen's servicing system of record or the ability to access any information or documents directly. Vathis Dep. 14:7-14 [Filing No. 336-33]. As of March 9, 2022, Ms. Vathis did not even know if Ocwen had a specific department responsible for investigating or responding to notices of error under RESPA. Vathis Dep. 14:19-15:2 [Filing No. 336-33]. Per Ms. Vathis, the people most knowledgeable about the investigation and findings responsive to Freeman's notices of error are Wendy Mclaughlin, Tom Burton, and Alex Gross. Vathis Dep. 9:19-11:5; 15:7-11 [Filing No. 336-33]; Vathis Dep. 9:19-24 [Filing No. 336-33].

    b. *Ocwen failed to correct errors, appropriately investigate and respond to NOE No. 2.*

Freeman directed NOE No. 2 on November 13, 2018 and it was received by Ocwen on November 17, 2018 [Filing No. 84-8], who mailed an acknowledgment letter on November 20, 2018. After requesting an extension of time, Ocwen responded to NOE No. 2 on January 22, 2019 [Filing No. 84-6]. A table outlining deficiencies in Ocwen's investigative efforts responsive to NOE No. 2 is set forth in ***Exhibit SS*** attached hereto and incorporated herein. Nearly identical to its handling of NOE No. 1, Ocwen's investigation and written response in relation to NOE No. 2 were entirely perfunctory. *See, e.g.*, *Kesten v.*

*Ocwen Loan Servicing, L.L.C.*, No. 11 C 6981, 2012 WL 426933, at *6 (N.D. Ill. Feb. 9, 2012) (finding that "perfunctory response" which does not contain an explanation or clarification as to why the borrowers' request for an interest overcharge refund could not be processed was not a sufficient statement of reasons for servicer's actions). Ocwen's records, as further detailed by the Expert Report of Bernard J. Patterson, reflects an abundance of identified errors, yet its response to Freeman's notices of error in no way convey that fact to Freeman.

4.      Freeman has Article III standing to pursue her RESPA claims.

"To ensure that what is before them is in fact a case or controversy, federal courts require that plaintiffs have 'standing' to sue. That means a plaintiff must have suffered an injury in fact that is traceable to the defendant's conduct and redressable by a favorable judicial decision." *Markakos v. Medicredit, Inc.*, 997 F.3d 778, 780 (7th Cir. 2021) (internal citations omitted). To fulfill the injury in fact requirement, the violation must have "harmed or presented an 'appreciable risk of harm' to the underlying concrete interest that Congress sought to protect." *Casillas v. Madison Avenue Associates, Inc.*, 926 F.3d 329, 333 (7th Cir. 2019) (quoting *Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884, 887 (7th Cir. 2017)); *see also Spokeo Inc. v. Robins*, 578 U.S. 330, 136. S. Ct. 1540, 1550, 194 L.Ed. 23 635 (2016). "To demonstrate standing at the summary judgment stage of litigation, the plaintiffs must '"set forth" by affidavit or other evidence "specific facts"' demonstrating that they have suffered a concrete and particularized injury that is both fairly traceable to the challenged conduct and likely redressable by a judicial decision." *Spuhler v. State Collection Services*, 983 F.3d 282, 284 (7th Cir. 2020) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

To be concrete, an injury must be "'real,' and not 'abstract,'" but concrete need not mean tangible. *Spokeo, Inc.*, 578 U.S. at 340–41. Traditional tangible harms, such as physical or monetary harm, easily meet the concreteness requirement. *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2204 (2021). Intangible harms are concrete if the plaintiff's alleged injury bears a "close relationship" to the sort of harms traditionally recognized by American courts, such as reputational harm. *Spokeo*, 578 U.S. at 341. The close-relationship inquiry looks for "a close historical or common-law analogue" to the alleged injury but does not require an "exact duplicate." *TransUnion*, 141 S. Ct. at 2204.

a. *Freeman has Article III standing regarding Ocwen's failure to appropriately respond to Freeman's RFI's*

With respect to the RFI's, Freeman has suffered "downstream consequences" as a result of Ocwen's failure to provide the information requested. As a result, Freeman has suffered a concrete injury. In *Lavallee v. Med-1 Solutions*, 932 F.3d 1049 (7th Cir. 2019), plaintiff had two unpaid medical bills that were submitted by her healthcare provider to the debt-collector defendant. During a phone call with the defendant to inquire about the debt, plaintiff learned that the defendant had already filed a lawsuit against her to collect the debts. During this call, plaintiff was not informed of the statutorily required disclosures pursuant to 15 U.S.C. § 1692g(a). Plaintiff sued defendant for a violation of § 1692g(a). On appeal, the defendant argued its procedural violation of the FDCPA did not cause the plaintiff concrete harm. The Seventh Circuit disagreed. The Court noted that it was during this initial phone call with the defendant that the plaintiff learned that the defendant had already filed a lawsuit against her to collect the relevant debts. The Court explained: "[w]ithout the knowledge that a consumer in her position is statutorily entitled to dispute and require verification of the debt on which the lawsuit was predicated, [plaintiff] stood at

a distinct disadvantage. If she had known about her rights, she could have disputed and sought verification of the debts - thereby requiring [defendant] to cease the collection action and obtain verification. Because she was already a collection-suit defendant, it's reasonable to infer that she would have exercised her statutory rights, thereby halting the collection litigation, if [defendant] had provided the required disclosures." *Id.* at 1053 (internal citations omitted). Thus, the Court concluded the plaintiff suffered a concrete injury. *Id.*

Freeman has suffered a similar informational disadvantage like the plaintiff in *Lavallee*. Had Ocwen properly provided the information requested in response to Freeman's RFI's, information to which Freeman was statutorily entitled, it would have changed how Freeman responded to Ocwen's collection efforts and servicing errors. Specifically, had Ocwen properly provided the information Freeman requested in response to RFI No. 1, she would have been able to properly dispute what exactly was happening with her Loan and have the necessary information in order to resolve the issue Ocwen was claiming in rejecting her monthly payments. Additionally, this informational disadvantage made it more difficult for Freeman to properly defend against the second foreclosure proceeding because Freeman could not fully articulate how Ocwen had misapplied payments to her mortgage loan account. *See Moore v. Wells Fargo Bank*, 908 F.3d 1050, 1058 (7th Cir. 2018) (finding sufficient for standing the allegation that plaintiff was injured by having to fight the foreclosure case without all the information he needed from the defendant who failed to properly respond to qualified written request). This informational disadvantage Freeman suffered as a result of Ocwen's failure to properly respond to the RFI's caused Freeman a concrete injury like that in *Lavallee. See Lavallee*, 932 F.3d 1049.

Further, Ocwen's failure to properly respond to the RFI's caused Freeman a concrete injury which bears a "close relationship" to the sort of harms traditionally recognized by American courts. *Spokeo*, 578 U.S. at 341. Namely, the harm caused to Freeman by Ocwen's failure to properly respond to the RFI's bears a close relationship to the harm caused by the commonly recognized tort of loss of consortium. *See Andrews v. Cty. of Hawaii*, Cv. No. 10-00749 DAE-KSC, 2012 WL 425167, at *8 (D. Haw. Feb. 9, 2012) (allegations of loss of consortium are sufficient to establish Article III standing). The common law has long recognized actions at law against defendants who committed tortious conduct which resulted in a person's "loss of consortium" in their spouse. See Restatement (Second) of Torts § 693 (1977). The tort of loss of consortium recognizes cognizable harms in the form of any loss or impairment of the other spouse's society, companionship, affection and sexual relations. Restatement (Second) of Torts § 693 (1977). Ocwen's failure to properly respond to Freeman's RFI's has caused marital distress and continuous arguments between Freeman and her husband. Freeman Declaration para 39 [Filing No. 336-23]; Demona Freeman Dep. 161:3-7 [Filing No. 336-21]; Allen Freeman Dep. 10:21-11:2 [Filing No. 336-25]; Allen Freeman Dep. 15:2-15 [Filing No. 336-25]. The marital distress caused by Ocwen has caused Freeman to experience a loss of companionship and affection in her marriage. Freeman Declaration para 43 [Filing No. 336-23]. Freeman's marital distress, loss of affection and loss of companionship as a result of Ocwen's failure to properly respond to the RFI's is a concrete injury that bears a close relationship to the harm caused by the commonly recognized tort of loss of consortium.

Lastly, Ocwen argues that Freeman does not have standing regarding RFI No. 2 because the time to respond to RFI No. 2 had not yet expired at the time Freeman's Original

Complaint was filed. Ocwen's Mem. in Supp. of Mot. for Summ. J. [D.E. 269] at 19. This argument is a red herring. Though Freeman's Original Complaint was filed on December 6, 2018, allegedly before the 30-day deadline to respond to RFI No. 2 had expired, Freeman's Second Amended Complaint – the operative complaint – was filed on September 20, 2019, long after the 30-day deadline to respond to RFI No. 2 had expired.[7] As Ocwen knows or should know, "an amended complaint completely replaces previous complaints, … ." *Ross v. Carter*, No. 1:20-cv-00876-JPH-MPB, 2020 WL 3104374, at *1 (S.D. Ind. June 10, 2020) Doc. 25 (additional citations). Accordingly, Freeman had indeed suffered an injury as a result of RFI No. 2, and had standing, at the time the operative complaint was filed.

b. *Freeman has Article III standing regarding Ocwen's failure to appropriately investigate or respond to Freeman's NOE's*

Ocwen argues that Freeman does not have standing regarding the three NOE's because the time to respond to the NOE's had not yet expired at the time Freeman's Original Complaint was filed. Ocwen's Mem. in Supp. of Mot. for Summ. J. [D.E. 269] at 19. Again, this argument is a red herring. Freeman's Second Amended Complaint – the operative complaint – was filed on September 20, 2019, long after the 30-day deadline to respond to the NOE's had expired.[8] *See Ross*, 2020 WL 3104374, at *1 ("an amended complaint completely replaces previous complaints, … ."). Accordingly, Freeman had indeed suffered an injury as a result of the NOE's, and had standing, at the time the operative complaint was filed.

Further, Freeman suffered a concrete harm as a result of Ocwen's failure to properly respond to Freeman's NOE's. First, because Ocwen failed to properly respond to the NOE's,

---

[7] The 30-day deadline to respond to RFI No. 2 expired on December 28, 2019.
[8] The 30-day deadline to respond to NOE No. 1 expired on December 14, 2018; the deadline to respond to NOE No. 2 expired on December 28, 2018; and the deadline to respond to NOE No. 3 expired on January 18, 2019.

Freeman was unable to resume making monthly payments, resulting in Freeman appearing in further default on the Loan. Further, improper fees and costs were not removed from the Loan when they should have been. Those improper fees and costs remain present on the Loan through the end of January 2019. *See* Patterson Expert Report para 73-74 [[Filing No. 336-28]. These monetary harms are concrete injuries Freeman has suffered as a result of Ocwen's failure to properly respond to the NOE's.

Additionally, Freeman has suffered physical harms as a result of Ocwen's failure to properly respond to the NOE's. While it's true that feelings of annoyance, indignation, stress, intimidation and confusion are not concrete injuries, "[p]hysical manifestations of emotions, however, can be concrete injuries." *See Gilbert v. TrueAccord Corp.*, No. 21-CV-485, 2022 WL 2257126, at *5 (N.D. Ill. June 23, 2022) (holding that plaintiff put forth sufficient evidence of a concrete injury based on evidence that she was so angry she began shaking); *see also Pennell v. Global Trust Management*, 990 F.3d 1045 (7th Cir. 2021). Ocwen's failure to properly respond to the NOE's caused Freeman anxiety, depression, anger, frustration, and stress. *See* Freeman Declaration para 40 and 45 [Filing No. 336-23]; *see also* Demona Freeman Depo. 147:14-18 [Filing No. 336-20]; Demona Freeman Depo. 114:5 and 123:8-11 **Exhibit YY**. This emotional distress caused Freeman to experience headaches, light-headedness, shortness of breath, nausea, trembling, and numbness. Freeman Declaration para 41 and 46 [Filing No. 336-23]. Further, Ocwen's failure to properly respond to the NOE's caused Freeman loss of appetite and loss of sleep. Freeman Declaration para 42 and 47 [Filing No. 336-23]. Each of these physical manifestations suffices as a concrete injury, given binding precedent that physical harms are concrete, *TransUnion*, 141 S.Ct. at 2204, and that the magnitude of the injury does not

matter (a trifle will do), *Sierra Club v. Franklin Cty. Power of Ill.*, 546 F.3d 918, 925 (7th Cir. 2008). *See also Gilbert*, 2022 WL 2257126, at *5. Accordingly, Freeman's physical manifestations resulting from her emotional distress caused by Ocwen's failure to properly respond to the NOE's are concrete injuries conferring Article III standing.

Lastly, as with Ocwen's failure to properly respond to the RFI's, its failure to properly respond to the NOE's caused Freeman arguments, marital distress, loss of companionship, and loss of affection between her and her husband. *See* Freeman Declaration para 43 and 47 [Filing No. 336-23]; *see also* Demona Freeman Dep. 161:3-7 [Filing No. 336-21]; Allen Freeman Dep. 10:21-11:2 [Filing No. 336-25]; Allen Freeman Dep. 15:2-15 [Filing No. 336-25]. This harm bears a close relationship to the harm caused by the commonly recognized tort of loss of consortium. *See Andrews*, 2012 WL 425167, at *8. Accordingly, Freeman has suffered a concrete injury as a result of Ocwen's failure to properly respond to the NOE's.

### 5. Pattern and Practice

Ocwen argues that no question of material fact exists as to whether it has engaged in a "pattern and practice" for purposes of statutory damages pursuant to 12 U.S.C. 2605(f). To be clear, "pattern and practice" comes in two different varieties. First, there is a "pattern and practice" involving a single borrower where the servicer fails to adequately respond to a request for information or notice of error on more than one occasion. The second variety of "pattern and practice" involves more than one borrower being affected by the non-compliance of the servicer. *See Quimby* at *2. For example, in *Obazee v. Bank of NY Mellon*, Civil Action No. 3:15-CV-1082-D, 2015 WL 8479677 (N.D. Tex. Dec. 10, 2015), the court determined that the plaintiff alleging that "several other lawsuits alleging RESPA

violations have been filed by other parties against the same defendant, and that more than 1,400 complaints related to ' collection, [or] foreclosure' have been made to the CFPB by other persons against the same defendant, is sufficient to establish a claim for statutory damages under RESPA"). *Id*. Here, Freeman has also established numerous violations of RESPA with respect to other parties as well as herself by way of portions of the RCRs set out above. *See also* Ocwen_006925, attached to Filing No. 337-2 as **Exhibit F**, dealing with the tracking of consumer complaints. This risk area remained unresolved in 2016 and there is nothing in the record to evidence these issues were resolved before the relevant time period. This, along with other portions of the RCRs and the stark similarity between this case and *Saccameno*, 372 F.Supp.3d 609 (N.D. Ill. 2018) create a question of fact as to whether Ocwen has engaged in a pattern and practice of servicing misconduct.

### 6. Freeman's Recovery under RESPA is not Limited to $2,000

Ocwen claims that Freeman is limited to a total recovery of $2,000.00 in statutory damages under RESPA regardless of the number of violations it has committed with respect to the error resolution procedures set forth in 12 U.S.C § 2605 and Section 1024.35 of Regulation X.   In doing so, Ocwen relies upon *Ploog v. Homeside Lending, Inc.*, 209 F. Supp. 2d 863 (N.D. Ill. 2002), which relies almost entirely on dicta from *Katz v. The Dime Savings Bank*, 992 F. Supp. 250, 257 (W.D.N.Y. 1997).[9]   Neither of these cases provide any precedential authority or adequately consider the plain reading of 12 U.S.C. § 2605.  *See, e.g., Howard v. Wal-Mart Stores, Inc.*, 160 F.3d 358, 359 (7th Cir. 1998) ("[D]istrict court's decision does not have precedential authority."). Ocwen also continues to ignore the more recent district court decision of *Moore v. Caliber Home Loans, Inc.*, Case No. 1:14-cv-852,

---

[9] Also, the district court in *Johnstone v. Bank of Am., N.A.*, 173 F. Supp. 2d 809 (N.D. Ill. 2001) criticized the *Katz* decision relied on by Ocwen for failing to construe 12 U.S.C. § 2605(f) liberally because it wrongfully concluded that RESPA was not a consumer protection statute. *Id.* at 816.

2015 WL 5162482 (S.D. Ohio Sept. 3, 2015) concluding a borrower can recover damages under 12 U.S.C. § 2605 for "each such failure" without making any distinction between actual damages versus statutory damages. *Id*. at * 8. Accordingly, the issue must be decided based upon a plain reading of the language of 12 U.S.C. § 2605(f), which provides in relevant part: Whoever fails to comply with any provision of this section shall be liable to the borrower *for each such failure* in the following amounts: …

> (A) any actual damages to the borrower as a result of the failure; and

> (B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000.

Here, a plain reading leads to only one possible interpretation, a borrower can recover actual damages "*for each such failure*" and additional statutory damages in an amount up to $2,000 "*for each such failure"* if the precondition of "pattern and practice" is satisfied. This reading of 12 U.S.C. § 2605(f) is further bolstered by the similar language of Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(3)(A), which has been uniformly interpreted as permitting a statutory damage award for *each* violation as is sought here. *See also A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1057 (7th Cir. 2018) ("Successful plaintiffs [under the TCPA] may recover the greater of the amount of (1) actual *damages* or (2) $500 for *each violation*, meaning each phone call.") (emphasis in original).

**B.      Freeman's FDCPA Claims Should Go to the Jury.**

1.      <u>Ocwen has violated numerous sections of the FDCPA via its various debt collection activities</u>

As set forth below, Ocwen's various debt collection activities were in violation of various provisions of the FDCPA because each seeks to collect upon amounts not owed, threaten to take an unlawful action - foreclosure upon Freeman's home (§ 1692e(5)), were false, and misrepresented the status of Freeman's loan. *See, e.g., Gritters v. Ocwen Loan*

*Servicing, L.L.C.*, No. 14 C 00916, 2014 WL 7451682 (N.D. Ill. Dec. 31, 2014) (FDCPA violation for servicer to falsely claimed consumer was in default); *Puryer v. HSBC Bank*, 391 Mont. 361 (Mont. May 18, 2018) (repeatedly threatening to foreclose when no right to do so stated claim under § 1692f(6)); *Ruvalcaba v. Ocwen Loan Servicing, L.L.C.*, Case No. 15-cv-744-BAS-DHB, 2016 WL 7178855 (S.D. Cal. Dec. 9, 2016) (wildly fluctuating stated amounts impeded borrower's ability to respond appropriately to payoff dispute in violation of FDCPA).

     a. *Ocwen's foreclosure related filings violated §1692f, § 1692e(8), and §1692d(5)*

Ocwen filed multiple foreclosure related pleadings that falsely stated the amount due from Freeman. Ocwen also falsely stated Freeman was in default, falsely asserted the right to foreclose on Freeman, falsely claimed that Freeman had abandoned her home in the bankruptcy case and that Ocwen had obtained relief from stay to pursue foreclosure, and failed to accurately account for Freeman's payments and treated her as being deeply in default for more than a year while Freeman had paid all amounts due and owing.

     b. *Ocwen's Collection Calls, both manual and automated, were in violation of § 1692f,*
        *§ 1692e(8), and § 1692c(a)(2).*

Due to the number of collection calls at issue, a table containing a description of each and citation to the record has been attached hereto as ***Exhibit TT***. In addition to being false and deceptive because Freeman neither owed the amounts alleged to be owed, and abusive due to their frequency, Ocwen's communications continued despite full knowledge she was represented by counsel in violation of Section 1692c(a)(2). *See* Ocwen_Freeman 002644 [Filing No. 336-1]; *see also McCusker v. Ocwen Loan Services, L.L.C.*, Civil Action No. 14-3663-MGM, 2015 WL 4529986 (D. Mass. July 27, 2015).

c. *Ocwen's Statements & Default Letters were in violation of §1692f, § 1692e(2), (4), (5), (6) and (10)*

Due to the number of written communications at issue, a table containing a description of each and citation to the record has been attached hereto as ***Exhibit UU***. Ocwen's periodic statements and default related letters have long been considered a debt collection activity, even though they include some disclaimer. *See, e.g.*, *Tabb v. Ocwen Loan Servicing, L.L.C.*, 798 Fed. Appx. 726 (3d Cir. 2020). Here, each of the statements and default related letters referenced above threaten foreclosure, misrepresent the status of Loan, as well as the amount owed despite Ocwen's knowledge of its servicing errors and systemic servicing deficiencies.

d. *Ocwen's Credit Reporting was in violation of FDCPA § 1692f*

Due to the number of reporting incidents at issue, a table containing a description of each and citation to the record has been attached hereto as ***Exhibit VV***. In addition to being inaccurate, this reporting constitutes repeated violations of the FDCPA's specific prohibition against "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." 15 U.S.C. § 1692e(8). This subsection establishes a "knows or should know" standard and depends solely on the debt collector's knowledge. *Evans v. Portfolio Recovery Assocs.*, LLC, 889 F.3d 337, 347 (7th Cir. 2018). This standard doesn't require notification by the consumer since the focus is on the debt collector's knowledge, no matter how the debt collector gains that knowledge. *Id*. (citing *Brady v. Credit Recovery Co*., 160 F.3d 64, 67 (1st Cir. 1998) (debt collector knew of dispute by oral communication of dispute)). Nor does § 1692e(8) incorporate procedural requirements,

writing requirements, or more specific definitions of "disputed debts" applied in other sections of the FDCPA or the Fair Credit Reporting Act. *Evans*, 889 F.3d at 347 (rejecting arguments that requirements from 15 U.S.C. §§ 1681s-2, 1692g(b) should be read into § 1692e (8)). Here, Ocwen knew or should have known the foregoing credit information was false or in dispute. Nonetheless, with the exception of a short period of time in November of 2018, Ocwen failed to provide any indication to the Credit Bureaus that its reporting of Freeman's loan was in dispute. This despite her calls, actual credit dispute letters, notices of error, and the resulting ACDVs it received. *See* Ocwen_Freeman 004006 [Filing No. 336-8]; Ocwen_Freeman 004009 [Filing No. 336-8].

> e. *Ocwen's door knocks and door tags were in violation of § 1692f and § 1692e*

Due to the number of incidents following beneath this category of debt collection activity, a table containing a description of each and citation to the record has been attached hereto as **Exhibit WW**. Here again, it is undisputed that each of the debt collection related activities above occurred in relation to a default status that either did not exist or in relation to an attempt to collect money from Freeman that she did not owe.

2. Freeman has Article III Standing to Pursue her FDCPA Claims

To fulfill the injury in fact requirement, the violation must have "harmed or presented an 'appreciable risk of harm' to the underlying concrete interest that Congress sought to protect." *Casillas*, 926 F.3d at 333 (quoting *Groshek*, 865 F.3d at 887); *see also Spokeo, Inc.*, 136 S. Ct. at 1550. For example, an FDCPA violation causes concrete injury harm if it leads a plaintiff to pay extra money, affects a plaintiff's credit, or otherwise alters a plaintiff's response to a debt. *Markakos*, 997 F.3d at 780 (citing *Larkin v. Fin. Sys. of Green Bay, Inc.*, 982 F.3d 1060, 1066 (7th Cir. 2020)).

a. *Freeman suffered a concrete injury traceable to Ocwen's violations of the FDCPA in relation to its foreclosure filings.*

Freeman has suffered a number of concrete injuries as a result of Ocwen's foreclosure filings. First, Freeman has incurred foreclosure fees and costs imposed by Ocwen which it still seeks to collect from her. On August 29, 2018, Ocwen assessed $191.01 in foreclosure costs and $1,025.00 in foreclosure fees against Freeman's account. Patterson Expert Report para 63 [Filing No. 336-28]. The previously assessed foreclosure fees and costs were waived on January 3, 2019, but were subsequently added back and assessed to Freeman's account on January 8, 2019. Patterson Expert Report paras. 83, 97 [Filing No. 336-28]. As of January 8, 2019, a total of $1,938.51 in foreclosure fees and costs are due and owing on Freeman's account. Patterson Expert Report paras. 83, 97 [Filing No. 336-28]. These foreclosure fees and costs constitute a concrete injury to Freeman caused by Ocwen's foreclosure filings.

Further, in order to investigate and defend herself against Ocwen's foreclosure filings, Freeman had to retain counsel, which resulted in Freeman incurring a debt of $12,067.50 in attorneys fees and costs owed to Clark, Quinn, Moses, Scott & Grahn, LLP. Freeman Declaration para. 18 [Filing No. 336-23]; *see also Loewe v. Weltman, Weinberg & Reis Co., L.P.A.*, No. 19-12187, 2020 WL 409655, at *4 (E.D. Mich. Jan. 24, 2020) (finding that legal costs incurred by the plaintiff to contest an allegedly invalid debt constituted "actual" and "real" injuries); *Nettles v. Midland Funding LLC*, 530 F. Supp. 3d 706, 713 (E.D. Mich. 2021); *Fleming v. ProVest Cal. L.L.C.*, Case No. 21-CV-04462-LHK, 2021 WL 6063565 (N.D. Cal. Dec. 22, 2021); *Lako v. Portfolio Recovery Assoc.*, 20-cv-355-wmc, 2021 WL 3403632 (W.D. Wis. Aug. 4, 2021) (cost of hiring attorney to defend collection action is concrete harm).

Freeman has likewise suffered loss of time as a result of Ocwen's foreclosure filings. "As the Seventh Circuit has explained, 'time and money spent resolving fraudulent charges are cognizable injuries for Article III standing.'" *Gilbert*, 2022 WL 2257126, at *5 (quoting *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 967 (7th Cir. 2016)); *see also Freedom From Religion Foundation, Inc. v. Obama*, 641 F.3d 803, 807 (7th Cir. 2011) ("What did provide standing, we held, is that the plaintiffs had altered their daily commute, thus incurring costs in both time and money, to avoid the unwelcome religious display."). As a result of the foreclosure filings, Freeman lost a significant amount of time reviewing documents related to her Loan, contacting her bankruptcy counsel and foreclosure counsel via email and phone calls, contacting Ocwen to resolve the issue, and participating in the production of the Answer and Counterclaims filed by Freeman in the second foreclosure action. Freeman Declaration para. 19 [Filing No. 336-23]. This loss of time constitutes a concrete injury Freeman experienced as a result of Ocwen's foreclosure filings.

Freeman has also suffered concrete injuries in the form of physical manifestations of her emotional distress caused by Ocwen's foreclosure filings. "Physical manifestations of emotions, however, can be concrete injuries." *See Gilbert*, 2022 WL 2257126, at *5; *see also Pennell*, 990 F.3d at 1045. Here, Freeman's depression, anxiety, stress, frustration and overall emotional distress caused by Ocwen's foreclosure filings has manifested in multiple physical respects, including loss of appetite, light-headedness, pounding in her chest, difficulty breathing, nausea, and trembling. Demona Freeman Dep. 151:3 [Filing No. 336-20]; *see also* Freeman Declaration paras. 14 and 21 [Filing No. 336-23]. Further, Freeman's emotional distress causes her to lose sleep multiple nights a week. *Pl.'s Responses to Ocwen Loan Servicing, LLC's First Set of Interrogatories* [Filing No. 336-38];

*see also* Freeman Declaration para. 21 [Filing No. 336-23]; Allen Freeman Dep. 45:3-11 [Filing No. 336-27]. Freeman did not suffer from loss of sleep prior to Ocwen's foreclosure filings. Freeman Declaration para 21 [Filing No. 336-23]; *see also* Allen Freeman Dep. 45:3-11 [Filing No. 336-27]. Further, the foreclosure filings have contributed to Freeman's increased blood pressure and neuromusculoskeletal issues. Dr. Newton has diagnosed a root cause of Freeman's neuromusculoskeletal ailments as psychosomatic factors. Newton Dep. 18: 11-24 [Filing No. 336-31]. Freeman's neuromusculoskeletal condition has progressively worsened over the course of Dr. Newton's treatment. *See* Newtown Dep. 26:5 as ***Exhibit XX***. For example, in 2018, Dr. Newton completed FMLA paperwork for Freeman, indicating that it would be medically necessary for Freeman to be absent from work once every four weeks for one to two days at a time. Newton Dep. 37:15-18 [Filing No. 336-32]. However, Freeman's status has worsened over time and, beginning in 2020, it has become medically necessary for Freeman to be absent from work for an increased amount of four to five days at a time. Newton Dep. 41:3-4 [Filing No. 336-32]. Finally, Dr. Beard noted Freeman presented with an abnormally high blood pressure in October of 2018 and formally diagnosed Freeman with hypertension in May of 2019 after she had been experiencing prolonged and chronic emotional distress caused by Ocwen. *See* Dr. Beard / Riverview Medical Records at p.4, attached to Filing No. 337-4 as ***Exhibit DD***; *see also* Beard Dep. 17:25-18:1 [Filing No. 336-29]. Freeman's physical manifestations resulting from her emotional distress caused by Ocwen's foreclosure filings are concrete injuries conferring Article III standing.

In addition to tangible harms, Freeman has likewise suffered concrete intangible harms which bear a close relationship to the sort of harms traditionally recognized by

American courts. In *TransUnion*, the Supreme Court held that plaintiffs whose credit reports had been disseminated had standing because the harm caused by the dissemination of a credit report with misleading information related closely to the reputational harm associated with defamation. *TransUnion*, 141 S. Ct. 2208-13. Similarly, in *Ewing v. MED-1 Solutions, LLC*, 24 F.4th 1146 (7th Cir. 2022), the Seventh Circuit held that plaintiffs who reported debts as disputed to their debt collectors, but whose debts were not reported as disputed by the debt collectors to the credit reporting agencies, had standing because the harm caused by the debt collectors' dissemination of false information to the credit reporting agencies is closely related to the reputational harm caused by defamation. *Ewing*, 24 F.4th 1154. Here, the foreclosure filings are publicly filed documents with the court (i.e., a third party) which contained materially false and misleading information about the status of Freeman's loan and her payment history. Like in *TransUnion* and *Ewing*, these foreclosure filings caused Freeman a reputational harm closely related to the reputational harm caused by defamation. Additionally, the reputation harm caused by defamation has continuously been found to be closely related to one of the harms Congress sought to remedy through the FDCPA. *See, e.g., Ewing*, 24 F.4th at 1153 ("[T]he harm Congress sought to remedy through § 1692e(8) is analogous to the harm caused by defamation, which has long common law roots."). Accordingly, the foreclosure filings caused Freeman a reputational harm which bears a close relationship to the sort of harm traditionally recognized by American courts as the harm caused by defamation. Thus, Freeman has suffered a concrete injury caused by the foreclosure filings for Article III standing purposes.

Similarly, the harm caused to Freeman by the foreclosure filings is akin to the reputational harm caused by the tort of publicity placing a person in a false light.

"Common-law privacy rights were historically understood as being invaded by 'unreasonable intrusion upon the seclusion of another, ... or publicity that unreasonably places the other in a false light before the public ...." *Long v. Se. Pennsylvania Transportation Auth.*, 903 F.3d 312, 324 (3d Cir. 2018) (citing Restatement (Second) of Torts § 652A(2)(a)-(d) (1977)). The interest protected by the common-law tort of false light is "the interest of the individual in not being made to appear before the public in an objectionable false light or false position, or in other worse, otherwise than he is." Restatement (Second) of Torts § 652E (1977). This is similar to the interest protected by the common-law tort of defamation, and the harm caused by defamation has continuously been found to be closely related to one of the harms Congress sought to remedy through the FDCPA. *See, e.g., Ewing v. MED-1 Solutions, LLC*, 24 F.4th 1146, 1153 (7th Cir. 2022). Here, Ocwen's foreclosure filings were public filings with the court that communicated to the public that Freeman was in default on her loan when in fact, she was not. The foreclosure filings thus portrayed Freeman in a false light and such false light would be highly offensive to a reasonable person. *See* Restatement (Second) of Torts § 652E (1977). And indeed, this reputational harm caused by an invasion to Freeman's privacy is the exact type of harm the FDCPA was enacted to protect against. In enacting the FDCPA, Congress recognized that abusive debt-collection practices may intrude on another's privacy interests. *See* 15 U.S.C. § 1692(a) ("Abusive debt collection practices contribute to ... marital instability, … and to invasions of individual privacy."); *see also Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 81 (2d Cir. 2018) ("Congress enacted the FDCPA to protect against the abusive debt collection practices likely to disrupt a debtor's life."). Thus, the harm Congress sought to remedy through the FDCPA is analogous to the harm caused by

the invasion of privacy tort known as publicity placing others in a false light. Accordingly, the publicity placing her in a false light that Freeman suffered as a result of Ocwen's foreclosure filings is a concrete injury sufficient to confer Article III standing.

Additionally, the harm caused to Freeman by Ocwen's foreclosure filings bears a close relationship to the harm caused by the commonly recognized torts related to unjustifiable litigation. The Eighth Circuit has held that the harm identified by § 1692f(1) of the FDCPA—which prohibits debt collectors' attempts to collect amounts not actually owed—bears a sufficiently close relationship to common law "unjustifiable-litigation torts," including the tort of malicious prosecution, wrongful use of civil proceedings, and abuse of process. *Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 691–92 (8th Cir. 2017); *see also Bertero v. Nat'l Gen. Corp.*, 13 Cal.3d 43, 118 Cal.Rptr. 184, 529 P.2d 608, 614 (1974) (in bank); *Carter v. Oster*, 134 Mo.App. 146, 112 S.W. 995, 999 (1908); *Baglini v. Lauletta*, 338 N.J.Super. 282, 768 A.2d 825, 839 (2001);  Restatement (Second) of Torts §§ 674, 681 (June 2017 update); Dan B. Dobbs et al., The Law of Torts § 593 (2d ed. June 2017 update) ("[A] majority of American courts allow the plaintiff to pursue the wrongful civil litigation claim without showing any special kind of injury."). Here, Freeman was harmed by being subjected to baseless legal claims for a foreclosure of her home which created mental distress. *See* Freeman Declaration paras. 12-13, 15 [Filing No. 336-23]; *see also* Demona Freeman Dep. 149:22-25 [Filing No. 336-20]. This harm provides the basis for a § 1692f(1) claim and bears a close relationship with the harm protected by common-law unjustifiable litigation torts. *See Demarais*, 869 F.3d at 692 ("The harm of being subjected to baseless legal claims, creating the risk of mental distress, provides the basis for both § 1692f(1) claims and the common-law unjustifiable-litigation torts."). Accordingly, the harm caused to

Freeman by Ocwen's wrongful foreclosure filings bears a close relationship to the common-law unjustifiable litigation torts and is thus a concrete injury for Article III standing purposes.

Lastly, the harm caused to Freeman by Ocwen's foreclosure filings bears a close relationship to the harm caused by the commonly recognized tort of loss of consortium. *See Andrews*, 2012 WL 425167, at *8. Ocwen's erroneous foreclosure filings have caused marital distress and continuous arguments between Freeman and her husband. Freeman Declaration paras. 10-11, 15 [Filing No. 336-23]; Demona Freeman Dep. 161:3-7 [Filing No. 336-21]; Allen Freeman Dep. 10:21-11:2 [Filing No. 336-25]; Allen Freeman Dep. 15:2-15 [Filing No. 336-25]. The marital distress caused by Ocwen has caused Freeman to experience a loss of companionship and affection in her marriage. Freeman Declaration para. 16 [Filing No. 336-23]. The arguments and marital stress between Freeman and her husband would not exist but for Ocwen's actions. *See* Demona Freeman Dep. 161:25-162:3 [Filing No. 336-21]. Further, the marital harms suffered by Freeman as a result of Ocwen's foreclosure filings are the exact type of harm Congress identified in enacting the FDCPA. *See* 15 U.S.C. § 1692(a) ("Abusive debt collection practices contribute to ... marital instability, … ."); *see also Cohen*, 897 F.3d at 81. Accordingly, "Congress identified a modern relative of a harm with long common law roots." *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.), *cert denied*, 209 L.Ed.2d 568 (2021). And Freeman claims to have suffered the very harm the FDCPA was designed to prevent – harms to Freeman's marital relationship. Accordingly, the marital harms caused to Freeman by Ocwen's wrongful foreclosure filings bears a close relationship to the common-law tort of loss of consortium and is thus a concrete injury.

     b. *Freeman suffered a concreted injury traceable to Ocwen's violations of the FDCPA in relation to its collection calls.*

Freeman has likewise suffered concrete injuries as a result of Ocwen's unwanted collection calls which violated the FDCPA. *See Brown v. I.C. Sys., Inc.*, No. 16 C 9784, 2019 WL 1281972 (N.D. Ill. Mar. 20, 2019) ("As this Court and numerous courts in this district have explained, a plaintiff who claims that a debt collector made 'unlawful debt collection' demands in violation of the FDCPA, has asserted an injury that, even if 'intangible,' is sufficiently 'concrete' to satisfy the standing requirements of Article III under *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016).") (internal citations omitted). First, Ocwen's collection calls have caused Freeman emotional distress which has manifested physically. *See Gilbert*, 2022 WL 2257126, at *5. Ocwen's collection calls caused Freeman anxiety, stress and frustration, Freeman Declaration para. 2 [Filing No. 336-23], which caused Freeman light-headedness, pounding in her chest, nausea, and trembling. Freeman Declaration para. 2 [Filing No. 336-23]. Further, the collection calls contributed to and exacerbated Freeman's increased blood pressure. Freeman Declaration para. 20 [Filing No. 336-23]. Each of these physical manifestations suffices as a concrete injury. *See Gilbert*, 2022 WL 2257126, at *5.

Further, Freeman has suffered a loss of time as a result of Ocwen's collection calls. Freeman lost time in answering and responding to the collection calls themselves, spending countless amounts of time on the phone with Ocwen representatives. This loss of time is a cognizable injury for purposes of Article III standing. *See Gilbert*, 2022 WL 2257126, at *5.

Moreover, Freeman has suffered concrete harms as a result of Ocwen's collection calls which bear a close relationship to the sort of harms traditionally recognized by American courts as invasion of privacy or intrusion upon seclusion. "At common law, courts

readily recognized a concrete injury arising from the tort of intrusion upon seclusion—a tort protecting against defendants who intrude into the private solitude of another. *See* Restatement (Second) of Torts § 652A(2)(a) (1977); *see also id.* § 652B. "This tort imposes liability for intrusions on a plaintiff's privacy, such as when a defendant demands payment of a debt by making repeated telephone calls 'with such persistence and frequency as to amount to a course of hounding the plaintiff.'" *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191 (10th Cir. 2021) (quoting Restatement, *supra*, § 652B cmt. d.). And the Supreme Court recently cited "intrusion upon seclusion" as a harm "traditionally recognized as providing a basis for [a] lawsuit[ ] in American courts." *TransUnion LLC*, 141 S. Ct. at 2204 (citing *Gadelhak*, 950 F.3d at 462); *Lupia*, 8 F.4th at 1191. In *Gadelhak*, AT&T's automated device sent the Plaintiff five unwanted text messages asking survey questions. The Plaintiff brought a putative class action against AT&T for violating the Telephone Consumer Protection Act. On appeal, the Seventh Circuit considered whether the five unwanted text messages constituted a concrete injury for Article III purposes and ultimately held that they did. Looking for an analogous common law harm, the Seventh Circuit pointed to the tort of intrusion upon seclusion, noting that courts have "recognized liability for intrusion upon seclusion for irritating intrusions – such as when 'telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff.'" *Gadelhak*, 950 F.3d at 462 (quoting Restatement, *supra*, § 652B cmt. d.) The Seventh Circuit concluded that "[t]he harm posed by unwanted text messages is analogous to that type of intrusive invasion of privacy." Similarly here, Freeman suffered a harm analogous to that type of intrusive invasion of privacy when Ocwen made over twelve collection calls to Freeman within the span of approximately one month attempting to collect an alleged

default on her loan. *See supra* Subsection C.1.b. This intrusion is far more invasive than five unwanted text messages or one single phone call – both of which have been found to be concrete injuries similar to the harm caused by intrusion upon seclusion. *See Gadelhak*, 950 F.3d 458; *see also Lupia*, 8 F.4th at 1192. This is because "when *Spokeo* instructs us to analogize to harms recognized by the common law, we are meant to look for a 'close relationship' in kind, not degree." *Gadelhak*, 950 F.3d at 462. Further, this invasion of privacy that Freeman has suffered is the exact type of harm that Congress chose to make legally cognizable under the FDCPA. *See* 15 U.S.C. § 1692(a) ("Abusive debt collection practices contribute to … invasions of individual privacy."); *see also Cohen*, 897 F.3d at 81; *Lupia*, 8 F.4th at 1192. Accordingly, the invasion of privacy that Freeman suffered as a result of Ocwen's unwanted collection calls is a concrete injury sufficient for Article III standing.

> c. *Freeman suffered a concrete injury traceable to Ocwen's violations of the FDCPA in relation to its statements, default letters, and credit reporting[10].*

Freeman has suffered concrete injuries as a result of Ocwen's violations of the FDCPA in relation to its statements and default letters. First, Freeman has suffered physical manifestations of the emotional distress caused by Ocwen's statements and default letters. Ocwen's statements and default letters caused Freeman such anxiety, stress, and frustration that she experienced light-headedness, pounding in her chest, difficulty breathing, nausea, and trembling. Freeman Declaration para. 2 [Filing No. 336-23]. Further, the statements and default letters contributed to Freeman's increased blood pressure noted by Dr. Beard in

---

[10] *See Ewing*, 24 F.4th 1146; *see also Proescher v. Security Collection Agency*, NO. 3:17-CV-1052-J-32PDB, 2018 WL 3432737 (M.D. Fla. June 8, 2018) (finding standing where collector reported debt to credit bureau even though consumer had already paid it, causing her emotional and physical distress), adopted, 2018 WL 3428157 (M.D. Fla. July 16, 2018).

October of 2018. Freeman Declaration para. 20 [Filing No. 336-23]; Dr. Beard / Riverview Medical Records at p. 4, attached to Filing No. 337-4 as **_Exhibit DD_**. Each of these physical manifestations suffices as a concrete injury. *See Gilbert*, 2022 WL 2257126, at *5.

Additionally, Ocwen's persistent statements and default letters caused Freeman a concrete harm which bears a close relationship to the harm traditionally recognized as invasion of privacy or intrusion upon seclusion. Similar to the invasion of privacy harm suffered by the plaintiff in *Gadelhak* who received five unwanted text messages, here, Freeman suffered a harm analogous to that type of intrusive invasion of privacy when Ocwen sent her bothersome and inaccurate statements and default letters attempting to collect an alleged default on her loan. *See Gadelhak*, 950 F.3d at 462. This intrusion is far more invasive than five unwanted text messages or one single phone call – both of which have been found to be concrete injuries similar to the harm caused by intrusion upon seclusion. *See Gadelhak*, 950 F.3d 458; *see also Lupia*, 8 F.4th at 1192. Accordingly, the invasion of privacy that Freeman suffered as a result of Ocwen's unwanted and erroneous statements and default letters is a concrete injury sufficient to confer Article III standing.

> d. *Freeman suffered a concrete injury traceable to Ocwen's violations of the FDCPA in relation to its door knocks/tags.*

As described above, Freeman contends Ocwen sent agents to her home to conduct door knocks and leave tags on her door about once a week since August of 2018 to mid 2021. Freeman Declaration para. 22 [[Filing No. 336-23]]. Each time Ocwen conducted a door knock and/or left a door tag, it caused Freeman stress and emotional distress in the form of stress, anxiety, frustration, embarrassment, anger, and fear. Freeman Declaration para. 24 [Filing No. 336-23]]. Ocwen's persistent door knocks and door tags have caused Freeman such anxiety and embarrassment that she no longer feels comfortable in her own

home. *See* Demona Freeman Dep. 78:24-79:11 [[Filing No. 336-17]; *see also* Freeman Declaration paras. 24 and 28 [Filing No. 336-23]]. This emotional distress has physically manifested, causing Freeman loss of appetite and loss of sleep. Freeman Declaration para. 24 [[Filing No. 336-23]]; *see also* Demona Freeman Dep. 151:3 [Filing No. 336-20]; *Pl.'s Supplemental Objections and Responses to Ocwen Loan Servicing LLC's First Set of Interrogatories* p. 12-13 [Filing No. 336-38]. Further, Ocwen's door knocks and door tags caused Freeman such stress, anxiety, and frustration that she experienced light-headedness and shortness of breath. Freeman Declaration para. 24 [Filing No. 336-23]]. Further, as discussed above, Freeman's neuromusculoskeletal issues are caused in part by the psychosomatic factors (i.e., Freeman's emotional distress and stress related to Ocwen's door knocks and door tags) and her condition has worsened over time since 2018. Newton Dep. 18: 11-24 [Filing No. 336-31] and Newton Dep. 26:5 [Filing No. 336-32]. As also discussed above, Freeman's emotional distress likewise manifested in abnormally high blood pressure beginning in 2018, which led to a formal diagnosis of hypertension by Dr. Beard in May of 2019. *See* Dr. Beard / Riverview Medical Records at p.4, attached to Filing No. 337-4 as **Exhibit DD**; *see also* Beard Dep. 17:25-18:1 [Filing No. 336-29], Each of these physical manifestations suffices as a concrete injury. *See Gilbert*, 2022 WL 2257126, at *5.

Further, Freeman has suffered intangible concrete harms which bear a "close relationship" to the sort of harms traditionally recognized by American courts. *See Spokeo*, 578 U.S. at 341. First, Ocwen's door knocks and door tags caused Freeman a concrete harm comparable to the harm traditionally recognized as invasion of privacy or intrusion upon seclusion. *See Gadelhak*, 950 F.3d at 462. Similar to the invasion of privacy harm suffered by the plaintiff in *Gadelhak* who received five unwanted text messages, Freeman suffered a

harm analogous to that type of intrusive invasion of privacy when Ocwen conducted unwanted door knocks and left bothersome door tags attempting to collect an alleged default on her loan. Moreover, Freeman's invasion of privacy has been far greater than that of *Gadelhak*. Ocwen has come to Freeman's home – a person's most private and intimate place – on a near weekly basis between August of 2018 and mid-2021 and conducted door knocks and/or left door tags. Freeman Declaration para. 22 [[Filing No. 336-23]]. This intrusion is far more invasive than five unwanted text messages or one single phone call – both of which have been found to be concrete injuries similar to the harm caused by intrusion upon seclusion. *See Gadelhak*, 950 F.3d 458; *see also Lupia*, 8 F.4th at 1192. Accordingly, the invasion of privacy that Freeman suffered as a result of Ocwen's unwanted door knocks and door tags is a concrete injury sufficient to confer Article III standing.

Additionally, Ocwen's door knocks and door tags caused Freeman a concrete reputational harm comparable to the harm traditionally recognized as publicity placing others in a false light. *See* Restatement (Second) of Torts § 652A(2)(a)-(d) (1977); *see also Long*, 903 F.3d at 324. Here, Ocwen's door knocks and door tags communicated to the public at large that Freeman was financially irresponsible so as to have her home in a foreclosure status that would justify such door knocks and door tags. Restatement (Second) of Torts § 652D (1977) ("'Publicity,' on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."). And the public did indeed recognize this message communicated by the door knocks and door tags. Freeman's neighbor, Pam Dunlap, indicated to Freeman that she had seen Ocwen at her home conducting such door knocks and taking photographs. Freeman Declaration para. 26

[[Filing No. 336-23]]; *see also* Demona Freeman Dep. 156:19-24 [Filing No. 336-20].

Because Freeman is aware that her neighbor, Pam Dunlap, and other possible neighbors are aware of Ocwen's door knocks and door tags, this causes Freeman to experience great anxiety and embarrassment, as she is embarrassed that her neighbors believe she is not financially responsible and would think less of her due to Ocwen's door knocks and door tags. Freeman Declaration para. 27 [[Filing No. 336-23]]. Further, this false light that Ocwen's door knocks and door tags have placed Freeman in – that she is financially irresponsible – would be highly offensive to a reasonable person. *See* Restatement (Second) of Torts § 652E (1977). Accordingly, Freeman has suffered a reputational harm caused by Ocwen's door knocks and door tags that is comparable to the harm traditionally recognized as publicity placing others in a false light and thus has suffered a concrete injury sufficient to confer Article III standing. *See Persinger v. Southwest Credit Systems*, *L.P.*, 20 F.4th 1184 (7th Cir. 2021).

3.    <u>Ocwen's violations of the FDCPA are not preempted</u>

Ocwen contends that Freeman's FDCPA claims are preempted by the Bankruptcy Code and in support cites to *Wehrheim v. Secrest*, No. IP 0-1328-C-T/K, 2002 WL 31242783 (S.D. Ind. Aug. 16, 2002).  But the analysis and conclusion from *Wehrheim* upon which it rests its argument have been overturned. The current law in the Seventh Circuit is that the Bankruptcy Code does *not* preempt claims under the FDCPA because they are concurrent, non-exclusive remedies with different standards under each.  *Randolph v. IMBS, Inc.*, 368 F.3d 726, 733 (7th Cir. 2004) (determining that the Bankruptcy Code and the FDCPA are "overlapping and not entirely congruent remedies systems" that can "coexist," therefore "any debt collector can comply with both simultaneously").  *Owens v. LVNV Funding, LLC*, No. 1:14-cv-02083-JMS-TAB, 2015 WL 1826005, at *7 (S.D. Ind. Apr. 21, 2015), aff'd, 832

F.3d 726 (7th Cir. 2016) (noting that *Randolph* holds that the Bankruptcy Code and the FDCPA are overlapping and entirely congruent, simultaneous remedies).

4. <u>Ocwen's Bona Fide Error Defense 15 U.S.C. § 1592k(c) Presents Questions of Fact</u>

Ocwen argues that even if it violated the FDCPA, it's entitled to summary judgment under the bona fide error defense. The bona fide error defense shields a defendant debt collector from FDCPA liability if the debt collector shows that the violation wasn't intentional, resulted from a bona fide error, and resulted despite the maintenance of procedures reasonably adapted to avoid such an error. *Kort v. Diversified Collection Servs*., 394 F.3d 530, 537 (7th Cir. 2005). A debt collector bears the burden of proof in establishing a bona fide error and the question is most typically a question of fact. *See Keisler v. Encore Receivable Mgmt*., No. 1:06-cv-0912-LJM-WTL, 2008 U.S. Dist. LEXIS 31987, 2008 WL 1774173 (S.D. Ind. April 17, 2008) (finding that a debt collector's bona fide error defense was a question of fact); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 933 (N.D. Ind. 2004) (denying cross motions for summary judgment on debt collector's bona fide error defense; finding issues of material fact); *Edmonds v. Nat'l Check Bureau, Inc.*, 2003 U.S. Dist. LEXIS 17476, at *18 (S.D. Ind. 2003) ("Because 'bona fide error' is an affirmative defense under the [FDCPA], a defendant bears the burden of proving" the elements to the defense).

Here, Ocwen has failed to establish as a matter of law that (1) the violation was unintentional; (2) the violation resulted from a bona fide error; and (3) it maintains procedures reasonably adapted to avoid the error. Foremost, Ocwen has not provided any specific evidence that its errors were unintentional nor provided reference to specific

portions of its policies and procedures addressing each alleged violation.[11],[12] *See Evans*, 889 F.3d 337; *Buckley v. Afni, Inc*., 133 F. Supp. 3d 1140 (S.D. Ind. 2016) (agency had actual knowledge of consumer's representation by counsel and did not provide any evidence that its error was unintentional); *VanHuss v. Rausch, Sturm, Israel, Enerson & Hornik*, 16-cv-372-slc, 2017 WL 1379402 (W.D. Wis. Apr. 14, 2017) (although law firm had extensive written materials explaining how debt verification request should be handled, it did not provide description of any training of its mailroom employees on how to handle consumer's debt verification letters when they arrived, or how to confirm that a piece of mail was properly received and routed). The best it can muster is a vague claim of "human error" - without identifying who said human is, what "error" - as opposed to errors, they contend were committed.

The duration, numerosity, and varying nature of the alleged violations also undermines Ocwen's claim the underlying conduct was the product of a bona fide error. Even if the initial violations were, a dubious and unsupported suggestion, its ongoing failure to take corrective action (especially after Freeman's calls and credit dispute letters) is suggestive of intent and the absence of any reasonably adapted procedures. *See, e.g.*, *Currier v. First Resolution Inv. Corp*., 762 F.3d 529 (6th Cir. 2014); *Wagner v. Chiari & Ilecki, L.L.P*., 973 F.3d 154 (2d Cir. 2020) (reasonable jury could find that collector's error was not bona fide since consumer was served in post judgment collection efforts after he twice informed collector that he was not judgment debtor); *Canady v. Wisenbaker Law Offices, P.C*., 372 F. Supp. 2d 1379 (N.D. Ga. 2005).

---

[11] Ocwen contends procedures are reasonable if they're designed to avoid reporting disputed debts generally, but that they needn't be designed to avoid the specific type of error. *Webster v. Receivables Performance Mgmt., LLC*, 473 F. Supp. 3d 861, 874 (S.D Ind. 2020), rev'd sub nom. *Ewing v. MED-1 Sols*., LLC, 24 F.4th 1146 (7th Cir. 2022). However, the Seventh Circuit reversed the *Webster* decision and clarified that the bona fide error defense requires that the procedures be aimed at the specific error that occurred, not at the type of violation generally. *Ewing*, 24 F.4th at 1154–1156.

[12] In fact, at least one of its policies relating to a type of violation alleged by Freeman is facially improper and inadequate. *See* Ocwen_Freeman 006929, attached to Filing No. 337-2 as ***Exhibit F***.

Finally, as demonstrated by the various RCR pages set forth above, and the similarity between this case and *Saccameno*, 372 F.Supp.3d 609, there is ample evidence in the record to create a question of fact about whether the violations were willful, the product of well-known and long-standing systemic deficiencies with Ocwen's system of record REALServicing. *See, e.g.*, *Booth v. Collection Experts, Inc.*, 969 F. Supp. 1161 (E.D. Wis. 1997).

## VI.    CONCLUSION

WHEREFORE, Plaintiff, Demona Freeman, respectfully requests Defendant Ocwen Loan Servicing, LLC's Motion for Summary Judgment be denied in all respects.

Respectfully submitted,

/s/ *Travis W. Cohron*
Travis W. Cohron, No. 29562-30
Olivia Hess, No. 36166-49
**CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP**
tcohron@clarkquinnlaw.com
ohess@clarkquinnlaw.com

/s/ *Nick Wooten*
Nick Wooten
**Nick Wooten, LLC**
nick@nickwooten.com

***Counsel for the Plaintiff***

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

_/s/ Travis W. Cohron_
Travis W. Cohron, No. 29562-30

**CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP**
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204